## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-22556-Civ-COOKE/TURNOFF

In re JIANGBO PHARMACEUTICALS,
INC. SECURITIES LITIGATION

_____ /

<u>**Class Action**</u>

<u>**Jury Trial Demanded**</u>

## CONSOLIDATED AMENDED COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Christopher S. Polaszek
(Fla. Bar No. 0116866)
**MILBERG LLP**
201 North Franklin Street, Suite 3200
Tampa, FL 33602
Telephone: (813) 367-5713
Facsimile: (561) 892-8164
E-mail: cpolaszek@milberg.com

Kristi Stahnke McGregor
(Florida Bar No. 0732931)
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: kmcgregor@milberg.com

Ethan D. Wohl
(Florida Bar No. 982210)
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
E-mail: ewohl@wohlfructer.com

*Attorneys for Lead Plaintiffs and the*
*Proposed Class*

## TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ................................................................1

II.    FACTUAL SUMMARY ................................................................3

    A.    Jiangbo Enters the Domestic Market Through a Reverse Merger and Then Is Confronted with a SEC Investigation, Resignation of Its Independent Audit Committee Members, and NASDAQ Delisting ................................3

    B.    The Audit Committee's Resignation Letter Details Management's Unlawful Obstruction of Its Investigation and Raises Series Concerns that the Company's Cash Balances Were Fraudulently Misstated ................................7

    C.    The Company's Default on Its Debt Obligations Further Indicates that the Company's Cash Balances Were Fraudulently Misstated ......................10

III.    JURISDICTION, VENUE, AND PROCEDURAL HISTORY ......................13

IV.    PARTIES ................................................................14

    A.    Plaintiffs ................................................................14

    B.    Jiangbo ................................................................14

    C.    Individual Defendants ................................................................14

    D.    CFO Oncall, Inc. ................................................................19

    E.    Auditor ................................................................21

V.    THE FRAUDULENT SCHEME ................................................................23

    A.    Numerous Chinese Companies Employ Reverse Mergers to Gain Quick Access to Domestic Exchanges ................................................................23

    B.    Jiangbo Used a Complicated and Dubious Reverse Merger In Order to Gain Easy Entry to the U.S. Capital Markets ......................................25

    C.    The Truth Emerges – SEC Investigation Leads to Internal Investigation, Change in Auditor and CFO, and Halt in Trading of Jiangbo Stock by NASDAQ ................................................................28

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .........36

    A.    Third Quarter Fiscal 2010 Results ................................................................36

|  | B. | Fiscal Year End 2010 Results ....................................................... | 38 |
|  | C. | First Quarter Fiscal 2011 Results ................................................ | 41 |
|  | D. | Second Quarter Fiscal Year 2011 Results .................................... | 42 |
|  | E. | Third Quarter Fiscal Year 2011 Results ....................................... | 44 |
|  | F. | Form 10-Q/A ............................................................................... | 45 |
| VII. | | THE DEFENDANTS' GAAP VIOLATIONS ....................................... | 46 |
|  | A. | Jiangbo's Manifestly Inaccurate Financial Statements................. | 49 |
|  | B. | Jiangbo's Overstated Accounts Receivable and Inadequate Reserves ................. | 50 |
| VIII. | | FRAZER FROST'S VIOLATIONS OF GAAS ....................................... | 51 |
|  | A. | Frazer Frost's Participation in the Fraud .................................... | 51 |
|  | B. | Frazer Frost Failed to Render an Accurate Audit Report ............ | 51 |
|  | C. | Frazer Frost Either Failed to Perform a True Audit of Jiangbo or Recklessly Disregarded Substantial Evidence of Jiangbo's Overstated Cash Balances ................. | 52 |
|  | D. | Jiangbo's Overstated Cash and Cash Equivalents ....................... | 53 |
|  | E. | Jiangbo's Understated Allowance for Doubtful Accounts ............ | 54 |
|  | F. | Frazer Frost Failed to Obtain Sufficiently Competent Evidential Matter............. | 55 |
|  | G. | Frazer Frost Failed to Exercise Due Professional Care ............... | 55 |
|  | H. | Frazer Frost's Additional Violations of GAAS ........................... | 56 |
|  | I. | Frazer Frost's Other Violations .................................................. | 56 |
|  | J. | Frazer Frost's  Motive to Commit Securities Fraud .................... | 57 |
| IX. | | CLASS ACTION ALLEGATIONS ....................................................... | 58 |
| X. | | LOSS CAUSATION ........................................................................... | 60 |
| XI. | | SCIENTER ALLEGATIONS ............................................................... | 63 |
|  | A. | Defendants' Violations of Law ..................................................... | 63 |
|  | B. | Sarbanes Oxley Certifications ...................................................... | 64 |

      C.      CFO and Auditor Resignations ................................................................65

      D.      GAAP and GAAS Violations .................................................................66

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
      MARKET DOCTRINE) ...................................................................................66

XIII.   NO SAFE HARBOR ........................................................................................67

      COUNT ONE       Violation of Section 10(b) of the Exchange Act and Rule
                       10b-5 Promulgated Thereunder Against Jiangbo, the
                       Individual Defendants, Frazer, Frost, and CFO Oncall ................68

      COUNT TWO      Violation of Section 20(a) of the Exchange Act  Against the
                       Individual Defendants ...................................................................71

XIV.   PRAYER FOR RELIEF ...................................................................................72

XV.    JURY TRIAL DEMANDED ...........................................................................73

Lead Plaintiffs Christopher Brophy and Tara Lewis ("Plaintiffs") bring this federal securities fraud class action on behalf of themselves and as a class action on behalf of all persons or entities who purchased or acquired the securities of Jiangbo Pharmaceuticals, Inc. ("Jiangbo or the "Company") on the open market during the period June 8, 2010 through and including May 31, 2011 (the "Class Period"), against Jiangbo and certain of its officers, as well as its external auditors and its former Chief Financial Officer's employer, CFO Oncall, Inc., for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

The allegations in this Complaint are made upon information and belief, except as to those allegations specifically concerning Plaintiffs and their counsel, which are alleged upon personal knowledge.

Plaintiffs' information and belief is based upon the thorough investigation conducted by and under the supervision of Plaintiffs' counsel, which included among other things, reviewing and analyzing: (1) publicly available information concerning Defendants and the industries and markets in which Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or the "Company") operates; (2) filings with the Securities and Exchange Commission ("SEC"); (3) annual reports; (4) press releases; (5) conference calls; (6) news articles and other media reports; and (7) reports of securities analysts and investor advisory services.

I.   **NATURE OF THE ACTION**

1.   Plaintiffs bring this securities fraud class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Jiangbo's securities on the open market between June 8, 2010, and May 31, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2.     Jiangbo is a pharmaceutical company incorporated in Florida whose operations are located in the People's Republic of China ("China" or "PRC").

3.     Jiangbo's domestic existence and emergence on the U.S. securities markets began on October 1, 2007 after the completion of a reverse merger, which allowed Jiangbo to avoid the rigorous registration process that accompanies an initial public offering ("IPO").

4.     By disseminating false and/or misleading statements outlined more fully below, Defendants fraudulently led unsuspecting investors to believe that purchasing the Company's securities would provide the opportunity to invest in a pharmaceutical company with strong operations in China, robust financials, and significant cash balances.

5.     Jiangbo began trading on the NASDAQ Global Market stock exchange ("NASDAQ") in June 2010.  Defendants' fraudulent and misleading statements regarding the Company's financial position and true cash balance artificially inflated the price of Jiangbo's securities throughout the Class Period.

6.     Unsuspecting investors watched their investment in Jiangbo peak at $10.49 per share on August 20, 2010.

7.     However, a series of events and disclosures over the next several months revealed the true state of Jiangbo's affairs and eliminated the artificial inflation reflected in the trading price of Jiangbo's common stock.  Indeed, following the commencement of an investigation by the SEC, the withdrawal of the Company's independent auditor, the resignation of the independent members the audit committee (the "Audit Committee") of the Company's board of directors (the "Board") on the grounds that management of the Company had refused to

cooperate with their investigation into the matters raised by the SEC, as required by the Exchange Act, and the resulting delisting of the Company's securities from the NASDAQ, investors were left holding nearly worthless Jiangbo common stock.

8.      Having suffered damages caused directly by Defendants' wrongful conduct, Plaintiffs bring this securities fraud class action in order to seek redress for themselves and all other similarly-situated investors.

## II.   FACTUAL SUMMARY

### A.   Jiangbo Enters the Domestic Market Through a Reverse Merger and Then Is Confronted with a SEC Investigation, Resignation of Its Independent Audit Committee Members, and NASDAQ Delisting

9.      Defendant Jiangbo is a holding company incorporated in Florida, which operates, controls and beneficially owns the pharmaceutical business of Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang Jiangbo").

10.     Defendant Sung is former Chief Financial Officer ("CFO") and registered agent for Jiangbo. Jiangbo outsourced the services of Defendant Sung as CFO from Defendant CFO Oncall, Inc., for which Defendant Sung serves as a director. Jiangbo's filings with the SEC state that Defendant Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants. However, according to public records, Defendant Sung's Georgia CPA license expired in 2009. In addition, according to public records, Defendant Sung's application for a CPA license in the State of Florida was denied in 2004 for undisclosed reasons.

11.     Laiyang Jiangbo is a limited liability company headquartered in China, which purports to research, develop, manufacture, market and sell pharmaceutical products, health supplements, and herbal-based medicinal compounds in China.

12.     On October 1, 2007, Laiyang Jiangbo executed a complex reverse merger, via a stock swap, with a publicly-traded U.S. shell corporation called Genesis Technology Group, Inc.

13.     By executing the reverse merger, Laiyang Jiangbo was able to bypass the arduous, time-consuming, and expensive registration and review process that accompanies a domestic IPO and quickly became a domestic publicly-traded company, listed on the OTC Bulletin Board ("OTCBB").

14.     Following the reverse merger, a newly-named entity emerged – Genesis Pharmaceuticals Enterprises, Inc. ("Genesis Pharmaceuticals").

15.     In April 2009, Genesis Pharmaceuticals changed its name to Jiangbo Pharmaceuticals, Inc.

16.     On June 8, 2010, Jiangbo shares began trading on NASDAQ.

17.     Shortly thereafter and unbeknownst to investors, in December 2010, the SEC commenced an informal investigation into, and requested documents from, Jiangbo.

18.     In February 2011 (again unbeknownst to investors), the Company's Audit Committee began its own parallel investigation into the issues and concerns raised by the SEC.

19.     One month later, in March 2011, Defendant Elsa Sung, the Company's CFO, resigned.

20.     On April 4, 2011, the Company reported that it had replaced its external auditor.

21.     On May 27, 2011, the Company filed an amendment to its quarterly report on Form 10-Q (which was filed just four days earlier) disclosing for the first time to the market the existence of the SEC's investigation and the Company's own parallel internal investigation.

22.     Just four days later, on May 31, 2011, less than one year from the date of Jianbgo began trading, NASDAQ announced that trading was halted in Jiangbo common stock (NASDAQ: JGBO) for "additional information requested" from the Company.

23.     Only four months after the Audit Committee began its internal investigation, on June 7, 2010, the Company filed a Form 8-K, which announced the resignation (a day earlier) of Michael Marks ("Marks") and John Wang ("Wang") who served as the independent members of the Audit Committee.

24.     The Form 8-K also attached a detailed 23-page resignation letter authored by Marks and Wang (attached hereto as Exhibit A and hereafter, the "Resignation Letter"), which detailed:  months of unanswered questions, unpaid bills, management deception,  the Company's explicit refusal to cooperate with the Audit Committee's investigation, the refusal the Company's Chief Executive Officer ("CEO") Linxian Jin ("Jin") and Chairman of the Board Wubo Cao ("Cao") to provide necessary materials to the Audit Committee's forensic accountants and counsel, and a host of other financial improprieties.

25.     According to Marks and Wang, Jiangbo's staff evaded their questions (once going so far as to hide in the employee washroom) and failed to produce essential information that was requested from them such as employee lists, bank statements and shipping records.

26.     Further, the Resignation Letter details how Jiangbo's chairman, Defendant Cao, repeatedly blocked efforts to conduct and complete a thorough and proper investigation by the Audit Committee and the Company's outside advisors, Cadwalader Wickersham & Taft LLP ("Cadwalader") and Ernst & Young (China) Advisory Limited ("E&Y").

27.     In this regard, Marks and Wang found that "the Chairman of the Board of Directors of Jiangbo [Defendant Cao] and members of his management team have exhibited

repeatedly their unwillingness to cooperate in even the most basic requests from the investigation team, despite numerous and repeated explanations by the Audit Committee and Cadwalader [of] the importance of this investigation and the expectations of the SEC." *See* Ex. A, at 1.

28.     Marks and Wang expressed concerns regarding "commitment of company resources to related parties" and sought documents related to a RMB 200 million ($31 million ) transfer to Shandong Hilead Biotechnology Co., Ltd. ("Hilead"), an entity controlled by Defendant Cao.  This related party transaction had not been disclosed in the Company's financial statements filed with the SEC.  Defendant Cao refused to provide the Audit Committee with any documents related to the RMB 200 million transfer to Hilead because "he believed the referenced transaction was unrelated to Jiangbo."

29.     In addition, the Audit Committee questioned the accuracy of the Company's financial reporting and noted that "the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation." *Id.*

30.     Marks and Wang further detailed the obstruction of their investigation by Defendants Cao and Sung, documented their grounds for doubting the accuracy of the banking information provided by the Company, and questioned the Company's "ability and willingness" to pay for the Audit Committee's investigation despite asserting in its quarterly and annual filings with the SEC to have cash on hand in excess of $100 million.

31.     Specifically, despite reporting more than $147 million in cash and equivalents as of March 31, 2011, the Company missed scheduled payments to the Audit Committee's counsel

and accountants.  When the payments were belatedly made, they were from the personal account of a Jiangbo employee.

### B. The Audit Committee's Resignation Letter Details Management's Unlawful Obstruction of Its Investigation and Raises Series Concerns that the Company's Cash Balances Were Fraudulently Misstated

32.     As set forth in the Resignation Letter, the SEC identified six problematic areas requiring investigation, and "expressed concern over the progress by Loeb & Loeb [the Company's counsel] in response to the SEC's subpoena . . . ." Ex. A, at 3.

33.     In response, E&Y requested that the Company provide essential documents and information, such as a list of employees during the relevant period, bank account information and statements, and information regarding the Company's IT environment and internal control processes.  *Id.* at 4.  The Resignation Letter describes these as "critical initial requests necessary for Cadwalader and E&Y to understand what further steps to take regarding the potential preservation, collection and review of relevant materials . . . ."  However, the Company's Controller, Yuanfeng Fu ("Controller Fu"), advised E&Y that "Mr. Cao did not agree to release these materials to Cadwalader and E&Y."  *Id.*

34.     In a subsequent meeting on May 3, 2011, "Mr. Cao further explained to the Audit Committee that he was not willing to provide materials to Cadwalader and E&Y that were beyond the scope of a regular audit."  *Id.* at 5.

35.     A day later, Cao reiterated his opposition to providing E&Y materials concerning the Company's IT environment and systems.  *Id.* at 6.

36.     On May 6, 2011, Controller Fu advised E&Y that Jiangbo would not release information other than certain bank information to E&Y or Cadwalader because "Mr. Cao had specifically instructed him not to release those materials."  *Id.*

37.     On May 12, 2011, despite repeated advice from Marks and the Audit Committee's advisors regarding the Company's duty to comply with the Audit Committee's independent investigation, Controller Fu again advised E&Y that "Mr. Cao had again instructed the Company not to provide any materials to E&Y, including those only relating to normal financial audit." *Id.* at 8.

38.     As documented in the Resignation Letter, Cao's directive not to cooperate with the Audit Committee permeated the Company and created an atmosphere of defiance and non-compliance.  For instance, the production department manager "indicated that he was too busy to prepare walk-through documents and then abruptly hung up the phone and refused to answer E&Y's questions," and the manager of the materials department "refused to respond to E&Y's requests to perform [a] walk-through in relation to purchasing and warehousing processes" and later "refused to leave the employee wash room in order to avoid answering E&Y's questions." *Id.* at 9.

39.     The refusal to comply with preservation and production obligations also extended to Defendant Sung.  In a meeting on May 5, 2011, Defendant Sung advised E&Y that the Company "had not authorized her to share Jiangbo materials with E&Y or Cadwalader and that Mr. Jin [Defendant Jin Linxian, Chief Executive Officer of the Company] instructed her not to provide any materials until further notice from the Company." *Id.* at 6.

40.     On May 12, 2011, Sung advised Cadwalader that "before the Company would authorize E&Y and Cadwalader to collect any Jiangbo-related materials in her possession, the Company required a list of the specific items that E&Y and Cadwalader were requesting."

41.     However Sung's actions as CFO effectively stymied the investigation because as "E&Y and Cadwalader were not permitted to review her materials, they necessarily could not

identify with particularity what materials might be subject to the SEC preservation requirements, or which of those materials Cadwalader and E&Y may need to review as part of the internal investigation." *Id.* at 9.

42.     On May 25, 2011, Sung again advised Cadwalader that "the Company would not authorize the collection of any of her Jiangbo-related materials without a list of what Cadwalader and E&Y intended to collect," despite Cadwalader's written assurance that the purpose of collection was "'simply [to] preserve all Jiangbo-related materials, and only Jiangbo-related materials, on Elsa's computer, emails and in hard copy, that are in her possession . . . .'" *Id.* at 15.

43.     Then, on May 27, 2011, although Sung advised Cadwalader that she had been authorized to permit examination of the materials in her possession, the Audit Committee found that "[n]o final arrangements for the collection of these materials were set," and no examination or collection appeared to have occurred at that time. *Id.* at 17.

44.     Marks and Wang also documented numerous instances of delayed and partial payments to the Audit Committee's advisors (*Id.* at 2, 13-14, 17, 18, 20-21), and found that Defendants' conduct in connection with payment for the Audit Committee's advisors also "*raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y . . . .*" *Id.* at 21.  (Emphasis added.)

45.     Specifically, Marks and Wang noted (Ex. A., at  21-22):

> the Company has previously provided documents indicating that it has a large cash balance at [redacted] representing approximately [redacted]% of the Company's cash balance as of December 31, 2010.  Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at [redacted].  Rather the Company has paid the Audit Committee's advisors from either a much smaller

Company account at [redacted] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo.

46.     Management's failure to cooperate with the Audit Committee's investigation, provide documents reasonably requested by it and its advisors, and pay compensation to its advisors violated Sections 10A(m)(5) and (m)(6) of the Exchange Act, and further violated Section 607.1605(1) of the Florida Statutes.

### C.     The Company's Default on Its Debt Obligations Further Indicates that the Company's Cash Balances Were Fraudulently Misstated

47.     In November 2007, the Company raised $5 million in gross proceeds through a private placement and sale of convertible notes ("November 2007 Debentures") to Pope Investments, LLC ("Pope").

48.     In May 2008, the Company raised an additional $30 million through the sale of convertible notes ("May 2008 Debentures") to certain investors including Pope.

49.     Despite the Company's ample stated cash reserves – allegedly $146.9 million in cash and equivalents on hand at March 31, 2011 – Jiangbo reported during the Class Period that it was unable to remain current on the November 2007 or May 2008 Debentures (collectively, the "Debentures").

50.     In its public filings, the Company alleged that "foreign exchange restrictions and regulations" caused a delay in its ability to transfer cash out of China, which ultimately led to the default on its payment obligations under the Debentures.

51.     Specifically, the Company cited Circular 75, issued by the PRC State Administration of Foreign Exchange ("SAFE") in October 2005, and its internal implementing guidelines, Notice 106, as the basis for why the Company may be impeded or prevented from distributing their profits or from engaging in other transfers of funds into or out of China.

52. These regulations, however, do not explain the Company's default. In a news release regarding Circular 75 issued by SAFE on October 23, 2005, SAFE made clear that efforts by Chinese private companies and high technology companies to obtain offshore financing are "encouraged, supported and guided" by China's national policies. Circular 75 confirms that the use of offshore special purpose vehicles as holding companies for Chinese investments are permitted as long as proper foreign exchange registrations are made with SAFE.

53. According to the Company's Form 10-K, for the period ending June 30, 2009, filed on September 28, 2009, in early September 2007, the three owners of 100% of the equity in Laiyang Jiangbo submitted their application to SAFE pursuant to Notice 106. That application was approved on September 19, 2007 and allowed them to establish an offshore company, Karmoya International Ltd., as a "special purpose vehicle" for any foreign ownership and capital raising activities by Laiyang Jiangbo.

54. As long as the relevant foreign exchange registrations are complied with, Circular 75 permits the domestic resident to "pay the profits, dividends, liquidation expenses, equity assignment expenses, capital decrease expenses, etc. to the special purpose company", in other words, to remit profits offshore.

55. Furthermore, on August 25, 2008, China promulgated the revised Regulations on the Administration of Foreign Exchange, which became effective on the same date. As a result of China's large foreign exchange reserves, the revised Regulations reflect China's current priority to balance inflow and outflow of foreign exchange by deterring the illegal and speculative inflow of foreign exchange and encouraging outflow of foreign exchange surplus. Therefore, the revised Regulations tighten and reinforce the restrictions on the inflow of foreign exchange and relax the rules controlling outflow of foreign exchange.

56.     Accordingly, there is simply no basis for the Company to assert that China's foreign exchange restrictions caused it to default on its payment obligations under the November 2007 Debentures and May 2008 Debentures.

57.     Nevertheless, on January 19, 2011, Jiangbo entered into a waiver agreement with Pope, the sole holder of its November 2007 Debenture and majority holder of its May 2008 Debentures, in order to induce Pope to continue to waive its right to send notice of default to the Company with respect to the Debentures.  The agreement provided, *inter alia*, that Pope would waive said right in return for interest payments and penalty payments in the form of Jiangbo common stock, and that Pope would extend the maturity date for the November 2007 Debentures to February 28, 2011.

58.     On May 23, 2011, the Company issued its delayed Form 10-Q for the third fiscal quarter of 2011.  In its Form 10-Q filing, the Company disclosed that it had failed to perform under the January 2011 Waiver Agreement and had defaulted on the November 2007 Debentures by failing to make the $3.5 million principal payment due on February 28, 2011, assertedly "due to its continued inability to transfer sufficient cash out of the PRC . . . ."  Jiangbo further disclosed that as a result, "it is likely that the sole holder of the November 2007 Debenture will institute legal proceedings against the Company to collect the amounts due under the November 2007 Debentures," which "would be materially adverse to the Company's ability to continue its business as it is presently conducted."

59.     Subsequently, on the morning of May 25, 2011, the Company held its quarterly earnings call.  On the call, Defendant Jin addressed a caller's request that he "elaborate a little bit on the possibility of you guys filing for bankruptcy protection for the debt acquired in 2007 and 2008," referring to the Debentures.

60.     In response, Jin replied that "the company is active negotiation and at discussion with their note and debenture holders, and so far they have come out with some alternative solutions and they are trying to find a solution that is acceptable for all parties and he also mentioned that so far the management hasn't thought of the procedures of seeking bankruptcy protection."

## III.     JURISDICTION, VENUE, AND PROCEDURAL HISTORY

61.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

62.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

63.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b).  According to its Florida public filings, Jiangbo maintained an executive office in this District at 1133 South University Drive, Suite 210, Plantation, FL, 33324-3303.  Consequently, many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.

64.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities trading platform.  At all relevant times, Jiangbo's stock traded on the NASDAQ.

65.     Plaintiffs filed an initial complaint against Jiangbo on July 15, 2011. (Dkt. No. 1).

66.     After Plaintiffs served Jiangbo with process through its former CFO and registered agent (Defendant Elsa Sung), Sung  resigned from that post on September 26, 2011.

67.     As of the date of this filing, the Company has failed to appoint a registered agent to take Defendant Sung's place, enter an appearance in this litigation, or otherwise respond to the initial complaint and therefore is in technical default.

## IV.    PARTIES

### A.     Plaintiffs

68.     Plaintiffs Christopher Brophy and Tara Lewis purchased or otherwise acquired Jiangbo common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

69.     On November 1, 2011, the Honorable Judge William C. Turnoff appointed Plaintiffs to serve as Lead Plaintiffs.

### B.     Jiangbo

70.     As stated above, Defendant Jiangbo is a holding company incorporated in Florida, which  operates, controls and beneficially owns the pharmaceutical business of Laiyang Jiangbo, a limited liability company headquartered in China.

### C.     Individual Defendants

71.     Defendant Wubo Cao has served as the Chairman of the Board of Directors of Jiangbo since October 2007.  Cao previously served as Chief Executive Officer ("CEO") of the Company from October 2007 until June 30, 2010, immediately following the Company's listing on NASDAQ.  Defendant Cao is the founder of Laiyang Jiangbo and, together with Guihong Xun and Yihua Zhang, owns of 100% of the equity in Laiyang Jiangbo.  Defendant Cao is also the majority shareholder of Shandong Hilead Biotechnology Co., Ltd. ("Hilead"), and, since August 2009, Cao has also served as Hilead's chairman and CEO.  Cao graduated from Wuchang Architectural Engineering Institute with a degree in Business Administration in July

1995. Cao signed various documents that the Company filed with the SEC, including the Company's 2010 Form 10-K and 3Q2010 Form 10-Q.

72.     Defendant Linxian Jin has served as the Company's CEO since July 1, 2010. According to the Company, Defendant Jin has over 20 years of experience in China's pharmaceutical industry.  Jin received a bachelor's degree with a major in Chemical Pharmaceutical from East China University of Science and Technology.  During the Class Period, Defendant Jin signed various documents that the Company filed with the SEC, including: (1) the 2010 Form 10-K;(2) Form 10-Qs for the First, Second, and Third Quarters of 2011; and (3) various 8-K filings (including those filed on March 18, 2011; April 4, 2011, April 20, 2011, and May 16, 2011). Furthermore, Defendant Jin also participated in earnings conference calls on September 28, 2010, November 16, 2010, February 23, 2011, and May 25, 2011.  Defendant Jin was quoted in Company press releases issued (and later filed with the SEC) on July 1, 2010, September 30, 2010, November 16, 2010, January 24, 2011, February 23, 2011, May 16, 2011, and May 24, 2011.  As a senior executive officer of the Company, Jin was responsible for the day-to-day operations of the Company.

73.     Defendant Elsa Sung ("Sung") was Jiangbo's CFO from October 2007 until her resignation effective March 31, 2011.  As a senior executive officer of the Company, Sung was responsible for the day-to-day operations of the Company.  Defendant Sung was an Audit Manager from January 2006 to July 2007 at Sherb & Co., Boca Raton, Florida, responsible for managing, monitoring, as well as performing audits for domestic and international clients. From June 2005 to December 2005, Defendant Sung was a Senior Internal Auditor at Applica Consumer Products, Inc., an U.S. publicly traded company.  From 2002 to 2005, Defendant Sung was employed by Ernst & Young, LLP in West Palm Beach, Florida, as a Senior Auditor in the

Assurance and Advisory Business Service Group.  She received her Master of Business

Administration and Bachelor's Degree in Accounting from Florida Atlantic University. She also

holds a Bachelor's Degree in Sociology from National Chengchi University in Taipei, Taiwan.

Jiangbo's filings with the SEC state that Defendant Sung is a licensed CPA in the State of

Georgia and a member of the American Institute of Certified Public Accountants.  ***However,

according to public records, Defendant Sung's Georgia CPA license expired in 2009.  In

addition, according to public records, Defendant Sung's application for a CPA license in the

State of Florida was denied in 2004 for undisclosed reasons.***  During the Class Period,

Defendant Sung signed various documents that the Company filed with the SEC, including: (1)

the 2010 Form 10-K;(2) Form 10-Qs for the Third Quarter of 2010 and First and Second

Quarters of 2011; and (3) various 8-K filings (including those filed on September 30, 2010,

November 17, 2010, January 14, 2011, January 24, 2011, and February 28, 2011). Defendant

Sung also participated in earnings conference calls on September 28, 2010, November 16, 2010,

and February 23, 2011.

74.     Defendant Ziling Sun ("Sun") has served as interim CFO since May 12, 2011,

following the resignation of CFO Sung.  As a senior executive officer of the Company, Sun was

responsible for the day-to-day operations of the Company.  According to the Company,

Defendant Sun has been serving as an accountant at Laiyang Jiangbo since January 2010. From

October 2007 to October 2009, she served as a financial controller at Yantai Human Special

Vehicle Co., Ltd. where she was responsible for overall financial accounting. From September

1997 to September 2007, Defendant Sun worked in the accounting department of Yantai

Automotive Manufacturing Company where she was responsible for the overall financial

accounting.  Defendant Sun received her associate degree in political science from Yantai

Normal College in July 1997. She also received her Intermediate Accountant Certificate in 2006, and (according to the Company) passed all required subjects of the Professional Stage of the National Uniform CPA Examination of P.R. China in 2011. During the Class Period, Defendant Sun signed both the Form 10-Q dated May 23, 2011, as well as the amended 10-Q dated May 27, 2011, each of which was filed with the SEC.

75.     Defendants Cao, Jin, Sung, and Sun are collectively referred to herein as the "Individual Defendants."

76.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, statements, and other publications, as alleged, resulted from the collective actions of the narrowly defined group of individuals. Indeed, each of the above-named officers and directors of Jiangbo, by virtue of their high level positions with the Company, directly participated in the day-to-day management and affairs of the Company, was directly involved in the daily operations of the Company at the highest levels, and was privy to confidential, proprietary information concerning the Company and its business, operations, products, growth, finances, financial statements, true financial conditions, and internal controls.

77.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Jiangbo, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, internal controls, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Jiangbo, as discussed in detail below. Because of their positions with Jiangbo, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate

- 17 -

documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

78.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Jiangbo's business.

79.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its public filings and statements, reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, filings, and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

80.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws,

the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Jiangbo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, internal controls, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Jiangbo's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

81.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Jiangbo's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Jiangbo's business, operations and management and the intrinsic value of Jiangbo's common stock; and (ii) caused Plaintiffs and members of the Class to purchase Jiangbo common stock at artificially inflated prices.

**D.     CFO Oncall, Inc.**

82.     Defendant CFO Oncall, Inc. ("CFO Oncall"), is a Florida firm specializing in financial consulting services. CFO Oncall lists its principal place of business at 1643 Royal Grove Way, Weston, Florida 33327, which is a residential address owned by Adam and Elizabeth Wasserman. Adam Wasserman ("Wasserman") is the CEO of CFO Oncall. According to its website (www.cfooncall.net), CFO Oncall, Inc. is an employer of CPAs and offers "Outsourced CFO/Controller Services" through which a company that lacks an accounting department can compensate "for any deficiencies within [its] organization." To that end, CFO Oncall provides its clients with "Contract CFO" services which entail "financial management and consulting services to businesses on a part-time or interim basis." CFO Oncall claims that

- 19 -

"[r]ather than hiring a full-time employee, it is more economical for [its] clients to engage [its] financial consulting services if the project requires less than three days per week for a project of indefinite length or a full-time project lasting less than a year."

83.     CFO Oncall's management has extensive ties to Jiangbo and its predecessor. Prior to June 2008, Defendant Sung was also Vice President of CFO Oncall.  Furthermore, Wasserman served as CFO of Genesis Technology Group, Inc., which was the shell corporation that Jiangbo merged up and into in order to obtain its domestic public listing.  Defendant Sung currently serves as a Director of CFO Oncall, Inc.

84.     Wasserman has significant involvement with Chinese companies entering the U.S. capital markets, including serving as a director or CFO of numerous Chinese companies, including, Gold Horse International, Inc., Bohai Pharmaceuticals Group, Inc., Oriental Dragon Corp. (f/k/a Emerald Acquisition Corp.), China Wind Systems, Inc., Relationserve, Inc., and Lotus Pharmaceuticals Inc.

85.     CFO Oncall provided Jiangbo with "Contract CFO" services such as SEC reporting and compliance,  the preparation of year-end and interim financial statements, and the preparation of SEC Forms 10-K and 10-Q.

86.     Perhaps most importantly, Jiangbo also outsourced the services of CFO Oncall's agent, Defendant Sung, as its CFO.

87.     In acting as Jiangbo's CFO while employed by CFO Oncall, Defendant Sung handled many complex and crucial tasks on behalf of the Company, such as:

- preparing, filing, and signing key financial documents filed with the SEC, such as those on Form 10-K, Form 10-Q, and Form 8-K;

- providing lengthy, and complex, presentations of financial information during earnings teleconferences with investors;

- fielding, and answering, investors' complex questions during earnings teleconferences; and

- acting as interpreter for Defendant Jin, and other Jiangbo managers, during those teleconferences.

88.     Under common theories of agency and respondeat superior, CFO Oncall is responsible for the false and/or misleading statements pertaining to Jiangbo that Defendant Sung disseminated to the investing public during the Class Period in her capacity as both CFO of Jiangbo and an employee of CFO Oncall.

### E.     Auditor

89.     Defendant Frazer LLP ("Frazer"), formerly known as Moore Stephens Wurth Frazer and Torbet LLP ("Moore Stephens"), is an accounting and consulting firm with its principal place of business in Brea, California.  On February 25, 2008, Jiangbo's board of directors engaged Frazer, then known as Moore Stephens, to serve as the Company's principal accountant to audit the Company's financial statements.

90.     Defendant Frost PLLC ("Frost") is an accounting firm with its principal place of business in Little Rock, Arkansas.

91.     Defendants Frost and Frazer are member firms of Moore Stephens North America, Inc. ("MSNA"), which represents itself as a progressive accounting firm association with 50 member firms based in the U.S., Canada, Mexico and the Caribbean.  According to its website, MSNA has combined member firm revenues of almost $1.1 billion generated by nearly 125 offices, making MSNA the sixth largest CPA firm association in the U.S.

92.     MSNA is a member of Moore Stephens International Limited, which is a global accountancy and advisory network with its headquarters in London, England.  The Moore Stephens network comprises 638 offices in 97 countries throughout the world, incorporating 20,588 people and with fees of more than $2 billion.

93.     Frazer Frost LLP ("Frazer Frost") was created on January 1, 2010 when Moore Stephens merged with Frost.  The merged company had 272 employees, operated in 47 states and 15 countries, and expected to have revenue of $60 million.  Frazer Frost provided auditing and accounting services, including data analysis, risk assessment, and financial statement audit and review services.

94.     Dozens of Chinese reverse merger companies hired Frazer Frost as their independent outside auditor.  Many of Frazer Frost's Chinese reverse merger company clients accessed the U.S. public markets to obtain investor money and several of those were subsequently accused of financial reporting irregularities and a glaring lack of audit and internal financial controls, including China Energy Savings Technology, China Natural Gas, China Valves Technology, and RINO International, among others.

95.     Frazer Frost served as Jiangbo's independent auditor throughout the Relevant Period and issued a "clean" audit opinion on the Company's 2010 Form 10-K.  A clean opinion is an integral part of a company's financials, providing credibility for a relatively unknown company like Jiangbo.

96.     Frazer also audited Jiangbo's financial statements filed with the SEC on Form 10-K on September 28, 2009 and September 29, 2008.

97.     In the summer of 2010, the SEC began investigating Frazer's audit practices.

98.     Then, in December 2010, the SEC issued a cease and desist order, settling a lawsuit and sanctioning Frazer, then known as Moore Stephens, and one of its partners, after finding the company had failed to follow professional standards in reviewing the financial

statements of one of its Chinese reverse merger company clients, China Energy Savings Technology, Inc, which was listed on NASDAQ in 2005.[1]

99.     In the wake of this settlement, on April 4, 2011, Jiangbo disclosed that Frazer Frost had notified the Company that it did not intend to stand for re-appointment as the Company's independent auditor for the next fiscal year.

100.    On May 1, 2011, Defendant Frost elected to unwind its merger with Defendant Frazer.  As a result, the firms resumed their existence as separate entities and dissolved Frazer Frost.

101.    Moore Stephens changed its name to Frazer after the merger with Frost was unwound.

102.    Defendants Frazer and Frost are liable, as the successor entities of Frazer Frost, for the allegations against Frazer Frost contained herein.

## V.      THE FRAUDULENT SCHEME

### A.      Numerous Chinese Companies Employ Reverse Mergers to Gain Quick Access to Domestic Exchanges

103.    In a "reverse merger," a non-public entity merges with and into a public company, typically a dormant, shell entity.  While the dormant shell company technically survives the transaction, the owners of the private business actually control the surviving entity. Specifically, the shareholders of the private company exchange their shares for a large majority of the shares of the public company, thus, obtaining control of the public company.  The management of the

---

[1] A copy of the Cease and Desist Order is available at:  http://www.sec.gov/litigation/admin/2010/33-9166.pdf.  *See also* Joshua Gallu, *SEC Probes Chinese 'Reverse Mergers' and Their U.S. Auditors*, BLOOMBERG, Dec. 21, 2010.

private company also takes over the board of directors and management of the public shell company.

104.    Critically, prior to the reverse merger, the public shell company no longer has substantial operations, but its public company registration remains in effect. The transaction gives the formerly private company the appearance of credibility and virtually immediate access to domestic equity markets (and access to capital available to a registered public company), while bypassing the arduous and expensive registration and rigorous vetting process performed by underwriters, regulators, and investors that companies undergo when they perform a traditional domestic IPO.

105.    The practice of entering the U.S. capital markets using a reverse merger became the dominant method used by Chinese companies to enter the U.S. capital markets in recent years, with 159 Chinese companies gaining access to U.S. capital markets via a reverse merger between January 2007 and March 2010 versus just 56 entering the U.S. capital markets via an IPO.[2]

106.    Post-reverse merger, the auditor of the former shell company is frequently dismissed and the company retains the Chinese operating company's auditor.

107.    The SEC has set up an internal task force to look for fraud in overseas companies engaging in reverse mergers (specifically from China) with listings on U.S. exchanges to achieve

---

[2] PCAOB, Research Note # 2011-P1, Activity Summary and Audit Implications for Reverse Mergers Involving Companies from the China Region: January 1, 2007 through March 31, 2010, (March 14, 2011), available at:
http://pcaobus.org/Research/Documents/Chinese_Reverse_Merger_Research_Note.pdf

backdoor SEC registration, and launched a probe last year asking auditors for information on audit practices of such firms.[3]

108.    On June 9, 2011, the SEC issued an Investor Bulletin warning investors about the risks associated with investing in reverse merger companies.  In its Investor Bulletin, the SEC noted some questions arising about Chinese reverse merger companies it was investigating, including questions regarding cash balances, accounts receivable, and size of operations and number of employees, in addition to failures to disclose auditor resignations and failures to disclose resignation of outside law firm and accountant hired by audit committee to conduct internal investigation.

109.    In June 2011, the NASDAQ filed a proposed rule change with the SEC that would impose stricter listing requirements for companies that become public through reverse mergers.

110.    On November 9, 2011, the SEC announced its approval of new rules for the three major U.S. listing markets that toughen standards for companies going public through a reverse merger.

### B.    Jiangbo Used a Complicated and Dubious Reverse Merger In Order to Gain Easy Entry to the U.S. Capital Markets

111.    In order to gain access to domestic markets, Jiangbo utilized a reverse merger and engineered a complex series of transactions involving a web of at least half-a-dozen related entities, stretching from China, to the Cayman Islands, to the British Virgin Islands, to Florida.

112.    As noted above, Laiyang Jiangbo was organized in China on August 18, 2003.   In September 2007, the three owners of 100% of the equity of Laiyang Jiangbo (Cao Wubo, Xun Guihong and Zhang Yihua), submitted their application to SAFE for approval to establish an

---

[3] Joshua Gallu, *SEC Halts Trading of Chinese Firm Heli Amid Accounting Questions*, BLOOMBERG, Mar. 21, 2011.

offshore holding company, Karmoya International Ltd. ("Karmoya"), in the British Virgin Islands ("BVI") as a special purpose vehicle for any foreign ownership and capital raising activities of Laiyang Jiangbo.  The SAFE application was approved on September 19, 2007.

113.    Genesis Technology Group, Inc., the shell company into which Jiangbo would merge, was incorporated in the State of Florida on August 15, 2001.

114.    On October 1, 2007, a Share Exchange Agreement was executed by and among Karmoya and the shareholders of 100% of Karmoya's capital stock (including Defendant Cao) on the one hand, and Jiangbo and the majority shareholders of its capital stock on the other hand. As a result of the share exchange, the Karmoya shareholders became Jiangbo's controlling shareholders and Karmoya became Jiangbo's wholly owned subsidiary.

115.    Karmoya owns 100% of the capital stock of Union Well International Limited, a Cayman Islands company, which established and owns 100% of the equity in Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., a wholly foreign owned enterprise in the PRC ("GJBT").  GJBT was incorporated under the laws of the PRC on September 16, 2007, and registered as a wholly foreign owned enterprise on September 19, 2007.

116.    The Company's corporate structure is depicted in the 2010 Form 10-K :



117.    The relationship between Jiangbo and Laiyang Jiangbo is governed by various agreements with Jiangbo's subsidiary GJBT.  GJBT entered into several consulting service agreements and equity-related agreements with Laiyang Jiangbo on or about September 21, 2007, summarized in the 2010 Form 10-K.

118.    Shortly after this vexing set of transactions, on October 12, 2007, the Company's name was changed to Genesis Pharmaceuticals Enterprises, Inc.

119.    On April 16, 2009, the Company's changed its name to Jiangbo Pharmaceuticals, Inc.

120.    On June 8, 2010, Jiangbo's shares began trading on NASDAQ under the ticker symbol "JGBO".

C.   **The Truth Emerges – SEC Investigation Leads to Internal Investigation, Change in Auditor and CFO, and Halt in Trading of Jiangbo Stock by NASDAQ**

121.   The truth regarding the Company's financial condition emerged in a series of partial corrective disclosures by Jiangbo beginning on January 21, 2011.  Jiangbo's shares lost approximately half of their value between this date and the halt of trading on May 31, 2011, declining from $6.28 to $3.08.  They subsequently resumed trading over-the-counter at $0.25 per share on August 4, 2011.

122.   In December 2010, unbeknownst to investors, the Company received a letter of informal investigation from the SEC requesting that the Company provide certain documents.

123.   On January 21, 2011, as discussed in paragraphs 47 to 60 above, the Company disclosed that it had entered into the January 2011 Waiver Agreement with Pope with respect to the November 2007 and May 2008 Debentures.  Under the terms of the January 2011 Waiver Agreement, delinquent interest and associated penalties were exchanged for common stock of the Company.  The January 2011 Waiver Agreement further provided that the maturity date of the November 2007 Debentures was extended until February 28, 2011.

124.   Disclosure of the January 2011 Waiver Agreement revealed to the market that Jiangbo – despite allegedly having $135.9 million in cash and equivalents on hand at December 31, 2010 – was unable to pay accrued debt obligations totaling less than $6 million.

125.   In February 2011, also unbeknownst to investors, the Audit Committee initiated an independent internal investigation, assisted by the Cadwalader law firm and E&Y.

126.   In the months following the institution of an informal investigation by the SEC and the initiation of the Audit Committee's internal investigation, a series of events took place, culminating in NASDAQ halting trading of Jiangbo.

127.    On Friday, March 18, 2011, the Company disclosed that Defendant Sung had resigned as CFO, to be effective on March 31, 2011, less than two weeks later.  The Company did not identify a successor, stating that it had "initiated a search for a new Chief Financial Officer and will make an announcement as soon as a candidate has been chosen."

128.    Sung's abrupt departure and the absence of a named successor provided further grounds for concern regarding the accuracy of the Company's financial reporting and the adequacy of its internal controls.

129.    On March 26, 2011, still unbeknownst to investors, the SEC informed the Company that it had begun a non-public formal investigation.

130.    On April 4, 2011, the Company disclosed that it had engaged a new independent auditor to replace Frazer Frost.  The Company's press release further disclosed that it had made its decision to engage a new auditor "following the notification by Frazer Frost that it did not intend to stand for re-appointment as the company's principal accountant for the next fiscal year."

131.    Disclosure that the Company's auditor had elected to cease its relationship with the Company provided further grounds for concern regarding the accuracy of the Company's financial reporting and the adequacy of its internal controls.

132.    On May 23, 2011, the Company issued its delayed Form 10-Q for the third fiscal quarter of 2011 ("3Q2011 Form 10-Q").  In the 3Q2011 Form 10-Q, the Company disclosed that it had failed to perform under the January 2011 Waiver Agreement and had defaulted on the November 2007 Debentures by failing to make the $3.5 million principal payment due on February 28, 2011, assertedly "due to its continued inability to transfer sufficient cash out of the PRC . . . ."  Jiangbo further disclosed that as a result, "it is likely that the sole holder of the

November 2007 Debenture will institute legal proceedings against the Company to collect the amounts due under the November 2007 Debentures," which "would be materially adverse to the Company's ability to continue its business as it is presently conducted."

133.   The Company's announced inability to pay a $3.5 million debt obligation – despite allegedly having $146.9 million in cash and equivalents on hand at March 31, 2011 – and its disclosure of a resulting risk to the Company's continuation in business provided further grounds to doubt the accuracy of the Company's financial reporting.

134.   On May 25, 2011, the Company held its quarterly earnings call to discuss its financial results for the third quarter of fiscal year 2011.  On the call, Defendant Jin addressed a caller's request that he "elaborate a little bit on the possibility of you guys filing for bankruptcy protection for the debt acquired in 2007 and 2008," referring to the November 2007 and May 2008 Debentures.

135.   In response, as reported through a translator, Jin replied that "the company is active negotiation and discussions with their note and debenture holders, and so far they have come out with some alternative solutions and they are trying to find a solution that is acceptable for all parties and he also mentioned that so far the management hasn't thought of the procedures of seeking bankruptcy protection."

136.   Jin's statements provided further grounds to doubt the accuracy of the Company's financial reporting.

137.   On May 27, 2011, at the close of the market, the Company issued a Form 10-Q/A for the third quarter of fiscal year 2011, amending the late-filed 3Q2011 Form 10-Q that it had issued just four days earlier.  The stated purpose of the amendment was "to include an additional

footnote under Note 19 - Commitments and Contingencies that had been requested by our auditors prior to the Original Filing but had not been included in the Original Filing."

138.    The "Note 19" referenced in the introductory explanatory note in the 3Q2011 Form 10-Q/A for the first time disclosed the existence of the SEC investigation.

139.    On May 31, 2011, NASDAQ halted trading in the Company's stock, which last traded at $ 3.08.  This action by NASDAQ wiped out virtually all remaining value in Jiangbo's shares.  The shares did not trade again until August 4, 2011, when they opened for trading on the OTC Bulletin Board at $0.25, down $2.83, or 92%, from their last traded price on NASDAQ more than two months earlier.  As recently as November 10, 2011, Jiangbo stock closed at a nearly worthless price of $0.14.

140.    On June 7, 2011, the Company filed a Form 8-K with the SEC disclosing that Audit Committee members Marks and Wang had informed the Board in a letter dated June 6, 2011 of their immediate resignations.  An exhibit to the Form 8-K was a 23-page letter signed by Marks and Wang, which detailed the reasons and timeline of events leading to their resignations. Specifically, directors Marks and Wang stated that they could no longer fulfill their duties as directors and Audit Committee members due to management's lack of support and cooperation with their independent internal investigation.  The letter stated, in pertinent part:

> On behalf of the Audit Committee of the Board of Directors of Jiangbo Pharmaceuticals, Inc., I write to memorialize the following events and to inform you of the resignation of the independent members of the Audit Committee for reasons set forth below.
>
> As you are aware, the Audit Committee charter authorizes the Committee "to retain independent legal, accounting or other advisers as it determines necessary to carry out its duties and, if necessary, to institute special investigations."  The Company received a subpoena from the U.S. Securities and Exchange Commission ("SEC") on March 26, 2011.  In response, the Audit Committee exercised its authority, with the Board's informed consent, to undertake an independent internal investigation of

certain issues raised by the SEC and to provide the findings of that investigation to the SEC.   The Audit Committee retained Cadwalader, Wickersham & Taft LLP ("Cadwalader"), a law firm that had done no prior work for the company, to conduct the independent investigation by, through, and at the exclusive direction of the Audit Committee.   Jointly with Cadwalader, the Audit Committee retained Ernst & Young (China) Advisory Limited ("E&Y") to provide forensic accounting services in connection with the internal investigation at the direction of Cadwalader.

An independent investigation requires the complete and total cooperation from senior management.   Unfortunately, the Chairman of the Board of Directors of Jiangbo and members of his management team have exhibited repeatedly their unwillingness to cooperate in even the most basic requests from the investigation team, despite numerous and repeated explanations by the Audit Committee and Cadwalader to explain the importance of this investigation and the expectations of the SEC.

As detailed below, the conduct and statements by the Company and those controlling and advising it have demonstrated a clear and continuing lack of cooperation over the past five weeks. Moreover, the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation.   As a result, the Audit Committee has determined that it can no longer effectively conduct an independent investigation as contemplated by the Audit Committee.   The independent internal investigation has been halted.   Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

<p style="text-align:center">*     *     *</p>

### *Reasons for Resignation*

The facts and circumstances described above reveal a situation in which it is not possible for us to fulfill our obligations as independent members of the Audit Committee, and have left us no choice but to tender our resignation.   In particular, the following reasons have compelled this decision:

<p style="text-align:center">- 32 -</p>

1.     **Lack of Cooperation.**   Over the past five weeks, the Company has revealed an overall and continuing lack of cooperation, evidenced most recently by the fact that the documents and information received from the Company to date still remain deficient in substantial respects.   In light of this conduct, the Audit Committee, Cadwalader and E&Y have been unable to conduct a thorough, independent internal investigation. Despite numerous and lengthy meetings, phone calls, emails, and memoranda in which expert advisors explained the importance of the internal investigation and the Company's cooperation with it, and despite the warning of the potential serious ramifications of the Company's lack of cooperation, the situation has not improved in any material way.   We can conclude that the Company, and in particular Mr. Cao, does not have the intention to cooperate with the internal investigation.[footnote 7]

2.     **Manner and Timing of Payments to the Audit Committee's Advisors.**  Although the Company has made certain invoice payments and retainer payments to Cadwalader and E&Y, the manner and timing of those payments have raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y.   In particular, the Company has previously provided documents indicating that it has a large cash balance at [redacted] representing approximately [redacted]% of the Company's cash balance as of December 31, 2010.  Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at [redacted]. Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at [redacted] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to internet banking but the Company transferred funds to the Audit Committee's advisers via internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full.  The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks.  This explanation for the timing and manner of payments is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

3.    **No Realistic Options for Corrective Action.**  The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue.  Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation.  However, we are convinced such a measure would be futile.  First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao.  Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman.  Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise de facto control over the Company and the Board.  The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner.  Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholder by remaining on the Board.

Footnote 7:  *To the extent any public disclosures imply that the Company is cooperating with the internal investigation, such statements are inaccurate.*

(Emphasis added).

141.    The June 6, 2011 Audit Committee letter also states that Defendant Cao, the Chairman of the Board, not an executive officer, had unilateral check approval authority for Jiangbo. Defendant Cao refused to provide the Audit Committee with any documents related to the RMB 200 million transfer because "he believed the referenced transaction was unrelated to Jiangbo."

142.    On July 26, 2011, Jiangbo received a letter from NASDAQ notifying the Company of NASDAQ's determination to delist Jiangbo at the opening of business on August 4, 2011 for the following reasons:

> (1)    Public interest concerns under Nasdaq Listing Rule 5101 raised by the efforts of the Company and its Chairman to obstruct the independent internal investigation authorized by its Audit Committee, and the failure to allow the Audit Committee to fulfill its responsibilities and duties;
>
> (2)    The Company's failures to comply with Listing Standard Rule 5605(c)(3) and IM-5605-5, which sets forth the responsibilities and authority of the Audit Committee, as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934; and
>
> (3)    the failure by the Company to comply with the Audit Committee composition requirements of Listing Rule 5605(c)(2)(A).

143.    The Company has never adequately responded to NASDAQ's request and has virtually disappeared from the U.S., including failing to appear in this lawsuit.

144.    On August 1, 2011, the Company announced in a press release that it has received a letter dated July 26, 2011, from NASDAQ indicating that the Company's securities will no longer be listed on it.  The press release also stated, in part:

> Nasdaq staff members have determined to delist the Company's securities based on: (1) public interest concerns under Nasdaq Listing Rule 5101 *regarding efforts of the Company and its Chairman to obstruct an independent internal investigation authorized by the Audit Committee and the failure to allow the Audit Committee to fulfill its responsibilities and duties*; (2) the Company's failure to comply with Listing Rule 5605(c)(3) and IM-5605-5 as well as the statutory responsibilities and authority of the Company's Audit Committee, set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934; and (3) the Company's failure to comply with the Audit Committee composition requirements of Listing Rule 5605(c)(2)(A).
>
> Unless the Nasdaq's determination is appealed, the Company expects that trading of its common stock will be suspended at the opening of business on August 4, 2011, and a Form 25-NSE will be filed with the Securities and Exchange Commission (the "SEC"), which will remove the Company's securities from listing and registration on Nasdaq. The Company has decided to focus on addressing current issues facing the Company and its business and

> will not appeal Nasdaq's determination. The Company hopes, but does not guarantee, that its shares will be eligible for quotation over the counter market following delisting from Nasdaq. The Company's common stock will not be eligible for quotation on the over the counter market until at least one market maker agrees to file the appropriate application with Financial Industry Regulatory Authority ("FINRA") and such application is accepted by FINRA. Trading in the Company's stock has been halted by Nasdaq since May 31, 2011.

(Emphasis added).

145.    On August 4, 2011, Jiangbo's shares opened for trading on the OTC Bulletin Board at just $0.25, down $2.83, or 92%, from their last traded price of $ 3.08 on NASDAQ on May 31, 2011, more than two months earlier.

146.    As of the time of the filing of this complaint, the Company's shares are nearly worthless, and no indication has been given by the Company's management or the Board that it will be taking concrete measures regarding the concerns raised in the June 6, 2011, letters from Marks and Wang.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

147.    Prior to and throughout the Class Period, Defendants issued various press releases, SEC filings, financial statements and other statements that consistently overstated Jiangbo's cash balances, failed to disclose related party transactions, and failed to disclose SEC investigations, internal Audit Committee investigations, and Chairman Cao and the Company's failure to cooperate with the Audit Committee's internal investigation.

### A.    Third Quarter Fiscal 2010 Results

148.    On May 17, 2010, Jiangbo filed its quarterly report on Form 10-Q for the third quarter of fiscal year 2009 (ended March 31, 2010) ("3Q2010 Form 10-Q") with the SEC, signed by Defendant Cao reporting cash of $96 million.

- 36 -

149.    In exhibits to the 3Q2010 Form 10-Q, Defendants Cao and Sung certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

150.    On May 17, 2010, Jiangbo hosted an earnings conference call to announce its financial results for the third quarter of 2010, discussed infra. During this conference call, Defendant Sung stated that the Company's cash position for the quarter ended March 31, 2010 was $108 million.  Defendant Sung also affirmed earnings guidance and spoke of "strong growth" and better cost controls.

151.    On May 20, 2010, the Company announced its third quarter results in a press release and Form 8-K signed by CFO Sung, repeating the financial results reported in the 3Q2010 Form 10-Q filed three days earlier, including $96.5 million in cash and an additional $11.5 million in restricted cash, and quoted Defendant Cao :  "As we continue to evaluate the best deployment of our cash for strategic product acquisition and licensing deals, we expect to continue improving our operational efficiency and to strengthen our operational management team to accelerate that effort."

152.    Reasons for Falsity:  The statements in paragraphs 148 to 151 regarding the Company's results for the Third Quarter of 2010 were materially false and misleading because:

      a.    The Company's cash balances were materially overstated;

b. The Company failed to disclose a 200 million RMB transaction of a related party nature with Hilead; and

c. The certifications signed by Defendants Cao and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

## B.  Fiscal Year End 2010 Results

153.  On September 28, 2010, Jiangbo filed an annual report on Form 10-K for the fiscal year 2010 (ended June 30, 2010) ("2010 Form 10-K") with the SEC, signed by Defendants Jin, Sung, and Cao, as well as Directors Xiaowei, Lei, Jian, and Wang, which reported cash of $108.6 million.

154.  The 2010 Form 10-K provided the following details regarding Jiangbo's stated cash position:

As of June 30, 2010, the company has cash and cash equivalents of approximately $108.6 million, which represents 53.6% of total assets as compared to approximately $104.4 million in the same period for fiscal 2009, which represented 61.8% of the total assets, an increase of $4.3 million.

155.  In exhibits to the 2010 Form 10-K, Defendants Jin and Sung certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

156. Frazer Frost issued an audit report in connection with the Company's consolidated financial statements included in the 2010 Form 10-K. In pertinent part, Frazer Frost's audit report stated :

> To the Board of Directors and Shareholders of Jiangbo Pharmaceuticals, Inc. and Subsidiaries
>
> We have audited the accompanying consolidated balance sheets of Jiangbo Pharmaceuticals, Inc. and Subsidiaries (the "Company") as of June, 2010 and 2009, and the related consolidated statements of income and other comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended June 30, 2010. Jiangbo Pharmaceuticals, Inc.'s management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010 in conformity with accounting principles generally accepted in the United States of America.

- 39 -

/s/ Frazer Frost, LLP (Successor Entity of Moore Stephens Wurth
Frazer and Torbet, LLP, see Form 8-K filed on January 7, 2010)

Brea, California

September 28, 2010

157.   On September 30, 2010, the Company announced its fiscal year 2010 and fourth

quarter results in a press release and Form 8-K signed by CFO Sung, repeating the financial

results reported in the 2010 Form 10-K filed two days earlier, including cash of $108.6 million,

and quoted Defendant Jin :

> We believe that our strong balance sheet and cash position
> provides Jiangbo with unique flexibility to acquire innovative new
> products and pursue strategic acquisitions.   Presently we are
> evaluating select opportunities to enhance our growth prospects,
> strengthen our market position and vertically integrate our
> operations.   With the transitional year of 2010 behind us, we
> believe that we are well positioned to create value for shareholders
> in 2011 and beyond.

158.   On September 30, 2010, Jiangbo hosted an earnings conference call to announce

its financial results for the fourth quarter and fiscal year 2010, discussed infra (paragraphs 153 -

157).  During this conference call, Defendant Sung described the Company's "strong cash

balance" and "unique flexibilities" to pursue new opportunities in the pharmaceutical space.  Ms.

Sung also served as interpreter for Defendant Jin during this call.

159.   <u>Reasons for Falsity:</u>  The statements in paragraphs 153 to 158 regarding the

Company's results for the fiscal year 2010 were materially false and misleading because:

> a.   The Company's cash balances were materially overstated;
>
> b.   The Company failed to disclose a 200 million RMB transaction of a
> related party nature with Hilead;
>
> c.   The certifications signed by Defendants Jin and Sung were untrue because
> the financial statements did not fairly present the financial condition of the
> Company or its operating results; and

- 40 -

d.     The "clean" Audit Report issued by Frazer Frost was untrue because Frazer Frost had not conducted its audit in accordance with Public Company Accounting Oversight Board ("PCAOB") standards and the financial statements did not present fairly the consolidated financial position of Jiangbo, as described in greater detail below in paragraphs 192 - 216.

## C.     First Quarter Fiscal 2011 Results

160.     On November 15, 2010, Jiangbo filed a Form 10-Q for the first quarter of fiscal year 2011 (ended Sept. 30, 2010) ("1Q2011 Form 10-Q") with the SEC, signed by Defendants Jin and Sung, reporting net revenues of $27.7 million for the quarter, net income of $10.6 million, and cash of $123.9 million.

161.     In exhibits to the 1Q2011 Form 10-Q, Defendants Jin and Sung certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

162.     The following day, November 16, 2010, Jiangbo issued a press release and Form 8-K signed by Defendant Sung, repeating the positive results for the quarter ended September 30, 2010 reported in the 1Q2011 Form 10-Q, including the Company's cash of $123.9 million.

163.     On November 16, 2010, Jiangbo hosted an earnings conference call to announce its financial results for the first quarter of fiscal year 2011 disclosed in the 1Q2011 Form 10-Q and November 16, 2010 press release and Form 8-K. During this conference call, Defendant

Sung reiterated the Company's cash position of $123 million, and stated that the Company was continuing to evaluate ways to deploy capital in order to enhance shareholder value.

164.    In reaction to these announcements, Jiangbo shares closed at $7.08 on November 16, 2010, up $0.40, or 6%, from the previous day's close on heavy trading volume of 258, 512 shares.

165.    <u>Reasons for Falsity:</u> The statements in paragraphs 160 to 163 regarding the Company's results for the First Quarter of 2011 were materially false and misleading because:

        a.      The Company's cash balances were materially overstated;

        b.      The Company failed to disclose a 200 million RMB transaction of a related party nature with Hilead; and

        c.      The certifications signed by Defendants Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

**D.      Second Quarter Fiscal Year 2011 Results**

166.    On February 14, 2011, the Company disclosed it was unable to timely file its Form 10-Q for the second quarter fiscal 2011 (ended December 31, 2010) because it was "unable to finalize its unaudited financial results as well as the disclosure requirements of Form 10-Q without unreasonable expense or effort."

167.    Defendants filed the Form 10-Q for the second quarter fiscal 2011 (ended December 31, 2010) ("2Q2011 Form 10-Q") with the SEC on February 22, 2011, signed by Defendants Jin and Sung, reporting cash of $135 million.

168.    Again in the 2Q2011 Form 10-Q, Defendants Jin and Sung certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this

report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

169.    The following day, February 23, 2011, Jiangbo issued a press release, which it filed with the SEC on February 28, 2011 in a Form 8-K signed by Defendant Sung, repeating the results for the second fiscal quarter 2011 reported in the 2Q2011 Form 10-Q, including cash of $135 million, and quoted Defendant Jin :

> In the second quarter of fiscal year 2011, we continued to generate robust cash flow from operations and we ended the period with over $135.0 million in cash and cash equivalents.

170.    On February 23, 2011, Jiangbo also hosted an earnings conference call to announce its financial results for the second quarter of fiscal year 2011, disclosed in the 2Q2011 Form 10-Q and the February 23, 2011 press release.  During this conference call, Defendant Sung described the Company's "increased revenue and strong cash flow."  She further stated that, from a management perspective, Jiangbo stock was undervalued.

171.    In reaction to these announcements, Jiangbo shares closed at $6.32 on February 23, 2011, up $0.27, or 4.5%, from the previous day's close on heavy trading volume of 160,380 shares.

172.    Reasons for Falsity:  The statements in paragraphs 166 to 170 regarding the Company's results for the Second Quarter of 2011 were materially false and misleading because:

    a.    The Company's cash balances were materially overstated;

    b.    The Company failed to disclose a 200 million RMB transaction of a related party nature with Hilead; and

      c.      The certifications signed by Defendants Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

**E.     Third Quarter Fiscal Year 2011 Results**

173.    Once again, on May 16, 2011, Jiangbo disclosed that it would be unable to timely file its Form 10-Q for the third quarter or fiscal year 2011 (ended March 31, 2011).

174.    On May 23, 2011, Jiangbo filed its late Form 10-Q for the third quarter of fiscal year 2011 (ended March 31, 2011), signed by Defendants Jin and Sun, reporting cash of $146 million.

175.    Once again in Exhibits to the 3Q2011 Form 10-Q, Defendants Jin and Sun certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

176.    The following day, May 24, 2011, Jiangbo issued a press release and Form 8-K signed by Defendants Jin and Sun, repeating the results for the quarter ended March 30, 2011 reported in the 3Q2011 Form 10-Q, including the Company's $146.9 million in cash and cash equivalents, and quoting Defendant Jin :

        This quarter we continued to generate robust cash flow from operations and ended the period with over $146 million in cash and cash equivalents, some of which we plan to deploy on strategic acquisitions (…)

177.     On May 25, 2011, Jiangbo hosted an earnings conference call to announce its

financial results for the third quarter of fiscal year 2011, discussed infra (paragraphs 174 - 176).

An investor relations representative read remarks prepared by Defendant Jin, in which the

Company's revenue guidance was reaffirmed.

178.     <u>Reasons for Falsity:</u>  The statements in paragraphs 174 to 177 regarding the

Company's results for the Second Quarter of 2011 were materially false and misleading because:

> a.     The Company's cash balances were materially overstated;
>
> b.     The Company failed to disclose a 200 million RMB transaction of a related party nature with Hilead;
>
> c.     The certifications signed by Defendants Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results;
>
> d.     In February 2011, unknown to the public, the Company had begun its own internal investigation relating to the SEC's investigation;
>
> e.     On March 26, 2011, unknown to shareholders, the SEC issued a subpoena to the Company and began a non-public formal investigation;
>
> f.     Chairman Cao and the Company's management were not cooperating with the SEC or the Audit Committee's independent investigation and were not properly nor promptly paying the Audit Committee's advisors from a Company account; and
>
> g.     Although undisclosed to the public until later, on May 23, 2011, Board and Audit Committee members Marks and Wang, who were conducting the Audit Committee's internal investigation in response to the SEC's information request and subsequent subpoena, had notified the Board that they did not intend to stand for re-election at the upcoming annual meeting scheduled for June 27, 2011.

**F.     Form 10-Q/A**

179.     On May 27, 2011, the Company filed an amended Form 10-Q/A, signed by

Defendants Jin and Sun, which disclosed for the first time that the SEC had been conducting an

investigation and requesting documents of the Company.  It stated, in pertinent part:

The Company received a letter of informal investigation dated December 22, 2010 from the U.S. Securities and Exchange Commission ("SEC") requesting the Company to provide certain documents. The letter indicated that the Company should not construe the investigation as an indication by the SEC or its staff that any violation of law has occurred or any adverse reflection on any person, entity or security.

In February 2011, the Company, through its Audit Committee, commenced an internal investigation into certain transactions. On March 26, 2011, the staff of the SEC having been informed by the Company of its internal investigation, notified the Company that it had begun a non-public formal investigation and requested certain information and materials relating to certain aspects of the Company's public disclosures and operations. The SEC has advised the Company that its investigation is not intended to suggest that the SEC believes at this time that the Company has done anything wrong and is in fact a fact finding investigation. The Company is committed to cooperating with the SEC Investigation and has responded to the SEC's request for materials and information. In light of the SEC's investigation, the Company, through its Audit Committee, decided that the investigation should be conducted as an independent investigation and that the scope of the independent investigation should cover all issues raised by the SEC Investigation. To that end the Audit Committee retained an international, U.S.-based law firm and an international professional accounting firm to conduct a comprehensive review of the issues raised by the SEC Investigation. The SEC Investigation and the Independent Investigation are still in their early stages, and the Company cannot predict the duration or outcome of the investigations, or the impact, if any, those investigations may have on the Company's financial condition or results of operations.

180.    The statements in paragraph 180 were materially false and misleading because they did not disclose that Chairman Cao and the Company's management were not cooperating with the SEC or the Audit Committee's independent investigation and were not properly nor promptly paying the Audit Committee's advisors from a Company account.

## VII.    **THE DEFENDANTS' GAAP VIOLATIONS**

181.    At all relevant times during the Class Period, Defendants represented that Jiangbo's financial statements when issued were prepared in conformity with Generally

- 46 -

Accepted Accounting Principles ("GAAP"), which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Jiangbo's stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity, and earnings during the Class Period.

182.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

183.   As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.

- 47 -

> The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

184.     Materiality is defined in the glossary of FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information* as:

> [T]he magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

185.     Concerning the concept of materiality, the Securities and Exchange Commission indicated the following in Staff Accounting Bulletin No. 99 ("SAB 99"):

> This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is – a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

186.     Moreover, SAB 99 emphasizes the need to assess and take into account the qualitative aspects of materiality including, but not limited to:

- whether the misstatement arises from an item capable of precise measurement;

- whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

- whether the misstatement masks a change in earnings or other trends;

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;

- 48 -

- whether the misstatement affects the registrant's compliance with regulatory requirements;

- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements;

- whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation; or

- whether the misstatement involves concealment of an unlawful transaction.

### A.  Jiangbo's Manifestly Inaccurate Financial Statements

187.     Defendants Jin, Sung and Sun signed certifications attesting to, *inter alia*, the adequacy of Jiangbo's internal controls over financial reporting to provide reasonable assurance and reliability that the Company's financial statements were prepared in accordance with GAAP. In addition, Defendants Jin and Sung certified that Jiangbo's 2010 Form 10-K fairly presented the financial condition and results of operations of the Company.  Defendants Jin, Sung and Sun fraudulently certified Jiangbo's financial statements even though they knew that the Company's financial statements were recklessly prepared and egregiously misstated.

188.     Jiangbo's accounts receivable disclosure (Note 4. Accounts receivable, net), e.g., for the quarter ended March 31, 2011 states that accounts receivable is reduced by accumulated depreciation.

Accounts receivable consist of the following:

|  | March 31, 2011 | June 30, 2010 |
|---|---|---|
| Accounts receivable | 21,497,034 | 34,538,622 |
| Less: accumulated depreciation | (737,268) | (1,343,421) |
| Total | $ 20,759,766 | $ 33,195,201 |

(Jiangbo 3/31/2011 Form 10-Q at 16)

- 49 -

This accounts receivable presentation is not GAAP-compliant and nonsensical, because accounts receivable pertains to amounts due from customers, and accumulated depreciation is a contra asset related to property, plant and equipment.

**B.      Jiangbo's Overstated Accounts Receivable and Inadequate Reserves**

189.    Jiangbo's collection of Accounts receivables progressively worsened during the Class Period and was significantly worse than its industry peers, yet Jiangbo decreased its allowance for doubtful accounts instead of increasing it.  According to the Life Science Analytics June 9, 2011 Competitor Report:

> As of June 2010, the accounts receivable for the company were $33.53 million, which is equivalent to 126 days of sales. This is sharply higher than at the end of 2009, when Jiangbo Pharmaceuticals Incorporated had 63 days of sales in accounts receivable. The 126 days of accounts receivable at Jiangbo Pharmaceuticals Incorporated are higher than all three comparable companies: Heritage Crystal Clean Incorporation had 44 days, Internet Capital Group Incorporated had 101 days, while SPAR Group, Inc. had 81 days outstanding at the end of the fiscal year 2010.

190.    As accounts receivables age, their probability of collection decreases. Consequently, Jiangbo should have been increasing its allowance for doubtful accounts. Pursuant to FASB 5, Accounting for Contingencies, an estimated loss contingency must be accrued if it is probable that an asset had been impaired and if the amount of the loss can be reasonably estimated.  Jiangbo knowingly ignored its unfavorable collection trend and intentionally understated its allowance for doubtful accounts.

191.    As a result, Jiangbo materially overstated its assets and earnings throughout the class period in violation of GAAP.

## VIII.   FRAZER FROST'S VIOLATIONS OF GAAS

192.    Independent external auditors of publicly traded companies, such as Frazer Frost, are supposed to act as corporate and investor watchdogs.  As such, strict guidelines and standards exist to ensure that auditors are fulfilling their critical roles.  However, Frazer Frost's audits of the Company during the Class Period were so grossly deficient that the audits amounted to no audit at all and a reckless disregard of standards established by the American Institute of Certified Public Accountants ("AICPA") and the PCAOB.

193.    As a result of Frazer Frost's knowing and/or reckless conduct and participation in Jiangbo's fraudulent scheme, Frazer Frost is jointly and severally liable for the fraudulent conduct alleged in the Complaint.  Frazer Frost certainly knew that its audit reports were being relied upon by investors, yet failed to comply with the standards of Generally Accepted Auditing Standards ("GAAS"), the PCAOB and COSO in the issuance of its false and misleading audit reports.

### A.    Frazer Frost's Participation in the Fraud

194.    With knowledge of Jiangbo's true financial condition, or in reckless disregard thereof, Frazer Frost certified the materially false and misleading financial statements of Jiangbo and provided an unqualified (i.e. "clean") Independent Auditors' Report, which was included in the Company's SEC filings. Without the materially false and misleading unqualified audit opinion, the fraud alleged above could not have been perpetrated by the other Defendants.

### B.    Frazer Frost Failed to Render an Accurate Audit Report

195.    Frazer Frost did not render an accurate audit report and thus did not exercise due professional care for three primary reasons.  First, Frazer Frost knew or recklessly disregarded that: Jiangbo's financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of

- 51 -

Jiangbo and its subsidiaries as of June 30, 2010, and the results of their operations and cash flow for the year then ended (AU § 508.04), and second, Frazer Frost recklessly disregarded or failed to perform sufficient procedures to audit Jiangbo's cash and accounts receivable accounts, as of June 30 2010, in accordance with standards of the PCAOB and GAAS.

196.    Finally, Frazer Frost also did not exercise due professional care regarding its audit procedures in light of Jiangbo's admitted significant internal control deficiencies as disclosed in the Company's Fiscal 2010 Form 10-K. :

> During our assessment of the effectiveness of internal control over financial reporting as of June 30, 2010, management identified significant deficiencies and determined that our internal controls over financial reporting were not effective as of that date.

Jiangbo disclosed several deficiencies related to their internal financial controls related to (1) weaknesses among the accounting and finance personnel, (2) dysfunctional internal controls, and (3) inadequate segregation of duties in the financial reporting function.

197.    As set forth in detail in paragraphs 181 through 191 above, Jiangbo's violations of GAAP during the Class Period include, among other things:

- overstated cash and cash equivalents; and

- understated allowance for doubtful accounts resulting in overstated net income and EPS.

**C.    Frazer Frost Either Failed to Perform a True Audit of Jiangbo or Recklessly Disregarded Substantial Evidence of Jiangbo's Overstated Cash Balances**

198.    In connection with its audits of Jiangbo, Frazer Frost violated numerous auditing standards, including the following:

- Frazer Frost knowingly or recklessly failed to exercise due professional care and professional skepticism in connection with its audits of Jiangbo (AU 230);

- 52 -

- Frazer Frost knowingly or recklessly failed to comply with the audit documentation requirements of Auditing Standard No. 3 (AS 3) and Auditing Standard No. 5 (AS 5) and the evidential matter requirements of AU 326;

- Frazer Frost knowingly or recklessly failed to state that Jiangbo's Class Period financial statements were not presented in accordance with GAAP. (AU 410); and

- Pursuant to AU Section 316: "Consideration of Fraud in a Financial Statement Audit," Frazer Frost was responsible for planning and performing its audit of Jiangbo's financial statements "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 316.01.

Quite simply, if Frazer Frost would have conducted its audit in compliance with GAAS and PCAOB standards, it would have discovered Jiangbo's overstated cash and understated allowance for doubtful accounts.

### D.    Jiangbo's Overstated Cash and Cash Equivalents

199.    Had Frazer Frost audits of Jiangbo's financial statements been in accordance with GAAS and the PCAOB as set forth below, Frazer Frost would have been aware that Jiangbo's cash was overstated in violation of GAAP.  Specifically, Frazer Frost's audit procedures for the year ended June 30, 2010, should have included, but not been limited to:

- Performing a walkthrough of Jiangbo's cash receipts system;

- Tracing a sample of cash receipts transactions to the cash receipts journal, bank statements and the general ledger;

- Examining Jiangbo's bank reconciliations for the period ended June 30, 2010 including an audit of the reconciling items; and

- Confirming bank balances at June 30, 2010 with respective banks and financial institutions by requesting independent verification of balances via a standard bank confirmation form.

Had Frazer Frost performed those fundamental audit procedures, they would have ascertained

that Jiangbo's cash and cash equivalents were materially overstated at June 30, 2010.

### E.      Jiangbo's Understated Allowance for Doubtful Accounts

200.     In connection with Frazer Frost's audit of Jiangbo's accounts receivable, Frazer

Frost's audit procedures for the year ended June 30, 2010, should have included, but not been

limited to:

- examination of  Frazer Frost's aged accounts receivable reports for proper aging;

- analyzed the days sales outstanding historical trend;

- verifying the basis for the allowance for doubtful accounts calculation and methodology;

- interviewing credit department staff and accounting staff to determine how the allowance for doubtful accounts is calculated and tested for adequacy; and

- testing the reconciliation of the aged accounts receivable reports to the general ledger.

201.     Frazer Frost should have challenged the fact that Jiangbo's was lowering its

allowance for doubtful accounts as a percentage of total A/R even thought Jiangbo's receivable

were being collected more slowly and the probability of collection progressively decreased as the

Class Period progressed.  Had Frazer Frost performed the above requisite procedures, they would

have ascertained that Jiangbo's allowance for doubtful accounts was materially understated,

resulting in an overstatement of Jiangbo's assets and earnings for the fiscal year ended June 30,

2010.

202.     Frazer Frost violated Statement on Auditing Standards No. 99 ("SAS No. 99"),

Consideration of Fraud in a Financial Statement Audit, which requires auditors to consider the

risk that a company's financial statements might not be free from material misstatement, whether caused by errors or fraud.

**F.   Frazer Frost Failed to Obtain Sufficiently Competent Evidential Matter**

203.   In conducting an audit, an auditor must obtain sufficiently competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

204.   Standards of the PCAOB and GAAS required Frazer Frost, at a minimum, to develop sufficiently competent evidential matter for its opinion regarding whether Jiangbo's cash and accounts receivable net of allowance for doubtful accounts were properly reported. Instead, Frazer Frost knew of or recklessly disregarded the fact that Jiangbo overstated its cash and understated its allowance for doubtful accounts in violation of GAAP. For example, Frazer Frost ignored the fact that Jiangbo's account receivables were aging (i.e., being collected more slowly) and, consequently, the probability of those receivables being collected progressively decreased during the Class Period.

**G.   Frazer Frost Failed to Exercise Due Professional Care**

205.   Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01.  Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

206.   Frazer Frost did not exercise due professional care because it failed to:  (1) obtain sufficient competent evidence to support the assertions in the financial statements; (2) maintain an attitude of professional skepticism; and (3) establish a basis for issuing Jiangbo an unqualified audit opinion.

207.     Frazer Frost violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. Regardless of the assessed level of control risk, the auditor should perform substantive procedures for all relevant assertions related to all significant accounts and disclosures in the financial statements. (AU § 319.02)

208.     Frazer Frost knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued an adverse opinion on Jiangbo's 2010 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the fiscal year ended June 30, 2010 to recognize Jiangbo's improper accounting and financial reporting stated above.

### H.     Frazer Frost's Additional Violations of GAAS

209.     Frazer Frost also violated GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.  In light of the irregularities, deficiencies, and issues identified above, Frazer Frost had only two viable options following the completion of its purported audit of Jiangbo -- either issue an adverse opinion stating that Jiangbo's 2010 financial statements were not fairly presented  or state that it could not issue any opinion at all.  Unfortunately, Frazer Frost chose neither, and instead issued an improper (albeit unqualified) audit opinion.

### I.     Frazer Frost's Other Violations

210.     As a result of its failure to report on Jiangbo's 2010 financial statements accurately, Frazer Frost utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

- 56 -

> [T]he audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

211.    Frazer Frost knew or recklessly disregarded facts that indicated that it should have disclaimed or issued adverse opinions on Jiangbo's 2010 year-end financial statements; improper accounting and financial reporting stated above.

212.    In addition, Frazer Frost violated the requirements of Section 10A of the Exchange Act, which requires auditors of public companies to design procedures to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts. Section 10A also requires an auditor to notify the SEC if he or she becomes aware of information indicating that an illegal act has, or may have, occurred, if management or the Board of Directors of the Company fails to take appropriate remedial actions with respect to the illegal acts. Frazer Frost knew or recklessly ignored that it violated Section 10A in the performance of its audits of Jiangbo's 2010 year end financial statements.

**J.    Frazer Frost's Motive to Commit Securities Fraud**

213.    Frazer Frost's audit and audit-related fees from Jiangbo totaled $290,250 for Fiscal 2010, $294,600 for Fiscal 2009, and $265,000 for Fiscal 2008. Frazer Frost's receipt of these substantial audit and audit-related fees from Jiangbo, and the desire of Frazer Frost to maintain those billings, provided a strong incentive for Frazer Frost to commit the fraud alleged herein. In addition, this fact suggests that Frazer Frost violated GAAS General Standard No. 2, which requires that independence in mental attitude must be maintained by the auditor in all matters related to the assignment. AU § 220.01.

214.    Moreover, as noted above, dozens of Chinese reverse merger companies hired Frazer Frost as their independent auditor in the U.S., and several of those ended up with financial reporting irregularities, including China Energy Savings Technology, Inc., China Natural Gas, China Valves Technology, and RINO International, among others.

215.    Frazer Frost's failure to follow professional auditing standards with regard to its client China Energy Savings Technology, Inc. resulted in sanctions by the SEC.  There are similarities between failures in the China Energy case and those here with regard to Jiangbo, including, in both instances: (1) Frazer Frost ignored regulatory authority inquiries, (2) the companies' financial statements included sloppy financial reporting and miscalculations; and (3) Frazer Frost violated auditing standards, including the standards of due professional care, professional skepticism and consideration of fraud risk.

216.    Frazer Frost's willingness to turn a blind eye to accounting irregularities in Chinese companies listed on U.S. exchanges made it an attractive auditor candidate for Chinese companies unfamiliar with and/or unwilling to comply with GAAP.

## IX.    CLASS ACTION ALLEGATIONS

217.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.

218.    The members of the Class are so numerous that joinder of all members is impracticable.  Further, the disposition of their claims in a class action will provide substantial benefits to the parties and the Class.

219.    While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Jiangbo shares were traded publicly during the Class Period on the NASDAQ and as of September 24, 2010, Jiangbo had

12,639,302 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Jiangbo and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

221.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities fraud litigation.  Further, Plaintiffs do not have any interests that conflict with those of other Class members.

222.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, finances, internal controls, operations, prospects of Jiangbo;

(c)    Whether Defendants knew or with severe recklessness disregarded that their statements were false and/or misleading;

(d)    Whether the price of Jiangbo's securities were artificially inflated during the Class Period; and

(e)    To what extent the members of the Class have sustained damages and the proper measure of damages.

223.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  However, there will be no difficulty in the management of this action as a class action.

224.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

225.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## X.    LOSS CAUSATION

226.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

227.    During the Class Period, Plaintiffs and the Class purchased Jiangbo securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

228.    On January 21, 2011, as discussed in paragraphs 47 to 57 above, the Company disclosed in a press release issued before the market opened that it had entered into the January 2011 Waiver Agreement with Pope with respect to the November 2007 and May 2008

Debentures. Under the terms of the January 2011 Waiver Agreement, delinquent interest and associated penalties were exchanged for common stock of the Company. The January 2011 Waiver Agreement further provided that the maturity date of the November 2007 Debentures was extended until February 28, 2011.

229.    In response, Jiangbo's shares declined 9.2% over the following two trading days, closing at $5.70 on January 24, 2011.

230.    On Friday, March 18, 2011, the Company disclosed in a Form 8-K filing released after the close of trading that Defendant Sung had resigned as CFO, to be effective on March 31, 2011, less than two weeks later, and that the Company had not identified a successor.

231.    In response, over the following two trading days, March 21-22, 2011, the Company's shares declined 8.0% and 3.0%, respectively, closing at $5.25 on March 22, 2011.

232.    On April 4, 2011, the Company disclosed in a press release issued before the market opened that it had engaged a new independent auditor to replace Frazer Frost. Such press release further disclosed that it had made its decision to engage a new auditor "following the notification by Frazer Frost that it did not intend to stand for re-appointment as the company's principal accountant for the next fiscal year."

233.    In response, the Company's shares declined 13.1% from the prior day's closing price, closing on April 4, 2011 at $3.85 per share.

234.    On May 23, 2011, the Company issued its delayed Form 10-Q for 3Q2011 after the close of the market. In the 3Q2011 Form 10-Q, the Company disclosed that it had failed to perform under the January 2011 Waiver Agreement and had defaulted on the November 2007 Debentures by failing to make the $3.5 million principal payment due on February 28, 2011, assertedly "due to its continued inability to transfer sufficient cash out of the PRC . . . ." Jiangbo

further disclosed that as a result, "it is likely that the sole holder of the November 2007 Debenture will institute legal proceedings against the Company to collect the amounts due under the November 2007 Debentures," which "would be materially adverse to the Company's ability to continue its business as it is presently conducted."

235.   In response, the Company's shares declined 8.8% the next trading day, closing on May 24, 2011 at $3.63 per share.

236.   In the morning of May 25, 2011, the Company held its quarterly earnings call to discuss its financial results for the third quarter of fiscal year 2011.  On the call, Defendant Jin addressed a caller's request that he "elaborate a little bit on the possibility of you guys filing for bankruptcy protection for the debt acquired in 2007 and 2008," referring to the November 2007 and May 2008 Debentures.

237.   In response, as reported through a translator, Jin replied that "the company is active negotiation and discussions with their note and debenture holders, and so far they have come out with some alternative solutions and they are trying to find a solution that is acceptable for all parties and he also mentioned that so far the management hasn't thought of the procedures of seeking bankruptcy protection."

238.   In response, over the following two trading days, the Company's shares declined 9.1% and 4.5%, respectively, closing at $3.15 on May 26, 2011.

239.   On May 27, 2011, at the close of the market, the Company issued a Form 10-Q/A for the third quarter of fiscal year 2011, amending the late-filed 3Q2011 Form 10-Q that it had issued just four days earlier.  The stated purpose of the amendment was "to include an additional footnote under Note 19 - Commitments and Contingencies that had been requested by our auditors prior to the Original Filing but had not been included in the Original Filing."

240.    The "Note 19" referenced in the introductory explanatory note in the 3Q2011 Form 10-Q/A for the first time disclosed the existence of the SEC investigation.

241.    The NASDAQ halted trading on the next trading day, May 31, 2011. Jiangbo's stock was thereafter delisted from the NASDAQ, and resumed trading on August 4, 2011 on the OTC Bulletin Board at $0.25, 92% below its last traded value on the NASDAQ.

## XI.    SCIENTER ALLEGATIONS

242.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Jiangbo, control over, and/or receipt and/or modification of Jiangbo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Jiangbo, participated in the fraudulent scheme alleged herein.

243.    Defendants' scienter is further established by the matters set forth below.

### A.    Defendants' Violations of Law

244.    Cao, Jin and Sung engaged in multiple violations of law in connection with the Audit Committee's investigation into the matters at issue in this Complaint.

245.    Section 10A(m)(5) of the Exchange Act (15 U.S.C. § 78j-1(m)(5)), as added by Section 301 of the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley"), provides that "[e]ach audit committee shall have the authority to engage independent counsel and other advisers, as it determines necessary to carry out its duties."

- 63 -

246.     Section 10A(m)(6)  of the Exchange Act (15 U.S.C. § 78j-1(m)(6)), as added by Section 301 of Sarbanes Oxley, provides in relevant part that "[e]ach issuer shall provide for appropriate funding, as determined by the audit committee, in its capacity as a committee of the board of directors, for payment of compensation . . . to any advisers employed by the audit committee under paragraph (5)."

247.     Under Section 607.1605(1) of the Florida Statutes, the director of a Florida corporation "is entitled to inspect and copy the books, records, and documents of the corporation at any reasonable time to the extent reasonably related to the performance of the director's duties as a director, including duties as a member of a committee . . . ."

248.     As discussed above in paragraphs 32 to 46, according to the members of the Audit Committee, they and their advisors repeatedly advised Defendants Cao, Jin and Sung of their legal obligations to provide full disclosure to the Audit Committee and to provide sufficient funding to pay its advisors.  Defendants, however, willfully refused to do so.

249.     Defendants' unlawful acts directly prevented the Audit Committee from discharging its obligations and resulted in the withdrawal of its advisors and resignation of its members.  Defendants' unlawful acts have further prevented disclosure regarding the true condition of the Company's business or the other matters that were the subject of investigation by the SEC and Audit Committee and are the subject of this Complaint.

**B.     Sarbanes Oxley Certifications**

250.     Scienter is further established by the Sarbanes Oxley certifications made by Defendants Jin, Sung and Sun during the Class Period.

251.     During the Class Period, Defendants Jin, Sung and Sun certified that they had designed sufficient disclosure controls and procedures to "ensure that material information"

concerning Jiangbo was made known to them.  Jin (with respect to each quarterly and annual

report filed by Jiangbo during the Class Period), Sung (with respect to Jiangbo's 2010 Form 10-

K and its 1Q2011 and 2Q 2011 Forms 10-Q), and Sun (with respect to Jiangbo's 3Q 2011 Form

10-Q), certified the following statements:

> 4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; . . . .

252.    The fact that the Company had materially misstated its financial condition

constituted "material information."  Defendants Jin, Sung and Sun therefore knew, or at a

minimum, were reckless in not knowing of such material misstatement.

### C.    CFO and Auditor Resignations

253.    Scienter is further established by the abrupt resignations of Sung, the Company's

CFO, and Frazer Frost, its independent auditor, within weeks of each other.

254.    Sung's departure was announced in a Form 8-K filing on Friday, March 18, 2011,

and disclosed that her resignation would be effective on March 31, 2011, just two weeks later.

The Company further announced that it had not identified a successor.

255.    Less than three weeks after Sung's planned departure was disclosed, the Company

announced that it had engaged a new independent auditor to replace Frazer Frost, "following the

notification by Frazer Frost that it did not intend to stand for re-appointment as the company's

principal accountant for the next fiscal year."

### D. GAAP and GAAS Violations

256.     Scienter is further supported by the violations of GAAP and GAAS described above.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

257.     The market for Jiangbo securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Jiangbo securities traded at artificially inflated prices during the Class Period. During the Class Period, on August 20, 2010, the Company's stock closed as high as $10.49 per share.

258.     Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Jiangbo securities and market information relating to Jiangbo, and have been damaged thereby.

259.     During the Class Period, the artificial inflation of Jiangbo stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jiangbo's financial performance and prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Jiangbo and its business, operations, and financial performance, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result

- 66 -

260.     At all relevant times, the market for Jiangbo securities was an efficient market for the following reasons, among others:

   (a)   Jiangbo stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

   (b)   As a regulated issuer, Jiangbo filed periodic public reports with the SEC and the NASDAQ;

   (c)   Jiangbo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   (d)   Jiangbo was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

261.     As a result of the foregoing, the market for Jiangbo securities promptly digested current information regarding Jiangbo from all publicly available sources and reflected such information in Jiangbo's stock price. Under these circumstances, all purchasers of Jiangbo securities during the Class Period suffered similar injury through their purchase of Jiangbo securities at artificially inflated prices and a presumption of reliance applies.

## XIII.  NO SAFE HARBOR

262.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

263.     The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Jiangbo who knew that the statement was false when made.

## COUNT ONE

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Jiangbo, the Individual Defendants, Frazer, Frost, and CFO Oncall

264.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

265.    During the Class Period, Defendants jointly and severally carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Jiangbo's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

266.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Jiangbo's securities in violation of Section 10(b) of

the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

267.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jiangbo's financial well-being and prospects, as specified herein.

268.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jiangbo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Jiangbo and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

269.    Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

270.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jiangbo's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

271.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jiangbo securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Jiangbo securities during the Class Period at artificially high prices and were damaged thereby.

272.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the SEC investigation and accounting and financial problems of the Company, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Jiangbo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

273.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

274.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

275.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants.

276.     The Individual Defendants acted as controlling persons of Jiangbo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiffs contend are false and misleading. The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

277.    In particular, each of these Defendants had direct and supervisory involvement in

the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same.

278.    As set forth above, Jiangbo and the Individual Defendants each violated either

Section 10(b) or Rule 10b-5, by their acts and/or omissions as alleged in this Complaint. By

virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful

conduct, Plaintiffs and other members of the Class suffered damages in connection with their

purchases of the Company's securities during the Class Period.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

B.       Awarding compensatory damages in favor of Plaintiffs and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.       Awarding Plaintiffs and the Class such other and further relief as the Court may

deem just and proper.

## XV.   <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: November 16, 2011

<div style="margin-left:50%">

_____/s/ Christopher S. Polaszek_____
Christopher S. Polaszek
(Fla. Bar No. 0116866)
**MILBERG LLP**
201 North Franklin Street, Suite 3200
Tampa, FL  33602
Telephone:  (813) 367-5713
Facsimile:  (561) 892-8164
E-mail:  cpolaszek@milberg.com

Kristi Stahnke McGregor
(Florida Bar No. 0732931)
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY  10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail:  kmcgregor@milberg.com

Ethan D. Wohl
(Florida Bar No. 982210)
**WOHL & FRUCHTER LLP**
570 Lexington Avenue, 16th Floor
New York, NY  10022
Telephone:  (212) 758-4000
Facsimile:  (212) 758-4004
E-mail:  ewohl@wohlfructer.com

</div>

*Attorneys for Lead Plaintiffs and the
Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to the email addresses indicated on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing via the methods described below to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div align="right">

*/s/ Christopher S. Polaszek*
Christopher S. Polaszek

</div>

<u>**MAILING INFORMATION FOR CASE 1:11-CV-22556-MGC**</u>

**Electronic Mail Notice List:**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Emily Cornelia Komlossy**
  ekomlossy@faruqilaw.com,ecf@faruqilaw.com,svernale@faruqilaw.com

- **Louise McAlpin**
  louise.mcalpin@hklaw.com,angel.barber@hklaw.com

- **Tracy Ann Nichols**
  tracy.nichols@hklaw.com,brenda.scott@hklaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

## <u>MANUAL NOTICE LIST</u>

### <u>VIA UPS:</u>

Linxian Jin
Jiangbo Pharmaceuticals, Inc.
25 Haihe Road
Laiyang Economic Development Zone
Laiyang City, Yantai, Shandong Province
People's Republic of China, CH 26520

Ziling Sun
Jiangbo Pharmaceuticals, Inc.
25 Haihe Road
Laiyang Economic Development Zone
Laiyang City, Yantai, Shandong Province
People's Republic of China, CH 26520

Wubo Cao
Jiangbo Pharmaceuticals, Inc.
25 Haihe Road
Laiyang Economic Development Zone
Laiyang City, Yantai, Shandong Province
People's Republic of China, CH 26520

Jiangbo Pharmaceuticals, Inc.
25 Haihe Road
Laiyang Economic Development Zone
Laiyang City, Yantai, Shandong Province
People's Republic of China, CH 26520

### <u>VIA UPS OVERNIGHT:</u>

Linxian Jin
Jiangbo Pharmaceuticals, Inc.
1133 South University Drive
Suite 210
Plantation, FL  33324

Ziling Sun
Jiangbo Pharmaceuticals, Inc.
1133 South University Drive
Suite 210
Plantation, FL  33324

Wubo Cao
Jiangbo Pharmaceuticals, Inc.
1133 South University Drive
Suite 210
Plantation, FL  33324

Jiangbo Pharmaceuticals, Inc.
1133 South University Drive
Suite 210
Plantation, FL  33324

Linxian Jin
Jiangbo Pharmaceuticals, Inc.
1643 Royal Grove Way
Weston, FL 33327

Ziling Sun
Jiangbo Pharmaceuticals, Inc.
1643 Royal Grove Way
Weston, FL 33327

Wubo Cao
Jiangbo Pharmaceuticals, Inc.
1643 Royal Grove Way
Weston, FL 33327

Jiangbo Pharmaceuticals, Inc.
1643 Royal Grove Way
Weston, FL 33327