UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-22556-CIV-COOKE/TURNOFF

In re JIANGBO PHARMACEUTICALS,                    <u>Class Action</u>
INC. SECURITIES LITIGATION

_____/

---

**MOTION BY DEFENDANT ELSA SUNG TO DISMISS THE CONSOLIDATED
AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

---

Tracy A. Nichols, Esq.
Louise McAlpin, Esq.
Stephen P. Warren, Esq.
HOLLAND & KNIGHT LLP
701 Brickell Avenue
Suite 3000
Miami, Florida 33131

## <u>TABLE OF CONTENTS</u>

INDEX OF EXHIBITS...........................................................................................................vii

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS....................................................................................................2

      Restrictions on the Transfer of Money Out of China.........................................3

      Jiangbo's Debt Issuances....................................................................................4

      Company Had Audited Financials with No Restatements..................................4

      SEC and Audit Committee Investigations.........................................................5

ARGUMENT........................................................................................................................7

I.      PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST SUNG FOR
PRIMARY LIABILITY UNDER SECTION 10(b)............................................................7

A.   Plaintiffs' Claims Lack the Necessary Particularity and Fail to Sufficiently Plead
Facts Demonstrating that the Challenged Statements Were False. .......................7

     1.   Plaintiffs' Claim that Jiangbo's Cash Balances Were Overstated Is Not Plead
with the Requisite Particularity. ...................................................................8

         (a)   *Jiangbo's Failure to Repay the 2007 and 2008 Debentures Does Not
Demonstrate that the Reported Cash Balances Were Inaccurate.* .........9

         (b)   *Jiangbo's Cash Balances were Reviewed and Certified as Part of the Audit
Process.*..................................................................................................12

     2.   Hilead Transaction Allegations Are Not Plead With The Necessary
Particularity To Support A Claim For Securities Fraud................................13

     3.   The Amended Complaint Fails to State a Claim Based Upon Overstated
Accounts Receivable. ...................................................................................15

B.   Sung Cannot Be Liable for any Post-Resignation Statements that She Did Not Make
and That Cannot be Attributed to Her. ...............................................................17

C.   Plaintiffs Have Not Pled Facts Giving Rise to a Strong Inference that Sung Acted
with Scienter. ......................................................................................................19

D.   The Only Compelling Inference That Can Be Drawn from the Facts Alleged in the
Amended Complaint is that Sung Did Not Act with Scienter.............................24

i

E.      The Amended Complaint Fails to Adequately Plead Loss Causation. ..................................27

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL
        PERSON LIABILITY AGAINST SUNG. ..........................................................................30

CONCLUSION...........................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ...............................................................................................21

*Berry v. Valence Tech., Inc.*,
   175 F.3d 699 (9th Cir. 1999) ...............................................................................................18

*Boilermakers Nat. Annuity Trust Fund v. WaMu Mortgage Pass Through Certificates,*
   *Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wash. 2010)..........................................................32

*Brown v. Enstar*,
   84 F.3d 39 (11th Cir. 1996)..................................................................................................31

*Bryant v. Avado Brands, Inc.*
   187 F.3d 1271 (11th Cir. 1999) ........................................................................................3, 7

*City of Austin Police Ret. Sys. v. ITT Educational Servs., Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ............................................................................18, 24

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................................................................................22

*City of New Orleans Employees' Retirement Sys. v. PrivateBancorp, Inc.*,
   No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011)....................................................17

*Cole v. Health Mgmt. Assocs., Inc.*,
   No. 2:07cv00484, 2009 WL 2713178 (M.D. Fla. July 17, 2009)......................................15, 25

*Druskin v. Answerthink*, Inc.
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...........................................................................24, 25

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................................27, 28

*Fait v. Regions Fin. Corp.*,
   655 F. 3d 105 (2d Cir. 2011)................................................................................................17

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) .........................................................................8, 10, 14, 23

*Genesee County Employees' Retirement Sys. v. Thornburg Mortgage Sec. Trust 2006–3*,
   No. CIV 09–0300 JB/KBM, 2011 WL 5840482 (D.N.M. Nov. 12, 2011) .............................32

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................................26

*Greenhouse v. MCG Capital Corp.,*
   392 F.3d 650 (4th Cir. 2004) .................................................................14

*Higginbotham v. Baxter Int'l Inc.,*
   495 F.3d 753 (7th Cir. 2007) ................................................................27

*Hubbard v. BankAtlantic Bancorp, Inc.*
   625 F. Supp. 2d 1267 (S.D. Fla. 2008) ..............................................3, 24

*In re Alpharma, Inc. Sec. Litig.,*
   372 F.3d 137 (3d Cir. 2004)..................................................................27

*In re Avista Corp. Sec. Litig.*
   415 F. Supp. 2d 1214 (E.D. Wash. 2005) .............................................30

*In re BISYS Sec. Litig.,*
   397 F. Supp. 2d 430 (S.D.N.Y. 2005).............................................20, 21

*In re Ceridian Corp. Sec. Litig.,*
   542 F.3d 240 (8th Cir. 2008) ................................................................24

*In re Constellation Energy Group, Inc. Sec. Litig.,*
   738 F. Supp. 2d 614 (D. Md. 2010) ......................................................32

*In re Corrpro Sec. Litig.,*
   No. 1:02CV1198, 2003 WL 23138459 (N.D. Ohio May 27, 2003).......21

*In re Dell Inc. Sec. Litig.,*
   591 F. Supp. 2d 877 (W.D. Tex. 2008)..................................................18

*In re Healthsouth Corp. Sec. Litig.,*
   No. CV-98-J-2634-S, 2000 WL 34211319 (N.D. Ala. Dec. 13, 2000) ...18

*In re Hutchinson Tech., Inc. Sec. Litig.,*
   536 F.3d 952 (8th Cir. 2008) ................................................................24

*In re Intelligroup Sec. Litig.,*
   527 F. Supp. 2d 262 (D.N.J. 2007) .......................................................22

*In re Manulife Fin. Corp. Sec. Litig.,*
   276 F.R.D. 87 (S.D.N.Y. 2011) .............................................................26

*In re Nvidia Corp. Sec. Litig.,*
   No. 08 08-CV-04260, 2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) .....21

*In re Paincare Holdings Sec. Litig.,*
   No. 6:06-CV-362, 2007 WL 1229703 (M.D. Fla. Apr. 25, 2007)...........28

iv

*In re Pegasus Wireless Corp. Sec. Litig.,*
No. 07-81113-CIV, 2009 WL 3055205 (S.D. Fla. Sept. 21, 2009)........................................18

*In re Radian Sec. Litig.,*
612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................22

*In re Ramp Networks, Inc. Sec.,*
201 F. Supp. 2d 1051 (N.D. Cal. 2002) ..................................................................18

*In re REMEC Inc. Sec. Litig.,*
702 F. Supp. 2d 1202 (S.D. Cal. 2010)....................................................................22

*In re Rexall Sundown, Inc. Sec. Litig.,*
No. 988798CIV, 2000 WL 33539428 (S.D. Fla. Mar. 29, 2000) .........................................10

*In re Sensormatic Elecs. Corp. Sec. Litig.,*
No. 018346, 2002 WL 1352427 (S.D. Fla. June 10, 2002) .................................................18

*In re Shoretel Inc. Sec. Litig.,*
No. C 08-00271, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009) .................................................16

*In re Smith Gardner Sec. Litig.,*
214 F. Supp. 2d 1291 (S.D. Fla. 2002) ..................................................................24

*In re Sportsline.com Sec. Litig.,*
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ......................................................21, 23, 31

*In re Sunstar Sec. Litig.,*
173 F. Supp. 2d 1315 (M.D. Fla. 2001) ...............................................................9, 19

*In re Sunterra Corp. Sec. Litig.,*
199 F. Supp. 2d 1308 (M.D. Fla. 2002)................................................................24, 25

*In re TECO Energy, Inc. Sec. Litig.,*
No. 8:04-CV-1948, 2006 WL 845161 (M.D. Fla. Mar. 30, 2006) .........................................28

*In re Thornburg Mortgage, Inc. Sec. Litig.,*
695 F. Supp. 2d 1165 (D.N.M. 2010) ....................................................................18

*In re Winn-Dixie Stores, Inc. Sec. Litig.,*
531 F. Supp. 2d 1334 (M.D. Fla. 2007).................................................................12

*Leder v. Shinfeld,*
No. 06-CV-1805, 2008 WL 2165097 (E.D. Pa. May 22, 2008).............................................26

*Malin v. Ivax,*
17 F. Supp. 2d 1345 (S.D. Fla. 1998), *aff'd,* 226 F.3d 647 (11th Cir. 2000).......................9, 19

*Meyer v. St. Joe Co.*,
    5:11-CV-27/RS-EMT, 2011 WL 3750324 (N.D. Fla. Aug. 24, 2011)...................................27

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ........................................................................................25

*New Equity Sec. Holders Comm. for Golden Gulf, Ltd. v. Phillips*,
    97 B.R. 492 (E.D. Ark. 1989) ..........................................................................................14

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ...........................................................................................25

*Teacher's Ret. Sys. of Louisiana v. Hunter*,
    477 F.3d 162 (4th Cir. 2007)............................................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................19, 24

*Thompson v. Relationserve Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) ....................................................................................13, 31

*Waterford Township General Employees Ret. Sys. v. BankUnited Fin. Corp.*,
    No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) .........................8, 10, 11, 14

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) .......................................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..........................................................................................22

## STATUTES

15 U.S.C. 78t(a) .........................................................................................................30

15 U.S.C. § 78u-4(b)(1) ...............................................................................................7

15 U.S.C. § 78u-4(b)(2) ............................................................................................7, 19

15 U.S.C. § 78u-4(b)(4) ...............................................................................................27

## INDEX OF EXHIBITS

| Document | Date Filed | Exhibit No. |
|---|---|---|
| Jiangbo Form 10-K | Sept. 28, 2010 | 1 |
| Jiangbo Form 8-K | June 12, 2008 | 2 |
| E. Sung Form 3 | Jan. 28, 2008 | 3 |
| Jiangbo Form 8-K | Mar. 18, 2011 | 4 |
| Jiangbo Form 10-Q | May 23, 2011 | 5 |
| Jiangbo Form 14A | May 31, 2011 | 6 |
| Jiangbo Form 8-K | Apr. 4, 2011 | 7 |
| Resignation Letter (Exh. A to Amended Complaint) | June 6, 2011 | 8 |
| Jiangbo Form 10-K | Sept. 28, 2009 | 9 |
| Jiangbo Form 8-K | June 7, 2011 | 10 |

Defendant Elsa Sung hereby moves to dismiss the Consolidated Amended Complaint ("Amended Complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

<u>**INTRODUCTION**</u>

This motion to dismiss is brought by Elsa Sung, who served as the chief financial officer ("CFO") of Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or the "Company") for part of the purported Class Period before resigning.  This securities fraud action attempts to hold Sung liable for allegedly actionable statements and conduct before and after her resignation.  It is founded almost exclusively on unsubstantiated allegations of purported accounting improprieties at Jiangbo that Plaintiffs have concocted from a resignation letter by two members of Jiangbo's board of directors.  However, not only have Plaintiffs failed to allege the necessary facts to support their claims, but the facts that are before this Court refute them.

The crux of Plaintiffs' allegations is that Jiangbo misled investors when it stated during the Class Period that it had cash in excess of $100 million.  Plaintiffs speculate that Jiangbo must have fraudulently inflated its cash numbers because the Company defaulted on its debt obligations and was slow to pay certain advisors to its audit committee.  Jiangbo warned investors, however, that it could have difficulty transferring cash out of China because of strict foreign exchange regulations imposed by the Chinese government, and that is what Jiangbo said caused it to miss its loan payments (not a lack of cash).  Whereas Plaintiffs rely solely on speculation, the facts are that: (a) Jiangbo received unqualified (*i.e.*, clean) audit opinions from an outside auditor on its financial statements (which included its cash balances); (b) Jiangbo has not restated any of its financial statements; and (c) Jiangbo did not have any reportable disagreements with its auditors over its financial statements.  Given these countervailing facts,

1

Plaintiffs' speculation that the Company misstated its cash position cannot support its fraud claim.

Because Plaintiffs rely heavily on the directors' resignation letter to try to show an actionable misstatement or omission, they cannot ignore it for loss causation purposes. The market reacted negatively, not to news that the Company misstated its cash position (because neither the Company nor its auditors ever made that announcement), but instead to the news in the resignation letter about the perceived lack of cooperation, after Sung's resignation as CFO, with an internal investigation. Thus, the Amended Complaint is also subject to dismissal for its failure to sufficiently plead loss causation.

## STATEMENT OF FACTS

Jiangbo is a Florida corporation with its principal place of business in the People's Republic of China ("China" or "PRC"). (Am. Compl. ¶ 2.) A holding company, Jiangbo does not itself conduct business; rather, it conducts its business through an affiliated entity, Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang"), a PRC company headquartered there. *Id.* ¶ 9. Laiyang researches, develops, manufactures, markets and sells pharmaceutical products and health supplements in the PRC.[1] *Id.* ¶ 11. Jiangbo began trading on the NASDAQ Global Market stock exchange in June 2010. *Id.* ¶ 5.

Because the Chinese government imposes strict limits on foreign ownership of companies in China, Jiangbo does not own Laiyang directly. Rather, Jiangbo substantially controls Laiyang through a series of contractual arrangements. *Id.* ¶¶ 114-17. As a result of its

---

[1] Although Laiyang is not a wholly-owned subsidiary of Jiangbo, Jiangbo's relationships with Laiyang and its shareholders are governed by a series of contractual arrangements primarily between two entities associated with Jiangbo's wholly-owned subsidiary, Karmoya: 1) Genesis Jiangbo Biotech Technologies Co., Ltd., Karmoya's wholly owned enterprise in the PRC; and 2) Laiyang, Karmoya's operating company in the PRC. Jiangbo's Form 10-K (Sept. 28, 2010) ("2010 10-K") at 4 (attached as Exh. 1). A diagram illustrating Jiangbo's corporate structure appears on page 27 of the Amended Complaint.

corporate structure, nearly all of Jiangbo's assets are located in China and its revenues are derived primarily from payments received from Laiyang.  The Chairman of Jiangbo's board of directors is Wubo Cao, who is also the founder and controlling shareholder of Laiyang.  *Id.* ¶ 71.

From October 2007 through March 2011, Sung served as the CFO of Jiangbo.   Initially she was on assignment from her then-employer, CFO Oncall, Inc., a firm that outsources CFO services, and then, as of June 2008, she became an employee of Jiangbo.  2010 10-K at 57; Form 8-K (June 12, 2008) (attached as Exh. 2).   Although Sung accounted for the Company's operations conducted in China and most of the Company's officers and employees were located in China, Sung's office and base of operations was in Broward County, Florida.  *See* Form 3 (Jan. 28, 2008) (attached as Exh. 3).[2]  On March 31, 2011, Sung resigned as CFO of Jiangbo due to family reasons and, thereafter, served only as a part-time consultant for the Company.  *See* Form 8-K (Mar. 15, 2011) (attached as Exh. 4).

**<u>Restrictions on the Transfer of Money Out of China</u>**

Almost all of Jiangbo's liquid assets were held in the Chinese currency, Renminbi ("RMB"), deposited in banks within the PRC.  *See* 2010 10-K at 46.  Throughout the Class Period, Jiangbo repeatedly advised investors that "the PRC has strict rules for converting RMB to other currencies and for movement of funds from the PRC to other countries."  Form 10-Q (May 23, 2011) at 36 (attached as Exh. 5).  *See also* 2010 10-K at 29 ("[T]he PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain circumstances, the remittance of currency out of China.").  The Company also warned investors that repatriating RMB to the United States to pay Jiangbo's obligations could be delayed or

---

[2] Although the Form 3 is not cited in the Amended Complaint, the Court may take judicial notice of SEC filings and consider them in ruling on this motion to dismiss.  *See Bryant v. Avado Brands, Inc.* 187 F.3d 1271, 1278 (11th Cir. 1999); *Hubbard v. BankAtlantic Bancorp, Inc.* 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008).  All of the exhibits attached to this Motion were either cited in the Amended Complaint or filed with the SEC.

thwarted entirely by the PRC government's "controls on the conversion of RMB into foreign currencies and the remittance of currencies out of China." *Id.* at 28. Jiangbo explained that "approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses . . . ." *Id.* at 29.

### Jiangbo's Debt Issuances

To raise capital, Jiangbo sold two convertible notes. First, the Company borrowed $5 million from Pope Investments, LLC ("Pope") in November 2007 (the "2007 Debentures"). (Am. Compl. ¶ 47). Second, the Company borrowed an additional $30 million from a group of investors that included Pope in May 2008 (the "2008 Debentures"). *Id.* ¶ 48. As Jiangbo had previously warned might occur, the Company subsequently experienced difficulty transferring cash out of the PRC to repay those debts. As a result, in December 2009 Jiangbo became delinquent on its interest payments. Form 10-Q (May 23, 2011) at 24. Pope, which was the sole holder of the 2007 Debentures and the majority holder of the 2008 Debentures, agreed to waive Jiangbo's default and to extend the due date on the 2007 Debentures until February 28, 2011. Pope also agreed to accept 886,277 shares of Jiangbo common stock (issued both to Pope and the minority holders of the 2008 Debentures) in exchange for the missed interest payments and the associated penalties. *Id.* at 24. Laiyang continued to experience difficulty, however, moving cash out of China and Jiangbo again became delinquent when it was unable to make the principal payments due on February 28, 2011 and May 30, 2011, respectively. *Id.* at 21, 24; Jiangbo Form 14A (May 31, 2011) at 12 (attached as Exh. 6).

### Company had Audited Financials with No Restatements

Throughout the time Sung was employed at Jiangbo, the accounting firm of Frazer Frost served as the Company's independent outside auditor. (Am. Compl. ¶¶ 89, 95.) Frazer Frost

issued unqualified audit opinions on Jiangbo's financial statements for fiscal years 2009 and 2010. *Id.* ¶ 95. Frazer Frost's year-end audit for fiscal year 2010 included a review and confirmation of the $108 million cash position that the Company had publicly reported. *See* 2010 10-K at 45, F-1. Jiangbo has not restated those, or any other, financial statements.[3]

In March 2011, Frazer Frost advised Jiangbo that it would not stand for re-appointment as the Company's independent auditor for the following fiscal year. (Am. Compl. ¶ 99.) In response, the Company retained a new auditor, Bernstein & Pinchuk, LLP, which, like Frazer Frost before it, did not publicly raise any concerns about the accuracy of the Company's financial statements. *See* Form 8-K (Apr. 4, 2011) (attached as Exh. 7).

**SEC and Audit Committee Investigations**

In December 2010, the Securities and Exchange Commission ("SEC") began an informal investigation into Jiangbo. (Am. Compl. ¶ 17.) In February 2011, Jiangbo's audit committee began its own investigation into the issues raised by the SEC ("Audit Committee investigation"). The audit committee retained Cadwalader Wickersham & Taft ("Cadwalader") and Ernst & Young (China) Advisory Limited ("E&Y") to assist as legal counsel and forensic accountants, respectively, in the investigation. *Id.* ¶ 26. In March 2011, the SEC advised the Company that it had begun a formal investigation. *Id.* ¶ 129. Just days later, on May 31, 2011, NASDAQ announced that it had halted trading in Jiangbo's common stock. *Id.* ¶ 22.

One week later, the audit committee suspended its investigation and its two independent members, Michael Marks and John Wang, resigned from the board of directors. *Id.* ¶ 23. Marks and Wang informed the Company in a resignation letter (the "Resignation Letter") that the Audit Committee investigation had been suspended because "the Company and those controlling and

---

[3] A restatement is a revision to correct a material error in a company's previous financial statements.

advising it" had failed to cooperate.  *See* Resignation Letter attached as Exh. A to Amended Complaint at 1 (attached as Exh. 8).  The Resignation Letter explained that Cadwalader and E&Y had requested various documents from the Company, but Chairman Cao had closely scrutinized the requests to ensure the confidentiality of proprietary documents and to keep the scope and cost of the investigation in check.  *Id.* ¶ 140.  Frustrated by the perceived lack of cooperation from Cao and the other employees in China, Marks and Wang interpreted Chairman Cao's oversight as impeding the investigation and the audit committee's independence.  As purported proof of the lack of cooperation, Marks and Wang alleged in the Resignation Letter that:

- various individuals, including Sung, refused to provide the audit committee with requested documents until they were authorized to release such documents by their superiors;

- the Company failed to timely make retainer and invoice payments to Cadwalader and E&Y and used unconventional methods when such payments were eventually made; and

- Chairman Cao refused to provide additional documents relating to an RMB 200 million payment by an unspecified party to Hilead Biotechnology, Ltd. ("Hilead") that, according to him, was "unrelated to Jiangbo" (the "Hilead Transaction").

*Id.*  After a two-month delay, Jiangbo's stock began to trade again in August 2011 on the over-the-counter Bulletin Board.  *Id.* ¶ 139.

This lawsuit was commenced in July 2011.  Lead Plaintiffs Christopher Brophy and Tara Lewis ("Plaintiffs") bring this action on their own behalf, and as a purported class action on behalf of all persons and entities who purchased Jiangbo stock from June 8, 2010 through May 31, 2011 (the "Class Period").  The Amended Complaint asserts claims under Section 10(b) against Jiangbo, certain officers of the Company, including Sung (the "Individual Defendants"), Frazer Frost, and CFO Oncall for alleged misstatements and omissions in public statements made by Jiangbo both while Sung was CFO and after her resignation.  Specifically, the Amended

Complaint alleges that while Sung was CFO, Jiangbo's cash balances were overstated, the Company failed to disclose the Hilead Transaction, and it improperly accounted for its accounts receivable.  The Amended Complaint also challenges certain public disclosures made after Sung resigned from her CFO post, including: the failure to timely disclose the Audit Committee and formal SEC investigations, as well as the lack of cooperation by Jiangbo's management with the Audit Committee investigation.  The Amended Complaint also asserts a Section 20(a) claim that attempts to hold the Individual Defendants vicariously liable for Jiangbo's primary violation.

<u>**ARGUMENT**</u>

I.    **PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST SUNG FOR PRIMARY LIABILITY UNDER SECTION 10(b).**

To state a securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934, a plaintiff must show: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; and (5) that proximately caused the plaintiff's injury. *Bryant,* 187 F.3d at 1281. Congress significantly heightened the pleading standards for Section 10(b) claims when it passed the PSLRA.  First, the plaintiff must identify "each statement alleged to have been misleading" and provide the specific reasons why each statement was misleading.  15 U.S.C. § 78u-4(b)(1).  Second, for each alleged misrepresentation or omission, the plaintiff must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.,* scienter]."  15 U.S.C. § 78u-4(b)(2).

A.    **Plaintiffs' Claims Lack the Necessary Particularity and Fail to Sufficiently Plead Facts Demonstrating that the Challenged Statements Were False.**

Plaintiffs have failed to support their Section 10(b) claim with the necessary facts or to state with the requisite level of particularity why each alleged misrepresentation or omission was false or misleading.

### 1.  Plaintiffs' Claim that Jiangbo's Cash Balances Were Overstated Is Not Plead with the Requisite Particularity.

Plaintiffs' primary claim is that Sung and the other Defendants are liable for securities fraud because Jiangbo publicly overstated its cash position throughout the Class Period.  *See, e.g.*, Am. Compl. ¶¶ 148-51; 153-58; 160-65; 167-70.   Plaintiffs have no concrete facts, however, to support this claim.  Instead, they speculate that Jiangbo's cash balances must have been overstated because, if the Company had the "cash reserves . . . on hand" that it reported, it would not have defaulted on the 2007 and 2008 Debentures.  *Id.*  ¶ 49.

Plaintiffs' sketchy allegations are insufficient to support a claim for securities fraud because they fail to provide the necessary particulars to substantiate their claim or to demonstrate why the reported cash balances were inaccurate.   *See, e.g., Waterford Township General Employees Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *12 (S.D. Fla. Mar. 30, 2010) (dismissing securities class action where "Plaintiffs entirely neglect to raise any specific facts from which [the Court] could find that the particular claims asserted by Defendants, and exhaustively recited in Plaintiffs' Complaint, were false").   Nowhere does the Amended Complaint include the following required details about the supposedly misstated cash balances: (i) the amount by which each of the reported cash balances was purportedly overstated; (ii) whether the amount of the overstatements was material; (iii) who authorized or participated in the overstatements; or (iv) whether Sung knew about the overstatements and, if so, how she knew.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (finding that to withstand dismissal of a Section 10(b) claim "the circumstances of the fraud [must be] pled in detail.  This means the who, what, when where, and how: the first paragraph of any newspaper story.") (internal quotations omitted).  Thus, the Section 10(b) claim founded upon the supposed overstatement of cash balances is not substantiated with the particularity mandated by the

8

PSLRA.  *See, e.g., Malin v. Ivax*, 17 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998) (finding that plaintiffs failed to adequately plead fraud claim merely by alleging the existence of an undisclosed "massive practice of shelf-stock adjustments on numerous pharmaceutical products," because the complaint was devoid of facts showing that the practice existed, specifying which products and customers were affected, the amount of the inventory adjustments, or the extent to which the adjustments affected Ivax's financial projections), *aff'd*, 226 F.3d 647 (11th Cir. 2000); *In re Sunstar Sec. Healthcare Litig.*, 173 F. Supp. 2d 1315, 1319 (M.D. Fla. 2001) (dismissing securities fraud claim premised on a supposed scheme to "reject and delay" legitimate medical claims because plaintiffs "failed to quantify the number of claims affected by such a policy, the dollar amount of claims delayed or unpaid, or the extent to which the practice affected the company's reported financial results").

       (a)      *Jiangbo's Failure to Repay the 2007 and 2008 Debentures Does Not Demonstrate that the Reported Cash Balances Were Inaccurate.*

Even if Plaintiffs could quantify the amount of the cash overstatements, their claim is still fatally flawed because it is devoid of the necessary facts to show why the reported cash balances were false.  According to Plaintiffs' theory, the Company misled investors when it stated throughout the Class Period that it was unable to make timely payments on the 2007 or 2008 Debentures "due to its inability to transfer sufficient cash out of the PRC."  2010 10-K at 21.  To reach that conclusion, Plaintiffs improperly assume that the Company must not have had the cash on hand that it reported in public filings because, according to their oversimplification of Chinese law, "there is simply no basis for the Company to assert that China's foreign exchange restrictions caused it to default on its payment obligations under the November 2007 Debentures and May 2008 Debentures."  (Am. Compl. ¶ 56.)

Notably, Plaintiffs cite to no internal document, opinion letter, or confidential witness account indicating that Jiangbo: could have, prior to the defaults, legitimately transferred money out of China to pay its obligations on the 2007 and 2008 Debentures; or did not have the reported cash balances on hand.  Without these types of particulars, their allegations amount to nothing more than unsubstantiated speculation that cannot withstand dismissal. *Garfield,* 466 F.3d at 1265 ("It is well established that claims of securities fraud cannot rest on speculation and conclusory allegations.") (internal quotations omitted); *BankUnited Fin. Corp.,* 2010 WL 1332574, at *11-12 (in granting motion to dismiss securities fraud, court refused to accept unwarranted inferences of falsity of challenged statements); *In re Rexall Sundown, Inc. Sec. Litig.*, No. 988798CIV, 2000 WL 33539428, at *3 (S.D. Fla. Mar. 29, 2000) (dismissing securities class action where complaint "fails on the issue of *why* the statements are false and misleading").

In support of their contention that China's foreign exchange restrictions did not prevent Jiangbo from repaying the Debentures, Plaintiffs allege that in August 2008 China adopted the Revised Regulations on the Administration of Foreign Exchange on August 5, 2008 ("Revised Regulations").  Plaintiffs contend that the Revised Regulations "relax[ed] the rules controlling the outflow of foreign exchange" and that if "relevant foreign exchange registrations are complied with," a domestic resident is allowed to "remit profits offshore."  (Am. Compl. ¶¶ 54-55.)

The Revised Regulations to which Plaintiffs cite relaxed only the foreign exchange registration and approval requirements for "current account items;" they did <u>not</u> relax the regulations for "capital account items."[4]  Because Jiangbo (the holding company) "did not have

---

[4] Under Chinese law, the inflow and outflow of foreign exchange is subject to strict administrative controls.  These

any assets or conduct any business operations," the money raised by the sale of Debentures could not have entered into China as current account items.  *See* 2010 10-K at 28.  Instead, the Debenture funds would have constituted capital account items that, contrary to Plaintiffs' contention, were subject to the strict foreign exchange controls and registration requirements. *See, e.g.,* 2010 10-K at 29 (disclosing that "approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses . . . .") (emphasis added).  Moreover, although Plaintiffs are correct that corporate profits may, under certain circumstances, be transferred out of China to a special purpose company, Plaintiffs have failed to demonstrate that Jiangbo's reported cash on hand qualified as distributable profits that could have been legally remitted offshore to pay the interest and principal owed on the Debentures.  Under Chinese law, cash on hand may be distributed as profits only after any losses and statutory common reserves are paid, two contingencies that Plaintiffs have not alleged were satisfied.  *See* Article 167 of the Company Law as amended by the Standing Committee of the National People's Congress October 27, 2005 and effective January 1, 2006.

The claims founded upon the alleged overstatement of Jiangbo's cash balances are premised on unsubstantiated speculation and must be dismissed as a matter of law for the failure to sufficiently demonstrate why those balances were false.[5]  *See BankUnited Fin. Corp.,* 2010

---

administrative controls are divided into "current account" and "capital account" controls.  *See* Chapters 2 and 3 of the Revised Regulations.  A current account item is a transactional item which is of a recurrent nature and typically involves payments for goods or services.  A capital account item consists of items such as paid-in capital, loans, and securities investments.  *See* Article 52 of the Revised Regulations.  Although the Chinese government has relaxed the requirements for current account foreign exchange, the inflow and outflow of capital account foreign exchange remain subject to strict controls that require registration with, and approval from, the relevant foreign exchange authorities.  *See* Articles 16, 18 and 22 of the Revised Regulations.

[5] Likewise, Plaintiffs fail to substantiate their theory that the "manner and timing of the Company's payments to the Audit Committee's advisers . . . raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary

WL 1332574, at *13 (finding that complaint "failed to properly allege the falsity of Defendants' statements regarding the Company's recipe for underwriting conservatism"); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1346 (M.D. Fla. 2007) (dismissing securities class action where complaint "failed to explain exactly why [the challenged] statements are false").

> *(b)      Jiangbo's Cash Balances were Reviewed and Certified as Part of the Audit Process.*

Not only is Plaintiffs' theory premised on improper speculation, it is belied by the fact that Jiangbo's cash balances were audited by an independent auditor.  For fiscal years 2009 and 2010, Frazer Frost audited Jiangbo's year-end financial statements and determined that they "present fairly, in all material respects, the consolidated financial position . . . and the consolidated results of its operations and its cash flows . . . in conformity with accounting principles generally accepted in the United States of America."  2009 Form 10-K (Sept. 28, 2009) ("2009 10-K") at F-1 (attached as Exh. 9); 2010 10-K at F-1.

Verifying a company's cash position is one of the most basic components of an audit, and auditors are required under the professional rules governing auditor conduct to do so without blindly relying on statements from management.  *See, e.g.,* Codification of Accounting Standards and Procedures, Statement of Auditing Standards No. 106, §18; Statement of Auditing Standards No. 67.  It is also fairly simple to verify a company's cash position.  Unlike other entries in a financial statement that are based on subjective estimates or assumptions, a company's reported

---

costs related to the [audit committee's] internal investigation."  (Am. Compl. ¶ 29.)  (quoting Resignation Letter). The fact that Jiangbo was slow to pay advisors who it thought were improperly expanding the scope of the investigation, or paid them from an account that had not been previously disclosed to them, does not demonstrate that the Company's audited financials were false.  Even assuming an expansive interpretation of the Resignation Letter it, at most, only questions the veracity of banking information provided to the advisors, not the Company's audited financial statements that are challenged in the Amended Complaint.  *See* Resignation Letter, at 21-22.

cash is an easily verifiable asset that either exists in a bank account or does not.[6]  So if, as Plaintiffs suggest, Jiangbo did not have the cash that it reported in its financial statements, Frazer Frost certainly would not have issued the unqualified audit opinions for the Company's 2009 and 2010 financials.  Accordingly, Plaintiffs' theory, founded upon the alleged overstatement of cash balances, is fatally undermined by the record facts and fails to support a cognizable claim for securities fraud.[7]

### 2.   Hilead Transaction Allegations Are Not Plead With The Necessary Particularity To Support A Claim For Securities Fraud.

The Amended Complaint also attempts to state a Section 10(b) claim based upon Jiangbo's failure to disclose the Hilead Transaction.  (Am. Compl. ¶¶ 152, 159, 172.)  Like the cash balance allegations, the Hilead Transaction allegations are short on critical facts.  To support their claim that Sung and the other Defendants committed securities fraud by failing to disclose the Hilead Transaction, Plaintiffs rely only on the Resignation Letter's vague reference to a request by E&Y in the Audit Committee investigation for documents relating to an RMB 200 million transfer to Hilead.  *Id.* ¶ 28.

To state a claim founded upon an omission, Plaintiffs must establish that the omitted information was material and that it consisted of information that the Defendants had a duty to disclose.  *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 681 (11th Cir. 2010)

---

[6] To verify a company's cash position, auditors routinely obtain third party confirmations of account balances from financial institutions.  *See, e.g.,* AU Section 330.05 (describing the confirmation process).  Plaintiffs here have alleged no facts to suggest that Frazer Frost did not obtain such third party confirmations in its audits of Jiangbo.

[7] Jiangbo's successful operations in China, which generated RMB which translate to $17 million, $62.9 million and $20.2 million in 2008, 2009 and 2010, respectively, further support the significant cash balances reported by the Company.  As part of its operations, Jiangbo paid third parties in China from its cash on hand for raw materials, research and development, sales commissions, and marketing and advertising services. 2010 10-K at 40-42.  The Company also paid the equivalent of $17 million in RMB to acquire rights to use land in its business.  *Id.* at 45.  That Jiangbo had the cash on hand to make these substantial payments in China further supports the legitimacy of the significant cash balances the Company reported during the Class Period.

("Under the plain language of Rule 10b-5, for the omission of a material fact to be actionable, there must have been a duty to disclose the fact.").  The paucity of information alleged here fails to provide even the most basic facts about the Hilead Transaction, much less establish that the omitted information was material and had to be disclosed.

For example, the Amended Complaint does not even hint at when the Hilead Transaction occurred.  Because there is no allegation that the transaction occurred before or during the Class Period, it is improper to assume that Defendants had a duty to disclose it in the challenged statements.  *See Garfield,* 466 F.3d at 1263 (affirming dismissal of securities fraud action in part because complaint "[did] not specify when the improper accounting occurred."); *BankUnited Fin. Corp.*, 2010 WL 1332574, at *12 (finding that plaintiffs failed to allege an actionable omission where they did not specify how the omitted fact was material or how it misled them). In addition, there are no well-plead allegations in the Amended Complaint identifying critical facts that would impact the materiality of the statement or any corresponding duty to disclose such as who authorized the Hilead Transaction, who made the transfer to Hilead, or whether Jiangbo was a party to the Hilead Transaction.  Without these basic facts, Plaintiffs' securities fraud claim founded upon Defendants' failure to disclose the Hilead Transaction fails as a matter of law.[8]  *See Garfield*, 466 F.3d at 1265; *BankUnited Fin. Corp.*, 2010 WL 1332574, at *12.

---

[8] Plaintiffs also attack a disclosure by Jiangbo in some unspecified SEC filing that Sung was a licensed CPA in Georgia.  They claim the disclosure is contradicted by an unidentified public record indicating that Sung's Georgia license expired in 2009.  (Am. Compl. ¶ 73.)  However, Plaintiffs do not allege that the licensing disclosure is an actionable misstatement under Section 10(b), nor could they because the change in Sung's CPA status is immaterial as a matter of law.  *See Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 658 (4th Cir. 2004) (finding alleged misrepresentation regarding the CEO's educational background was not material); *New Equity Sec. Holders Comm. for Golden Gulf, Ltd. v. Phillips,* 97 B.R. 492, 496 (E.D. Ark. 1989) (finding alleged misrepresentation regarding executive's educational background was immaterial).

3.      **The Amended Complaint Fails to State a**
        **Claim Based Upon Overstated Accounts Receivable.**

Notwithstanding that Jiangbo received clean audit opinions and has not restated its financial statements, Plaintiffs contend that Sung overstated the value of the Company's accounts receivable in the 2010 10-K by intentionally understating the Company's offsetting allowance for doubtful accounts. (Am. Compl. ¶¶ 187-91.)  In support of their contention, Plaintiffs cite to a June 2011 analyst report which noted a reduction in the pace of the Company's collections and that its collections were at a slower rate than its competitors ("Analyst Report").  Plaintiffs allege that Jiangbo ignored the "unfavorable collection trend" referenced in the Analyst Report and decreased, rather than increased, its allowance for doubtful accounts.  *Id.* ¶ 190.  These allegations are fatally deficient because they too lack the particularity required by the PSLRA and are based on an inaccurate premise.[9]

To demonstrate that the accounts receivable balance was overstated, Plaintiffs must present particular facts showing that the accounts reflected in the balance were either non-existent or not collectible, and they must quantify the amount of the overstatement.  *See, e.g., Cole v. Health Mgmt. Assocs., Inc.*, No. 2:07cv00484, 2009 WL 2713178, at *7 (M.D. Fla. July 17, 2009) (noting that "the complaint must include details about when and to what level the accounts receivable should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts were uncollectible" to prove that statements of reserve amounts are fraudulent) (internal quotations omitted).  Neither

---

[9] Plaintiffs also seek to impose liability based on a disclosure in the Company's Form 10-Q for the period ending March 31, 2011 (Exh. 5) which included a typographical error noting that the accounts receivable were reduced by "accumulated depreciation," rather than "allowance for doubtful accounts."  (Am. Compl. ¶ 188.)  Although it is unlikely that the immaterial error could support a securities fraud claim against anyone who authorized or was responsible for that filing, Sung cannot possibly be liable for it because she did not sign the filing and was not an officer of the Company when it was filed on May 23, 2011.  *See* Form 10-Q (May 23, 2011); Section I.D *supra.*

the Amended Complaint nor the Analyst Report includes this requisite detail.  Neither gives any indication of the amount of any supposed accounts receivable overstatement, nor do they include any facts, such as a contemporaneous document or a witness account, indicating that any of the accounts were fictitious or that the Company failed to properly write off any uncollectible receivable.[10]  Thus, the Amended Complaint's general allegations fall well short of satisfying the PSLRA's particularity pleading standards.  *Id.* at *5-8 (dismissing securities fraud class action alleging the company understated account receivable reserve; complaint failed to allege facts showing the reported figures differed from its actual bad debt experience);  *In re Shoretel Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 WL 248326, at *4 (N.D. Cal. Feb. 2, 2009) (dismissing Securities Act claim for failure to adequately plead facts showing why the allowance for doubtful accounts was misstated).

In addition to lacking the necessary particulars, Plaintiffs' claim is also founded on a factually incorrect premise -- that the Company "decreased its allowance for doubtful accounts instead of increasing it."  (Am. Compl. ¶ 189.)  Contrary to Plaintiffs' claim, Jiangbo actually increased its allowance for doubtful accounts in fiscal year 2010 by more than 93% over the prior year.[11]  *See* 2010 10-K at F-13 (allowance increased from $694,370 in 2009 to $1,343,421

---

[10] The Analyst Report's observation that the Company was collecting its accounts receivable, albeit at a slower pace than its competitors, actually undermines, rather than supports, Plaintiffs' claim because it demonstrates that the accounts were not uncollectible, but were merely slow pay accounts.  Moreover, the Company's favorable collection trend in the nine months following June 30, 2010 refutes any suggestion that the challenged accounts were fictitious or that the Company should have written off more accounts as uncollectible.  By March 31, 2011, the Company's accounts receivable balance declined by almost $13 million.  *Compare* 2010 10-K at F-2 (reflecting $33.2 million in accounts receivable) *with* 3Q 2011 Form 10-Q (May 23, 2011) at 3 (reflecting $20.8 million in accounts receivable).  During the same time period, the allowance for doubtful accounts decreased by approximately $600,000.  *Compare* 2010 10-K at F-2 (reflecting a $1.3 million allowance) *with* 3Q 2011 Form 10-Q at 3 (reflecting a $737,268 allowance).  Thus, in the months following the 2010 10-K that Plaintiffs allege included overstated accounts receivable, Jiangbo collected many of the aged accounts receivable that had been on its books.  *See* 3Q 2011 Form 10-Q (May 23, 2011) at 6 (statement of cash flow showing a $14 million increase in cash from the increase in accounts receivable and decline in allowance).

[11] The increase in the allowance for doubtful accounts outpaced the increase in the Company's accounts receivable over the same period.  *See* 2010 10-K at F-2 (reflecting only 73% increase in accounts receivable from 2009 to

in 2010).  Because Plaintiffs' contention that Jiangbo "intentionally understated its allowance for doubtful accounts" is undermined by the facts properly before this Court, and the Amended Complaint fails to adequately substantiate its allegations that the Company's accounts receivable were overstated by some undisclosed amount, this Court should dismiss any claim founded upon those allegations.[12]

### B. Sung Cannot Be Liable for any Post-Resignation Statements that She Did Not Make and That Cannot be Attributed to Her.

Plaintiffs also try to pin liability on Sung for challenged statements made after she resigned as the Company's CFO on March 31, 2011 ("Post-Resignation Statements").  (Am. Compl. ¶¶ 173-78).  However, Sung cannot be held liable for the Post-Resignation Statements because she did not make them and they cannot be attributed to her.

Although a plaintiff may, under certain circumstances, impute false and misleading statements that appear in a company's public filings, press releases, or other "group published" information to corporate officers who are presumed to be involved in a company's day to day affairs, no such presumption applies to part-time consultants, such as Sung, who are not responsible for the preparation or communication of any group published information.  *See In re*

---

2010).

[12] Even if Plaintiffs were able to get their facts straight, they would not be able to state a claim based on the subjective allowance account estimates unless they demonstrated that the estimates lacked any reasonable basis and were not genuinely believed when they were made.  *See, e.g., Fait v. Regions Fin. Corp.*, 655 F. 3d 105, 112-113 (2d Cir. 2011) (affirming dismissal of claim premised on allegedly understated loan loss reserves because reserves were opinions which were not sufficiently alleged to be objectively and subjectively false); *City of New Orleans Employees' Retirement Sys. v. PrivateBancorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *4 (N.D. Ill. Nov. 3, 2011) (holding that determinations regarding loan loss reserves are "actionable only if they lacked any reasonable basis and were not genuinely believed.").  The Company explained in its public filings that the estimation process for determining the allowance for doubtful accounts was subjective and was based on estimates.  *See* 2010 10-K at F-13.  The Amended Complaint's general allegations, which quibble with management's assessment of the allowance for doubtful accounts, amount to, at most, a difference of opinion which courts have repeatedly held do not support a claim for securities fraud.  *See, e.g., PrivateBancorp, Inc.*, 2011 WL 5374095, at *4 (dismissing securities fraud claim founded upon alleged misstatement of loan loss reserves because complaint did not "plead facts demonstrating that any particular collectability or reserve decisions were not reasonably based and believed in good faith at the time.").

*Pegasus Wireless Corp. Sec. Litig.,* No. 07-81113-CIV, 2009 WL 3055205, at *8  (S.D. Fla. Sept. 21, 2009) (refusing to attribute challenged statement to officer that was not made by him and which was made after his announced retirement from the company); *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346-CIV-HURLEY, 2002 WL 1352427, at *4 (S.D. Fla. June 10, 2002) (group published doctrine applies "to all <u>inside</u> corporate officers and directors, who are presumed to have knowledge of and involvement in the day to day affairs of the company."); *see also In re Healthsouth Corp. Sec. Litig.*, No. CV-98-J-2634-S, 2000 WL 34211319, at *46 (N.D. Ala. Dec. 13, 2000) (group pleading doctrine is "limited in scope" and applies "only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions") (citations omitted).  Accordingly, the Section 10(b) claim against Sung founded upon the Post-Resignation Statements, should be dismissed as a matter of law for failure to sufficiently plead any actionable statement by her.[13]  *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 707 (9th Cir. 1999) (affirming dismissal of claims against former officer "to the extent they are based on alleged misstatements made after his resignation"); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1078 (N.D. Cal. 2002) ("Because [defendant] was not an officer of [the company] at the time the statements were made, the group published information doctrine cannot apply.").

---

[13] Plaintiffs' contention that the Post-Resignation Statements are actionable because they did not disclose the Audit Committee, or the formal SEC, investigation, is likewise unfounded.  (Am. Compl. ¶ 178.)  A duty to disclose is generally triggered by a statutory obligation or because the omitted fact was necessary to render a preexisting statement not misleading.  There is no statute or SEC regulation requiring the disclosure of these types of investigations.  *See, e.g., In re Thornburg Mortgage, Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1209 (D.N.M. 2010) (holding that failure to disclose NYSE investigation was not actionable under Section 10(b)); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 912 n.4 (W.D. Tex. 2008) (dismissing securities fraud action where plaintiffs failed to cite to any statute imposing a duty to disclose an SEC investigation); *City of Austin Police Ret. Sys. v. ITT Educational Servs., Inc.*, 388 F. Supp. 2d 932, 945-46 (S.D. Ind. 2005) (finding no Section 10(b) liability for a company's failure to disclose a government investigation).  Nor have Plaintiffs pointed to any affirmative representation in the Post-Resignation Statements that was supposedly rendered misleading by the challenged non-disclosure.  Thus, they cannot sustain a claim against Sung, or any other defendant, for a Section 10(b) violation for the failure to earlier disclose the Audit Committee, or the formal SEC, investigation.

### C.     Plaintiffs Have Not Pled Facts Giving Rise to a Strong Inference that Sung Acted with Scienter.

One of the key provisions of the PSLRA concerns pleading the element of scienter, which is the mental state under Section 10(b) that embraces an intent to deceive, manipulate or defraud.  Scienter has been defined narrowly in the Eleventh Circuit as acting "knowingly or in a severely reckless manner."  *In re Sunstar,* 173 F. Supp. 2d at 1318-19 (quotation omitted); *see also Malin*, 17 F. Supp. 2d at 1357.  "Severe recklessness," which is the minimum that a plaintiff must plead, is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but "an extreme departure from the standards of ordinary care [such that] . . . the defendant must have been aware of [the fraud]."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation omitted).  When Congress passed the PSLRA, it heightened the standard for pleading scienter by mandating that "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  To satisfy the "strong inference" requirement, the facts alleged in the complaint must give rise to a "persuasive, effective, and cogent" inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Plaintiffs have failed to plead facts that give rise to a strong inference that Sung acted with scienter.  In a section labeled "Scienter Allegations," the Amended Complaint asserts that the Defendants' requisite mental state is established by: (1) Defendants' violations of law; (2) the Sarbanes-Oxley certifications; (3) the resignation of Sung and Frazer Frost; and (4) violations of GAAP and GAAS.  *See* Am. Compl. § XI.  As explained below, these allegations do not give rise to a persuasive, effective, and cogent inference that Sung knowingly, or with severe

19

recklessness, intended to defraud Jiangbo's investors.   If anything, the allegations in the Amended Complaint taken as a whole give rise to a competing inference that Sung did not act with scienter.

While the Amended Complaint alleges that Sung violated certain Federal and Florida statutes when she responded to the requests by the audit committee's advisors for documents, Sung submitted her resignation letter before the audit committee or its advisors requested any documents from her and therefore was not an employee at the time of the requests.[14]   Even if she had still been an employee, Plaintiffs have not adequately alleged that Sung violated the statutes by informing E&Y that the Company had not authorized her to turn over any documents and that Jin, the Company's Chief Executive Officer, had specifically instructed her not to produce any documents to E&Y until further notice.   In fact, Sung later informed Cadwalader that "she had no objections" to turning over documents that had been requested from her, but the Company had not given her authorization to do so.   *See* Exh. 99.4 to Jiangbo Form 8-K, at 15 (June 7, 2011) (attached as Exh. 10).   When the Company subsequently gave Sung authorization to produce the documents, she informed Cadwalader that she had received authorization and she began to make arrangements for an examination and review of the documents.   *See id.* at 17.   No scienter can be inferred from her conduct.

Plaintiffs also contend that scienter may be inferred from Sung's and Frazer Frost's "resignations," but Plaintiffs have not alleged any facts that establish a connection between Sung's departure and the alleged fraud.   *See, e.g., In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430,

---

[14] Plaintiffs appear to be confused about the timing of Sung's resignation and the document requests.   Plaintiffs allege in the Amended Complaint that by not turning over documents to E&Y, "Sung's actions as CFO effectively stymied the investigation."  (Am. Compl. ¶ 41.)   According to the Resignation Letter, however, E&Y made its first request for information to Sung on May 5, 2011, which was more than one month <u>after</u> the effective date of her resignation as CFO.   *See* Resignation Letter at 6.   Thus, Sung was a former employee when she received the request.

446 (S.D.N.Y. 2005) (finding no strong inference of scienter because "Plaintiffs . . . alleged no facts linking the resignation of [individual defendants] to the accounting improprieties at [the company]."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (holding that resignation of key employees in conjunction with a number of other allegations was insufficient to demonstrate a strong inference of scienter); *In re Corrpro Sec. Litig.*, No. 1:02CV1198, 2003 WL 23138459, at *5–6, (N.D. Ohio May 27, 2003) (finding no inference of scienter from departure of four CFOs when complaint did not establish any connection between job turnover and company's problems).  Most notably, the Amended Complaint does not allege that Sung was forced to resign because of accounting improprieties.  *See In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1172 (S.D. Fla. 2004) (holding that plaintiffs failed to allege facts indicating that defendants resigned because they knew about or approved any misconduct on the part of other employee).

As courts have recognized, a resignation by a corporate officer does not give rise to an inference of scienter because "[i]n reality, there are any number of reasons that an executive might resign, most of which are not related to fraud." *BISYS Sec. Litig.*, 397 F. Supp. 2d at 446. Such was the case here.  When Jiangbo announced Sung's resignation, the Company explained that Sung was resigning "due to family reasons."  *See* Jiangbo Form 8-K (Mar. 18, 2011) (Exh. 4).  This was confirmed in Sung's resignation letter, which was filed as an exhibit with the SEC. *See* Exh. 99.1 to Jiangbo Form 8-K (Exh. 4).  The Company also explained that "[t]here were no disagreements between Ms. Sung and the Company on any matter relating to the Company's operations, policies or practices, which resulted in her resignation," and that Sung would continue to work with the Company as a consultant on a part-time basis.  *Id.*  These facts do not permit any inference of scienter.  *See In re Nvidia Corp. Sec. Litig.*, No. 08-CV-04260, 2010 WL

4117561, at *11 (N.D. Cal. Oct. 19, 2010) (finding that resignation did not support scienter where individual stayed on as interim CEO following resignation).

Likewise, Frazer Frost's "resignation" does not support an inference of scienter. In the absence of facts linking an auditor's resignation to an accounting fraud, courts consistently have found that an auditor's resignation is insufficient to support an inference of scienter. *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 348–49 (D.N.J. 2007). Here, Frazer Frost did not even resign as Plaintiffs suggest; rather, it informed Jiangbo that it would not stand for reappointment as the Company's principal accountant for the next fiscal year. This does not support an inference of scienter.[15] *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 621 (E.D. Pa. 2009) ("Deloitte's decision to decline reappointment as Radian's auditor is also not evidence of conscious misbehavior or recklessness.").

The Amended Complaint posits that scienter may be inferred from the fact that Sung and Frazer Frost resigned "within weeks of each other" in March 2011. (Am. Compl. ¶ 253.) The timing was not, however, suspicious. Frazer Frost merely informed the Company that it would not stand for reappointment for the next fiscal year. Thus, Frazer Frost informed Jiangbo several

---

[15] Plaintiffs do not provide any information to suggest that Frazer Frost declined to stand for reappointment because of accounting irregularities on Jiangbo's part. In fact, Jiangbo explained that Frazer Frost's decision was not due to any disagreement over the Company's accounting treatment and that "(i) there were no disagreements with [Frazer Frost] on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements, if not resolved to [Frazer Frost]'s satisfaction, would have caused [Frazer Frost] to make reference in connection with its opinion to the subject matter of the disagreement, and (ii) there were no 'reportable events,' as that term is described in Item 304(a)(1)(v) of Regulation S-K." Jiangbo Form 8-K (Apr. 4, 2011) (Exh. 7). Given these circumstances, Frazer Frost's decision not to stand for re-appointment does not support an inference of scienter. If anything, it supports a competing inference of non-scienter. *See City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) (finding that E&Y's resignation could not support inference of scienter because E&Y signed letter noting that there were no disagreements between it and the company); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1255 (S.D. Cal. 2010) (finding no inference of scienter because E&Y's resignation shortly after issuing clean audit opinion "cannot be used to infer Defendants made financial statements with an intent to defraud").

months before the Company's July 1st fiscal year start date that it would not stand for reappointment.  Sung, on the other hand, resigned her position as CFO for family reasons, but continued to work with the Company as a part-time consultant.  Thus, the timing of her announcement is not circumspect.

Plaintiffs further allege that scienter is established by the fact that Sung signed Sarbanes-Oxley certifications during the Class Period attesting that the Company had adequate internal controls.  (Am. Compl. ¶ 250.)  However, in *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267 (11th Cir. 2006), the Eleventh Circuit Court of Appeals rejected a similar argument.  There, the court held:

> The plain language of Sarbanes-Oxley evidences no congressional intent to alter the pleading requirements set forth in the PSLRA . . . .  If we were to accept [the plaintiff's] proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.

*Id.* at 1266.  Thus, the fact that Sung signed Sarbanes-Oxley certifications during the Class Period does not add any weight to the scienter scale.

Lastly, the Amended Complaint contends that Sung's scienter is established "by the violations of GAAP."  (Am. Compl. ¶ 256.)  GAAP (shorthand for Generally Accepted Accounting Procedures) are a common set of accounting principles, standards and procedures that companies use to compile their financial statements.  As demonstrated above, Plaintiffs have failed to establish that there were, in fact, any GAAP violations.  But even if Plaintiff could satisfy this pleading requirement, it is well established in the Eleventh Circuit that allegations of GAAP violations, without more, do not support a strong inference of scienter.  *See Sportsline.com Sec. Litig.*, 366 F. Supp. 2d at 1165 (holding that, absent other indicia of scienter, "a defendant's failure to follow GAAP or publication of inaccurate accounting figures, is

23

insufficient to state a claim for securities fraud"); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) ("[I]t is well-settled that GAAP violations in and of themselves are not sufficient to establish a strong inference of scienter."); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1302 (S.D. Fla. 2002) ("Violations of GAAP, without more, may establish negligence but do not establish scienter under Rule 10b–5 and the Reform Act.").[16]

### D. The Only Compelling Inference That Can Be Drawn from the Facts Alleged in the Amended Complaint is that Sung Did Not Act with Scienter.

When assessing a plaintiff's scienter allegations and determining whether they are sufficient for purposes of surviving a motion to dismiss, "a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.  Here, the most cogent inference that can be drawn from the allegations in the Amended Complaint is that Sung did not intentionally or severely recklessly mislead Jiangbo's investors.  First, it is undisputed that Jiangbo received unqualified audit opinions from Frazer Frost for its financial statements for fiscal years 2009 and 2010.  *See BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d at 1291 ("[T]he Company actually received a clean opinion as to its financials, which is a competing inference of scienter."); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1327 n.27 (S.D. Fla. 2004) ("The fact that the auditors gave a 'clean opinion' at the year end of 2000

---

[16] Plaintiffs do not allege that scienter may be inferred from the fact that the SEC and Jiangbo's audit committee commenced investigations during the Class Period.  Presumably that is because courts have consistently held that the mere existence of an SEC or audit committee investigation, without more, does not support a strong inference of scienter.  *See, e.g., ITT Educ. Servs., Inc.*, 388 F. Supp. 2d at 942 ("[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management."); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248-49 (8th Cir. 2008) (holding that allegation of ongoing SEC investigation "[w]ithout more" was not sufficient to establish scienter); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false . . .[,] nor does it add an inference of scienter.").  That is certainly true here because Plaintiffs do not allege that the SEC or the Audit Committee were investigating Sung or found that she committed any wrongdoing.

raises an inference that Answerthink was properly reserving for bad debt and that the reserves were appropriate at year end.").  Similarly, the fact that Jiangbo has not restated any of its financial statements gives rise to a competing inference of non-scienter.  *See Druskin*, 299 F. Supp. 2d at 1323 (finding no scienter because plaintiffs failed to allege, among other things, that company restated its financial statements); *Cole,* 2009 WL 2713178, at *10 (holding that plaintiffs' failure to allege a restatement weighed against any inference of scienter).

Second, the Amended Complaint does not allege that Sung sold a single share of Jiangbo stock during the Class Period, which undercuts any showing of an intent to defraud because she did not profit.  *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008) ("[T]he amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter."); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) ("[T]here is no allegation that defendants sold their [company] shares, calling into question the alleged motive to artificially inflate the stock price."); *In re Sunterra*, 199 F. Supp. 2d at 1326 ("This lack of sales by these high-level insiders . . . certainly weighs against an inference of scienter.").

Third, a competing inference of non-scienter is supported by the fact that Jiangbo's debtholders agreed during the Class Period to accept equity in the Company.  In December 2009, the Company became delinquent on the 2007 and 2008 Debentures when it missed scheduled interest payments due to its inability to timely transfer cash out of China.  The majority debtholder, Pope, entered into negotiations with the Company and in January 2011 reached an agreement whereby all of the debtholders would accept 886,277 shares of common stock in exchange for the accrued interest and penalties they were owed by the Company.  *See* Jiangbo Form 10-Q (Exh. 6) at 24.  Approximately $6 million of the accrued interest and penalties were

settled this way. *See id.* This fact weighs strongly against a finding of scienter because it is reasonable to infer that a major corporate debtholder, such as Pope, would not have agreed to convert millions of dollars of debt into equity if it had any reason to believe that Jiangbo was overstating its cash.[17] *See, e.g., Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 593-94 (S.D.N.Y. 2011) (company's repurchase of shares and investments in equipment and subsidiaries signal "only confidence in the future of the company" and are, thus, a competing inference of non-scienter) (internal quotation omitted); *In re Manulife Fin. Corp. Sec. Litig.,* 276 F.R.D. 87, 102 (S.D.N.Y. 2011) (company's decision to take on exposure to the equity markets through the issuance of investment products is competing inference of non-scienter because rather than proving defendants' intent to defraud, it is more plausible that it portends defendants' belief in the long-term profitability of the company); *Leder v. Shinfeld*, No. 06-CV-1805, 2008 WL 2165097, at *6 (E.D. Pa. May 22, 2008) (defendant's investment in the company was a competing inference of non-fraudulent intent because if the company failed, defendant would be harmed and thus, defendant would not make the investment if he intended to defraud plaintiffs).

Lastly, the circumstances of Sung's employment give rise to a competing inference of non-scienter. Jiangbo—for which Sung served as CFO—was a holding company that had no business of it own. All of the operations occurred at Laiyang in China. Jiangbo's principal executive offices, manufacturing complexes, warehouses, and undeveloped property were all located in China. *See* 2010 10-K at 34. Sung, however, conducted her work primarily from Florida. *See* Form 3 (Exh. 3) (listing Sung at a Florida address). The fact that Sung worked at

---

[17] In the event of a bankruptcy, debtholders are given preference over equityholders. Pope and the other debtholders would not have agreed to waive the default without satisfying themselves that the missed interest payments were, in fact, caused by the foreign exchange controls and Jiangbo had sufficient cash. Thus, Jiangbo's debtholders would not have agreed to convert approximately $6 million of debt into common stock unless they believed Jiangbo was adequately capitalized.

the parent company in the United States cuts against any inference that she knew, or was severely reckless in not knowing, that any fraud was occurring at Laiyang in China, notwithstanding that Jiangbo incorporated Laiyang's financial results into its SEC filings.  *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (holding that plaintiffs failed to adequately plead scienter of parent company and parent company's officers where fraud was carried out at Brazilian subsidiary); *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 149 (3d Cir. 2004) (holding that plaintiffs could not impute knowledge of fraud at Brazilian subsidiary to U.S. parent company's officers "simply by virtue of the [executive] positions they hold").  Absent specific facts showing that Sung actually knew of, or participated in, any alleged fraud at Laiyang in China, the only rational inference to be drawn from the Amended Complaint is that she acted without scienter.

### E.     The Amended Complaint Fails to Adequately Plead Loss Causation.

The Section 10(b) claim must also be dismissed against Sung because it fails to sufficiently allege that Plaintiffs (and the class of investors they purport to represent) incurred an economic loss as a result of the alleged misrepresentations or omissions.  To make out a claim under Section 10(b), a plaintiff must adequately plead "loss causation," which is the "causal connection between the [material] misrepresentation and the economic loss."  *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345 (2005); *see also* 15 U.S.C. § 78u-4(b)(4).  For a stock price to decline as a result of allegedly-fraudulent conduct, the fraudulent conduct must be publicly disclosed.  *See id.* at 342 (noting that investor suffers no loss "before the relevant truth begins to leak out").  The revelation of truth—the moment when the alleged misstatements or omissions become public—is called a "corrective disclosure."

Here, Plaintiffs have not adequately pled loss causation.  *See Meyer v. St. Joe Co.*, 5:11-cv-27/RS-EMT, 2011 WL 3750324, at *3 (N.D. Fla. Aug. 24, 2011) ("Plaintiff has the burden of

proving that the act or omission of the Defendants 'caused the loss for which [P]laintiff seeks to recover damages.'").  Plaintiffs allege that they acquired Jiangbo stock during the Class Period at artificially inflated prices, but an "'artificially inflated purchase price' is not itself a relevant economic loss."  *Dura,* 544 U.S. at 347; *see also Teacher's Ret. Sys. of Louisiana v. Hunter,* 477 F.3d 162, 186 (4th Cir. 2007) ("[A] plaintiff does not state a claim upon which relief can be granted . . . by simply alleging that the plaintiff purchased defendant's stock at an 'artificially inflated purchase price' and thereby sustained damages.").  To sufficiently plead loss causation, a plaintiff must also allege that the fraud that purportedly caused the stock price to trade at artificially inflated prices was subsequently revealed to the market, and as a result of that disclosure, the stock price dropped to its "true" value.  *In re TECO Energy, Inc. Sec. Litig.,* No. 8:04-CV-1948, 2006 WL 845161, at *2 (M.D. Fla. Mar. 30, 2006) ("Establishing a connection between a drop in stock price and the disclosure of the 'truth' about a defendant's previous misstatement or omission is essential in pleading loss causation . . . ."); *In re Paincare Holdings Sec. Litig.,* No. 6:06-cv-362, 2007 WL 1229703, at *8 (M.D. Fla. Apr. 25, 2007) ("[T]o sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop.").

In an unsuccessful attempt to satisfy this requirement, Plaintiffs contend that Jiangbo's stock price declined significantly when Defendants' alleged misrepresentations and omissions were "revealed" in six different press releases, SEC filings, and conference calls between January and May 2011.  (Am. Compl. ¶¶ 226-41.)  The six events relied upon by Plaintiffs in the Amended Complaint are:

| Date | Event | "Revelation" |
|------|-------|--------------|
| Jan. 21, 2011 | Press Release | Jiangbo announced that, due to difficulty moving cash out of China, it was delinquent on debenture payments, but had negotiated a waiver agreement with Pope. |
| Mar. 18, 2011 | SEC Filing | Jiangbo announced Sung's resignation. |
| Apr. 4, 2011 | Press Release | Jiangbo announced retention of Bernstein & Pinchuk as new auditor. |
| May 23, 2011 | SEC Filing | Jiangbo announced that due to continued difficulty transferring cash out of China, it had again become delinquent on debenture payments and that, as a result, it was likely that Pope would commence legal proceedings, which would be materially adverse to the Company's ability to continue its business. |
| May 25, 2011 | Earnings Call | In response to a question about a possible bankruptcy, Defendant Jin responded that the Company was in active negotiations with debtholders and that management "hasn't thought of the procedures of seeking bankruptcy protection." |
| May 27, 2011 | SEC Filing | Jiangbo disclosed SEC investigation. |

*See* Am. Compl. ¶¶ 228-40.

None of these six events satisfy the loss causation requirement because they did not reveal Plaintiffs' theories of alleged fraud and, therefore, are not corrective disclosures. According to the Amended Complaint, the "materially false and misleading statements" during the relevant time period (*i.e.*, when Sung was employed as CFO) related to: (a) Jiangbo's cash balance; (b) the Hilead transaction; and (c) the Company's accounts receivable balance.[18] However, the six events listed above did not reveal that: Jiangbo's cash position was overstated; the Company was a party to the Hilead Transaction; or there was any overstatement of the Company's accounts receivable.

---

[18] The Amended Complaint also alleges that certain Jiangbo statements issued during the latter part of the Class Period were actionable because they failed to disclose that the SEC had commenced a formal investigation, the audit committee had commenced an investigation, and Chairman Cao and other members of management were not cooperating with the investigations.  As explained earlier, Sung cannot be held liable for those statements because they were issued after she resigned as CFO.

Plaintiffs fail to allege loss causation because the disclosures summarized in the prior chart announced other events, not those underlying the purported fraud.  In two of the public filings Jiangbo announced Sung's resignation and the retention of a new auditor.  These facts do not reveal any "fraud" because Sung resigned for family reasons and Frazer Frost did not have any disagreements with Jiangbo's accounting treatment when it stopped working for the Company.  Similarly, the press releases disclosing Jiangbo's delinquency on the Debentures did not reveal any "fraud" because the press releases stated that the delinquencies were caused by China's restrictions on foreign exchange.  Any stock price drop following those announcements was due to the uncertain repercussions that could result from the delinquencies.  Indeed, when Jiangbo announced in May 2011 that it had become delinquent for the second time, it warned investors that Pope would likely commence legal proceedings against the Company, which would be materially adverse to the Company's ability to continue its business.  The final filing on May 27, 2011 announcing the SEC investigation does not satisfy the loss causation requirement because the announcement of a regulatory investigation is insufficient, on its own, to plead loss causation.  *See In re Avista Corp. Sec. Litig.,* 415 F. Supp. 2d 1214, 1220 (E.D. Wash. 2005) ("Plaintiffs fail to allege loss causation because the two [disclosures announcing an investigation] do not contain factual information that reveals any of these misrepresentations [alleged in the complaint] or reveals any fraud by [Defendant.]").  As a result, Plaintiffs have failed to plead loss causation.

## II.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY AGAINST SUNG.

The Amended Complaint also fails to state a claim against Sung for control person liability under Section 20(a) of the Exchange Act.  15 U.S.C. § 78(t)(a).  To state a control person claim, a plaintiff must allege: (1) a primary violation of the securities laws by a controlled

30

person; (2) that the defendant had the power to control the general business affairs of the controlled person; and (3) that the defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.  *See Thompson*, 610 F.3d at 691 (quoting *Brown v. Enstar*, 84 F.3d 393, 396-97 (11th Cir. 1996)). Section 20(a) also provides that a control person cannot be held liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

Plaintiffs assert that Sung is liable under Section 20(a) as a control person of Jiangbo.  As set forth earlier, however, Plaintiffs have not adequately shown that Jiangbo made an actionable misstatement or omission.  *See* supra § I.A.  It necessarily follows that Sung cannot be held liable under Section 20(a) because there was no primary violation by Jiangbo.  *See Sportsline.com Sec. Litig.*, 366 F. Supp. 2d at 1175 ("Because Plaintiffs have failed to establish a predicate violation of Section 10(b) or Rule 10b-5 as to any of the Defendants, their Section 20(a) claim cannot stand.").

Even if Plaintiffs had adequately pled a primary violation by the Company, the Section 20(a) claim against Sung would still fail because they have not pled facts establishing that Sung had the power to control the general affairs at Jiangbo and to influence the corporate policy that resulted in the primary violation.   The Amended Complaint alleges that the Individual Defendants had such power and control:

> [b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading."

(Am. Compl. ¶ 276.)  Vague allegations such as these are not sufficient to plead control person liability.

Where, as here, there is nothing more to allege "control" other than a defendant's high-ranking position, control person liability cannot stand.  *See Genesee County Employees' Retirement Sys. v. Thornburg Mortgage Sec. Trust 2006–3*, No. CIV 09–0300 JB/KBM, 2011 WL 5840482, at *39 (D.N.M. Nov. 12, 2011) (high-ranking position within the corporation, standing alone, is not enough to satisfy the "control" element of a control person claim); *In re Constellation Energy Group, Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 639 (D. Md. 2010) ("An individual's position alone does not establish control person liability.").  In addition, making "blanket allegations" about a group of individual defendants "make no sense when the defendants apparently held different positions." *Boilermakers Nat. Annuity Trust Fund v. WaMu Mortgage Pass Through Certificates, Series AR1,* 748 F. Supp. 2d 1246, 1257 (W.D. Wash. 2010) (holding that plaintiffs are required to "substantiate[] their allegations about the Individual Defendants with individualized facts").

Further, Sung had no ability as a practical matter to control the general affairs of the Company because she was located in Florida while the principal executive offices, operations, employees, and warehouses were in China.  Moreover, Sung was employed by Jiangbo, the parent company, not by Laiyang, the operating company in China.[19]

---

[19] The only reasonable inference that can be drawn from the Amended Complaint is that Cao and possibly Jin were the control persons of Jiangbo.  Cao was the founder, Chairman, and former CEO.  Jin was the current CEO.  It appears that Cao and Jin not only had the power to control Jiangbo's general affairs, but that they also exercised that power.  As detailed in the Resignation Letter, Cao and Jin instructed Jiangbo's employees not to produce documents to the audit committee's advisors without their prior authorization.  (Am Compl. ¶¶ 34, 36, 39-40, 42-43.)  In addition, Cao had ultimate check writing authority for the Company.  *See* Exhibit 99.6 to Form 8-K (June 7, 2011) (Exh. 10).

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendant Elsa Sung respectfully requests that this Court enter an order dismissing all claims in the Amended Complaint against her.

Dated: December 16, 2011

By: <u>/s/ Tracy A. Nichols</u>
    Tracy A. Nichols
    email:  tracy.nichols@hklaw.com
    Louise McAlpin
    email:  louise.mcalpin@hklaw.com
    Stephen P. Warren
    email:  stephen.warren@hklaw.com
    HOLLAND & KNIGHT LLP
    701 Brickell Avenue, Suite 3000
    Miami, Florida  33131
    Tel. (305) 374-8500
    Fax (305) 789-7799

    *Attorneys for Defendant Elsa Sung*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically

filed this 16th day of December 2011, with the Clerk of the Court via CM/ECF which will send a

notice of electronic filing to:

**Christopher S. Polaszek**
Milberg LLP
201 North Franklin Street
Suite 3200
Tampa, FL 33602
813-367-5713
Fax: 813-221-7335
Email: cpolaszek@milberg.com
*Attorney for Lead Plaintiffs and the*
*Proposed Class*

A true and correct copy of the foregoing will be served via first class mail on the 19th day

of December 2011 on counsel listed below.

**Kristi Stahnke McGregor**
MILBERG LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119
212-594-5300
Fax: 212-868-1229
*Attorney for Lead Plaintiffs and the*
*Proposed Class*

**Ethan D. Wohl**
WOHL & FRUCHTER LLP
570 Lexington Avenue
16th Floor
New York, NY 10022
(212) 758-4000
Fax: 212-758-4004
*Attorney for Lead Plaintiffs and the*
*Proposed Class*

#10793307_v6

34