No transactions, relationships or arrangements were considered by the Board of Directors in determining that these directors were independent.

## ITEM 13 PRINCIPAL ACCOUNTANT FEES AND SERVICES

Aggregate fees billed by our current principal accountants, Frazer Frost, LLP (a successor entity of Moore Stephens Wurth Frazer and Torbet, LLP) for audit services related to the most recent fiscal year, and for other professional services billed in the most recent fiscal year, were as follows:

|  | Fiscal 2010 | Fiscal 2009 | Fiscal 2008 |
|---|---|---|---|
| Audit Fees | $ 265,250 | $ 268,600 | $ 245,000 |
| Audit-Related Fees | 25,000 | 26,000 | 20,000 |
| Tax Fees | 10,000 | 8,000 | - |
| All Other Fees | - | - | - |
| Total | 300,250 | $ 302,600 | $ 265,000 |

**Audit Fees**— This category includes the audit of our annual financial statements, review of financial statements included in our Form 10-Q Quarterly Reports and services that are normally provided by the independent auditors in connection with engagements for those fiscal years. This category also includes advice on audit and accounting matters that arose during, or as a result of, the audit or the review of interim financial statements.

**Audit-Related Fees**— This category consists of assurance and related services by the independent auditors that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees disclosed under this category include consultation regarding our correspondence with the SEC and other accounting consulting.

**Tax Fees**— This category consists of professional services rendered by our independent auditors for tax compliance and tax advice. The services for the fees disclosed under this category include tax return preparation and technical tax advice.

**All Other Fees**— This category consists of fees for other miscellaneous items.

**Pre-Approval Policies and Procedures**— Prior to engaging its accountants to perform particular services, our board of directors obtains an estimate for the service to be performed. All of the services described above were approved by the board of directors in accordance with its procedure.

## PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES

(a) Financial Statements and Financial Statements Schedules

The following financial statements of Jiangbo Pharmaceuticals, Inc. and Reports of Independent Registered Public Accounting Firms are presented in the "F" pages of this report:

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets - as of June 30, 2010 and 2009 | F-2 |
| Consolidated Statements of Income and Other Comprehensive Income - for the Years ended June 30, 2010, 2009 and 2008 | F-3 |
| Consolidated Statements of Shareholders' Equity - for the Years ended June 30, 2010, 2009 and 2008 | F-4 |
| Consolidated Statements of Cash Flows - for the Years ended June 30, 2010, 2009 and 2008 | F-5 |
| Notes to Consolidated Financial Statements | F-6 - F-35 |

(b) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Share Acquisition and Exchange Agreement by and among Genesis, Karmoya and Karmoya Shareholders dated October 1, 2007 (1) |
| 3.1 | Articles of Incorporation (2) |
| 3.2 | Bylaws (2) |
| 3.3 | Articles of Amendment to Articles of Incorporation (2) |
| 3.4 | Articles of Amendment to Articles of Incorporation (2) |
| 3.5 | Articles of Amendment to Articles of Incorporation (3) |
| 3.6 | Articles of Amendment to Articles of Incorporation (4) |
| 3.7 | Articles of Amendment to Articles of Incorporation (5) |
| 4.1 | Articles of Amendment to Articles of Incorporation, Preferences and Rights of Series A Preferred Stock (6) |
| 4.2 | Articles of Amendment to Articles of Incorporation, Preferences and Rights of Series B Voting Convertible Preferred Stock (7) |
| 4.3 | 6% Convertible Subordinated Debenture, dated November 7, 2007 (8) |
| 4.4 | Common Stock Purchase Warrant, dated November 7, 2007 (8) |
| 4.5 | Form of 6% Convertible Note (9) |
| 4.6 | Form of Class A Common Stock Purchase Warrant (9) |
| 10.1 | Securities Purchase Agreement, dated as of November 6, 2007, between Genesis Pharmaceuticals Enterprises, Inc. and Pope Investments, LLC (8) |
| 10.2 | Registration Rights Agreement, dated as of November 6, 2007, between Genesis Pharmaceuticals Enterprises, Inc. and Pope Investments, LLC (8) |
| 10.3 | Closing Escrow Agreement, dated as of November 6, 2007, by and among Genesis Pharmaceuticals Enterprises, Inc., Pope Investments, LLC and Sichenzia Ross Friedman Ference LLP (8) |
| 10.4 | Securities Purchase Agreement, dated May 30, 2008, by and among the Company, Karmoya International Ltd., Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., Wubo Cao and the investors party thereto (9) |
| 10.5 | Make Good Escrow Agreement, dated May 30, 2008, by and among the Company, the investors party thereto, Pope Investments LLC, Wubo Cao and Loeb & Loeb LLP (9) |
| 10.6 | Holdback Escrow Agreement, dated May 30, 2008, by and among the Company, the investors party thereto and Loeb & Loeb LLP (9) |
| 10.7 | Registration Rights Agreement, dated May 30, 2008, by and among the Company and the investors party thereto (9) |
| 10.8 | Lock-up Agreement, dated May 30, 2008, between the Company and Wubo Cao (9) |
| 10.9 | Employment Agreement between Elsa Sung and the Company, dated June 10, 2008 (10) |
| 10.10 | Consulting Agreement between the Company and Robert Cain, dated September 10, 2008 (11) |
| 10.11 | Asset Transfer Contract between Shandong Traditional Chinese Medicine College, The Traditional Chinese Medicine College of Shandong Hongrui Pharmaceutical Factory and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated January 23, 2009.(14) |
| 10.12 | Lease Agreement between Laiyang Jiangbo Pharmaceutical Co., Ltd and Jiangbo Chinese-Western Pharmacy dated May 4, 2008 (15) |
| 10.13 | Unofficial Summary Translation of the Supplemental Asset Transfer Agreement between Shandong Traditional Chinese Medicine College, The Traditional Chinese Medicine College of Shandong Hongrui Pharmaceutical Factory and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated February 10, 2009. (16) |
| 10.14 | Letter Agreement between the Company and Pope Investments LLC dated August 10, 2009. (17) |

| 10.15 | Unofficial Summary Translation of the Technology Cooperation Agreement between Shangdon University and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 16, 2007 (18) |
| 10.16 | Unofficial Summary Translation of the Pharmaceutical Industrialization Joint Base Agreement between Institute of Microbiology, Chinese Academy of Sciences and Laiyang Jiangbo Pharmaceutical Co. Ltd date November 12, 2007 (18) |
| 10.17 | Letter Agreement Between the Company and Pope Investments LLC dated August 10, 2009. (19) |
| 10.18 | Letter Agreement Between the Company and Pope Investments LLC dated February 15, 2010. (20) |
| 10.19 | Contract for Transfer of State-Owned Construction Land Use Right by and between Laiyang Jiangbo Pharmaceuticals, Co., Ltd. and the Land and Resources Bureau of Laiyang City, dated October 27, 2009. (21) |
| | |
| 14.1 | Code of Business Conduct and Ethics (12) |
| 31.1 | Certification by the Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) * |
| 31.2 | Certification by the Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a)* |
| 32.1 | Certification of the Chief Executive Officer pursuant 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 32.2 | Certification of the Chief Financial Officer pursuant 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 99.1 | Consulting Services Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.2 | Equity Pledge Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.3 | Operating Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.4 | Proxy Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.5 | Option Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.6 | Audit Committee Charter (13) |
| 99.7 | Compensation Committee Charter (13) |
| 99.8 | Nominating and Corporate Governance Committee Charter * |

*Filed herewith.

(1) Incorporated by reference to the Company's Current Report on Form 8-K filed on October 1, 2007.
(2) Incorporated by reference to the Company's Registration Statement on Form SB-2 filed on September 1, 1999.
(3) Incorporated by reference to the Company's Current Report on Form 8-K filed on August 21, 2008.
(4) Incorporated by reference to the Company's Current Report on Form 8-K filed on September 5, 2008.
(5) Incorporated by reference to the Company's Current Report on Form 8-K filed on April 21, 2009.
(6) Incorporated by reference to the Company's Quarterly Report on Form 10-QSB filed on January 22, 2004.
(7) Incorporated by reference to the Company's Current Report on Form 8-K filed on October 9, 2007.
(8) Incorporated by reference to the Company's Current Report on Form 8-K filed on November 9, 2007.
(9) Incorporated by reference to the Company's Current Report on Form 8-K filed on June 3, 2008.
(10) Incorporated by reference to the Company's Current Report on Form 8-K filed on June 12, 2008.
(11) Incorporated by reference to the Company's Current Report on Form 8-K filed on September 12, 2008.
(12) Incorporated by reference to the Company's Annual Report on Form 10-KSB filed on January 13, 2006.
(13) Incorporated by reference to the Company's Registration Statement on Form S-1/A filed on August 26, 2008.
(14) Incorporated by reference to the Company's Current Report on Form 8-K filed on January 29, 2009.
(15) Incorporated by reference to the Company's Annual Report on Form 10-K/A filed on April 10, 2009.
(16) Incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on May 15, 2009.
(17) Incorporated by reference to the Company's Current Report on Form 8-K filed on August 14, 2009.
(18) Incorporated by reference to the Company's Annual Report on Form 10-K filed on September 28, 2009.
(19) Incorporated by reference to the Company's Current Report on Form 8-K filed on August 14, 2009.
(20) Incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on February 19, 2010.
(21)Incorporated by reference to the Company's current report on Form 8-K filed March 18, 2010.

## SIGNATURES

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on September 28, 2010.

**JIANGBO PHARMACEUTICALS, INC.**

/s/ *Jin Linxian*
Jin Linxian, Chief Executive Officer

In accordance with the Securities Exchange of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| NAME | TITLE | DATE |
|---|---|---|
| /s/ *Jin Linxian*<br>Jin Linxian | Chief Executive Officer | September 28, 2010 |
| /s/ *Elsa Sung*<br>Elsa Sung | Chief Financial Officer and Principal Accounting Officer | September 28, 2010 |
| /s/ *Cao Wubo*<br>Cao Wubo | Chairman of the Board | September 28, 2010 |
| /s/ *Feng Xiaowei*<br>Feng Xiaowei | Director | September 28, 2010 |
| /s/ *Huang Lei*<br>Huang Lei | Director | September 28, 2010 |
| /s/ *Ge Jian*<br>Ge Jian | Director | September 28, 2010 |
| <br>Michael Marks | Director | September 28, 2010 |
| /s/*John (Yang) Wang*<br>John (Yang) Wang | Director | September 28, 2010 |

72

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Jiangbo Pharmaceuticals, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of Jiangbo Pharmaceuticals, Inc. and Subsidiaries (the "Company") as of June, 2010 and 2009, and the related consolidated statements of income and other comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended June 30, 2010. Jiangbo Pharmaceuticals, Inc.'s management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board(United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010 in conformity with accounting principles generally accepted in the United States of America.

/s/ Frazer Frost, LLP (Successor Entity of Moore Stephens Wurth Frazer and Torbet, LLP, see Form 8-K filed on January 7, 2010)

Brea, California

September 28, 2010

F-1

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
CONSOLIDATED BALANCE SHEETS
AS OF JUNE 30, 2010 AND 2009

| | 2010 | 2009 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash | $ 108,616,735 | $ 104,366,117 |
| Restricted cash | 11,135,880 | 7,325,000 |
| Investments | 168,858 | 879,228 |
| Accounts receivable, net of allowance for doubtful accounts of $1,343,421 and $694,370 as of June 30, 2010 and 2009, respectively | 33,195,201 | 19,222,707 |
| Inventories | 2,200,614 | 3,277,194 |
| Other receivables | 13,241 | 167,012 |
| Other receivable - related party | 324,060 | - |
| Advances to suppliers | 260,688 | 236,496 |
| Financing costs - current | 435,634 | 680,303 |
| Total current assets | 156,350,911 | 136,154,057 |
| **PLANT AND EQUIPMENT, net** | 13,284,312 | 13,957,397 |
| **OTHER ASSETS:** | | |
| Long Term Perpayments | 110,725 | - |
| Restricted investments | - | 1,033,463 |
| Financing costs, net | - | 556,365 |
| Intangible assets, net | 32,594,326 | 17,041,181 |
| Total other assets | 32,705,051 | 18,631,009 |
| Total assets | $ 202,340,274 | $ 168,742,463 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 4,113,219 | $ 6,146,497 |
| Short term bank loans | 2,209,500 | 2,197,500 |
| Notes payable | 11,135,880 | 7,325,000 |
| Other payables | 3,888,034 | 2,152,063 |
| Refundable security deposits due to distributors | 3,829,800 | 4,102,000 |
| Other payables - related parties | 255,595 | 238,956 |
| Accrued liabilities | 4,899,829 | 1,356,898 |
| Liabilities assumed from reorganization | 524,614 | 1,565,036 |
| Taxes payable | 6,259,271 | 11,248,226 |
| Derivative liabilities | 18,497,227 | - |
| Convertible debt, net of discount $13,669,752 as of June 30, 2010 | 12,210,248 | - |
| Total current liabilities | 67,823,217 | 36,332,176 |
| Convertible debt, net of discount $28,493,089 as of June 30, 2009 | - | 6,346,911 |
| Total liabilities | 67,823,217 | 42,679,087 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Convertible preferred stock Series A ($0.001 par value; 20,000,000 shares authorized as of June 30, 2010 and 2009, respectively; 0 shares issued and outstanding as of June 30, 2010 and 2009) | | |
| Common stock ($0.001 par value, 22,500,000 shares authorized, 11,701,802 and 10,435,099 shares issued and outstanding as of June 30, 2010 and 2009, respectively) | 11,702 | 10,435 |
| Paid-in-capital | 30,846,915 | 48,397,794 |
| Captial contribution receivable | (11,000) | (11,000) |
| Retained earnings | 92,797,859 | 67,888,667 |
| Statutory reserves | 3,253,878 | 3,253,878 |
| Accumulated other comprehensive income | 7,617,703 | 6,523,602 |
| Total shareholders' equity | 134,517,057 | 126,063,376 |

| Total liabilities and shareholders' equity | $ 202,340,274 | $ 168,742,463 |
| --- | --- | --- |

See report of independent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

F-2

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF INCOME AND OTHER COMPREHENSIVE INCOME
FOR THE YEARS ENDED JUNE 30, 2010, 2009 AND 2008

| | 2010 | 2009 | 2008 RESTATED |
|---|---|---|---|
| REVENUE: | | | |
| Sales | $ 97,443,897 | $ 117,143,950 | $ 93,982,407 |
| Sales – related parties | - | 244,026 | 5,564,098 |
| TOTAL REVENUE, net | 97,443,897 | 117,387,976 | 99,546,505 |
| | | | |
| Cost of sales | 26,097,103 | 27,854,747 | 21,072,674 |
| Cost of sales – related parties | - | 54,519 | 1,433,873 |
| COST OF SALES | 26,097,103 | 27,909,266 | 22,506,547 |
| | | | |
| GROSS PROFIT | 71,346,794 | 89,478,710 | 77,039,958 |
| | | | |
| RESEARCH AND DEVELOPMENT EXPENSE | 4,400,100 | 4,395,000 | 3,235,715 |
| | | | |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 18,731,844 | 35,315,529 | 41,593,197 |
| | | | |
| INCOME FROM OPERATIONS | 48,214,850 | 49,768,181 | 32,211,046 |
| | | | |
| OTHER (INCOME) EXPENSE, NET | | | |
| Change in fair value of derivative liabilities | (14,631,455) | | |
| Non-operating expense (income), net | 382,122 | 804,561 | (572,811) |
| Non-operating income – related party | (322,674) | (382,970) | (110,152) |
| Interest expense, net | 19,796,531 | 5,904,511 | 3,092,183 |
| Loss from discontinued operations | 243,792 | 1,781,946 | 380,027 |
| OTHER EXPENSE, NET | 5,468,316 | 8,108,048 | 2,789,247 |
| | | | |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 42,746,534 | 41,660,133 | 29,421,799 |
| | | | |
| PROVISION FOR INCOME TAXES | 12,896,179 | 12,779,869 | 6,970,739 |
| | | | |
| NET INCOME | 29,850,355 | 28,880,264 | 22,451,060 |
| | | | |
| OTHER COMPREHENSIVE INCOME: | | | |
| Unrealized gain (loss) on marketable securities | 166,378 | (1,514,230) | 1,347,852 |
| Foreign currency translation adjustment | 927,723 | 336,927 | 5,206,612 |
| | | | |
| COMPREHENSIVE INCOME | $ 30,944,456 | $ 27,702,961 | $ 29,005,524 |
| | | | |
| WEIGHTED AVERAGE NUMBER OF SHARES: | | | |
| Basic | 11,104,025 | 10,061,326 | 9,164,127 |
| Dilulted | 15,135,130 | 14,484,830 | 9,900,428 |
| | | | |
| EARNINGS PER SHARE: | | | |
| Basic | $ 2.69 | $ 2.87 | $ 2.45 |
| Diluted | $ 1.36 | $ 0.09 | $ (1.17) |

See report of independent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financials statements.

F-3

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Common Stock Par Vaule $0.001 | | Treasury Stock | | Additional Paid-in capital | Capital contribution receivable | Retained Earnings | | Accumulated other comprehensive income | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of shares | Common stock | Number of shares | Treasury stock | | | Statutory reserves | Unrestricted earnings | | |
| BALANCE, June 30, 2007 | 7,494,740 | $ 7,495 | 10,000 | $ (2,805) | $ 18,344,309 | $ (12,011,000) | $ 2,157,637 | $ 17,693,584 | $ 1,146,441 | $ 27,295,661 |
| Recapitalization of Company | 2,131,609 | 2,132 | | | 3,815,813 | | | | | 3,817,959 |
| Common stock issued for conversion of options | 44,031 | 44 | | | (44) | | | | | 0 |
| Issuance of common stock @ $4.80 per share | 37,500 | 38 | | | 179,963 | | | | | 180,001 |
| Exercise of stock options to common stock @ $4.20 per share | 37,500 | 38 | | | 157,463 | | | | | 157,501 |
| Conversion of convertible preferred stock A to common stock | 16,595 | 17 | | | (2) | | | | | 1,975 |
| Capital contribution registered | | | | | | (12,000,000) | 12,000,000 | | | |
| Sales of treasury stock | | | (10,000) | 2,805 | (830) | | | | | 1,975 |
| Grant of warrants and beneficial conversion feature in connection with convertible debt | | | | | 35,000,000 | | | | | 35,000,000 |
| Common stock issued for service @ $8.00 per share | 5,875 | 6 | | | 46,994 | | | | | 47,000 |
| Stock option compensation | | | | | 10,847 | | | | | 10,847 |
| Net income | | | | | | | 1,096,241 | (1,096,241) | | 22,451,060 |
| Adjustment to statutory reserve | | | | | | | 1,096,241 | (1,096,241) | | |
| Change in fair value on restricted marketable equity securities | | | | | | | | | 1,347,852 | 1,347,852 |
| Foreign currency translation gain | | | | | | | | | 5,206,612 | 5,206,612 |
| BALANCE, June 30, 2008 | 9,767,844 | $ 9,770 | $ - | $ - | $ 45,554,513 | $ (11,000) | $ 3,253,878 | $ 39,008,403 | $ 7,700,905 | $ 95,516,469 |
| Shares issued for adjustments for 1:40 reverse split | 1,104 | | | | | | | | | |
| Cancellation of common stock for settlement @ $8 per share | (2,500) | (2) | | | (19,998) | | | | | (20,000) |
| Common stock issued for service @ $8 per share | 2,500 | | | | 19,998 | | | | | 20,000 |
| Common stock issued for service @ $9 per share | 2,500 | 2 | | | 22,498 | | | | | 22,500 |
| Common stock issued for Hongni @ $4.035 per share | 643,651 | 643 | | | 2,596,488 | | | | | 2,597,131 |
| Stock-based compensation | | | | | 64,315 | | | | | 64,315 |
| Conversion of convertible debt to stock | 20,000 | 20 | | | 159,980 | | | | | 160,000 |
| Net income | | | | | | | | 28,880,264 | | 28,880,264 |
| Change in fair value on restricted marketable equity securities | | | | | | | | | (1,514,230) | (1,514,230) |
| Foreign currency translation gain | | | | | | | | | 336,927 | 336,927 |
| BALANCE, June 30, 2009 | 10,435,099 | $ 10,435 | $ - | $ - | $ 48,397,794 | $ (11,000) | $ 3,253,878 | $ 67,888,667 | $ 6,523,602 | $ 126,063,376 |
| Cumulative effect of reclassification of warrants | | | | | (34,971,570) | | | (4,941,163) | | (39,912,733) |
| | 10,435,099 | 10,435 | - | | 13,426,224 | (11,000) | 3,253,878 | 62,947,504 | 6,523,602 | 86,150,643 |
| Common stock issued for payment for other payable-related party @$8.75 per share | 2,286 | 2 | | | 19,998 | | | | | 20,000 |
| Common stocked issued for services @$8.75 per share | 1,143 | 1 | | | 9,999 | | | | | 10,000 |
| Common stock issued for services @$9.91 per share | 1,009 | 1 | | | 9,999 | | | | | 10,000 |
| Common stock issued for interest payment @ $8 per share | 84,015 | 85 | | | 990,968 | | | | | 991,053 |
| Common stock issued for services @$9 per share | 17,350 | 17 | | | 156,133 | | | | | 156,150 |
| Common stock issuable for bonuses @ 8.5 per share | 25,000 | 25 | | | 212,475 | | | | | 212,500 |
| Common stock issuable for bonuses @ 9 per share | 15,900 | 16 | | | 143,084 | | | | | 143,100 |
| Conversion of convertible debt to stock @ $8 per share | 1,120,000 | 1,120 | | | 8,958,880 | | | | | 8,960,000 |
| Stock based compensation | | | | | 135,104 | | | | | 135,104 |
| Reclassification of derivative liabilities to APIC due to conversion of convertible debt | | | | | 6,784,051 | | | | | 6,784,051 |
| Net Income | | | | | | | | 29,850,355 | | 29,850,355 |
| Change in fair value on restricted marketable equity securities | | | | | | | | | 166,378 | 166,378 |
| Foreign currency translation gain | | | | | | | | | 927,723 | 927,723 |
| BALANCE, June 30, 2010 | 11,701,802 | 11,702 | | | 30,846,915 | (11,000) | 3,253,878 | 92,797,859 | 7,617,703 | 134,517,057 |

See report of independent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

F-4

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED JUNE 30, 2010, 2009 AND 2008

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 29,850,355 | $ 28,880,264 | $ 22,451,060 |
| Loss from discontinued operations | 243,792 | 1,781,946 | 380,027 |
| Income from continued operations | 30,094,147 | 30,662,210 | 22,831,087 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation | 823,087 | 679,507 | 517,863 |
| Amortization of intangible assets | 1,585,141 | 735,427 | 184,465 |
| Amortization of debt issuance costs | 801,034 | 680,276 | 123,964 |
| Amortization of debt discount | 14,823,337 | 4,006,868 | 2,500,043 |
| Loss from issuance of shares for in lieu of interest | 318,936 | - | - |
| Interest payment with shares in lieu of cash | 4,457 | - | - |
| Bad debt (recovery) expense | 642,499 | 538,069 | (27,641) |
| Loss on sale of marketable securities | 406,346 | 473,303 | - |
| Unrealized (gain) loss on investments | (150,525) | 229,425 | 696,528 |
| Other non-cash settlement (income) expense | - | (20,000) | - |
| Change in fair value of derivative liabilities | (14,631,455) | | |
| Stock based compensation | 531,750 | | 46,994 |
| Amortization of stock option compensation | 135,104 | 106,815 | 10,847 |
| Gain on forgiveness of debt | - | - | (86,752) |
| Changes in operating assets and liabilities | | | |
| Accounts receivable | (14,450,712) | 4,651,284 | (10,534,270) |
| Accounts receivable - related parties | - | 676,579 | (113,465) |
| Notes receivables | - | - | 60,694 |
| Inventories | 1,089,795 | 792,293 | 1,686,090 |
| Other receivables | 154,018 | (21,038) | (111,571) |
| Other receivables - related parties | (322,674) | | |
| Advances to suppliers | (22,856) | 1,495,805 | (1,259,254) |
| Other assets | - | - | 92,996 |
| Accounts payable | (2,057,625) | 3,795,084 | 55,085 |
| Refundable security deposits due to distributors | (293,340) | 4,102,000 | |
| Other payables | 1,716,847 | (1,534,740) | 2,033,689 |
| Other payables - related parties | 16,571 | (86,692) | (822,155) |
| Accrued liabilities | 4,221,119 | 1,182,018 | 211,362 |
| Liabilities assumed from reorganization | (150,407) | (1,301,337) | (1,172,816) |
| Taxes payable | (5,028,760) | 11,081,110 | 169,790 |
| Net cash provided by operating activities | 20,255,834 | 62,924,266 | 17,093,573 |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Acquisition of Hongru | - | (8,584,900) | - |
| Proceeds from sale of investments | 531,750 | 407,005 | 1,034,028 |
| Proceeds from sale of restricted investments | - | - | 155,000 |
| Purchase of equipment | (76,993) | (156,702) | (453,718) |
| Prepayments made for purchase of equipments | (110,251) | - | - |
| Purchase of intangible assets | (16,979,106) | - | (8,870,631) |
| Cash proceeds from sale of equipment | - | 15,615 | - |
| Cash proceeds from reverse acquisition | - | - | 534,950 |
| Net cash used in investing activities | (16,634,600) | (8,318,982) | (7,600,371) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Change in restricted cash | (3,754,752) | 538,815 | 3,292,168 |
| Proceeds from notes payable | 14,843,004 | 13,896,990 | - |
| Principal payments on notes payable | (11,088,252) | (12,439,315) | (3,292,168) |
| Borrowings on short term bank loans | 2,200,050 | 2,197,500 | 2,616,110 |
| Principal payments on short term bank loans | (2,200,050) | (2,783,500) | (4,819,150) |
| Proceeds from sale of common stock | - | - | 337,500 |
| Proceeds from sale of treasury stock | - | - | 1,975 |
| Payment to escrow account | - | - | (1,996,490) |
| Payments for dividend | - | - | (10,608,000) |
| Proceeds from convertible debt | - | - | 32,974,500 |
| Payments for debt issuance cost | - | - | (15,408) |

| | | | | | |
|---|---|---|---|---|---|
| Net cash provided by financing activities | | | 1,410,490 | | 18,491,037 |
| EFFECTS OF EXCHANGE RATE CHANGE IN CASH | | 629,384 | 154,545 | | 2,474,351 |
| NET INCREASE IN CASH | | 4,250,618 | 56,170,319 | | 30,458,590 |
| CASH, beginning of the year | | 104,366,117 | 48,195,798 | | 17,737,208 |
| CASH, end of the year | $ | 108,616,735 | $ 104,366,117 | $ | 48,195,798 |

| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | | | |
|---|---|---|---|---|---|
| Cash paid for interest | $ | 142,523 | $ 2,255,809 | $ | 493,781 |
| Cash paid for taxes | $ | 14,900,838 | $ 6,167,810 | $ | 7,001,264 |

| Non-cash investing and financing activities: | | | | | |
|---|---|---|---|---|---|
| | $ | | $ | $ | |
| Common stock issued to acquire Hongrui | $ | - | $ 2,597,132 | $ | - |
| Common stock issued to offset related party payable | $ | 20,000 | | | - |
| Common stock issued for interest payment | $ | 673,929 | - | | - |
| Common stock issued for convertible notes conversion, net of discount | $ | 8,960,000 | 16,000 | | - |
| Derivative liability reclassified to equity upon conversion | $ | 6,784,051 | - | | - |
| Transfer of investments to settle liabilities assumed from reorganization | $ | 1,133,807 | - | | - |

See report of independent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

F-5

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

JUNE 30, 2010

**Note 1 – Organization and business**

Jiangbo Pharmaceuticals, Inc. (the "Company" or "Jiangbo") was originally incorporated in the state of Florida on August 15, 2001.

Pursuant to a Certificate of Amendment to the Amended and Restated Articles of Incorporation filed with the State of Florida which took effect as of April 16, 2009, the Company's name was changed from "Genesis Pharmaceuticals Enterprises, Inc." to "Jiangbo Pharmaceuticals, Inc." (the "Corporate Name Change"). The Corporate Name Change was approved and authorized by the Board of Directors of the Company as well as the holders of a majority of the outstanding shares of the Company's voting stock by written consent. As a result of the Corporate Name Change, the Company's stock symbol changed to "JGBO" with the opening of trading on May 12, 2009 on the OTCBB. The Company's stocks have started trading on Nasdaq Global Market under the symbol " JGBO" since June 8, 2010.

The Company's primary operations consist of the business and operations of its direct and indirect subsidiaries and Variable Interest Entity ("VIE"), which produce and sell western pharmaceutical products in China and focuses on developing innovative medicines to address various medical needs for patients worldwide.

**Note 2 - Summary of significant accounting policies**

Basis of presentation

The Company prepares its consolidated financial statements in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). All significant inter-company accounts and transactions have been eliminated in consolidation.

Principles of consolidation

The accompanying consolidated financial statements include the accounts of the following entities, and all significant intercompany transactions and balance have been eliminated in consolidation:

| Consolidated entity name: | Percentage of ownership |
|---|---|
| Karmoya International Ltd. | 100% |
| Union Well International Limited | 100% |
| Genesis Jiangbo Biotech Technology Co., Ltd. | 100% |
| Laiyang Jiangbo Pharmaceutical Co., Ltd. | Variable Interest Entity |

In accordance with the interpretation of US GAPP, Laiyang Jiangbo is considered a variable interest entity, and the Company is the primary beneficiary. VIEs are generally entities that lack sufficient equity to finance their activities without additional financial support from other parties or whose equity holders lack adequate decision making ability. The Company's relationships with Laiyang Jiangbo and its shareholders are governed by a series of contractual arrangements between GJBT, the Company's wholly foreign-owned enterprise in the PRC, and Laiyang Jiangbo, which is the operating company of the Company in the PRC. Under PRC laws, each of GJBT and Laiyang Jiangbo is an independent legal entity and neither of them is exposed to liabilities incurred by the other parties. The contractual arrangements constitute valid and binding obligations of the parties of such agreements. Each of the contractual arrangements and the rights and obligations of the parties thereto are enforceable and valid in accordance with the laws of the PRC. The Financial Accounting Standards Board's ("FASB") accounting standards address whether certain types of entities, referred to as VIEs, should be consolidated in a company's consolidated financial statements. In accordance with the provisions of the accounting standard, the Company has determined that Laiyang Jiangbo Pharmaceuticals Co., Ltd. ("Laiyang Jiangbo") is a VIE and that the Company is the primary beneficiary, and accordingly, the financial statements of Laiyang Jiangbo are consolidated into the financial statements of the Company.

See report of independent registered public accounting firm.

On September 21, 2007, the Company entered into the following contractual arrangements with Laiyang Jiangbo:

Consulting Services Agreement: Pursuant to the exclusive consulting services agreement between GJBT and Laiyang Jiangbo, GJBT has the exclusive right to provide to Laiyang Jiangbo general consulting services related to pharmaceutical business operations, as well as consulting services related to human resources and technological research and development of pharmaceutical products and health supplements (the "Services"). Under this agreement, GJBT owns the intellectual property rights developed or discovered through research and development while providing the Services for Laiyang Jiangbo. Laiyang Jiangbo pays a quarterly consulting service fee in Chinese Renminbi ("RMB") to GJBT that is equal to all of Laiyang Jiangbo's revenue for such quarter.

Operating Agreement: Pursuant to the operating agreement among GJBT, Laiyang Jiangbo and the shareholders of Laiyang Jiangbo who collectively hold 100% of the outstanding shares of Laiyang Jiangbo (collectively, the " Laiyang Shareholders "), GJBT provides guidance and instructions on Laiyang Jiangbo's daily operations, financial management and employment issues. The Laiyang Shareholders must appoint the candidates recommended by GJBT as members of Laiyang Jiangbo's board of directors. GJBT has the right to appoint senior executives of Laiyang Jiangbo. In addition, GJBT agrees to guarantee Laiyang Jiangbo's performance under any agreements or arrangements relating to Laiyang Jiangbo's business arrangements with any third party. Laiyang Jiangbo, in return, agreed to pledge its accounts receivable and all of its assets to GJBT. Moreover, Laiyang Jiangbo agrees that without the prior consent of GJBT, Laiyang Jiangbo will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Laiyang Jiangbo, including, but not limited to, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party, or transfer of any agreements relating to its business operation to any third party. The term of this agreement is ten (10) years from September 21, 2007, unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

Equity Pledge Agreement: Pursuant to the equity pledge agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders pledged all of their equity interests in Laiyang Jiangbo to GJBT to guarantee Laiyang Jiangbo's performance of its obligations under the consulting services agreement. If either Laiyang Jiangbo or any of the Laiyang Shareholders breaches its respective contractual obligations, GJBT, as pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The Laiyang Shareholders also granted GJBT an exclusive, irrevocable power of attorney to take actions in the place and stead of the Laiyang Shareholders to carry out the security provisions of the equity pledge agreement and take any action and execute any instrument that GJBT may deem necessary or advisable to accomplish the purposes of the equity pledge agreement. The Laiyang Shareholders agreed, among other things, not to dispose of the pledged equity interests or take any actions that would prejudice GJBT's interest. The equity pledge agreement will expire two (2) years after Laiyang Jiangbo obligations under the exclusive consulting services agreement have been fulfilled.

Option Agreement: Pursuant to the option agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders irrevocably granted GJBT or its designated person an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Laiyang Jiangbo for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. GJBT or its designated person has sole discretion to decide when to exercise the option, whether in part or in full. The term of this agreement is ten (10) years from September 21, 2007, unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

See report of independent registered public accounting firm.

F-7

Proxy Agreement: Pursuant to the proxy agreement among GJBT and the Laiyang Shareholders, the Laiyang Shareholders agreed to irrevocably grant and entrust all the rights to exercise their voting power to the person(s) appointed by GJBT. GJBT may from time to time establish and amend rules to govern how GJBT shall exercise the powers granted to it by the Laiyang Shareholders, and GJBT shall take action only in accordance with such rules. The Laiyang Shareholders shall not transfer their equity interests in Laiyang Jiangbo to any individual or company (other than GJBT or the individuals or entities designated by GJBT). The Laiyang Shareholders acknowledged that they will continue to perform this agreement even if one or more than one of them no longer hold the equity interests of Laiyang Jiangbo. This agreement may not be terminated without the unanimous consent of all of the parties, except that GJBT may terminate this agreement by giving thirty (30) days prior written notice to the Laiyang Shareholders.

These contractual arrangements obligate GJBT to absorb a majority of the risk of loss from Laiyang Jiangbo's activities and enable GJBT to receive a majority of its expected returns. GJBT also has the right to appoint senior executives and members of Laiyang Jiangbo's board of directors, and Laiyang Jiangbo also agrees that without the prior consent of GJBT, Laiyang Jiangbo will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Laiyang Jiangbo. Because of the contractual arrangements, the Company has a pecuniary interest in Laiyang Jiangbo that requires consolidation of the Company's and Laiyang Jiangbo's financial statements.

The carrying amount and classification of the VIE's assets and liabilities as of June 30, 2010 are as follows:

|  | Year Ended June 30, 2010 |
|---|---|
| Current assets | $ 155,613,750 |
| Plant and equipment, net | 13,284,312 |
| Other noncurrent assets | 32,594,326 |
| Total assets | 201,492,388 |
| Current liabilities | 67,932,556 |
| Total liabilities | 67,932,556 |
| Net assets | 133,559,832 |

Laiyang Jiangbo has payables to the Company and its wholly owned subsidiary JGBT amounted to $34,705,277 which was included in Laiyang Jiangbo's current liabilities and eliminated in the consolidated financial statements. Creditors of Laiyang Jiangbo have no recourse to the general credit or assets of the Company. Laiyang Jiangbo and JGBT are both direct beneficiary of the proceeds of November 2007 Debentures and May 2008 Notes and jointly and severally guarantee the payments of the Company's obligations under the November 2007 Debentures and May 2008 Notes (see Note 13).

Foreign currency translation

The reporting currency of the Company is the U.S. dollar. The functional currency of the Company is the local currency, the Chinese Renminbi ("RMB"). In accordance with the FASB's accounting standard governing foreign currency translation, results of operations and cash flows are translated at average exchange rates during the period, assets and liabilities are translated at the unified exchange rates as quoted by the People's Bank of China at the end of the period, and equity is translated at historical exchange rates. As a result, amounts related to assets and liabilities reported on the consolidated statements of cash flows will not necessarily agree with changes in the corresponding balances on the consolidated balance sheets. Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in the results of operations as incurred.

See report of independent registered public accounting firm.

F-8

Asset and liability accounts at June 30, 2010, were translated at 6.79 RMB to $1.00 USD as compared to 6.83 RMB to $1.00 USD at June 30, 2009. The average translation rates applied to income statements for the years ended June 30, 2010, 2009, and 2008 were 6.82 RMB, 6.83 RMB and 7.26 RMB to $1.00 USD, respectively.

<u>Use of estimates</u>

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. The significant estimates made in the preparation of the Company's consolidated financial statements relate to the assessment of the carrying values of accounts receivable and related allowance for doubtful accounts, allowance for obsolete inventory, sales returns, fair value of warrants and beneficial conversion features related to the convertible notes, and fair value of options granted to employees. Actual results could be materially different from these estimates upon which the carrying values were based.

<u>Revenue recognition</u>

Revenue from product sales is generally recognized when title to the product has transferred to customers in accordance with the terms of the sale. In general, the Company records revenue when persuasive evidence of an arrangement exists, services have been rendered or product delivery has occurred, the sales price to the customer is fixed or determinable, and collectability is reasonably assured.

The Company is generally not contractually obligated to accept returns. However, on a case by case negotiated basis, the Company permits customers to return their products. Therefore, revenue is recorded net of an allowance for estimated returns. Such reserves are based upon management's evaluation of historical experience and estimated costs. The amount of the reserves ultimately required could differ materially in the near term from amounts included in the accompanying consolidated statements of income.

<u>Financial instruments</u>

The accounting standard governing financial instruments adopted on July 1, 2008, defines financial instruments and requires fair value disclosures about those instruments. It defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosure requirements for fair value measures. Cash, investments, receivables, payables, short term loans and convertible debt all qualify as financial instruments. Management concluded cash, receivables, payables and short term loans approximate their fair values because of the short period of time between the origination of such instruments and their expected realization and, if applicable, their stated rates of interest are equivalent to rates currently available.

The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.
- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.
- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

The Company analyzes all financial instruments with features of both liabilities and equity under the FASB's accounting standard for such instruments. Under this standard, financial assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. Depending on the product and the terms of the transaction, the fair value of notes payable and derivative liabilities were modeled using a series of techniques, including closed-form analytic formula, such as the Black-Scholes option-pricing model.

See report of independent registered public accounting firm.

Effective July 1, 2009, as a new accounting standard took effect, the Company's two convertible notes with principal amounts totaling $34,840,000 and 2,275,000 warrants previously treated as equity pursuant to the derivative treatment exemption are no longer afforded equity treatment because the strike price of the warrants is denominated in US dollar, a currency other than the Company's functional currency, the Chinese Renminbi. As a result, those financial instruments are not considered indexed to the Company's own stock, and as such, all future changes in the fair value of these convertible notes and warrants are recognized currently in earnings until such time as the convertible notes and warrants are converted, exercised or expired.

As such, effective July 1, 2009, the Company reclassified the fair value of the conversion features on the convertible notes and warrants from equity to liability, as if these conversion features on the convertible notes and warrants were treated as a derivative liability since their initial issuance dates. On July 1, 2009, the Company reclassified approximately $35 million from additional paid-in capital and approximately $4.9 million from beginning retained earnings to warrant liabilities, as a cumulative effect adjustment, to recognize the fair value of the conversion features on the convertible notes and warrants. For the year ended June 30, 2010, $8,960,000 of convertible notes were converted into common shares. As of June 30, 2010, the Company has $25,880,000 convertible notes and 2,275,000 warrants related to the convertible debentures outstanding. The fair value of the conversion features on the convertible notes was approximately $8.4 million and the fair value of the warrants was approximately $10.1 million. The Company recognized $14.6 million gains from the change in fair value of the conversion features on the convertible notes and warrants for the year ended June 30, 2010.

These common stock purchase warrants do not trade in an active securities market, and as such, the Company estimates the fair value of the conversion features on the convertible notes and warrants using the Black-Scholes option pricing model using the following assumptions:

| | June 30, 2010 | | | | July 1, 2009 | | | |
|---|---|---|---|---|---|---|---|---|
| | Annual dividend yield | Expected term (years) | Risk-free interest rate | Expected volatility | Annual dividend yield | Expected term (years) | Risk-free interest rate | Expected volatility |
| Conversion feature on the $4 million convertible notes | - | 0.35 | 0.22% | 57.00% | - | 1.35 | 1.11% | 95.80% |
| Conversion feature on the $21.9 million convertible notes | - | 0.92 | 0.32% | 57.00% | - | 1.92 | 1.11% | 102.00% |
| 400,000 warrants issued in November 2007 | - | 0.35 | 0.22% | 57.00% | - | 1.35 | 1.11% | 95.80% |
| 1,875,000 warrants issued in May 2008 | - | 2.92 | 1.00% | 85.00% | - | 3.92 | 2.54% | 97.51% |

Expected volatility is based primarily on historical volatility. Historical volatility was computed using weekly pricing observations for recent periods that correspond to the term of the warrants and one year period is used when the remaining contractual terms of warrants have less than one year. The Company's management believes this method produces an estimate that is representative of the expectations of future volatility over the expected term of these warrants. The Company has no reason to believe future volatility over the expected remaining life of these warrants will likely differ materially from historical volatility. The expected life is based on the remaining term of the warrants. The risk-free interest rate is based on U.S. Treasury securities according to the remaining term of the financial instruments.

The following table sets forth by level within the fair value hierarchy the financial assets and liabilities that were accounted for at fair value on a recurring basis.

See report of independent registered public accounting firm.

| | Carrying Value at June 30, 2010 | Fair Value Measurements at June 30, 2010, Using Fair Value Hierarchy | | |
| --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 |
| Investments | $ 168,858 | $ 168,858 | $ - | $ - |
| Conversion options - $ 4.0M Convertible Debt (November 2007) | 1,007,722 | - | - | 1,007,722 |
| Conversion options - $21.9M Convertible Debt (May 2008) | 7,358,478 | - | - | 7,358,478 |
| 400,000 warrants issued in November 2007 | 806,177 | - | - | 806,177 |
| 1,875,000 warrants issued in May 2008 | 9,324,850 | - | - | 9,324,850 |
| Total | $ 18,666,085 | $ 168,858 | $ - | $ 18,497,227 |

Level 3 Valuation Reconciliations:

| | Derivative Liabilities |
| --- | --- |
| Balance, July 1, 2009 | 39,912,733 |
| Reclassification to APIC due to conversion of notes | (6,784,051) |
| Change in fair value for the year ended June 30, 2010 | (14,631,455) |
| Balance, June 30, 2010 | 18,497,227 |

The Company did not identify any other non-recurring assets and liabilities that are required to be presented on the consolidated balance sheets at fair value in accordance with the relevant accounting standards.

An accounting standard provides the Company with the irrevocable option to elect fair value for the initial and subsequent measurement for certain financial assets and liabilities on a contract-by-contract basis with the difference between the carrying value before election of the fair value option and the fair value recorded upon election as an adjustment to beginning retained earnings. The Company chose not to elect the fair value option.

Stock-based compensation

The Company records stock-based compensation expense pursuant to the governing accounting standard which requires companies to measure compensation cost for stock-based employee compensation plans at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company estimates the fair value of the awards using the Black-Scholes option pricing model. Under this accounting standard, the Company's expected volatility assumption is based on the historical volatility of Company's stock or the expected volatility of similar entities. The expected life assumption is primarily based on historical exercise patterns and employee post-vesting termination behavior. The risk-free interest rate for the expected term of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

See report of independent registered public accounting firm.

F-11

Stock-based compensation expense is recognized based on awards expected to vest, and there were no estimated forfeitures as the Company has a short history of issuing options.

The Company uses the Black-Scholes option-pricing model which was developed for use in estimating the fair value of options. Option-pricing models require the input of highly complex and subjective variables including the expected life of options granted and the Company's expected stock price volatility over a period equal to or greater than the expected life of the options. Because changes in the subjective assumptions can materially affect the estimated value of the Company's employee stock options, it is management's opinion that the Black-Scholes option-pricing model may not provide an accurate measure of the fair value of the Company's employee stock options. Although the fair value of employee stock options is determined in accordance with the accounting standards using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction.

Comprehensive income

FASB's accounting standard regarding comprehensive income establishes standards for reporting and display of comprehensive income and its components in financial statements. It requires that all items that are required to be recognized under accounting standards as components of comprehensive income be reported in a financial statement that is displayed with the same prominence as other financial statements. The accompanying consolidated financial statements include the provisions of this accounting standard.

Cash and cash equivalents

Cash and cash equivalents include cash on hand and demand deposits in accounts maintained with state-owned banks within the PRC. The Company considers all highly liquid instruments with original maturities of three months or less, and money market accounts to be cash and cash equivalents.

The Company maintains cash deposits in financial institutions that exceed the amounts insured by the U.S. government. Balances at financial institutions or state-owned banks within the PRC are not covered by insurance. Non-performance by these institutions could expose the Company to losses for amounts in excess of insured balances. At June 30, 2010 and 2009, the Company's bank balances, including restricted cash balances, exceeded government-insured limits by approximately $119,675,000 and $111,684,000, respectively. The Company has not experienced non-performance by these institutions.

Restricted cash

Restricted cash represent amounts set aside by the Company in accordance with the Company's debt agreements with certain financial institutions. These cash amounts are designated for the purpose of paying down the principal amounts owed to the financial institutions, and these amounts are held at the same financial institutions with which the Company has debt agreements. Due to the short-term nature of the Company's debt obligations to these banks, the corresponding restricted cash balances have been classified as current in the consolidated balance sheets.

As of June 30, 2010 and 2009, the Company had restricted cash of $11,135,880 and $7,325,000, respectively, of which $11,135,880 and $7,325,000, respectively, were maintained as security deposits for bank acceptance related to the Company's notes payable.

Investments and restricted investments

Investments are comprised of marketable equity securities of publicly traded companies and are stated at fair value based on the quoted price of these securities. These investments are classified as trading securities based on the Company's intent and ability to short them within the year. Restricted investments are marketable equity securities of publicly traded companies that were acquired through the reverse merger and contained certain SEC Rule 144 restrictions on the securities. These securities are classified as available-for-sale and are reflected as restricted and noncurrent, as the Company intends to hold them beyond one year. Restricted investments are carried at fair value based on the trading price of these securities.

See report of independent registered public accounting firm.

F-12

For trading securities, realized and unrealized gains and losses are included in the accompanying consolidated statements of income. For available-for-sale securities, realized gains and losses are included in the consolidated statements of income. Unrealized gains and losses for these available-for-sale securities are reported in other comprehensive income, net of tax, in the consolidated statements of shareholders' equity. The Company has no investments that are considered to be held-to-maturity securities.

The following is a summary of the components of the gain/loss on investments and restricted investments for the years ended June 30, 2010 and 2009:

| | For the Year Ended June 30, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| Realized loss on trading securities | $ 406,346 | $ 473,303 | $ 44,481 |
| Unrealized (gain) loss on trading securities | (150,525) | 229,425 | 696,528 |
| Unrealized (gain) loss on restricted investments – available-for-sale securities | (166,378) | 1,514,230 | (1,347,852) |

Accounts receivable

During the normal course of business, the Company extends credit to its customers without requiring collateral or other security interests. Management reviews its accounts receivable at each reporting period to provide for an allowance against accounts receivable for an amount that could become uncollectible. This review process may involve the identification of payment problems with specific customers. The Company estimates this allowance based on the aging of the accounts receivable, historical collection experience, and other relevant factors, such as changes in the economy and the imposition of regulatory requirements that can have an impact on the industry. These factors continuously change, and can have an impact on collections and the Company's estimation process. These impacts may be material.

Certain accounts receivable amounts are charged off against allowances after unsuccessful collection efforts. Subsequent cash recoveries are recognized as income in the period when they occur.

The activities in the allowance for doubtful accounts are as follows for the years ended June 30, 2010 and 2009:

| | 2010 | 2009 |
|---|---|---|
| Beginning allowance for doubtful accounts | $ 694,370 | $ 155,662 |
| Bad debt expense (recovery) | 642,499 | 538,068 |
| Foreign currency translation adjustments | 6,552 | 640 |
| Ending allowance for doubtful accounts | $ 1,343,421 | $ 694,370 |

See report of independent registered public accounting firm.

F-13

Inventories

Inventories, consisting of raw materials, work-in-process, packing materials and finished goods related to the Company's products, are stated at the lower of cost or market utilizing the weighted average method. The Company reviews its inventory periodically for possible obsolete goods or to determine if any reserves are necessary. As of June 30, 2010 and 2009, the Company determined that no inventory reserves were necessary.

Advances to suppliers

Advances to suppliers represent partial payments or deposits for future inventory purchases. These advances to suppliers are non-interest bearing and unsecured. From time to time, vendors require a certain amount of monies to be deposited with them as a guarantee that the Company will receive their purchases on a timely basis. As of June 30, 2010, and 2009, the Company's advance to suppliers amounted to approximately $261,000 and $236,000, respectively.

Plant and equipment

Plant and equipment are stated at cost less accumulated depreciation. Additions and improvements to plant and equipment accounts are recorded at cost. When assets are retired or disposed of, the cost and accumulated depreciation are removed from the accounts, and any resulting gains or losses are included in the results of operations in the year of disposition. Maintenance, repairs, and minor renewals are charged directly to expense as incurred. Major additions and betterments to plant and equipment accounts are capitalized. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The estimated useful lives of the assets are as follows:

|  | Useful Life |
|---|---|
| Buildings and building improvements | 5 – 40 Years |
| Manufacturing equipment | 5 – 20 Years |
| Office equipment and furniture | 5 – 10 Years |
| Vehicles | 5 Years |

Intangible assets

All land in the PRC is owned by the PRC government and cannot be sold to any individual or company. The Company has recorded the amounts paid to the PRC government to acquire long-term interests to utilize land underlying the Company's facilities as land use rights. This type of arrangement is common for the use of land in the PRC. The land use rights are amortized on the straight-line method over the terms of the land use rights of 50 years.

Patents and licenses include purchased technological know-how, secret formulas, manufacturing processes, technical and procedural manuals, and the certificate of drugs production and is amortized using the straight-line method over the expected useful economic life of 5 years, which reflects the period over which those formulas, manufacturing processes, technical and procedural manuals are kept secret to the Company as agreed between the Company and the selling parties.

The estimated useful lives of intangible assets are as follows:

|  | Useful Life |
|---|---|
| Land use rights | 50 Years |
| Patents | 5 Years |
| Licenses | 5 Years |
| Customer list and customer relationships | 3 Years |
| Trade secrets - formulas and know how technology | 5 Years |

See report of independent registered public accounting firm.

Impairment of long-lived assets

Long-lived assets of the Company are reviewed periodically or more often if circumstances dictate, to determine whether their carrying values have become impaired. The Company considers assets to be impaired if the carrying values exceed the future projected cash flows from related operations. The Company also re-evaluates the periods of depreciation to determine whether subsequent events and circumstances warrant revised estimates of useful lives. As of June 30, 2010, the Company expects these assets to be fully recoverable.

Beneficial conversion feature of convertible notes

In accordance with accounting standards governing the beneficial conversion feature of convertible notes, the Company has determined that the convertible notes contained a beneficial conversion feature because on November 6, 2007, the effective conversion price of the $5,000,000 convertible note was $5.81 when the market value per share was $16.00, and on May 30, 2008, the effective conversion price of the $30,000,000 convertible note was $5.10 when the market value per share was $12.00. Total value of beneficial conversion feature of $2,904,092 for the November 6, 2007 convertible note and $19,111,323 for the May 30, 2008 convertible debt was discounted from the carrying value of the convertible notes. The beneficial conversion feature is amortized using the effective interest method over the term of the note. As of June 30, 2010 and 2009, a total of $8,637,647 and $17,955,637, respectively, remained unamortized for the beneficial conversion feature.

Income taxes

The Company accounts for income taxes in accordance with the accounting standard for income taxes. Deferred income taxes are recognized for the tax consequences of temporary differences by applying enacted statutory tax rates applicable to future years to differences between the financial statement carrying amounts and the tax bases of existing assets and liabilities. Under this accounting standard, the effect on deferred income taxes of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recognized if it is more likely than not that some portion, or all of, a deferred tax asset will not be realized.

The accounting standards clarify the accounting and disclosure for uncertain tax positions and prescribe a recognition threshold and measurement attribute for recognition and measurement of a tax position taken or expected to be taken in a tax return. The accounting standards also provide guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

Under this accounting standard, evaluation of a tax position is a two-step process. The first step is to determine whether it is more-likely-than-not that a tax position will be sustained upon examination, including the resolution of any related appeals or litigation based on the technical merits of that position. The second step is to measure a tax position that meets the more-likely-than-not threshold to determine the amount of benefit to be recognized in the financial statements. A tax position is measured at the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. Tax positions that previously failed to meet the more-likely-than-not recognition threshold should be recognized in the first subsequent period in which the threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not criteria should be de-recognized in the first subsequent financial reporting period in which the threshold is no longer met. Penalties and interest incurred related to underpayment of income tax are classified as income tax expense in the year incurred. No significant penalties or interest relating to income taxes have been incurred during the years ended June 30, 2010 and 2009. GAAP also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosures and transition.

The Company's operations are subject to income and transaction taxes in the United States and in the PRC jurisdictions. Significant estimates and judgments are required in determining the Company's worldwide provision for income taxes. Some of these estimates are based on interpretations of existing tax laws or regulations, and as a result the ultimate amount of tax liability may be uncertain. However, the Company does not anticipate any events that would lead to changes to these uncertainties.

See report of independent registered public accounting firm.

Value added tax

The Company is subject to value added tax ("VAT") for manufacturing products and business tax for services provided. The applicable VAT rate is 17% for products sold in the PRC. The amount of VAT liability is determined by applying the applicable tax rate to the invoiced amount of goods sold (output VAT) less VAT paid on purchases made with the relevant supporting invoices (input VAT). Under the commercial practice of the PRC, the Company pays VAT based on tax invoices issued. The tax invoices may be issued subsequent to the date on which revenue is recognized, and there may be a considerable delay between the date on which the revenue is recognized and the date on which the tax invoice is issued. In the event that the PRC tax authorities dispute the date on which revenue is recognized for tax purposes, the PRC tax office has the right to assess a penalty, which can range from zero to five times the amount of the taxes which are determined to be late or deficient, and will be charged to operations in the period if and when a determination is made by the taxing authorities that a penalty is due.

VAT on sales and VAT on purchases amounted to $16,565,462 and $3,542,607, respectively, for the year ended June 30, 2010. VAT on sales and VAT on purchases amounted to $17,037,463 and $2,918,492, respectively, for the year ended June 30, 2009. Sales and purchases are recorded net of VAT collected and paid as the Company acts as an agent for the government. VAT taxes are not impacted by the income tax holiday.

Shipping and handling

Shipping and handling costs related to costs of goods sold are included in selling, general and administrative expenses. Shipping and handling costs amounted to $575,357, $575,743 and $365,327 for the years ended June 30, 2010, 2009, and 2008, respectively.

Advertising

Expenses incurred in the advertising of the Company and the Company's products are charged to operations currently. Advertising expenses amounted to $5,566,458, $2,572,631and $4,653,121 for the years ended June 30, 2010, 2009 and 2008, respectively.

Research and development

Research and development costs are expensed as incurred. These costs primarily consist of cost of material used and salaries paid for the development of the Company's products and fees paid to third parties to assist in such efforts. Research and development costs for the years ended June 30, 2009, 2008, and 2007 were approximately $4,400,000, $4,395,000, and $3,236,000, respectively.

Recent accounting pronouncements

In January 2010, FASB issued ASU No. 2010-01 Accounting for Distributions to Shareholders with Components of Stock and Cash. The amendments in this ASU clarify that the stock portion of a distribution to shareholders that allows them to elect to receive cash or stock with a potential limitation on the total amount of cash that all shareholders can elect to receive in the aggregate is considered a share issuance that is reflected in EPS prospectively and is not a stock dividend for purposes of applying Topics 505 and 260 (Equity and Earnings Per Share). The amendments in this update are effective for interim and annual periods ending on or after December 15, 2009, and should be applied on a retrospective basis. This ASU did not have a material impact on the accompanying consolidated financial statements.

In January 2010, FASB issued ASU No. 2010-02 Accounting and Reporting for Decreases in Ownership of a Subsidiary – a Scope Clarification. The amendments in this ASU affect accounting and reporting by an entity that experiences a decrease in ownership in a subsidiary that is a business or nonprofit activity. The amendments also affect accounting and reporting by an entity that exchanges a group of assets that constitutes a business or nonprofit activity for an equity interest in another entity. The amendments in this update are effective beginning in the period that an entity adopts SFAS No. 160, "Non-controlling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51." If an entity has previously adopted SFAS No. 160 as of the date the amendments in this update are included in the Accounting Standards Codification, the amendments in this update are effective beginning in the first interim or annual reporting period ending on or after December 15, 2009. The amendments in this update should be applied retrospectively to the first period that an entity adopted SFAS No. 160. The adoption of this ASU did not have a material impact on the Company's consolidated financial statements.

See report of independent registered public accounting firm.

F-16

In January 2010, FASB issued ASU No. 2010-06 Improving Disclosures about Fair Value Measurements. This ASU provides amendments to Subtopic 820-10 that requires new disclosure as follows: 1) Transfers in and out of Levels 1 and 2. A reporting entity should disclose separately the amounts of significant transfers in and out of Level 1 and Level 2 fair value measurements and describe the reasons for the transfers. 2) Activity in Level 3 fair value measurements. In the reconciliation for fair value measurements using significant unobservable inputs (Level 3), a reporting entity should present separately information about purchases, sales, issuances, and settlements (that is, on a gross basis rather than as one net number). This update provides amendments to Subtopic 820-10 that clarify existing disclosures as follows: 1) Level of disaggregation. A reporting entity should provide fair value measurement disclosures for each class of assets and liabilities. A class is often a subset of assets or liabilities within a line item in the statement of financial position. A reporting entity needs to use judgment in determining the appropriate classes of assets and liabilities. 2) Disclosures about inputs and valuation techniques. A reporting entity should provide disclosures about the valuation techniques and inputs used to measure fair value for both recurring and nonrecurring fair value measurements. Those disclosures are required for fair value measurements that fall in either Level 2 or Level 3. The new disclosures and clarifications of existing disclosures are effective for interim and annual reporting periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level 3 fair value measurements. Thos disclosures are effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. The Company is currently evaluating the impact of this ASU, however, the Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In February 2010, the FASB issued Accounting Standards Update 2010-09, Subsequent Events (Topic 855): Amendments to Certain Recognition and Disclosure Requirements, or ASU 2010-09. This ASU 2010-09 primarily rescinds the requirement that, for listed companies, financial statements clearly disclose the date through which subsequent events have been evaluated. Subsequent events must still be evaluated through the date of financial statement issuance; however, the disclosure requirement has been removed to avoid conflicts with other SEC guidelines. This ASU was effective immediately upon issuance and was adopted in February 2010. The adoption of this ASU did not have a material impact on the accompanying consolidated financial statements.

In April 2010, the FASB issued Accounting Standards Update 2010-13, "Compensation—Stock Compensation (Topic 718): Effect of Denominating the Exercise Price of a Share-Based Payment Award in the Currency of the Market in Which the Underlying Equity Security Trades," or ASU 2010-13. This Update provides amendments to Topic 718 to clarify that an employee share-based payment award with an exercise price denominated in currency of a market in which a substantial porting of the entity's equity securities trades should not be considered to contain a condition that is not a market, performance, or service condition. Therefore, an entity would not classify such an award as a liability if it otherwise qualifies as equity. The amendments in this Update are effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2010. The Company does not expect the adoption of ASU 2010-17 to have a significant impact on its consolidated financial statements.

In April 2010, the FASB issued Accounting Standard Update 20-10-17, "Revenue Recognition—Milestone Method (Topic 605): Milestone Method of Revenue Recognition" or ASU 2010-17. This Update provides guidance on the recognition of revenue under the milestone method, which allows a vendor to adopt an accounting policy to recognize all of the arrangement consideration that is contingent on the achievement of a substantive milestone (milestone consideration) in the period the milestone is achieved. The pronouncement is effective on a prospective basis for milestones achieved in fiscal years and interim periods within those years, beginning on or after June 15, 2010. The adoption of ASU 2010-17 does not have a significant impact on its consolidated financial statements.

<u>Reclassifications</u>

Non-operating income and expenses were grossed up and in the prior year's consolidated financial statements these amounts have been netted into Non-operating expense (income) to conform to the current period presentation with no impact on the previously reported net income or cash flows.

See report of independent registered public accounting firm.

F-17

**Note 3 - Acquisition**

On January 23, 2009, Laiyang Jiangbo entered into an asset acquisition agreement (the "Agreement") with Shandong Traditional Chinese Medicine College (the "Medicine College") and Shandong Hongrui Pharmaceutical Factory ("Shandong Hongrui" or "Hongrui"), a wholly-owned subsidiary of Medicine College, pursuant to which Laiyang Jiangbo purchased the majority of the assets owned by Hongrui, including all tangible assets, all manufacturing and office buildings, land, equipment and inventories and all rights to manufacture and distribute Hongrui's 22 Traditional Chinese Medicines ("TCMs"), for an original contract purchase price of approximately $12 million consisting of approximately $9.6 million in cash and 643,651 shares of Jiangbo's common stock. The $4.035 fair value of each common share was based on the weighted average trading price of the common stock of 5 days prior to the execution of the Agreement and amounted to $2,597,132. On February 10, 2009, the Agreement was amended to revise the total purchase price to approximately $11.1 million consisting of approximately $8.6 million in cash. The Company is obligated to issue 643,651 shares of Jiangbo's stock to Medicine College within one year of the date of the execution of the Agreement. As of June 30, 2009, Laiyang Jiangbo paid approximately $8.6 million in cash in full. The 643,651 shares of Jiangbo's common stock issuable to Medicine College in connection with the acquisition of Hongrui have been included in the accompanying consolidated balance sheet as outstanding shares.

The Company accounted for this acquisition using the purchase method of accounting in accordance with an accounting standard relates to, "Business Combinations." The purchase price was determined based on an arm's length negotiation and no finder's fees or commissions were paid in connection with this acquisition.

The following represents the allocation of the purchase price to the net assets acquired based on their respective fair values. The accompanying consolidated financial statements include the acquisition of Hongrui, effective February 5, 2009. The following represents the allocation of the purchase price to the net assets acquired based on their respective fair values.

| | |
|---|---:|
| Inventory | $ 147,250 |
| Plant and equipments | 3,223,808 |
| Intangible assets | 7,810,974 |
| Total assets acquired | 11,182,032 |
| Net assets acquired | 11,182,032 |
| Total consideration | $11,182,032 |

The following pro forma consolidated results of operations for the years ended June 30, 2009 and 2008, as if the acquisition of Hongrui had been completed as of the beginning of each year presented. The pro forma information gives effect to actual operating results prior to the acquisition. The pro forma amounts does not purport to be indicative of the results that would have actually been obtained if the acquisition had occurred as of the beginning of the years presented and is not intended to be a projection of future results:

| | Year Ended June 30, 2009 | Year Ended June 30, 2008 |
|---|---:|---:|
| Net Revenues | $ 124,729,372 | $ 115,573,456 |
| Income from Operations | 50,265,379 | 34,244,471 |
| Net Income | 29,234,644 | 23,848,737 |
| Net Income (loss) Per Shares | | |
| Basic | $ 2.8 | $ 2.43 |
| Diluted | $ 0.11 | $ (0.97) |
| Weighted Average number of shares outstanding | | |
| Basic | 10,424,592 | 9,807,778 |
| Diluted | 14,848,096 | 10,544,079 |

See report of independent registered public accounting firm.

**Note 4 - Earnings per share**

The FASB's accounting standard for earnings per share requires presentation of basic and diluted earnings per share in conjunction with the disclosure of the methodology used in computing such earnings per share. Basic earnings per share excludes dilution and is computed by dividing income available to common stockholders by the weighted average common shares outstanding during the period. Diluted earnings per share takes into account the potential dilution that could occur if securities or other contracts to issue common stock were exercised and converted into common stock.

All share and per share amounts used in the Company's financial statements and notes thereto have been retroactively restated to reflect the 40-to-1 reverse stock split, which occurred on September 4, 2008.

The following is a reconciliation of the basic and diluted earnings per share computations for the years ended June 30, 2010, 2009, and 2008:

**Basic earnings per share**

|                                                  | 2010        | 2009        | 2008        |
| ------------------------------------------------ | ----------- | ----------- | ----------- |
| For the years ended June 30, 2010, 2009 and 2008 |             |             |             |
| Net income for basic earnings per share          | $ 29,850,355 | $ 28,880,264 | $ 22,451,060 |
| Weighted average shares used in basic computation | 11,104,025 | 10,061,326  | 9,164,127   |
| Earnings per share – Basic                       | $      2.69 | $      2.87 | $      2.45 |

**Diluted earnings (loss) per share**

|                                                         | 2010         | 2009         | 2008 RESTATED |
| ------------------------------------------------------- | ------------ | ------------ | ------------- |
| For the years ended June 30, 2010, 2009 and 2008        |              |              |               |
| Net income for basic earnings per share                 | $ 29,850,355 | $ 28,880,264 | $ 22,451,060  |
| Add: interest expense                                   | 4,887,484    | 2,124,340    | 345,833       |
| Add: financing cost amortization                        | 801,034      | 680,276      | 123,963       |
| Add: note discount amortization                         | 14,823,337   | 4,004,868    | 2,500,043     |
| Subtract: unamortized financing cost at beginning of the period | (1,236,668) | (1,916,944) | (2,040,907) |
| Subtract: unamortized debt discount at beginning of the period | (28,493,089) | (32,499,957) | (35,000,000) |
| Net income for diluted earnings per share               | 20,632,453   | 1,274,847    | (11,620,008)  |
| Weighted average shares used in basic computation       | 11,104,025   | 10,061,326   | 9,164,127     |
| Diluted effect of stock options                         | 267,185      | 48,504       | -             |
| Diluted effect of warrants                              |              |              |               |
| Diluted effect of convertible notes                     | 3,763,920    | 4,375,000    | 736,301       |
| Weighted average shares used in diluted computation     | 15,135,130   | 14,484,830   | 9,900,428     |
| Earnings (loss) per share:                              |              |              |               |
| Basic                                                   | $      2.69  | $      2.87  | $      2.45   |
| Diluted                                                 | $      1.36  | $      0.09  | $     (1.17)  |

See report of independent registered public accounting firm.

For the year ended June 30, 2010, 7,500 options at an average exercise price of $17.93 were not included in the diluted earnings per share calculation due to the anti-dilutive effect.

For the year ended June 30, 2009, 2,275,000 warrants at an average exercise price of $9.59 and 7,500 options at an average exercise price of $17.93 were not included in the diluted earnings per share calculation due to the anti-dilutive effect.

For the year ended June 30, 2008, 2,349,087 warrants at an average exercise price of $9.60 and 140,900 options at an average exercise price of $4.93 were not included in the diluted earnings per share calculation due to the anti-dilutive effect.

**Note 5 - Discontinued operations**

In connection with the reverse merger with Karmoya on October 1, 2007, the Company determined to discontinue its operations of business development and marketing, as it no longer supported its core business strategy. The discontinuance of these operations did not involve any sale of assets of assumption of liabilities by another party. In conjunction with the discontinuance of operations, the Company determined that the assets related to the Company's business development and marketing operations were subject to the recognition of impairment. However, since the related assets are continuing to be used by the Company's Karmoya and subsidiaries, the Company determined that there had been no impairment. The remaining liabilities of the discontinued operations are reflected in the consolidated balance sheets under the caption "liabilities assumed from reorganization" which amounted to approximately $525,000and $1,565,000 as of June 30, 2010 and 2009, respectively.

The FASB's accounting standard, "Accounting for the Impairment or Disposal of Long-Lived Assets," the results of operations of a component of entity that has been disposed of or is classified as held for sale shall be reported in discontinued operations. Accordingly, the results of operations of the business development and marketing operation segment are reported as discontinued operations in the accompanying consolidated statements of income for the years ended June 30, 20010, 2009 and 2008. The following is a summary of the components of the loss from discontinued operations for the years ended June 30, 2010, 2009 and 2008:

See report of independent registered public accounting firm.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| Revenues | $ - | $ - | $ - |
| Cost of sales | | $ - | - |
| Gross profit | | | - |
| Operating and other non-operating expenses | 243,792 | 1,781,946 | 380,027 |
| Loss from discontinued operations before other expenses and income taxes | 243,792 | 1,781,946 | 380,027 |
| Income tax benefit | - | - | - |
| Loss from discontinued operations | $ 243,792 | $ 1,781,946 | $ 380,027 |

**Note 6 - Inventories**

Inventories consisted of the following as of June 30, 2010 and 2009:

|  | 2010 | 2009 |
|---|---|---|
| Raw materials | $ 822,460 | $ 1,539,612 |
| Work-in-process | 326,831 | 55,992 |
| Packing materials | 140,328 | 483,287 |
| Finished goods | 910,995 | 1,198,303 |
| Total | $ 2,200,614 | $ 3,277,194 |

**Note 7 - Plant and equipment**

Plant and equipment consist of the following at June 30, 2010 and 2009:

|  | 2010 | 2009 |
|---|---|---|
| Buildings and building improvements | $ 12,891,331 | $ 12,798,375 |
| Manufacturing equipment | 2,783,090 | 2,603,114 |
| Office equipment and furniture | 222,172 | 291,061 |
| Vehicle | 479,999 | 477,396 |
| Total | 16,376,592 | 16,169,946 |
| Less: accumulated depreciation | (3,092,280) | (2,212,549) |
| Total | $ 13,284,312 | $ 13,957,397 |

For the years ended June 30, 2010, 2009, and 2008, depreciation expense amounted to $823,087, $679,507, and $517,863, respectively.

**Note 8 - Intangible assets**

At June 30, 2010 and 2009, intangible assets consist of the following:

See report of independent registered public accounting firm.

F-21

| | 2010 | 2009 |
|---|---|---|
| Land use rights | $ 28,359,388 | $ 11,245,939 |
| Patents | 4,964,010 | 4,937,050 |
| Customer lists and customer relationships | 1,129,716 | 1,123,580 |
| Trade secrets- formulas and manufacture process know-how | 1,031,100 | 1,025,500 |
| Licenses | 23,494 | 23,367 |
| Total | 35,507,708 | 18,355,436 |
| Less: accumulated amortization | (2,913,382) | (1,314,255) |
| Total | $ 32,594,326 | $ 17,041,181 |

The estimated amortization expenses for the next five years and thereafter are:

| Years ending June 30: | |
|---|---|
| 2011 | $ 2,091,043 |
| 2012 | 1,907,869 |
| 2013 | 1,707,106 |
| 2014 | 1,270,853 |
| 2015 and thereafter | 25,617,455 |
| Total | $32,594,326 |

For the years ended June 30, 2010, 2009, and 2008, amortization expense relating to the above intangible assets amounted to $1,585,141, $735,427, and $184,465, respectively.

**Note 9 - Debt**

Short term bank loans

Short term bank loan represents an amount due to a bank that is due within one year. This loan can be renewed with the bank upon maturity. The Company's short term bank loan consisted of the following:

| | June 30, 2010 | June 30,2009 |
|---|---|---|
| Loan from Communication Bank; due December 2010 and 2009; interest rate of 6.37% and 6.37% per annum; monthly interest payment; guaranteed by related party, Jiangbo Chinese-Western Pharmacy. | $ 2,209,500 | $ 2,197,500 |
| Total | $ 2,209,500 | $ 2,197,500 |

Interest expense related to the bank loans amounted to $142,523, $116,649, and $436,818 for the years ended June 30, 2010, 2009, and 2008, respectively.

See report of independent registered public accounting firm.

F-22

Notes Payable

Notes payable represent amounts due to a bank which are normally secured and are typically renewed. All notes payable are secured by the Company's restricted cash. The Company's notes payables consist of the following:

| | June 30, 2010 | June 30, 2009 |
|---|---|---|
| Commercial Bank, 100% of restricted cash deposited | $ 11,135,880 | $ 7,325,000 |
| Total | $ 11,135,880 | $ 7,325,000 |

**Note 10 - Related party transactions**

Other receivable - related party

The Company leases two of its buildings to Jiangbo Chinese-Western Pharmacy, a company owned by the Company's Chief Executive Officer and other majority shareholders. For the years ended June 30, 2010, 2009 and 2008, the Company recorded other income of approximately $323,000, 383,000and $110,000 from leasing the two buildings to this related party. As of June 30, 2010 and 2009, amount due from this related party was approximately $324,000 and $0, respectively. The other receivable – related party outstanding amount at June 30, 2010 was fully received in September 2010.

Other payables - related parties

The Company leases two warehouses from Shandong Hilead Biotechnology Co., Ltd., a company majority owned by the Company's Chairman and former Chief Executive Officer, in fiscal year 2010. For the years ended June 30, 2010, the Company recorded rent expenses related to this lease of approximately $103,000 which are included in the Company's selling, general and administrative expenses. As of June 30, 2010, amount due to this related party was approximately $49,000.

Other payables-related parties primarily consist of accrued salary payable to the Company's officers and directors, and advances from the Company's Chairman and former Chief Executive Officer. These advances are short-term in nature and bear no interest. The amounts are expected to be repaid in the form of cash. Other payables - related parties consisted of the following:

| | June 30, 2010 | June 30, 2009 |
|---|---|---|
| Payable to Wubo Cao, Chairman of the Board and former Chief Executive Officer | $ 154,866 | $ 184,435 |
| Payable to Shandong Hilead Biotechnology Co., Ltd., majority owned by Wubo, Cao, Chairman of the Board and formal Chief Executive Officer | 48,609 | |
| Payable to Haibo Xu, formal Chief Operating Officer and Director | 33,688 | 33,688 |
| Payable to Elsa Sung, Chief Financial Officer | 5,932 | 18,333 |
| Payable to John Wang, Director | 12,500 | 2,500 |
| Total other payable - related parties | $ 255,595 | $ 238,956 |

See report of independent registered public accounting firm.

F-23

**Note 11 - Concentration of major customers, suppliers, and products**

For the years ended June 30, 2010, 2009 and 2008, sales from top four products accounted for 99.6%, 96.42% and 95.9%, respectively, of the Company's total sales.

For the years ended June 30, 2010 and 2009, top two customers accounted for approximately 20.4% and 13.3%, respectively, of the Company's sales. These two customers represented 19.2% and 16.2% of the Company's total accounts receivable as of June 30, 2010 and 2009, respectively.

For the years ended June 30, 2010 and 2009, two suppliers accounted for approximately 57.0% and 49.1%, respectively, of the Company's purchases. These two suppliers represented 53.0% and 53.0% of the Company's total accounts payable as of June 30, 2010 and 2009, respectively.

**Note 12 - Taxes**

<u>Income taxes</u>

The Company is subject to the United States federal income tax at a tax rate of 34%. No provision for income taxes in the U.S. has been made as the company had no U.S. taxable income during the years ended June 30, 2010, 2009, and 2008.

The Company's wholly-owned subsidiaries, Karmoya and Union Well were incorporated in the British Virgin Islands and Cayman Islands, respectively. Under the current laws of the BVI and Cayman Islands, the two entities are not subject to income taxes.

On March 16, 2007, the National People's Congress of China passed the new Enterprise Income Tax Law ("EIT Law"), and on November 28, 2007, the State Council of China passed the Implementing Rules for the EIT Law ("Implementing Rules") which took effect on January 1, 2008. The EIT Law and Implementing Rules impose a unified EIT of 25.0% on all domestic-invested enterprises and Foreign Investment Enterprises ("FIEs"), unless they qualify under certain limited exceptions. Therefore, nearly all FIEs are subject to the new tax rate alongside other domestic businesses rather than benefiting from the foreign enterprise income tax, and its associated preferential tax treatments, beginning January 1, 2008.

In addition to the changes to the current tax structure, under the EIT Law, an enterprise established outside of China with "de facto management bodies" within China is considered a resident enterprise and will normally be subject to an EIT of 25.0% on its global income. The Implementing Rules define the term "de facto management bodies" as "an establishment that exercises, in substance, overall management and control over the production, business, personnel, accounting, etc., of a Chinese enterprise." If the PRC tax authorities subsequently determine that the Company should be classified as a resident enterprise, then the organization's global income will be subject to PRC income tax of rate 25.0%. Laiyang Jiangbo and GJBT were subject to 25% income tax rate since January 1, 2008.

Liangyang Jiangbo was subject to 25% income tax rate from January 1, 2008, to June 30, 2010. In 2008, the Chinese local government granted Laiyang Jiangbo special tax waivers to exempt and release certain corporate income tax, value added tax, and other miscellaneous tax liabilities; the PRC local government has provided various incentives to local companies in order to encourage economic development. Such incentives include reduced tax rates and other measures. The tax waivers were provided on a non-recurring basis. For the year ended June 30, 2010 and 2009, the Company did not receive any tax exemptions. For the year ended June 30, 2008, the Company received $5,256,634 in tax exemption. Of that amount, $2,114,983 was reflected as reduction of the provision for income taxes; $1,695,671 was reflected as reduction of sales tax and miscellaneous fees; and $1,445,980 was recorded as non-operating income.

See report of independent registered public accounting firm.

F-24

Total tax exemptions for the years ended June 30, 2008 is summarized as follows:

| | June 30, 2008 |
|---|---|
| VAT tax exemption | $ 1,428,804 |
| Income tax exemption | 2,114,983 |
| City construction tax exemption | 1,079,063 |
| Others | 633,784 |
| Total | $ 5,256,634 |

The table below summarizes the differences between the U.S. statutory federal rate and the Company's effective tax rate and are as follows for the fiscal years ended June 30, 2010, 2009 and 2008:

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| U.S. statutory rates | 34.0% | 34.0% | 34.0% |
| Foreign income not recognized in the U.S. | (34.0)% | (34.0)% | (34.0)% |
| China income taxes | 25.0% | 25.0% | 25.0% |
| China income tax exemptions | - | - % | (5.6)% |
| Other Items(a) | 5.2% | 5.7% | 4.3% |
| Total provision for income taxes | 30.2% | 30.7% | 23.7% |

(a) The 5.2%, 5.7% and 4.3% represent the expenses incurred by the Company that are not deductible for PRC income tax purpose for the years ended June 30, 2010, 2009 and 2008 respectively.

Taxes Payable

Taxes payable as of June 30, 2010 and 2009 are as follows:

| | 2010 | 2009 |
|---|---|---|
| Value added tax | $ 1,372,353 | $ 4,090,492 |
| Income taxes | 4,504,188 | 6,689,199 |
| Other taxes | 382,730 | 468,535 |
| Total | $ 6,259,271 | $ 11,248,226 |

Jiangbo incurred net operating losses of approximately $2,729,000 for income tax purposes for the year ended June 30, 2010. The estimated net operating loss carry forwards for US income taxes amounted to approximately $4,884,000 which may be available to reduce future years' taxable income. These carry forwards will expire, if not utilized, from 2027 through 2030. Management believes that the realization of the benefits from these losses appears uncertain due to the Company's limited operating history and continuing losses for US income tax purposes. Accordingly, the Company has provided a 100% valuation allowance on the deferred tax asset benefit to reduce the asset to zero. The net change in the valuation allowance for the period ended June 30, 2010 was approximately $899,000 and the accumulated valuation allowance as of June 30, 2010 amounted to approximately $1,661,000. Management reviews this valuation allowance periodically and makes adjustments as necessary.

The Company has cumulative undistributed earnings of foreign subsidiaries of approximately $116,653,000 as of June 30, 2010, and is included in consolidated retained earnings and will continue to be indefinitely reinvested in international operations. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of these earnings, nor is it practicable to estimate the amount of income taxes that would have to be provided if the Company concluded that such earnings will be remitted in the future.

See report of independent registered public accounting firm.

F-25

**Note 13 - Convertible Debt**

<u>November 2007 Convertible Debentures</u>

On November 7, 2007, the Company entered into a Securities Purchase Agreement (the "November 2007 Purchase Agreement") with Pope Investments, LLC (the "November 2007 Investor"). Pursuant to the November 2007 Purchase Agreement, the Company issued and sold to the November 2007 Investor, $5,000,000 consisting of: (a) 6% convertible subordinated debentures due November 30, 2010 (the "November 2007 Debenture") and (b) a three-year warrant to purchase 250,000 shares of the Company's common stock, par value $0.001 per share, at an exercise price of $12.8 per share, subject to adjustment as provided therein. The November 2007 Debenture bears interest at the rate of 6% per annum and the initial conversion price of the debentures is $10 per share. In connection with the offering, the Company placed in escrow 500,000 shares of its common stock. In connection with the May 2008 financing, the November 2007 Debenture conversion price was subsequently adjusted to $8 per share (Post 40-to-1 reverse split).

The Company evaluated the FASB's accounting standard regarding convertible debentures and concluded that the convertible debenture has a beneficial conversion feature. The Company estimated the intrinsic value of the beneficial conversion feature of the November 2007 Debenture at $2,904,093. The fair value of the warrants was estimated at $2,095,907. The two amounts are recorded together as debt discount and amortized using the effective interest method over the three-year term of the debentures.

The fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 3 years, (3) expected volatility of 197%, and (4) zero expected dividends. The total estimated fair value of the warrants granted and beneficial conversion feature of the November 2007 Debenture should not exceed the $5,000,000 Debenture, and the calculated warrant value was used to determine the allocation between the fair value of the beneficial conversion feature of the November 2007 Debenture and the fair value of the warrants.

In connection with the private placement, the Company paid the placement agents a fee of $250,000 and incurred other expenses of $104,408, which were capitalized as deferred debt issuance costs and is being amortized to interest expense over the life of the debenture. During the years ended June 30, 2010 and 2009, amortization of debt issuance costs related to the November 2007 Purchase Agreement was $127,037 and $118,136, respectively. The remaining balance of debt issuance costs of the November 2007 Purchase Agreement at June 30, 2010 and 2009 was $32,118 and $159,155, respectively. The amortization of debt discounts was $2,381,647 and $817,564 for the years ended June 30, 2010 and 2009, respectively, which has been included in interest expense on the accompanying consolidated statements of income. The balance of the debt discount was $1,255,430 and $3,637,077 at June 30, 2010 and 2009, respectively.

The November 2007 Debenture bears interest at the rate of 6% per annum, payable in semi-annual installments on May 31 and November 30 of each year, with the first interest payment due on May 31, 2008. The initial conversion price ("November 2007 Conversion Price") of the November 2007 Debentures is $10 per share. If the Company issues common stock at a price that is less than the effective November 2007 Conversion Price, or common stock equivalents with an exercise or conversion price less than the then effective November 2007 Conversion Price, the November 2007 Conversion Price of the November 2007 Debenture and the exercise price of the warrants will be reduced to such price. The November 2007 Debenture may not be prepaid without the prior written consent of the Holder, as defined. In connection with the Offering, the Company placed in escrow 500,000 shares of common stock issued by the Company in the name of the escrow agent. In the event the Company's consolidated Net Income Per Share (as defined in the Purchase Agreement), for the year ended June 30, 2008, is less than $1.52, the escrow agent shall deliver the 500,000 shares to the November 2007 Investor. The Company has concluded its fiscal 2008 Net Income Per Share has met the required amount and no shares were delivered to the November 2007 Investor. As of June 30, 2010, the 500,000 shares are still in escrow.

See report of independent registered public accounting firm.

F-26

The financing was completed through a private placement to accredited investors and is exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended ("Securities Act").

During the year ended June 30, 2010, the Company issued 125,000 shares of its common stock upon conversion of $1,000,000 November 2007 Debentures. As of June 30, 2010, a total of $1,000,000 November 2007 Debentures has been converted into common shares

<u>May 2008 Convertible Debentures</u>

On May 30, 2008, the "Company entered into a Securities Purchase Agreement (the "May 2008 Securities Purchase Agreement") with certain investors (the "May 2008 Investors"), pursuant to which, on May 30, 2008, the Company sold to the May 2008 Investors 6% convertible debentures (the "May 2008 Notes") and warrants to purchase 1,875,000 shares of the Company's common stock ("May 2008 Warrants"), for an aggregate amount of $30,000,000 (the "May 2008 Purchase Price"), in transactions exempt from registration under the Securities Act of 1933, as amended (the "May 2008 Financing"). Pursuant to the terms of the May 2008 Securities Purchase Agreement, the Company will use the net proceeds from the Financing for working capital purposes. Also pursuant to the terms of the May 2008 Securities Purchase Agreement, the Company must, among other things, increase the number of its authorized shares of common stock to 22,500,000 by August 31, 2008, and is prohibited from issuing any "Future Priced Securities" as such term is described by NASD IM-4350-1 for one year following the closing of the Financing. The Company has satisfied the increase in the number of its authorized shares of common stock in August 2008 (post 40-to-1 reverse split).

The May 2008 Notes are due May 30, 2011, and are convertible into shares of the Company's common stock at a conversion price equal to $8, subject to adjustment pursuant to customary anti-dilution provisions and automatic downward adjustments in the event of certain sales or issuances by the Company of common stock at a price per share less than $8. Interest on the outstanding principal balance of the May 2008 Notes is payable at a rate of 6% per annum, in semi-annual installments payable on November 30 and May 30 of each year, with the first interest payment due on November 30, 2008. At any time after the issuance of the May 2008 Note, any May 2008 Investor may convert its May 2008 Note, in whole or in part, into shares of the Company's common stock, provided that such May 2008 Investor shall not effect any conversion if immediately after such conversion, such May 2008 Investor and its affiliates would, in the aggregate, beneficially own more than 9.99% of the Company's outstanding common stock. The May 2008 Notes are convertible at the option of the Company if the following four conditions are met: (i) effectiveness of a registration statement with respect to the shares of the Company's common stock underlying the Notes and the Warrants; (ii) the Volume Weighted Average Price ("VWAP" of the common stock has been equal to or greater than 250% of the conversion price, as adjusted, for 20 consecutive trading days on its principal trading market; (iii) the average dollar trading volume of the common stock exceeds $500,000 on its principal trading market for the same 20 days; and (iv) the Company achieves 2008 Guaranteed EBT (as hereinafter defined) and 2009 Guaranteed EBT (as hereinafter defined). A holder of a May 2008 Note may require the Company to redeem all or a portion of such May 2008 Note for cash at a redemption price as set forth in the May 2008 Notes, in the event of a change in control of the Company, an event of default or if any governmental agency in the PRC challenges or takes action that would adversely affect the transactions contemplated by the Securities Purchase Agreement. The May 2008 warrants are exercisable for a five-year period that is beginning on May 30, 2008 at an initial exercise price of $10 per share.

The Company estimated the intrinsic value of the beneficial conversion feature of the May 2008 Note at $19,111,323. The fair value of the warrants was estimated at $10,888,677. The two amounts are recorded together as debt discount and amortized using the effective interest method over the three-year term of the debentures.

The fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.2%), (2) expected warrant life of 5 years, (3) expected volatility of 95%, and (4) zero expected dividends. The total estimated fair value of the warrants granted and beneficial conversion feature of the May 2008 Note should not exceed the $30,000,000 Debenture, and the calculated warrant value was used to determine the allocation between the fair value of the beneficial conversion feature of the May 2008 Debenture and the fair value of the warrants.

See report of independent registered public accounting firm.

F-27

In connection with the private placement, the Company paid the placement agents a fee of $1,500,000 and incurred other expenses of $186,500, which were capitalized as deferred debt issuance costs and is being amortized to interest expense over the life of the debenture. During the years ended June 30, 2010 and 2009, amortization of debt issuance costs related to the May 2008 Purchase Agreement was $673,997 and $562,140, respectively. The remaining balance of debt issuance costs of the May 2008 Purchase Agreement at June 30, 2010 and 2009 was $403,516 and $1,077,513, respectively. The amortization of debt discounts was $12,441,691 and $3,189,304 for the years ended June 30, 2010 and 2009, respectively, which has been included in interest expense on the accompanying consolidated statements of income. The balance of the unamortized debt discount was $12,414,322 and $24,856,012 at June 30, 2010 and 2009, respectively.

In connection with the May 2008 Financing, the Company entered into a holdback escrow agreement (the "Holdback Escrow Agreement") dated May 30, 2008, with the May 2008 Investors and Loeb & Loeb LLP, as Escrow Agent, pursuant to which $4,000,000 of the May 2008 Purchase Price was deposited into an escrow account with the Escrow Agent at the closing of the Financing. Pursuant to the terms of the Holdback Escrow Agreement, (i) $2,000,000 of the escrowed funds will be released to the Company upon the Company's satisfaction no later than 120 days following the closing of the Financing of an obligation that the board of directors be comprised of at least five members (at least two of whom are to be fluent English speakers who possess necessary experience to serve as a director of a public company), a majority of whom will be independent directors acceptable to Pope Investments LLC ("Pope") and (ii) $2,000,000 of the escrowed funds will be released to the Company upon the Company's satisfaction no later than six months following the closing of the Financing of an obligation to hire a qualified full-time chief financial officer (as defined in the May 2008 Securities Purchase Agreement). In the event that either or both of these obligations is not so satisfied, the applicable portion of the escrowed funds will be released pro rata to the Investors. The Company has satisfied both requirements and the holdback money was fully released to the Company in July 2008.

In connection with the May 2008 Financing, Mr. Cao, the Company's Chief Executive Officer and Chairman of the Board, placed 3,750,000 shares of common stock of the Company owned by him into an escrow account pursuant to a make good escrow agreement, dated May 30, 2008 (the "Make Good Escrow Agreement"). In the event that either (i) the Company's adjusted 2008 earnings before taxes is less than $26,700,000 ("2008 Guaranteed EBT") or (ii) the Company's 2008 adjusted fully diluted earnings before taxes per share is less than $1.60 ("2008 Guaranteed Diluted EBT"), 1,500,000 of such shares (the "2008 Make Good Shares") are to be released pro rata to the May 2008 Investors. In the event that either (i) the Company's adjusted 2009 earnings before taxes is less than $38,400,000 ("2009 Guaranteed EBT") or (ii) the Company's adjusted fully diluted earnings before taxes per share is less than $2.32 (or $2.24 if the 500,000 shares of common stock held in escrow in connection with the November 2007 private placement have been released from escrow) ("2009 Guaranteed Diluted EBT"), 2,250,000 of such shares (the "2009 Make Good Shares") are to be released pro rata to the May 2008 Investors. Should the Company successfully satisfy these respective financial milestones, the 2008 Make Good Shares and 2009 Make Good Shares will be returned to Mr. Cao. In addition, Mr. Cao is required to deliver shares of common stock owned by him to the Investors on a pro rata basis equal to the number of shares (the "Settlement Shares") required to satisfy all costs and expenses associated with the settlement of all legal and other matters pertaining to the Company prior to or in connection with the completion of the Company's October 2007 share exchange in accordance with formulas set forth in the May 2008 Securities Purchase Agreement (post 40-to-1 reverse split). The Company has determined that both thresholds for the years ended June 30, 2009 and June 30, 2008 have been met. The Make Good Shares have yet to be returned to Mr. Cao as of June 30, 2010.

The security purchase agreement set permitted indebtedness which the Company's lease obligations and purchase money indebtedness is limited up to $1,500,000 per year in connection with new acquisition of capital assets and lease obligations. Permitted investment set forth with the security purchase agreement limits capital expenditure of the Company not to exceed $5,000,000 in any rolling 12 months.

Pursuant to a Registration Rights Agreement, the Company agreed to file a registration statement covering the resale of the shares of common stock underlying the May 2008 Notes and Warrants, (ii) the 2008 Make Good Shares, (iii) the 2009 Make Good Shares, and (iv) the Settlement Shares. The Company must file an initial registration statement covering the shares of common stock underlying the Notes and Warrants no later than 45 days from the closing of the Financing and to have such registration statement declared effective no later than 180 days from the closing of the Financing. If the Company does not timely file such registration statement or cause it to be declared effective by the required dates, then the Company will be required to pay liquidated damages to the Investors equal to 1.0% of the aggregate Purchase Price paid by such Investors for each month that the Company does not file the registration statement or cause it to be declared effective. Notwithstanding the foregoing, in no event shall liquidated damages exceed 10% of the aggregate amount of the May 2008 Purchase Price. The Company satisfied its obligations under the Registration Rights Agreement by filing the required registration statement and causing it to be declared effective within the time periods set forth in the Registration Rights Agreement.

See report of independent registered public accounting firm.

During the year ended June 30, 2010, the Company issued 995,000 shares of its common stock upon conversion of $7,960,000 May 2008 Notes. As of June 30, 2010, a total of $8,120,000 May 2008 Notes has been converted into common shares.

The above two convertible debenture liabilities are as follows:

|  | June 30, 2010 | June 30, 2009 |
|---|---|---|
| November 2007 convertible debenture note payable | $ 4,000,000 | $ 5,000,000 |
| May 2008 convertible debenture note payable | 21,880,000 | 29,840,000 |
| Total convertible debenture note payable | 25,880,000 | 34,840,000 |
| Less: Unamortized discount on November 2007 convertible debenture note payable | (1,255,430) | (3,637,077) |
| Less: Unamortized discount on May 2008 convertible debenture note payable | (12,414,322) | (24,856,012) |
| Convertible debentures, net | $ 12,210,248 | $ 6,346,911 |

Interest and Penalty

As a result of the delay in its ability to transfer cash out of PRC (partially due to the stricter foreign exchange restrictions and regulations imposed in the PRC starting in December 2008), the Company became delinquent on the payment of interest under the November 2007 Debentures and May 2008 Notes in December 2009. In February 2010, the Company and the majority November 2007 Debentures and May 2008 Notes holders entered to a waiver agreement regarding to the delinquent interest payment; the waiver agreement required the Company to make the delinquent interest payments by February 25, 2010 and to have its common stock listed on the Nasdaq Stock market on or prior to April 15, 2010. The Company was not able to meet the waiver letter requirements and has continued dialogue with the November 2007 Debentures and May 2008 Notes holders. As of June 30, 2010 and through the date of this filling, no formal event of default notice has been presented by the November 2007 Debentures and May 2008 Notes holders. Accrued interest and related interest penalty as of June 30, 2010 amounted to $4,679,787.

**Note 14 - Shareholders' equity**

Common Stock

In July 2009, the Company issued 1,009 shares of common stock to a Company's current director as part of his compensation for services. The Company valued these shares at the fair market value on the date of grant of $9.91 per share, or $10,000 in total, based on the trading price of common stock. For the year ended June 30, 2010, the Company recorded stock based compensation expense of $10,000 accordingly.

In August 2009, the Company issued 82,500 shares to Pope as interest payment for the interest due on May 30, 2009 on the November 2007 Debentures and the May 2008 Notes at $8 per share. The Company valued these shares at the fair market value on the date of grant of $11.81 per share based on the trading price of common stock, or $974,325 in total, of which $660,000 was recorded as interest expense for the year ended June 30, 2009 and $314,325 was recorded as additional interest expense in the year ended June 30, 2010.

See report of independent registered public accounting firm.

F-29

In August 2009, the Company issued 82,500 shares of its common stock to Pope, the majority holder of the Company's November 2007 Debentures and May 2008 Notes. As a result of the delay in its ability to transfer cash out of the PRC (partially due to the stricter foreign exchange restrictions and regulations imposed in the PRC starting in December 2008), the Company was delinquent on the payment of interests under the November 2007 Debentures and May 2008 Notes Due on May 30, 2009. On August 10, 2009, the Company and Pope entered into a Letter Agreement (the "Letter Agreement"). Pursuant to the Letter Agreement, Pope (i) agreed to waive the Events of Default (as defined in the November 2007 Debentures and May 2008 Notes) that have occurred as a result of the Company's failure to timely make interest payments on the November 2007 Debentures and May 2008 Notes that were due and payable on May 30, 2009, and agreed not to provide written notice to the Company with respect to the occurrence of either of such Events of Default provided that the Company has made such interest payment to the holders of the November 2007 Debentures and the holders of the May 2008 Notes (ii) agreed that in lieu of payment of the $660,000 in cash interest with respect to the Pope Notes that was due and payable to Pope on May 30, 2009, that the Company shall issue to Pope on or prior to August 17, 2009, 82,500 shares (the "Shares") of its Common Stock (such payment shall be referred to herein as the "Special Interest Payment"), and (iii) waived each and every applicable provision of the 2007 Purchase Agreement, the 2008 Securities Purchase Agreement (including, without limitation Section 4.17 (Right of First Refusal) and 4.21(c) (Additional Negative Covenants of the Company), the November 2007 Debentures and the May 2008 Notes, each to the extent necessary in order to permit the Company to make the Special Interest Payment. The Company valued the 82,500 shares at the fair market value on the date of issuance of $11.81 and recorded additional $314,325 interest expense accordingly.

In September 2009, the Company issued 62,500 shares of its common stock in connection with the conversion of $500,000 of convertible debt. In connection with the conversion, the Company recorded $402,112 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures. In connection with the conversion, the Company issued 938 shares of its common stock for the final interest payment at $8 per share. The Company valued the 938 shares at the fair market value on the date of issuance of $11 per share and recorded $10,300 interest expense in total.

In October 2009, the Company issued 462,500 shares of its common stock in connection with the conversion of $3,700,000 of convertible debt. In connection with the conversion, the Company recorded $3,032,668 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures.

In November 2009, the Company issued 62,500 shares of its common stock in connection with the conversion of $500,000 of convertible debt. In connection with the conversion, the Company recorded $326,425 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures.

In December 2009, the Company issued 62,500 shares of its common stock in connection with the conversion of $500,000 of convertible debt. In connection with the conversion, the Company recorded $309,373 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures.

In January 2010, the Company issued 301,250 shares of its common stock in connection with the conversions of $2,410,000 of convertible debt. In connection with the conversion, the Company recorded $1,822,111 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures. In connection with one of the conversions, the Company issued 577 shares of its common stock for the final interest payment at $8 per share. The Company valued the 577 shares at the fair market value on the date of issuance of $11.14 per share and recorded $6,429 interest expense in total.

In March 2010, the Company issued 1,143 shares of common stock to a Company's current director as part of his compensation for services and 2,286 shares of common stock to a Company's officer to pay off part of her accrued compensation. The Company valued these shares at the fair market value on the date of grant of $8.75 per share, or $30,000 in total, based on the trading price of common stock. For the year ended June 30, 2010, the Company recorded stock based compensation expense of $10,000 and reduced $20,000 of other payable-related parties accordingly.

In April 2010, the Company issued 43,750 shares of its common stock in connection with the conversion of $350,000 of convertible debt. In connection with the conversion, the Company recorded $237,846 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures.

See report of independent registered public accounting firm.

In June 2010, the Company issued 125,000 shares of its common stock in connection with the conversion of $1,000,000 of convertible debt. In connection with the conversion, the Company recorded $618,976 of interest expense to fully amortize the unamortized discount and deferred financing costs related to the converted dentures.

In June 2010, the Company issued 25,000 shares of common stock to a Company's Chairman and then Chief Executive Officer as his compensation for annual bonus. The Company valued these shares at the fair market value on the date of grant of $8.50 per share, or $212,500 in total, based on the trading price of common stock. For the year ended June 30, 2010, the Company recorded stock based compensation expense of $212,500 for the issuance accordingly.

In June 2010, the Company's Board approved to issue 33,250 shares of common stock to several of the Company's directors and officers as their compensation for services and bonus pending on shareholders' vote to approve an S-8 plan for employee incentive stock option plan. The Company valued these shares at the fair market value of $9.0 per share, or $299,250 in total, based on the trading price of common stock. For the year ended June 30, 2010, the Company recorded stock based compensation expense of $143,100 and reduced $156,150 of other payable-related parties accordingly.

Registered capital contribution receivable

At inception, Karmoya issued 1,000 shares of common stock to its founder. The shares were valued at par value. On September 20, 2007, the Company issued 9,000 shares of common stock to nine individuals at par value. The balance of $10,000 is shown in capital contribution receivable on the accompanying consolidated financial statements. As part of its agreements with the shareholders, the Company was to receive the entire $10,000 in October 2007. As of June 30, 2010, the Company has not received the $10,000.

Union Well was established with a registered capital of $1,000. In connection with Karmoya's acquisition of Union Well, the registered capital of $1,000 is reflected as capital contribution receivable on the accompanying consolidated financial statements. The $1,000 was due in October 2007; however, as of June 30, 2010, the Company has not received the $1,000.

Note 15 – Warrants

In connection with the $5,000,000 November 2007 Convertible Debenture, 6% convertible subordinated debenture note, the Company issued a three-year warrant to purchase 250,000 shares of common stock, at an exercise price of $12.80 per share. The calculated fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 3 years, (3) expected volatility of 197%, and (4) zero expected dividends. In connection with the May 2008 financing, the exercise price of outstanding warrants issued in November 2007 was reduced to $8 per share and the total number of warrants to purchase common stock was increased to 400,000.

In connection with the $30,000,000 May 2008 Convertible Debentures, the Company issued a five-year warrant to purchase 1,875,000 shares of common stock, at an exercise price of $10 per share. The calculated fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 5 years, (3) expected volatility of 95%, and (4) zero expected dividends.

On February 15, 2009, the Company granted 40,000 stock warrants to a consultant at an exercise price of $6.00 per share exercisable for a period of three years. The warrants fully vest on July 15, 2009. The fair value of this warrant grant was estimated on the date of grant using the Black-Scholes option-pricing model with the following assumptions: (1) risk-free interest rate at the date of grant (1.83%), (2) expected warrant life of three years, (3) expected volatility of 106%, and (4) zero expected dividends. In connection with these warrants, the Company recorded stock-based compensation expense of $46,508 and stock based deferred compensation of $77,400 for the year ended June 30, 2009.

See report of independent registered public accounting firm.

A summary of the warrants as of June 30, 2010, and changes during the years ended June 30, 2010 and 2009, respectively, is presented below:

|  | Number of warrants |
|---|---|
| Outstanding as of June 30, 2008 | 2,349,085 |
| Granted | 40,000 |
| Forfeited | (74,085) |
| Exercised | |
| Outstanding as of June 30, 2009 | 2,315,000 |
| Granted | - |
| Forfeited | - |
| Exercised | - |
| Outstanding as of June 30, 2010 | 2,315,000 |

The following is a summary of the status of warrants outstanding at June 30, 2010:

| | Outstanding Warrants | | | Exercisable Warrants | | |
|---|---|---|---|---|---|---|
| | Average Exercise Price | Number | Average Remaining Contractual Life | Average Exercise Price | Number | Average Remaining Contractual Life |
| | $ 6.00 | 40,000 | 1.63 | $ 6.00 | 40,000 | 1.63 |
| | $ 8.00 | 400,000 | 0.35 | $ 8.00 | 400,000 | 0.35 |
| | $ 10.00 | 1,875,000 | 2.92 | $ 10.00 | 1,875,000 | 3.17 |
| Total | | 2,315,000 | | | 2,315,000 | |

The Company has 2,315,000 warrants outstanding and exercisable at an average exercise price of $9.59 per share as of June 30, 2010.

**Note 16 - Stock options**

On July 1, 2007, 133,400 options were granted and the fair value of this option grant was estimated on the date of the grant using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Expected Life | Expected Volatility | Dividend Yield | Risk Free Interest Rate | Grant Date Fair Value |
|---|---|---|---|---|---|
| Former officers | 3.50 years | 195% | 0% | 4.50% | $ 5.20 |

On June 10, 2008, 7,500 options were granted and the fair value of this option grant was estimated on the date of the grant using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Expected Life | Expected Volatility | Dividend Yield | Risk Free Interest Rate | Grant Date Average Fair Value |
|---|---|---|---|---|---|
| Current officer | 5 years | 95% | 0% | 2.51% | $ 8.00 |

As of June 30, 2010, of the 7,500 options held by the Company's executives, directors, and employees, are fully vested.

The following is a summary of the option activity during the years ended June 30, 2010 and 2009, respectively:

|  | Number of options |
|---|---|
| Outstanding as of June 30, 2008 | 140,900 |
| Granted | - |
| Forfeited | - |
| Exercised | - |
| Outstanding as of June 30, 2009 | 140,900 |
| Granted | - |
| Forfeited | - |
| Exercised | - |
| Outstanding as of June 30, 2010 | 140,900 |

See report of independent registered public accounting firm.

| Outstanding options | | | Exercisable options | | |
|---|---|---|---|---|---|
| Average Exercise price | Number | Average remaining contractual life (years) | Average Exercise price | Number | Average remaining contractual life (years) |
| $ 4.2 | 133,400 | 0.5 | $ 4.2 | 133,400 | 0.50 |
| 12 | 2,000 | 2.95 | 12 | 2,000 | 2.95 |
| 16 | 1,750 | 2.95 | 16 | 1,750 | 2.95 |
| 20 | 1,875 | 2.95 | 20 | 1,875 | 2.95 |
| 24 | 1,875 | 2.95 | 24 | 1,875 | 2.95 |
| $ 4.93 | 140,900 | | $ 4.93 | 140,900 | |

For the years ended June 30, 2010 and 2009, the Company recorded total stock-based compensation expense of $666,854 and $104,107, respectively. As of June 30, 2010 and 2009, there was approximately $0 and $89,000, respectively, of total unrecognized compensation expense related to unvested share-based compensation arrangements granted.

**Note 17 - Statutory reserves**

The Company is required to make appropriations to reserve funds, comprising the statutory surplus reserve and discretionary surplus reserve, based on after-tax net income determined in accordance with generally accepted accounting principles of the PRC ("PRC GAAP"). Appropriation to the statutory surplus reserve is required to be at least 10% of the after tax net income determined in accordance with PRC GAAP until the reserve is equal to 50% of the entities' registered capital. Appropriations to the discretionary surplus reserve are made at the discretion of the Board of Directors.

The statutory surplus reserve fund is non-distributable other than during liquidation and can be used to fund previous years' losses, if any, and may be utilized for business expansion or converted into share capital by issuing new shares to existing shareholders in proportion to their shareholding or by increasing the par value of the shares currently held by them, provided that the remaining reserve balance after such issue is not less than 25% of the registered capital.

The discretionary surplus fund may be used to acquire fixed assets or to increase the working capital to expend on production and operations of the business. The Company's Board of Directors decided not to make an appropriation to this reserve for 2010, 2009, and 2008.

Pursuant to the Company's articles of incorporation, the Company should appropriate 10% of the net profit as statutory surplus reserve up to 50% of the Company's registered capital. For the year ended June 30, 2008, the Company appropriated to the statutory surplus reserve in the amount of $1,096,241. The Company's statutory surplus reserve has reached 50% of its registered capital as of June 30, 2008, as such; no additional reserve was recorded during the year ended June 30, 2010 and 2009.

See report of independent registered public accounting firm.

**Note 18 - Employee pension**

Employee pension in the Company generally includes two parts: the first part to be paid by the Company is 30.6% of $128 for each qualified employee each month. The other part, paid by the employees, is 11% of $128 each month. For the years ended June 30, 2010, 2009, and 2008, the Company made pension contributions in the amount of approximately $178,000, $146,000, and $35,000, respectively.

**Note 19 - Accumulated other comprehensive income**

The components of accumulated other comprehensive income for the years ended June 30, 2010 and 2009 are as follows:

|  | June 30, 2010 | June 30, 2009 |
|---|---|---|
| Beginning Balance | $ 6,523,602 | $ 7,700,905 |
| Foreign currency translation gain | 927,723 | 336,927 |
| Unrealized gain (loss) on restricted marketable securities | 166,378 | (1,514,230) |
| Ending Balance | $ 7,617,703 | $ 6,523,602 |

**Note 20 - Commitments and contingencies**

<u>Commitment</u>

*R&D Agreement*

In September 2007, the Company entered into a three year Cooperative Research and Development Agreement ("CRADA") with Pharmaceutical Institute of Shandong University (the "University"). Pursuant to the CRADA, the University is responsible for designing, researching and developing designated pharmaceutical projects for the Company. Additionally, the University will also provide technical services and training to the Company. As part of the CRADA, the Company will pay approximately $3,500,000 (RMB 24,000,000) plus out-of-pocket expenses to the University annually, and provide internship opportunities for students of the University. The Company will have the primary ownership of the designated research and development project results.

In November 2007, the Company entered into a five year CRADA with Institute of Microbiology (Chinese Academy of Sciences) (the "Institute"). Under the CRADA, the Institute is responsible for designing, researching and developing designated pharmaceutical projects for the Company. Additionally, the Institute will also provide technical services and trainings to the Company. As part of the CRADA, the Company will pay approximately $880,000 (RMB 6,000,000) to the Institute annually. The Company will have the primary ownership of the designated research and development project results.

For the years ended June 30, 2010 and 2009, approximately $4,400,000 and $4,395,000 related to the two CRADAs, respectively, was incurred as research and development expenses. As of June 30, 2010, the Company's future estimated payments to those CRADAs amounted to approximately $3.4 million.

See report of independent registered public accounting firm.

Contingencies

*Delinquent in the Payment of Interest and required to repay November 2007 Debenture and May 2008 Notes*

As discussed on note 13, the Company became delinquent in the payment of interest on its 2007 Debenture and May 2008 Notes in December 2009. To date, the Company has remained unable to make these payments. Additionally, the Company will be required to repay the then outstanding aggregate principal amount of the 2007 Debentures, together with all accrued interest and penalties, on November 7, 2010 and repay the 2008 Notes then outstanding aggregate principal amount, together with all accrued interest and penalties, on May 30, 2011. The Company has been engaged in continuing discussions with the holders of the 2007 Debenture and the 2008 Notes with respect to this payment delinquency. As of the date of this report the Company has not received a formal acceleration notice under the terms of the 2007debentures and May 2008 Notes, nor have any actions been taken against the Company to secure the obligations. In the event that the Company is unable to repay the 2007 Debentures and/or the 2008 Notes, upon such an acceleration, or in the event that the Company is unable to repay the 2007 Debentures and the 2008 Notes, when due, it is likely that the debenture holders will institute legal proceedings against the Company to collect the amounts due under the 2007 Debentures and/or the 2008 Notes. The occurrence of any of these events would be materially adverse to the Company's ability to continue its business as it is presently conducted.

*Operations based in the PRC*

The Company's operations are carried out in the PRC. Accordingly, the Company's business, financial condition, and results of operations may be influenced by the political, economic, and legal environments in the PRC, and by the general state of the PRC's economy.

The Company's operations in the PRC are subject to specific considerations and significant risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic, and legal environments, and foreign currency exchange. The Company's results may be adversely affected by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among others.

*Legal proceedings*

The Company is involved in various legal matters arising in the ordinary course of business. The following summarizes the Company's pending and settled legal proceedings as of June 30, 2010:

China West II, LLC and Genesis Technology Group, Inc., n/k/a Jiangbo Pharmaceuticals, Inc. (Arbitration)

In April 2010, China West II, LLC ("CW II") filed a Demand For Arbitration with the American Arbitration Association the case of *CW II and Genesis Technology Group, Inc. n/k/a Jiangbo Pharmaceuticals, Inc.* In that matter, CW II seeks repayment and interest on a $142,500 promissory note dated August 3, 2007 made by Genesis Equity Partners II LLC ("GEP"), a subsidiary of the Company prior to the October 2007 reverse merger, and guaranteed by the Company. The Company believes the promissory note has been paid in full by members of GEP and CWII's demand is without merit and plans to vigorously defend its position. As of the date of these consolidated financial statements, the Company is unable to estimate a loss, if any, the Company may incur related expenses to this lawsuit.

**Note 21- Subsequent event**

In July 2010, the Company issued 562,500 shares of its common stock in connection with the conversion of $4,500,000 of May 2008 Convertible Debentures.

In August 2010, the Company issued 125,000 shares of its common stock in connection with the conversion of $1,000,000 of May 2008 Convertible Debentures.

In September 2010, the Company issued 250,000 shares of its common stock in connection with the conversion of $2,000,000 of May 2008 Convertible Debentures.

See report of independent registered public accounting firm.

**EXHIBIT 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**ACCOMPANYING PERIODIC REPORT**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jin Linxian, Chief Executive Officer of Jiangbo Pharmaceuticals, Inc. (the "Company"), certify that:

1. I have reviewed this report on Form 10-K of Jiangbo Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: September 28, 2010

/s/ Jin Linxian
Jin Linxian
Chief Executive Officer

**EXHIBIT 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**ACCOMPANYING PERIODIC REPORT**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Elsa Sung, Chief Financial Officer of Jiangbo Pharmaceuticals, Inc. (the "Company"), certify that:

1.  I have reviewed this report on Form 10-K of Jiangbo Pharmaceuticals, Inc.

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)  all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: September 28, 2010

/s/ Elsa Sung
Elsa Sung,
Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO 18 USC § 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE**
**SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Jiangbo Pharmaceuticals, Inc. ("the Company") on Form 10-K for the period ended June 30, 2010 as filed with the Securities and Exchange Commission on the date hereof ("the Report"), I, Jin Linxian, Chief Executive Officer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(a)   The annual report on Form 10-K for the year ended June 30, 2010 of the Company fully complies with the requirements of section 13 (a) or 15(d) of the Securities Exchange Act of 1934; and

(b)   Information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: September 28, 2010

/s/ Jin Linxian
Jin Linxian
Chief Executive Officer

**EXHIBIT 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 USC § 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE**
**SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Jiangbo Pharmaceuticals, Inc. ("the Company") on Form 10-K for the period ended June 30, 2010 as filed with the Securities and Exchange Commission on the date hereof ("the Report"), I, Elsa Sung, Chief Financial Officer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

    (a)  The annual report on Form 10-K for the year ended June 30, 2010 of the Company fully complies with the requirements of section 13 (a) or 15(d) of the Securities Exchange Act of 1934; and

    (b)  Information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: September 28, 2010

/s/ Elsa Sung
_____
Elsa Sung
Chief Financial Officer

**Exhibit 99.8**

### NOMINATING AND CORPORATE GOVERNANCE

### COMMITTEE CHARTER OF

### JIANGBO PHARMACEUTICALS, INC.

The Nominating and Corporate Governance Committee (the "Nominating Committee") of the Board of Directors (the "Board") of Jiangbo Pharmaceuticals, Inc. (the "Company") shall consist of a minimum of two (2) directors, each of which shall meet the independence requirements and standards established from time to time by the Securities and Exchange Commission (the "SEC") and any such securities exchange on which the Company's securities are listed or quoted for trading.  The Nominating Committee shall meet at least once a year.

The purpose of the Nominating Committee shall be to assist the Board in identifying qualified individuals to become board members, in determining the composition of the Board and in monitoring a process established to assess Board effectiveness.

In furtherance of this purpose, the Nominating Committee shall have the following authority and responsibilities:

1.  Make recommendations to the Board regarding the size and composition of the Board, establish procedures for the nomination process and screen and recommend candidates for election to the Board.

2.  To review with the Board from time to time the appropriate skills and characteristics required of Board members.

3.  To establish and administer a periodic assessment procedure relating to the performance of the Board as a whole and its individual members.

4.  Make recommendations to the Board regarding corporate governance matters and practices, including formulating and periodically reviewing corporate governance guidelines to be adopted by the Board.

The Nominating Committee shall have the authority to delegate any of its responsibilities to subcommittees as it may deem appropriate in its sole discretion.

The Nominating Committee shall have the authority to retain any search firm engaged to assist in identifying director candidates, and to retain outside counsel and any other advisors as it may deem appropriate in its sole discretion. The Nominating Committee shall have sole authority to approve related fees and retention terms.

The Nominating Committee shall report its actions and recommendations to the Board after each committee meeting.

Adopted: February 27, 2010