# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: **June 30, 2009**

☐ TRANSITION REPORT PURSUANT SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: **333-86347**

# JIANGBO PHARMACEUTICALS, INC.
### (Name of small business issuer in its charter)

| | |
|---|---|
| **Florida** | **65-1130026** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**Middle Section, Longmao Street, Area A, Laiyang Waixiangxing Industrial Park
Laiyang City, Yantai, Shandong Province, People's Republic of China 265200**
(Address of principle executive offices)

**(0086) 535-7282997**
(Issuer's telephone number)

Securities registered under Section 12(b) of the Exchange Act:
**None**

Securities registered under Section 12(g) of the Exchange Act:
**Common Stock, $0.001 Par Value**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No   ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐   No   ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such report(s), and (2) has been subject to such filing requirements for the past 90 days. Yes   ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and smaller reporting companies in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer  ☐ |
| Non-accelerated filer (Do not check if a smaller reporting company)   ☐ | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, based upon the closing sale price of the registrant's common stock on December 31, 2008 as reported on the OTC Bulletin Board was approximately $18.2 million (4,844,009 shares at $3.75). Approximately 4,880,460 shares of common stock held by each officer and director and by each person who owns 10% or more of the outstanding common stock have been excluded because such persons may be deemed to be affiliates.

The number of outstanding shares of the registrant's common stock on September 24, 2009 was 11,142,046.

## TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1. | Description of Business | 3 |
| Item 1A | Risk Factors | 17 |
| Item 1B | Unresolved Staff Comments | 36 |
| Item 2. | Description of Property | 36 |
| Item 3. | Legal Proceedings | 37 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 37 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Common Equity , Related Stockholder Matters and Issuer Purchases of Equity Securities | 38 |
| Item 6. | Selected Financial Data | 39 |
| Item 7. | Management's Discussion and Analysis or Plan of Operation | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures and Market Risk | 57 |
| Item 8. | Financial Statement and Supplementary Data | 57 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 57 |
| Item 9A. | Controls and Procedures | 57 |
| Item 9B | Other Information | 60 |

**PART III**

| | |
|---|---|
| Item 10. Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of the Exchange Act | 60 |
| Item 11. Executive Compensation | 65 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 69 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 71 |
| Item 14. Principal Accountant Fees and Services | 73 |

**PART IV**

| | |
|---|---|
| Item 15. Exhibits and Financial Statement Schedules | 74 |
| SIGNATURES | 77 |
| EXHIBIT INDEX | |
| FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | |

2

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

Certain statements in this annual report on Form 10K contain or may contain forward-looking statements that are subject to known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These forward-looking statements were based on various factors and were derived utilizing numerous assumptions and other factors that could cause our actual results to differ materially from those in the forward-looking statements. These factors include, but are not limited to, economic, political and market conditions and fluctuations, government and industry regulation, interest rate risk, global competition, and other factors as relate to our doing business within the People's Republic of China. Most of these factors are difficult to predict accurately and are generally beyond our control. You should consider the areas of risk described in connection with any forward-looking statements that may be made herein. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this report. Readers should carefully review this annual report in its entirety, including but not limited to our financial statements and the notes thereto and the risks described in "Item 1. Description of Business—Risk Factors." Except for our ongoing obligations to disclose material information under the Federal securities laws, we undertake no obligation to release publicly any revisions to any forward-looking statements, to report events or to report the occurrence of unanticipated events.

When used in this annual report, the terms the "Company," "Jiangbo," "JGBO," "we," "us," "our," and similar terms refer to Jiangbo Pharmaceuticals, Inc., a Florida corporation, and our subsidiaries. The information which appears on our website www.jiangbopharma.com is not part of this report.

## PART I

## ITEM 1. DESCRIPTION OF BUSINESS

Jiangbo Pharmaceuticals, Inc. is a holding company incorporated in Florida with its principal place of business in the People's Republic of China (the "PRC"). We operate, control and beneficially own the pharmaceutical business of Laiyang Jiangbo. Laiyang Jiangbo researches, develops, manufactures, markets and sells pharmaceutical products and health supplements in the PRC. From our inception in 2001 until our acquisition of Karmoya International Ltd. ("Karmoya") in October 2007, we were a business development and marketing firm specializing in advising and providing turn-key solutions for Chinese small and mid-sized companies entering Western markets.

On July 27, 2008, our board of directors and the majority holders of our capital stock approved a one-for-forty reverse stock split of our common stock. On August 29, 2008, we received confirmation from the Department of the State of Florida that the Articles of Amendment to the Amended and Restated Articles of Incorporation ("August 2008 Amended Articles of Incorporation") to effect a reverse stock split was duly filed and on September 3, 2008, the reverse stock split was effectuated. Following the reverse stock split, the total number of shares of our common stock outstanding was reduced from 412,986,078 shares to approximately 10,325,000 shares and the maximum number of shares of common stock that the Company is authorized to issue was also reduced from 900,000,000 to 22,500,000. Our financial statements have been retroactively adjusted to reflect the reverse split. Additionally, all share representations are on a post-split basis hereinafter.

Pursuant to a Certificate of Amendment to our Amended and Restated Articles of Incorporation filed with the Department of State of the State of Florida which took effect as of April 16, 2009, our name was changed from "Genesis Pharmaceuticals Enterprises, Inc." to "Jiangbo Pharmaceuticals, Inc." (the "Corporate Name Change"). The Corporate Name Change was approved and authorized by our Board of Directors as well as our holders of a majority of the outstanding shares of voting stock by written consent.

3

As a result of the Corporate Name Change, our stock symbol changed to "JGBO" with the opening of trading on May 12, 2009 on the OTCBB.

**Corporate Structure**

The following diagram illustrates our current corporate structure:



**CONTRACTUAL ARRANGEMENTS WITH LAIYANG JIANGBO AND ITS SHAREHOLDERS**

Our relationships with Laiyang Jiangbo and its shareholders are governed by a series of contractual arrangements primarily between two entities associated with our wholly owned subsidiary Karmoya: (1) GJBT, Karmoya's wholly foreign owned enterprise in PRC, and (2) Laiyang Jiangbo, Karmoya's operating company in PRC. Under PRC laws, each of GJBT and Laiyang Jiangbo is an independent legal person and neither of them is exposed to liabilities incurred by the other party. The contractual arrangements constitute valid and binding obligations of the parties of such agreements. Each of the contractual arrangements, as amended and restated, and the rights and obligations of the parties thereto are enforceable and valid in accordance with the laws of the PRC. Other than pursuant to the contractual arrangements described below, Laiyang Jiangbo does not transfer any other funds generated from its operations to any other member of the LJ Group. On September 21, 2007, we entered into the following contractual arrangements (collectively, the "LJ Agreements"):

Consulting Services Agreement. Pursuant to the exclusive consulting services agreement between GJBT and Laiyang Jiangbo, GJBT has the exclusive right to provide to Laiyang Jiangbo general consulting services related to pharmaceutical business operations, as well as consulting services related to human resources and technological research and development of pharmaceutical products and health supplements (the "Services"). Under this agreement, GJBT owns the intellectual property rights developed or discovered through research and development while providing the Services for Laiyang Jiangbo. Laiyang Jiangbo pays a quarterly consulting service fee in Chinese Renminbi ("RMB") to GJBT that is equal to all of Laiyang Jiangbo's revenue for such quarter.

Operating Agreement. Pursuant to the operating agreement among GJBT, Laiyang Jiangbo and the shareholders of Laiyang Jiangbo who collectively hold 100% of the outstanding shares of Laiyang Jiangbo (collectively, the "Laiyang Shareholders"), GJBT provides guidance and instructions on Laiyang Jiangbo's daily operations, financial management and employment issues. The Laiyang Shareholders must appoint the candidates recommended by GJBT as members of Laiyang Jiangbo's board of directors. GJBT has the right to appoint senior executives of Laiyang Jiangbo. In addition, GJBT agrees to guarantee Laiyang Jiangbo's performance under any agreements or arrangements relating to Laiyang Jiangbo's business arrangements with any third party. Laiyang Jiangbo, in return, agrees to pledge its accounts receivable and all of its assets to GJBT. Moreover, Laiyang Jiangbo agrees that without the prior consent of GJBT, Laiyang Jiangbo will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Laiyang Jiangbo, including, but not limited to, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party, or transfer of any agreements relating to its business operation to any third party. The term of this agreement is ten (10) years from September 21, 2007 unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

Equity Pledge Agreement. Pursuant to the equity pledge agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders pledged all of their equity interests in Laiyang Jiangbo to GJBT to guarantee Laiyang Jiangbo's performance of its obligations under the consulting services agreement. If either Laiyang Jiangbo or any of the Laiyang Shareholders breaches its respective contractual obligations, GJBT, as pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The Laiyang Shareholders also granted GJBT an exclusive, irrevocable power of attorney to take actions in the place and stead of the Laiyang Shareholders to carry out the security provisions of the equity pledge agreement and take any action and execute any instrument that GJBT may deem necessary or advisable to accomplish the purposes of the equity pledge agreement. The Laiyang Shareholders agreed, among other things, not to dispose of the pledged equity interests or take any actions that would prejudice GJBT's interest. The equity pledge agreement will expire two (2) years after Laiyang Jiangbo obligations under the exclusive consulting services agreement have been fulfilled.

Option Agreement. Pursuant to the option agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders irrevocably granted GJBT or its designated person an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Laiyang Jiangbo for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. GJBT or its designated person has sole discretion to decide when to exercise the option, whether in part or in full. The term of this agreement is ten (10) years from September 21, 2007 unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

Proxy Agreement. Pursuant to the proxy agreement among GJBT and the Laiyang Shareholders, the Laiyang Shareholders agreed to irrevocably grant and entrust all the rights to exercise their voting power to the person(s) appointed by GJBT. GJBT may from time to time establish and amend rules to govern how GJBT shall exercise the powers granted to it by the Laiyang Shareholders, and GJBT shall take action only in accordance with such rules. The Laiyang Shareholders shall not transfer their equity interests in Laiyang Jiangbo to any individual or company (other than GJBT or the individuals or entities designated by GJBT). The Laiyang Shareholders acknowledged that they will continue to perform this agreement even if one or more than one of them no longer hold the equity interests of Laiyang Jiangbo. This agreement may not be terminated without the unanimous consent of all of the parties, except that GJBT may terminate this agreement by giving thirty (30) days prior written notice to the Laiyang Shareholders.

## LAIYANG JIANGBO PHARMACEUTICAL CO., LTD.

As discussed above, our operations are conducted through Laiyang Jiangbo Pharmaceutical Co., Ltd., ("Laiyang Jiangbo") a limited liability company headquartered in the PRC and organized under the laws of PRC (" Laiyang Jiangbo"). Laiyang Jiangbo was organized on August 18, 2003, and its fiscal year end is June 30.

## PRINCIPAL PRODUCTS OR SERVICES

Laiyang Jiangbo is engaged in research, development, production, marketing and sales of pharmaceutical products. It is located in East China in an Economic Development Zone in Laiyang City, Shandong province, and is one of the major pharmaceutical companies in China producing tablets, capsules, granules, syrup and electuary for both Western medical drugs and Chinese herbal-based medical drugs. Approximately 35% of its current products are Chinese herbal-based drugs and 65% are Western medical drugs. Laiyang Jiangbo has several Certificates of Good Manufacturing Practices for Pharmaceutical Products (GMP Certificates) issued by the Shandong State Drug Administration (SDA) and currently produces thirteen types of drugs.

Laiyang Jiangbo's top four products in fiscal 2009 include Clarithromycin sustained-release tablets, Itopride Hydrochloride granules, Baobaole Chewable tablets and Radix Isatidis Disperable tablets and they accounted for approximately 96% of the Company's total revenue in fiscal 2009.

### Drug Development and Production

Development and production of pharmaceutical products is Laiyang Jiangbo's largest and most profitable business. Its principal pharmaceutical products include:

### *Western Pharmaceutical Products*

### *Clarithromycin sustained-release tablets*

Clarithromycin sustained-release tablets, Chinese Drug Approval Number H20052746, are semi-synthetic antibiotics for curing Clarithromycin sensitive microorganism infections. Laiyang Jiangbo is one of only two domestic Chinese pharmaceutical companies that has the technology to manufacture and actively produce and sell this drug. The Company's sales of this drug were approximately RMB282.3 million (US $41.4 million) with gross margin over 71% in fiscal 2009, with approximately 45% of the market share in China for this type of drug.

Clarithromycin is the second generation of macrolide antibiotic and replaces the older generation of Erythromycin. Clarithromycin first entered the pharmaceutical market in Ireland in 1989, and as of 2007, it is one of thirty medicines which generate the greatest sales revenue all over the world. Chemically, Clarithromycin has a wider antimicrobial spectrum and longer duration of acid resistance. Its activity is 2 to 4 times better than Erythromycin, but the toxicity is 2-12 times lower. The product was in its growth period in 2007 and 2008 and entered into its maturity in later part of fiscal 2008. The Company anticipates the product will stay in the maturity period through fiscal 2011 and gradually enters into its declining period starting in later part of fiscal year 2011. During the growth period, the product had an over 35 % annual sales growth. The Company expects the annual sales for this product to remain materially consistent with minimal growth in its maturity. Once Clarithromycin reaches its declining period, the sale of this product may experience up to 10-15 % decline on an annual basis. Factors such as extended Chinese SFDA approval time might extend this product's life in its maturity as it will be less likely for other similar products and new competitors to enter into the market. If Clarithromycin is distributed in more Chinese provincial or national drug reimbursement lists, it is likely that the market share for this product will increase. In the event that the Chinese government imposes pricing control on this product, the profit margin on this product may decrease and as a result, the net profit generated from this product may decline accordingly.

6

Clarithromycin sustained-release tablets utilize sustained-release technology, which requires a high degree of production technology. Because of the high degree of technology required to produce this product, PRC production requirements are very strict and there are very few manufacturers who gain permission to produce this product. Therefore, there is a significant barrier to entry in the PRC market. Currently, our Clarithromycin sustained-release tablets are the one of the leading products in the PRC domestic antibiotic sustained-release tablets market. Our goal is to maintain our current market share for this product.

*Itopride Hydrochloride granules*

Itopride Hydrochloride granules, Chinese Drug Approval Number H20050932, are a stomach and intestinal drug for curing digestive system-related diseases. The Company's sales for this drug reached RMB 227.5 million (US $33.3 million) with gross margin over 84% in the fiscal year 2009, and the Company has approximately 10-12% of the market share in China for this type of drug. This product is widely regarded for its pharmacological properties, i.e., rapid absorption, positive clinical effects, and few side effects. Based on clinical observation, it has been shown that Itopride Hydrochloride granules can improve 95.1% of gastrointestinal indigestion symptoms.

Itopride Hydrochloride granules are the fourth generation of gastrointestinal double dynamic medicines, which are used for curing most symptoms due to functional indigestion. The older generations are Metoclopramide Paspertin, Domperidone and Cisapride.

Itopride Hydrochloride granules are SDA-approved and entered the PRC pharmaceutical market in June 2005. Since 2005, Laiyang Jiangbo has seized the opportunity presented by this product by rapidly establishing a domestic sales network and developing the market for this product. The product was in its growth period in 2006 and 2007 and entered into its maturity in 2008. The Company anticipates the product will stay in the maturity period through 2010 and gradually enters into its declining period starting in fiscal year 2011. During the growth period, the product had average 10 to 15 % annual sales growth. Once the product enters into its maturity, the Company expects the sales for this product will remain flat with minimal growth. As the product enters into its declining period, the product sales may experience up to 20% decline on an annual basis. Factors such as extended Chinese SFDA approval time might extend this product's life in its maturity as it will be less likely for new competitors to enter into the market. If Itopride Hydrochloride is distributed in more Chinese provincial or national drug reimbursement lists, it is likely that the market share for this product will increase. In the event that the Chinese government imposes pricing control on this product, the profit margin on this product may decrease and as a result, the net profit generated from this product may decline accordingly.

The Company currently faces the competition from two other famous stomach medicines, namely Dompendone Tablets and Vitamin U Belladonna and Aluminum Capsules II. The Company plans to continue utilizing its nationwide sales network in China to strength its sales effort for this product and the goal is to maintain the current market share and profit margin for this product.

*Ciprofloxacin Hydrochloride tablets*

Ciprofloxacin Hydrochloride tablets, Chinese Drug Approval Number H37022737, are an antibiotic drug used to cure infection caused by bacteria. Although the Company generated more than 50% of its revenue from this product in the fiscal year 2004, as other companies entered into the production market, the Company began experiencing a significant decrease in sales and profits from this product in the fiscal year 2007. The drug accounted for less than 1% of the Company's revenue in the fiscal year 2009. The drug is included in the recently announced China's Essential Drug List. As both the sales volume and profit are thin for this product, the Company is not actively promoting this product and only continues to produce Ciprofloxacin Hydrochloride tablets to support the Company's product variety and brand name.

7

*Paracetamol tablets*

Paracetamol tablets, Chinese Drug Approval Number H37022733, are a nonprescription analgesic drug, mainly used for curing fever due to common flu or influenza. It is also used for relief of aches and pains. The Company's sales for this drug was less than 1% of the total revenue in the fiscal year 2009 . Laiyang Jiangbo is authorized by the PRC Ministry of Health to be an appointed producer of common antibiotics in Jiangsu Province, Guangdong Province, Zhejiang Province, Fujian Province, Shandong Province and Guangxi Province. Paracetamol tablets are one of PRC's national A-level Medicare medicines. This product was commercially launched in the Chinese market in July 2004. The drug is included in the recently announced China's Essential Drug List. As the sales volume and profit both significantly decreased in recent years, the Company will only produce this product under customers' special requests.

**Chinese herbal-based Pharmaceutical Products**

*Baobaole Chewable tablets*

Baobaole Chewable tablets, Chinese Drug Approval Number Z20060294 formally entered the market in November 2007. Baobaole Chewable tablets are nonprescription over-the counter drugs for gastric cavity aches. This drug stimulates the appetite and promotes digestion. Baobaole is used to cure deficiencies in the spleen and stomach, abdomen aches, loss of appetite, and loose bowels. Its effects are mild and lasting. The drug has quickly gained its popularity in the market and the sales for this drug has grown at a fast pace since its initial introduction.

The Company's sales for Baobaole Chewable tablets was approximately RMB 205.9 million (US $30.2 million) with gross margin over 80% in the fiscal year 2009. The product quickly went through its growth period in fiscal 2008 and 2009. The Company anticipates the product will enter into its maturity period in the fiscal year 2010 and approach its declining period in later part of the fiscal year 2012. Once the product enters into its maturity, the Company expects the sales for this product will have less than 5% annual growth. As the product enters into its declining period, the product sales may experience up to 5-10 % decline on an annual basis and the profit margin may decrease up to 10% during its declining period. Factors such as extended Chinese SFDA approval time might extend this product's life in its maturity as it will be less likely for new competitors to enter into the market.

The Company intend to strengthen its sales and marketing effort for this product and sustain the product's sales growth.

*Radix Isatidis Disperable Tablet*

Radix Isatidis Disperable Tablets, Chinese Drug Approval Number Z20080142, nonprescription Traditional Chinese Medicine, is used to cure virus influenza and sour throat. It clears away heat, detoxifies and promote pharynx. Laiyang Jiangbo is the only company that owns the product's manufacturing technology in China. The research study indicates Radix Isatidisthe's ingredients included Indole, hapoxanthineuraci, quina-alkaloids, amino acid, etc., have anti-inflammation and anti-virus effects. The Company's sales for this drug was approximately RMB 56.7 million (US $ 8.3 million) with gross margin over 76% in 2009.

Compared with similar existing Radix Isatidis products, Radix Isatidis Disperable Tablet utilizes the new disperable tablet formula, which is convenient to take and fast to dissolve. It is also easy to absorb and has high stability. The product was first commercially launched in October 2008 and the market demand for this product has continued to grow since. The Company anticipates the product sales will continue to grow through the fiscal year 2013 and reach its maturity in the year 2014. The Company plans to continue promoting this drug through advertising and various promotional activities and believes that these activities will strengthen the product and brand-name recognition, a major driver of the historical popularity of the drug.

8

*New Compound Foliumisatidis Tablets*

New Compound Foliumisatidis Tablet addresses influenza symptoms and includes both western chemical ingredients and traditional Chinese herbs. This is a well known essential drug for Chinese family. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Laiyang Pear Cough Syrup*

Laiyang Pear Cough Syrup helps relieve coughs arising from colds and other illnesses. Market feedback has shown that children like its fresh pear taste. The Company plans to promote Laiyang Pear Couch Syrup through direct-to-consumer advertising, including television commercial campaigns. We believe that these advertisements will strengthen our brand loyalty, a major driver of the historical popularity of the drug. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Kang Gu Sui Yan Pian*

Kang Gu Sui Yan Pian (osteomyelitis treatment tablets) is used to treat bone and bone marrow inflammations.  It's a 100% herb-based traditional Chinese medicine. Most osteomyelitis patients currently use chemical drugs such as antibiotics for treatment which may develop drug resistance if the chemical drugs are taken over a long period of time. Chronic patients are also likely to need surgery which is a less preferable treatment for patients in China. Laiyang Jiangbos' osteomyelitis tablets offer an alternative mild treatment and was clinically tested to be effective in treating long term osteomyelitis problems. Laiyang Jiangbo is the exclusive manufacturer of this product in China. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Gan Mao Zhi Ke Ke Li*

Gan Mao Zhi Ke Ke Li, an antipyretic and antitussive granule that helps to relieve cold and flu symptoms such as fever, headache, rhinocleisis, cough, throat pain and phlegm. It is used in a large number of China's hospitals and clinics and is popular with consumers. The drug is included in the recently announced China's Essential Drug List and more hospitals and clinics are expect to carry this product, making it even more widely available to consumers and more consumers to be reimbursed for the cost of purchasing this product. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Yi Mu Cao Gao*

Yi Mu Cao Gao , is used to treat dysmenorrhoea, oligminorrhea and postpartum abdominal pain. The drug is included in the recently announced China's Essential Drug List and more hospitals and clinics are expect to carry this product, making it even more widely available to consumers and more consumers to be reimbursed for the cost of purchasing this product. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Ban Lan Gen Ke Li*

Ban Lan Gen Ke Li is an herbal-based traditional Chinese medicine used to cure viral influenza. The drug is included in the recently announced China's Essential Drug List and more hospitals and clinics are expect to carry this product, making it even more widely available to consumers and more consumers to be reimbursed for the cost of purchasing this product. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

*Gan Mao Zhi Ke Tang Jiang*

Gan Mao Zhi Ke Tang Jiang is a syrup that helps relieve cold and flu symptoms such as fever, headache, rhinocleisis, cough, throat pain and phlegm. The drug is included in the recently announced China's Essential Drug List and more hospitals and clinics are expect to carry this product, making it even more widely available to consumers and more consumers to be reimbursed for the cost of purchasing this product. The Company owns this product as a result of the acquisition of Shandong Hongrui Pharmaceutical Factory, which was completed in February 2009.

Other than the commercialized products mentioned above, we have a portfolio of 15 approved over-the-counter Chinese herb based pharmaceutical products that have not been commercially launched.

## RESEARCH AND DEVELOPMENT

For the fiscal year ended June 30, 2009, Laiyang Jiangbo spent approximately US $4.4 million or approximately 3.7% of its fiscal 2009 revenue on research and development of products. For the fiscal year ended June 30, 2008, Laiyang Jiangbo spent approximately US $3.2 million or approximately 3.3% of its fiscal 2008 revenue on research and development of various pharmaceutical products.

Laiyang Jiangbo places great emphasis on product research and development and maintains strategic relationships with several research institutions in PRC developing new drugs, such as Pharmaceutical Institute of Shandong University and the Institute of Microbiology (Chinese Academy of Sciences) . The Company currently have two Cooperative Research and Development Agreements (the " CRDAs") with the two research institutions and the following is a summary of the material terms of each of the two CRDAs :

Pharmaceutical Institute of Shandong University (the "University") Cooperative Research and Development Agreement

Laiyang Jiangbo entered into a  three year CRDA with the University in September 2007. The agreement provides that Laiyang Jiangbo will pay RMB 24,000,000 (approximately USD $3.5 million) plus various expenses incurred by the University for servicing Laiyang Jiangbo to the University annually and provide internship opportunities for students of the University and in exchange the University agreed (i) to provide technical services, establish projects to develop new products with Laiyang Jiangbo, (ii) to train technical personnel for Laiyang Jiangbo, and (iii) actively apply for related scientific and technological funding with Laiyang Jiangbo. Laiyang Jiangbo will have the primary ownership of the designated research and development project results.

Institute of Microbiology ( Chinese Academy of Sciences) (the "Institute") Cooperative Research and Development Agreement

Laiyang Jiangbo entered into a five year CRDA with the Institute in November 2007.  The agreement provides that Laiyang Jiangbo will pay  RMB 6,000,000 (approximately USD $879,000) to the Institute annually and bear enterprise related responsibilities during the  application process of various projects and  in exchange the Institute agreed (i)  to give Laiyang Jiangbo the priority to obtain the transferable technological achievement (ii) to train related technical staff for Laiyang Jiangbo (iii) to provide technical support and  solve problems encountered in Laiyang Jiangbo's production process within the scientific research scope.

10

Laiyang Jiangbo has strategic relationships with many research institutions in PRC developing new drugs with various other reputable research and development institutes in China. However, except for the two CRDAs mentioned above, Laiyang Jiangbo have not entered into formal agreements with other research institutions. The strategic relationships with various non-contracted research institutions are primarily built and maintained by frequent visits and correspondences with the research institutions to share knowledge and expertise on topics such as technology, industrial standards and regulations and market feasibility. These relationships help to ensure that Laiyang Jiangbo maintains a continuing pipeline of high quality drugs into the future.

Other than a number of potential R&D projects that are currently under evolution and yet to be locked in, the Company currently has three products pending on PRC SFDA approval in the pipeline for commercialization in China.

| Drug Name | Target Treatment/Drug Type | Status |
|---|---|---|
| Felodipine Sustained Release Tablets | Treat high blood pressure and arteriosclerosis/Western Drug | (A) Expected approval date - second quarter of fiscal year 2010 |
| Yuandu Hanbi Capsules | Relieve arthritis pain /Traditional Chinese Medicine | (A) Expected approval date - to be announced |
| Bezoar Yijin Tablets | Cures inflammations such as pharyngitis/Traditional Chinese Medicine | (A) Expected approval date - To be announced. |

(A) Subject to SFDA. Pending administrative protection and approval.

**DISTRIBUTION METHODS OF THE PRODUCTS OR SERVICES AND OUR CUSTOMERS**

Laiyang Jiangbo has a well-established sales network across China. It has a distribution network covering over 29 provinces and regions in the PRC. Currently, Laiyang Jiangbo has approximately 1,000 distribution agents and salespeople throughout the PRC. Laiyang Jiangbo will continue to establish more representative offices and engage additional distribution agents in order to strengthen its distribution network.

Laiyang Jiangbo recognizes the importance of branding as well as packaging. All of Laiyang Jiangbo's products bear a uniform brand but have specialized designs to differentiate the different categories of Laiyang Jiangbo's products.

Laiyang Jiangbo conducts promotional marketing activities to publicize and enhance its image as well as to reinforce the recognition of its brand name including:

1. publishing advertisements and articles in national as well as specialized and provincial newspapers, magazines, and in other media, including the Internet;

11

2.  participating in national meetings, seminars, symposiums, exhibitions for pharmaceutical and other related industries;

3.  organizing cooperative promotional activities with distributors; and

4.  sending direct mail to major physician offices and laboratories.

**CUSTOMERS**

Currently, Laiyang Jiangbo has over1,200 terminal clients. Terminal clients are hospitals and medical institutions which purchase large supplies of pharmaceutical drugs as well as over the counter retail pharmacies. Laiyang Jiangbo is also authorized by the PRC Ministry of Health as an appointed Medicare medication supplier in six provinces, namely Jiangsu Province, Shandong Province, Zhejiang Province, Fujian Province, Guangdong Province and Guangxi Province.

For the fiscal years ended June 30, 2009, 2008 and 2007, five customers accounted for approximately 25.6%, 18.1% and 33.3%, respectively, of Laiyang Jiangbo's sales. These five customers represented 31.4% and 11.8% of Laiyang Jiangbo's total accounts receivable as of June 30, 2009 and 2008, respectively.

**COMPETITION**

As a pharmaceutical manufacturing and distribution company in PRC, we believe that we are well positioned to compete in the fast-developing Chinese pharmaceutical market with our strong brand, diverse product portfolio, established sales and marketing network and favorable cost structure. We believe that competition and leadership in our industry are based on managerial and technological expertise, and the ability to identify and exploit commercially viable products. Other factors affecting our competitive position include time to market, patent position, product efficacy, safety, convenience, reliability, availability and pricing. Our competitors in the industry typically would have number of popular pharmaceutical products, strong financial position and a large market share in the industry. Laiyang Jiangbo is able to compete with these competitors because of our favorable geographic position, strong financial position, unique products, extensive sales network, and lower prices.

Our major competitors in China on individual product basis are Jiangsu Hengrui Pharmaceuticals (Clarithromycin sustained release tablets), Xi'an Yangsen ( Itopride Hydrochloride Granules) and Jiangzhong Pharmaceuticals (Baobaole Chewable tablets), respectively. We are able to compete with Jiangsu Hengrui Pharmaceuticals because of our extensive sales network as well as flexible and favorable incentive policy. Compared with Motihium of Xi'an Yangsen, a gastro dynamic only drug, our Itopride Hydrochloride Granules has better efficacy due to its gastro-intestinal dynamic characteristic, higher security and less side effects. Referring to Children Jiangwei Xiaoshi Tablets of Jiangzhong Pharmaceutcials, our Baobaole Chewable tablet is able to significantly stimulate appetite and fundamentally nurse children's gastro-intestinal system. Also, it is very convenient for children to take. As such, we believe we have competitive advantages for those products.

**SOURCES AND AVAILABILITY OF RAW MATERIALS AND THE PRINCIPAL SUPPLIERS**

Laiyang Jiangbo designs, creates prototypes and manufactures its products at its manufacturing facilities located in Laiyang City, Shandong province. We require a supply of quality raw materials to manufacture our products. Historically, we have not had difficulty obtaining raw materials from suppliers. Currently, we rely on numerous suppliers to deliver our required raw materials. the prices for these raw materials are subject to market forces largely beyond our control, including energy costs, organic chemical prices, market demand, and freight costs. The prices for these raw materials have varied significantly in the past and may vary significantly in the future.

**INTELLECTUAL PROPERTY**

Laiyang Jiangbo relies on a combination of trademarks copyright and trade secret protection laws in the PRC and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect its intellectual property and brand. We consider our packaging designs, service marks, trademarks, trade secrets, patents and similar intellectual property as part of our core competence that is critical to our success. Laiyang Jiangbo has been issued design patents in the PRC for drug packaging and drug containers, each valid for 10 years, and it intends to apply for more patents to protect its core technologies. Laiyang Jiangbo also enters into confidentiality, non-compete and invention assignment agreements with its employees and consultants and nondisclosure agreements with third parties. "Jiangbo" and a certain circular design affiliated with our brand are our registered trademarks in the PRC.

Pharmaceutical companies are at times involved in litigation based on allegations of infringement or other violations of intellectual property rights. Furthermore, the application of laws governing intellectual property rights in the PRC and abroad is uncertain and evolving and could involve substantial risks to us.

**GOVERNMENT REGULATION**

*General Regulations related to the pharmaceutical industry in the PRC*

The Drug Administration Law of the PRC governs Laiyang Jiangbo and its products. The State Food & Drug Administration of the PRC regulates and implements PRC drug laws. As a developer, producer and distributor of medicinal products, we are subject to regulation and oversight by the SFDA and its provincial and local branches. The Law of the PRC on the Administration of Pharmaceuticals provides the basic legal framework for the administration of the production and sale of pharmaceuticals in China and covers the manufacturing, distributing, packaging, pricing and advertising of pharmaceutical products. Its implementing regulations set forth detailed rules with respect to the administration of pharmaceuticals in China. We are also subject to other PRC laws and regulations that are applicable to business operators, manufacturers and distributors in general.

*Registration and Approval of Medicine.* A medicine must be registered and approved by the SFDA before it can be manufactured. The registration and approval process requires the manufacturer to submit to the SFDA a registration application containing detailed information concerning the efficacy and quality of the medicine and the manufacturing process and the production facilities the manufacturer expects to use. To obtain the SFDA registration and approval necessary for commencing production, the manufacturer is also required to conduct pre-clinical trials, apply to the SFDA for permission to conduct clinical trials, and, after clinical trials are completed, file clinical data with the SFDA for approval. Our pharmaceutical products are approved by the SFDA and are being sold both as prescription and over-the-counter medicines.

*New Medicine.* If a medicine is approved by the SFDA as a new medicine, the SFDA will issue a new medicine certificate to the manufacturer and impose a monitoring period which shall be calculated starting from the day of approval for manufacturing of the new medicine and may not exceed five years. The length of the monitoring period is specified in the new medicine certificate. During the monitoring period, the SFDA will monitor the safety of the new medicine, and will neither accept new medicine certificate applications for an identical medicine by another pharmaceutical company, nor approve the production or import of an identical medicine by other pharmaceutical companies. For new medicines approved prior to September 2002, the monitoring period could be longer than five years. As a result of these regulations, the holder of a new medicine certificate effectively has the exclusive right to manufacture the new medicine during the monitoring period.

13

*Provisional National Production Standard.* In connection with the SFDA's approval of a new medicine, the SFDA will normally direct the manufacturer to produce the medicine according to a provisional national production standard, or a provisional standard. A provisional standard is valid for two years, during which the SFDA closely monitors the production process and quality consistency of the medicine to develop a national final production standard for the medicine, or a final standard. Three months before the expiration of the two-year period, the manufacturer is required to apply to the SFDA to convert the provisional standard to a final standard. Upon approval, the SFDA will publish the final standard for the production of this medicine. In practice, the approval for conversion to a final standard is a time-consuming process. However, during the SFDA's review period, the manufacturer may continue to produce the medicine according to the provisional standard.

*Transitional Period.* Prior to the latter of (1) the expiration of a new medicine's monitoring period or (2) the date when the SFDA grants a final standard for a new medicine after the expiration of the provisional standard, the SFDA will not accept applications for an identical medicine nor will it approve the production of an identical medicine by other pharmaceutical companies. Accordingly, the manufacturer will continue to have an exclusive production right for the new medicine during this transitional period.

*Continuing SFDA Regulation.* Pharmaceutical manufacturers in China are subject to continuing regulation by the SFDA. If the labeling or manufacturing process of an approved medicine is significantly modified, a new pre-market approval or pre-market approval supplement will be required by the SFDA. A pharmaceutical manufacturer is subject to periodic inspection and safety monitoring by the SFDA to determine compliance with regulatory requirements. The SFDA has a variety of enforcement actions available to enforce its regulations and rules, including fines and injunctions, recall or seizure of products, the imposition of operating restrictions, partial suspension or complete shutdown of production and criminal prosecution.

**Pharmaceutical Product Manufacturing**

*Permits and Licenses for Pharmaceutical Manufacturers.* A pharmaceutical manufacturer must obtain a pharmaceutical manufacturing permit from the SFDA's relevant provincial branch. This permit is valid for five years and is renewable upon its expiration. Each of our manufacturing facilities has a pharmaceutical manufacturing permit. We do not anticipate any difficulty in renewing our pharmaceutical manufacturing permits upon expiration.

*Good Manufacturing Practice.* A pharmaceutical manufacturer must meet Good Manufacturing Practice standards, or GMP standards, for each of its production facilities in China in respect of each form of pharmaceutical products it produces. GMP standards include staff qualifications, production premises and facilities, equipment, raw materials, environmental hygiene, production management, quality control and customer complaint administration. If a manufacturer meets the GMP standards, the SFDA will issue to the manufacturer a Good Manufacturing Practice certificate, or a GMP certificate, with a five-year validity period. However, for a newly established pharmaceutical manufacturer that meets the GMP standards, the SFDA will issue a GMP certificate with only a one-year validity period. We have obtained a GMP certificate for all of our production facilities covering all of the products that we produce.

*Pharmaceutical Distribution.* A distributor of pharmaceutical products in China must obtain a pharmaceutical distribution permit from the relevant provincial or local SFDA branches. The distribution permit is granted if the relevant SFDA provincial branch receives satisfactory inspection results of the distributor's facilities, warehouse, hygiene environment, quality control systems, personnel and equipment. A pharmaceutical distribution permit is valid for five years.

*Restrictions on Foreign Ownership of Pharmaceutical Wholesale and Retail Businesses in China.* Chinese regulations on foreign investment currently permit foreign companies to establish or invest in wholly foreign-owned companies or joint ventures that engage in wholesale or retail sales of pharmaceuticals in China.

14

***Good Supply Practice Standards.*** The SFDA applies Good Supply Practice standards, or GSP standards, to all pharmaceutical wholesale and retail distributors to ensure the quality of distribution in China. The currently applicable GSP standards require pharmaceutical distributors to implement controls on the distribution of medicine, including standards regarding staff qualifications, distribution premises, warehouses, inspection equipment and facilities, management and quality control. A certificate for GSP standards, or GSP certificate, is valid for five years, except for a newly established pharmaceutical distribution company, for which the GSP certificate is valid for only one year.

***Price Controls.*** The retail prices of prescription and over-the-counter medicines that are included in the national medicine catalog are subject to price controls administered by the Price Control Office under the National Development and Reform Commission, or the NDRC, and provincial price control authorities, either in the form of fixed prices or price ceilings. The controls over the retail price of a medicine effectively set the limits for the wholesale price of that medicine. From time to time, the NDRC publishes and updates a national list of medicines that are subject to price control. Fixed prices and price ceilings on medicines are determined based on profit margins that the NDRC deems reasonable, the type and quality of the medicine, its production costs, the prices of substitute medicines and the extent of the manufacturer's compliance with the applicable GMP standards. The NDRC directly regulates the price of some of the medicines on the list, and delegates the power to provincial price control authorities to regulate the remainder on the list. For those medicines under the authority of provincial price control authorities, each provincial price control authority regulates medicines manufactured by manufacturers registered in that province. Provincial price control authorities have the discretion to authorize price adjustments based on the local conditions and the level of local economic development. Only the manufacturer of a medicine may apply for an increase in the retail price of the medicine and it must apply either to the NDRC, if the price of the medicine is nationally regulated, or to the provincial price control authorities in the province where it is registered, if the price of the medicine is provincially regulated. For a provincially regulated medicine, when provincial price control authorities approve an application, they will file the new approved price with the NDRC for confirmation and thereafter the newly approved price will become binding and enforceable across China.

***Tendering Requirement for Hospital Purchases of Medicines.*** Provincial and municipal government agencies such as provincial or municipal health departments also operate a mandatory tendering process for purchases by state-owned hospitals of a medicine included in provincial medicine catalogs. These government agencies organize a tendering process once every year in their province or city and typically invite manufacturers of provincial catalog medicines that are on the hospitals' formularies and are in demand by these hospitals to participate in the tendering process. A government-approved committee consisting of physicians, experts and officials is delegated by these government agencies the power to review bids and select one or more medicines for the treatment of a particular medical condition. The selection is based on a number of factors, including bid price, quality and manufacturer's reputation and service. The bidding price of a winning medicine will become the price required for purchases of that medicine by all state-owned hospitals in that province or city. The tendering requirement was first introduced in 2001 and has since been implemented across China. We understand that the level of present implementation of the tendering requirement varies among different provinces in China.

15

*Reimbursement under the National Medical Insurance Program.* As of the end of 2006, approximately 157.4 million people were enrolled into the National Medical Insurance Program. The Ministry of Labor and Social Security, together with other government authorities, determines which medicines are to be included in or removed from the national medicine catalog for the National Medical Insurance Program, and under which tier a medicine should fall, both of which affect the amounts reimbursable to program participants for their purchases of those medicines. These determinations are based on a number of factors, including price and efficacy. A National Medical Insurance Program participant can be reimbursed for the full cost of a Tier 1 medicine and 80 to 90% of the cost of a Tier 2 medicine. Although it is designated as a national program, the implementation of the National Medical Insurance Program is delegated to various provincial governments, each of which has established its own medicine catalog. A provincial government must include all Tier 1 medicines listed in the national medicine catalog in its provincial medicine catalog, but may use its discretion based on its own selection criteria to add other medicines to, or exclude Tier 2 medicines listed in the national medicine catalog from, its provincial medicine catalog, so long as the combined numbers of the medicines added and excluded do not exceed 15% of the number of the Tier 2 medicines listed in the national catalog. In addition, provincial governments may use their discretion to upgrade a nationally classified Tier 2 medicine to Tier 1 in their provincial medicine catalogs, but may not downgrade a nationally classified Tier 1 medicine to Tier 2. The total amount of reimbursement for the cost of prescription and over-the-counter medicines, in addition to other medical expenses, for an individual program participant in a calendar year is capped at the amount in that participant's individual account. The amount in a participant's account varies, depending upon the amount of contributions from the participant and his or her employer. Generally, program participants who are from relatively wealthier eastern parts of China and relatively wealthier metropolitan centers have greater amounts in their individual accounts than those from less developed provinces.

*Circular 106 Compliance and Approval*

On May 31, 2007, the PRC State Administration of Foreign Exchange ("SAFE") issued an official notice known as "Circular 106," which requires the owners of any Chinese companies to obtain SAFE's approval before establishing any offshore holding company structure for foreign financing as well as subsequent acquisition matters in China.

In early September 2007, the three owners of 100% of the equity in Laiyang Jiangbo, Cao Wubo, Xun Guihong and Zhang Yihua, submitted their application to SAFE. On September 19, 2007, SAFE approved their application, permitting these Chinese citizens to establish an offshore company, Karmoya International Ltd., as a "special purpose vehicle" for any foreign ownership and capital raising activities by Laiyang Jiangbo.

After SAFE's approval, Cao Wubo, Xun Guihong and Zhang Yihua became the majority owners of Karmoya International Ltd. on September 20, 2007.

## COSTS AND EFFECTS OF COMPLIANCE WITH ENVIRONMENTAL LAWS

Laiyang Jiangbo complies with the Environmental Protection Law of China as well as the applicable local regulations. In addition to statutory and regulatory compliance, we actively ensure the environmental sustainability of our operations. The cost for PRC environmental regulation compliance in u/ the past three fiscal years has been immaterial and mainly for the wastewater treatment in connection with its production facilities. Penalties would be levied upon us if we fail to adhere to and maintain certain standards. Such failure has not occurred in the past, and we generally do not anticipate that it will occur in the future, but no assurance can be given in this regard.

## EMPLOYEES

Laiyang Jiangbo currently has 1,539 employees, including 114 administrative staff, 425 production crew, 440 full-time salespersons and 560 part-time salespersons. Approximately 200 of these employees are represented by Laiyang City Jiangbo Pharmaceuticals Union, which is governed by the City of Laiyang. Laiyang Jiangbo has not experienced a work stoppage since inception and does not anticipate any work stoppage in the foreseeable future. Management believes that its relations with its employees and the union are good.

## CORPORATE INFORMATION

Laiyang Jiangbo's principal executive offices are located at 25 Haihe Road, Laiyang Development Zone, Yantai, Shandong Province, PRC 265200.

## ITEM 1A. RISK FACTORS

*Investing in our securities involves a great deal of risk. Careful consideration should be made of the following factors as well as other information included in this prospectus before deciding to purchase our common stock. You should pay particular attention to the fact that we conduct all of our operations in China and are governed by a legal and regulatory environment that in some respects differs significantly from the environment that may prevail in other countries. Our business, financial condition or results of operations could be affected materially and adversely by any or all of these risks.*

THE FOLLOWING MATTERS MAY HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS, FINANCIAL CONDITION, LIQUIDITY, RESULTS OF OPERATIONS OR PROSPECTS, FINANCIAL OR OTHERWISE. REFERENCE TO THIS CAUTIONARY STATEMENT IN THE CONTEXT OF A FORWARD-LOOKING STATEMENT OR STATEMENTS SHALL BE DEEMED TO BE A STATEMENT THAT ANY ONE OR MORE OF THE FOLLOWING FACTORS MAY CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN SUCH FORWARD-LOOKING STATEMENT OR STATEMENTS.

### *Risks Relating to Our Business*

**Our limited operating history makes it difficult to evaluate our future prospects and results of operations.**

We have a limited operating history. Laiyang Jiangbo commenced operations in 2003 and first achieved profitability in the fiscal year ended June 30, 2005. Accordingly, you should consider our future prospects in light of the risks and uncertainties experienced by early stage companies in evolving industries such as the pharmaceutical industry in China. Some of these risks and uncertainties relate to our ability to:

. maintain our market position in the pharmaceuticals business in China;

. offer new and innovative products to attract and retain a larger customer base;

. attract additional customers and increase spending per customer;

. increase awareness of our brand and continue to develop user and customer loyalty;

. respond to competitive market conditions;

. respond to changes in our regulatory environment;

. manage risks associated with intellectual property rights;

. maintain effective control of our costs and expenses;

. raise sufficient capital to sustain and expand our business;

. attract, retain and motivate qualified personnel; and

. upgrade our technology to support additional research and development of new products.

If we are unsuccessful in addressing any of these risks and uncertainties, our business may be materially and adversely affected

17

**We may need additional financing to execute our business plan.**

The revenues from the production and sale of pharmaceutical products and the projected revenues from these products may not be adequate to support our expansion and product development programs. We may need substantial additional funds to build our new production facilities, pursue further research and development, obtain regulatory approvals, market our products, and file, prosecute, defend and enforce our intellectual property rights. We will seek additional funds through public or private equity or debt financing, strategic transactions and/or from other sources. We could enter into collaborative arrangements for the development of particular products that would lead to our relinquishing some or all rights to the related technology or products.

There are no assurances that future funding will be available on favorable terms or at all. If additional funding is not obtained, we will need to reduce, defer or cancel development programs, planned initiatives or overhead expenditures, to the extent necessary. The failure to fund our capital requirements would have a material adverse effect on our business, financial condition and results of operations.

**Our success depends on collaborative partners, licensees and other third parties over whom we have limited control.**

Due to the complexity of the process of developing pharmaceuticals, our core business depends on arrangements with pharmaceutical institutes, corporate and academic collaborators, licensors, licensees and others for the research, development, clinical testing, technology rights, manufacturing, marketing and commercialization of our products. We have several research collaborations. Our license agreements could obligate us to diligently bring potential products to market, make milestone payments and royalties that, in some instances, could be substantial, and incur the costs of filing and prosecuting patent applications. There are no assurances that we will be able to establish or maintain collaborations that are important to our business on favorable terms, or at all.

A number of risks arise from our dependence on collaborative agreements with third parties. Product development and commercialization efforts could be adversely affected if any collaborative partner:

. terminates or suspends its agreement with us

. causes delays

. fails to timely develop or manufacture in adequate quantities a substance needed in order to conduct clinical trials

. fails to adequately perform clinical trials

. determines not to develop, manufacture or commercialize a product to which it has rights or

. otherwise fails to meet its contractual obligations.

Our collaborative partners could pursue other technologies or develop alternative products that could compete with the products we are developing.

18

**The profitability of our products will depend in part on our ability to protect proprietary rights and operate without infringing the proprietary rights of others.**

The profitability of our products will depend in part on our ability to obtain and maintain patents and licenses and preserve trade secrets, and the period our intellectual property remains exclusive. We must also operate without infringing the proprietary rights of third parties and without third parties circumventing our rights. The patent positions of pharmaceutical enterprises, including ours, are uncertain and involve complex legal and factual questions for which important legal principles are largely unresolved. The pharmaceutical patent situation outside the US is uncertain, is currently undergoing review and revision in many countries, and may not protect our intellectual property rights to the same extent as the laws of the US. Because patent applications are maintained in secrecy in some cases, we cannot be certain that we or our licensors are the first creators of inventions described in our pending patent applications or patents or the first to file patent applications for such inventions.

Most of our drug products have been approved by the PRC's Food and Drug Administration (SFDA) but have not received patent protection. For instance, Clarithromycin sustained-release tablets, one of our most profitable products, are produced by other companies in China. If any other company were to obtain patent protection for Clarithromycin sustained-release tablets in China, or for any of our other drug products, it would have a material adverse effect on our revenue.

Other companies may independently develop similar products and design around any patented products we develop. We cannot assure you that:

. any of our patent applications will result in the issuance of patents;

. we will develop additional patentable products;

. the patents we have been issued will provide us with any competitive advantages;

. the patents of others will not impede our ability to do business; or

. third parties will not be able to circumvent our patents.

A number of pharmaceutical, research, and academic companies and institutions have developed technologies, filed patent applications or received patents on technologies that may relate to our business. If these technologies, applications or patents conflict with ours, the scope of our current or future patents could be limited or our patent applications could be denied. Our business may be adversely affected if competitors independently develop competing technologies, especially if we do not obtain, or obtain only narrow, patent protection. If patents that cover our activities are issued to other companies, we may not be able to obtain licenses at a reasonable cost, or at all; develop our technology; or introduce, manufacture or sell the products we have planned.

Patent litigation is becoming widespread in the pharmaceutical industry. Such litigation may affect our efforts to form collaborations, to conduct research or development, to conduct clinical testing or to manufacture or market any products under development. There are no assurances that our patents would be held valid or enforceable by a court or that a competitor's technology or product would be found to infringe our patents in the event of patent litigation. Our business could be materially affected by an adverse outcome to such litigation. Similarly, we may need to participate in interference proceedings declared by the U.S. Patent and Trademark Office or equivalent international authorities to determine priority of invention. We could incur substantial costs and devote significant management resources to defend our patent position or to seek a declaration that another company's patents are invalid.

Much of our know-how and technology may not be patentable, though it may constitute trade secrets. There are no assurances that we will be able to meaningfully protect our trade secrets. We cannot assure you that any of our existing confidentiality agreements with employees, consultants, advisors or collaborators will provide meaningful protection for our trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure. Collaborators, advisors or consultants may dispute the ownership of proprietary rights to our technology, for example by asserting that they developed the technology independently.

19

**We may encounter difficulties in manufacturing our products.**

Before our products can be profitable, they must be produced in commercial quantities in a cost-effective manufacturing process that complies with regulatory requirements, including GMP, production and quality control regulations. If we cannot arrange for or maintain commercial-scale manufacturing on acceptable terms, or if there are delays or difficulties in the manufacturing process, we may not be able to conduct clinical trials, obtain regulatory approval or meet demand for our products. Production of our products could require raw materials which are scarce or which can be obtained only from a limited number of sources. If we are unable to obtain adequate supplies of such raw materials, the development, regulatory approval and marketing of our products could be delayed.

**We could need more clinical trials or take more time to complete our clinical trials than we have planned.**

Clinical trials vary in design by factors including dosage, end points, length, and controls. We may need to conduct a series of trials to demonstrate the safety and efficacy of our products. The results of these trials may not demonstrate safety or efficacy sufficiently for regulatory authorities to approve our products. Further, the actual schedules for our clinical trials could vary dramatically from the forecasted schedules due to factors including changes in trial design, conflicts with the schedules of participating clinicians and clinical institutions, and changes affecting product supplies for clinical trials.

We rely on collaborators, including academic institutions, governmental agencies and clinical research organizations, to conduct, supervise, monitor and design some or all aspects of clinical trials involving our products. Since these trials depend on governmental participation and funding, we have less control over their timing and design than trials we sponsor. Delays in or failure to commence or complete any planned clinical trials could delay the ultimate timelines for our product releases. Such delays could reduce investors' confidence in our ability to develop products, likely causing our share price to decrease.

**We may not be able to obtain the regulatory approvals or clearances that are necessary to commercialize our products.**

The PRC and other countries impose significant statutory and regulatory obligations upon the manufacture and sale of pharmaceutical products. Each regulatory authority typically has a lengthy approval process in which it examines pre-clinical and clinical data and the facilities in which the product is manufactured. Regulatory submissions must meet complex criteria to demonstrate the safety and efficacy of the ultimate products. Addressing these criteria requires considerable data collection, verification and analysis. We may spend time and money preparing regulatory submissions or applications without assurances as to whether they will be approved on a timely basis or at all.

Our product candidates, some of which are currently in the early stages of development, will require significant additional development and pre-clinical and clinical testing prior to their commercialization. These steps and the process of obtaining required approvals and clearances can be costly and time-consuming. If our potential products are not successfully developed, cannot be proven to be safe and effective through clinical trials, or do not receive applicable regulatory approvals and clearances, or if there are delays in the process:

. the commercialization of our products could be adversely affected;

. any competitive advantages of the products could be diminished; and

. revenues or collaborative milestones from the products could be reduced or delayed.

20

Governmental and regulatory authorities may approve a product candidate for fewer indications or narrower circumstances than requested or may condition approval on the performance of post-marketing studies for a product candidate. Even if a product receives regulatory approval and clearance, it may later exhibit adverse side effects that limit or prevent its widespread use or that would force us to withdraw the product from the market.

Any marketed product and its manufacturer will continue to be subject to strict regulation after approval. Results of post-marketing programs may limit or expand the further marketing of products. Unforeseen problems with an approved product or any violation of regulations could result in restrictions on the product, including its withdrawal from the market and possible civil actions.

In manufacturing our products we will be required to comply with applicable good manufacturing practices regulations, which include requirements relating to quality control and quality assurance, as well as the maintenance of records and documentation. If we cannot comply with regulatory requirements, including applicable good manufacturing practice requirements, we may not be allowed to develop or market the product candidates. If we or our manufacturers fail to comply with applicable regulatory requirements at any stage during the regulatory process, we may be subject to sanctions, including fines, product recalls or seizures, injunctions, refusal of regulatory agencies to review pending market approval applications or supplements to approve applications, total or partial suspension of production, civil penalties, withdrawals of previously approved marketing applications and criminal prosecution.

**Competitors may develop and market pharmaceutical products that are less expensive, more effective or safer, making our products obsolete or uncompetitive.**

Some of our competitors and potential competitors have greater product development capabilities and financial, scientific, marketing and human resources than we do. Technological competition from pharmaceutical companies is intense and is expected to increase. Other companies have developed technologies that could be the basis for competitive products. Some of these products have an entirely different approach or means of accomplishing the desired curative effect than products we are developing. Alternative products may be developed that are more effective, work faster and are less costly than our products. Competitors may succeed in developing products earlier than us, obtaining approvals and clearances for such products more rapidly than us, or developing products that are more effective than ours. In addition, other forms of treatment may be competitive with our products. Over time, our technology or products may become obsolete or uncompetitive.

**Our products may not gain market acceptance.**

Our products may not gain market acceptance in the pharmaceutical community. The degree of market acceptance of any product depends on a number of factors, including establishment and demonstration of clinical efficacy and safety, cost-effectiveness, clinical advantages over alternative products, and marketing and distribution support for the products. Limited information regarding these factors is available in connection with our products or products that may compete with ours.

To directly market and distribute our pharmaceutical products, we or our collaborators require a marketing and sales force with appropriate technical expertise and supporting distribution capabilities. We may not be able to further establish sales, marketing and distribution capabilities or enter into arrangements with third parties on acceptable terms. If we or our partners cannot successfully market and sell our products, our ability to generate revenue will be limited.

**Our revenue is highly concentrated on four of our products**

Our top four products, which include Clarithromycin sustained-release tablets, Itopride Hydrochloride granules, Baobaole Chewable tablets and Radix Isatidis Disperable tablets generated approximately 96.4% of our total revenues in 2009 and 95.9% of our total revenues in 2008. We expect that these four products will continue to account for a majority of our sales in the near future. Because of our dependence on a few products, any disruption in, or compromise of, our manufacturing operations, sales operations or distribution channels, relating to any of these products could result in our failure to meet shipping and delivery deadlines or meet quality standards, which in turn could result in the cancellation of purchase orders, refusal to accept deliveries or a reduction in purchase prices, any of which could have a material adverse effect on our financial condition and results of operations.

21

**Our operations and the use of our products could subject us to damages relating to injuries or accidental contamination.**

Our research and development processes involve the controlled use of hazardous materials. We are subject to PRC national, provincial and local laws and regulations governing the use, manufacture, storage, handling and disposal of such materials and waste products. The risk of accidental contamination or injury from handling and disposing of such materials cannot be completely eliminated. In the event of an accident involving hazardous materials, we could be held liable for resulting damages. We are not insured with respect to this liability. Such liability could exceed our resources. In the future we could incur significant costs to comply with environmental laws and regulations.

**If we were successfully sued for product liability, we could face substantial liabilities that may exceed our resources.**

We may be held liable if any product we develop, or any product which is made using our technologies, causes injury or is found unsuitable during product testing, manufacturing, marketing, sale or use. These risks are inherent in the development of agricultural and pharmaceutical products. We currently do not have product liability insurance. We are not insured with respect to this liability. If we choose to obtain product liability insurance but cannot obtain sufficient insurance coverage at an acceptable cost or otherwise protect against potential product liability claims, the commercialization of products that we develop may be prevented or inhibited. If we are sued for any injury caused by our products, our liability could exceed our total assets.

**We have limited business insurance coverage.**

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption, litigation or natural disaster may result in our incurring substantial costs and the diversion of our resources.

**Our business depends substantially on the continuing efforts of our executive officers and our ability to maintain a skilled labor force, and our business may be severely disrupted if we lose their services.**

Our future success depends substantially on the continued services of our executive officers, especially Wubo Cao our chief executive officer and the chairman of our board. We do not maintain key man life insurance on any of our executive officers. If one or more of our executive officers are unable or unwilling to continue in their present positions, we may not be able to replace them readily, if at all. Therefore, our business may be severely disrupted, and we may incur additional expenses to recruit and retain new officers. In addition, if any of our executives joins a competitor or forms a competing company, we may lose some of our customers.

**Our success depends on attracting and retaining qualified personnel.**

We depend on a core management and scientific team. The loss of any of these individuals could prevent us from achieving our business objective of commercializing our product candidates. Our future success will depend in large part on our continued ability to attract and retain other highly qualified scientific, technical and management personnel, as well as personnel with expertise in clinical testing and government regulation. We face competition for personnel from other companies, universities, public and private research institutions, government entities and other organizations. If our recruitment and retention efforts are unsuccessful, our business operations could suffer.

**We may not be able to manage the expansion of our operations effectively, which may have an adverse effect on our business and results of operations.**

The revenues from the production and sale of our current product offerings and the projected revenues from these products may not be adequate to support our expansion and product development programs. We will need substantial additional funds to expand our production facilities, pursue research and development, obtain regulatory approvals; file, prosecute, defend and enforce our intellectual property rights and market our products. We will seek additional funds through public or private equity or debt financing, strategic transactions and/or from other sources. We could enter into collaborative arrangements for the development of particular products that would lead to our relinquishing some or all rights to the related technology or products. There are no assurances that future funding will be available on favorable terms or at all. If additional funding is not obtained, we will need to reduce, defer or cancel development programs, planned initiatives or overhead expenditures, to the extent necessary. The failure to fund our capital requirements would have a material adverse effect on our business, financial condition and results of operations.

### *Risks Related to Our Corporate Structure*

**PRC laws and regulations governing our businesses and the validity of certain of our contractual arrangements are uncertain. If we are found to be in violation, we could be subject to sanctions. In addition, changes in such PRC laws and regulations may materially and adversely affect our business.**

There are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including, but not limited to, the laws and regulations governing our business, or the enforcement and performance of our contractual arrangements with our affiliated Chinese entity, Laiyang Jiangbo, and its shareholders. We are considered a foreign person or foreign invested enterprise under PRC law. As a result, we are subject to PRC law limitations on foreign ownership of Chinese companies. These laws and regulations are relatively new and may be subject to change, and their official interpretation and enforcement may involve substantial uncertainty. The effectiveness of newly enacted laws, regulations or amendments may be delayed, resulting in detrimental reliance by foreign investors. New laws and regulations that affect existing and proposed future businesses may also be applied retroactively.

The PRC government has broad discretion in dealing with violations of laws and regulations, including levying fines, revoking business and other licenses and requiring actions necessary for compliance. In particular, licenses and permits issued or granted to us by relevant governmental bodies may be revoked at a later time by higher regulatory bodies. We cannot predict the effect of the interpretation of existing or new PRC laws or regulations on our businesses. We cannot assure you that our current ownership and operating structure would not be found in violation of any current or future PRC laws or regulations. As a result, we may be subject to sanctions, including fines, and could be required to restructure our operations or cease to provide certain services. Any of these or similar actions could significantly disrupt our business operations or restrict us from conducting a substantial portion of our business operations, which could materially and adversely affect our business, financial condition and results of operations.

The PRC government restricts foreign investment in pharmaceutical businesses in China. Accordingly, we operate our business in China through Laiyang Jiangbo. Laiyang Jiangbo holds the licenses and approvals necessary to operate our pharmaceutical business in China. We have contractual arrangements with Laiyang Jiangbo and its shareholders that allow us to substantially control Laiyang Jiangbo. We cannot assure you, however, that we will be able to enforce these contracts.

23

Although we believe we comply with current PRC regulations, we cannot assure you that the PRC government would agree that these operating arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. If the PRC government determines that we do not comply with applicable law, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, require us to restructure our operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business.

**We may be adversely affected by complexity, uncertainties and changes in PRC regulation of pharmaceutical business and companies, including limitations on our ability to own key assets.**

The PRC government regulates the pharmaceutical industry including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the pharmaceutical industry. These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainty. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be a violation of applicable laws and regulations. Issues, risks and uncertainties relating to PRC government regulation of the pharmaceutical industry include the following:

. we only have contractual control over Laiyang Jiangbo. We do not own it due to the restriction of foreign investment in Chinese businesses; and

. uncertainties relating to the regulation of the pharmaceutical business in China, including evolving licensing practices, means that permits, licenses or operations at our company may be subject to challenge. This may disrupt our business, or subject us to sanctions, requirements to increase capital or other conditions or enforcement, or compromise enforceability of related contractual arrangements, or have other harmful effects on us.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, pharmaceutical businesses in China, including our business.

**Our contractual arrangements with Laiyang Jiangbo and its shareholders may not be as effective in providing control over these entities as direct ownership.**

Since the law of the PRC limits foreign equity ownership in pharmaceutical companies in China, we operate our business through Laiyang Jiangbo. We have no equity ownership interest in Laiyang Jiangbo and rely on contractual arrangements to control and operate such business. These contractual arrangements may not be effective in providing control over Laiyang Jiangbo as direct ownership. For example, Laiyang Jiangbo could fail to take actions required for our business despite its contractual obligation to do so. If Laiyang Jiangbo fails to perform under its agreements with us, we may have to incur substantial costs and resources to enforce such arrangements and may have to rely on legal remedies under the law of the PRC, which may not be effective. In addition, we cannot assure you that Laiyang Jiangbo's shareholders would always act in our best interests.

**The chairman of the board of directors of Laiyang Jiangbo has potential conflicts of interest with us, which may adversely affect our business.**

Mr. Cao Wubo, our Chairman and Chief Executive Officer, is also the Chairman of the Board of Directors and General Manager of Laiyang Jiangbo. Conflicts of interests between his duties to our company and Laiyang Jiangbo may arise. As Mr. Cao is a director and executive officer of our company, he has a duty of loyalty and care to us under Florida law when there are any potential conflicts of interests between our company and Laiyang Jiangbo. We cannot assure you, however, that when conflicts of interest arise, Mr. Cao will act completely in our interests or that conflicts of interests will be resolved in our favor. In addition, Mr. Cao could violate his legal duties by diverting business opportunities from us to others. If we cannot resolve any conflicts of interest between us and Mr. Cao, we would have to rely on legal proceedings, which could result in the disruption of our business.

24

*Risks Related to Doing Business in China*

**Failure to comply with PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident shareholders to personal liability, limit our ability to acquire PRC companies or to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to distribute profits to us or otherwise materially adversely affect us.**

In October 2005, the PRC State Administration of Foreign Exchange, or SAFE, issued the Notice on Relevant Issues in the Foreign Exchange Control over Financing and Return Investment Through Special Purpose Companies by Residents Inside China, generally referred to as Circular 75, which required PRC residents to register with the competent local SAFE branch before establishing or acquiring control over an offshore special purpose company, or SPV, for the purpose of engaging in an equity financing outside of China on the strength of domestic PRC assets originally held by those residents. Internal implementing guidelines issued by SAFE, which became public in June 2007 (known as Notice 106), expanded the reach of Circular 75 by (i) purporting to cover the establishment or acquisition of control by PRC residents of offshore entities which merely acquire "control" over domestic companies or assets, even in the absence of legal ownership; (ii) adding requirements relating to the source of the PRC resident's funds used to establish or acquire the offshore entity; (iii) covering the use of existing offshore entities for offshore financings; (iv) purporting to cover situations in which an offshore SPV establishes a new subsidiary in China or acquires an unrelated company or unrelated assets in China; and (v) making the domestic affiliate of the SPV responsible for the accuracy of certain documents which must be filed in connection with any such registration, notably, the business plan which describes the overseas financing and the use of proceeds. Amendments to registrations made under Circular 75 are required in connection with any increase or decrease of capital, transfer of shares, mergers and acquisitions, equity investment or creation of any security interest in any assets located in China to guarantee offshore obligations, and Notice 106 makes the offshore SPV jointly responsible for these filings. In the case of an SPV which was established, and which acquired a related domestic company or assets, before the implementation date of Circular 75, a retroactive SAFE registration was required to have been completed before March 31, 2006; this date was subsequently extended indefinitely by Notice 106, which also required that the registrant establish that all foreign exchange transactions undertaken by the SPV and its affiliates were in compliance with applicable laws and regulations. Failure to comply with the requirements of Circular 75, as applied by SAFE in accordance with Notice 106, may result in fines and other penalties under PRC laws for evasion of applicable foreign exchange restrictions. Any such failure could also result in the SPV's affiliates being impeded or prevented from distributing their profits and the proceeds from any reduction in capital, share transfer or liquidation to the SPV, or from engaging in other transfers of funds into or out of China.

We believe our shareholders who are PRC residents, as defined in Circular 75, have registered with the relevant branch of SAFE, as currently required, in connection with their equity interests in us and our acquisitions of equity interests in our PRC subsidiaries. However, we cannot provide any assurances that their existing registrations have fully complied with, or that they have made all necessary amendments to their registration to fully comply with, all applicable registrations or approvals required by Circular 75. Moreover, because of uncertainty over how Circular 75 will be interpreted and implemented, and how or whether SAFE will apply it to us, we cannot predict how it will affect our business operations or future strategies. For example, our present and prospective PRC subsidiaries' ability to conduct foreign exchange activities, such as the remittance of dividends and foreign currency-denominated borrowings, may be subject to compliance with Circular 75 by our PRC resident beneficial holders. In addition, such PRC residents may not always be able to complete the necessary registration procedures required by Circular 75. We also have little control over either our present or prospective direct or indirect shareholders or the outcome of such registration procedures. A failure by our PRC resident beneficial holders or future PRC resident shareholders to comply with Circular 75, if SAFE requires it, could subject these PRC resident beneficial holders to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our subsidiaries' ability to make distributions or pay dividends or affect our ownership structure, which could adversely affect our business and prospects.

25

**If the PRC enacts regulations which forbid or restrict foreign investment, our ability to grow may be severely impaired.**

We intend to expand our business in areas relating to our present business. We may also expand by making acquisitions of companies in related industries. Many of the rules and regulations that we would face are not explicitly communicated, and we may be subject to rules that would affect our ability to grow, either internally or through acquisition of other Chinese or foreign companies. There are also substantial uncertainties regarding the proper interpretation of current laws and regulations of the PRC. New laws or regulations that forbid foreign investment could severely impair our businesses and prospects. Additionally, if the relevant authorities find us in violation of PRC laws or regulations, they would have broad discretion in dealing with such a violation, including, without limitation:

- levying fines;

- revoking our business and other licenses; and

- requiring that we restructure our ownership or operations.

**Any deterioration of political relations between the United States and the PRC could impair our operations and your investment in us.**

The relationship between the United States and the PRC is subject to sudden fluctuation and periodic tension. Changes in political conditions in the PRC and changes in the state of Sino-U.S. relations are difficult to predict and could adversely affect our operations or cause potential acquisition candidates or their goods and services to become less attractive. Such a change could lead to a decline in our profitability. Any weakening of relations between the United States and the PRC could have a material adverse effect on our operations and your investment in us, particularly in our efforts to raise capital to expand our other business activities.

**Adverse changes in economic and political policies of the PRC government could have a material adverse effect on the overall economic growth of China, which could adversely affect our business.**

Substantially all of our business operations are conducted in China. Accordingly, our results of operations, financial condition and prospects are subject to a significant degree to economic, political and legal developments in China. China's economy differs from the economies of most developed countries in many respects, including with respect to:

- the amount of government involvement;

- level of development;

- growth rate;

- control of foreign exchange; and

- allocation of resources.

26

While the PRC economy has experienced significant growth in the past 20 years, growth has been uneven across different regions and among various economic sectors of China. The PRC government has implemented various measures to encourage economic development and guide the allocation of resources. Some of these measures benefit the overall PRC economy, but may also have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations that are applicable to us. Since early 2004, the PRC government has implemented certain measures to control the pace of economic growth. Such measures may cause a decrease in the level of economic activity in China, which in turn could adversely affect our results of operations and financial condition.

**Price controls may affect both our revenues and net income.**

The laws of the PRC provide for the government to fix and adjust prices. Although we are not presently subject to price controls in connection with the sale of our products, it is possible that price controls may be imposed in the future. To the extent that we are subject to price control, our revenue, gross profit, gross margin and net income will be affected since the revenue we derive from our sales will be limited and, unless there is also price control on the products that we purchase from our suppliers, we may face no limitation on our costs. Further, if price controls affect both our revenue and our costs, our ability to be profitable and the extent of our profitability will be effectively subject to determination by the applicable regulatory authorities in the PRC.

**Our operations may not develop in the same way or at the same rate as might be expected if the PRC economy were similar to the market-oriented economies of OECD member countries.**

The economy of the PRC has historically been a nationalistic, "planned economy," meaning it functions and produces according to governmental plans and pre-set targets or quotas. In certain aspects, the PRC's economy has been making a transition to a more market-oriented economy, although the government imposes price controls on certain products and in certain industries. However, we cannot predict the future direction of these economic reforms or the effects these measures may have. The economy of the PRC also differs from the economies of most countries belonging to the Organization for Economic Cooperation and Development (the "OECD"), an international group of member countries sharing a commitment to democratic government and market economy. For instance:

- the level of state-owned enterprises in the PRC, as well as the level of governmental control over the allocation of resources is greater than in most of the countries belonging to the OECD;

- the level of capital reinvestment is lower in the PRC than in other countries that are members of the OECD;

- the government of the PRC has a greater involvement in general in the economy and the economic structure of industries within the PRC than other countries belonging to the OECD;

- the government of the PRC imposes price controls on certain products and our products may become subject to additional price controls; and

- the PRC has various impediments in place that make it difficult for foreign firms to obtain local currency, as opposed to other countries belonging to the OECD where exchange of currencies is generally free from restriction.

As a result of these differences, our business may not develop in the same way or at the same rate as might be expected if the economy of the PRC were similar to those of the OECD member countries.

**Because some of our officers and directors reside outside of the United States, it may be difficult for you to enforce your rights against them or enforce United States court judgments against them in the PRC.**

Most of our executive officers and directors reside in the PRC and a substantial portion of our assets are located in the PRC. It may therefore be difficult for United States investors to enforce their legal rights, to effect service of process upon our directors or officers or to enforce judgments of United States courts predicated upon civil liabilities and criminal penalties of our directors and officers under federal securities laws. Further, it is unclear if extradition treaties now in effect between the United States and the PRC would permit effective enforcement of criminal penalties of the federal securities laws.

**We may have limited legal recourse under Chinese law if disputes arise under contracts with third parties.**

Almost all of our agreements with our employees and third parties, including our supplier and customers, are governed by the laws of the PRC. The legal system in the PRC is a civil law system based on written statutes. Unlike common law systems, such as we have in the United States, it is a system in which decided legal cases have little precedential value. The government of the PRC has enacted some laws and regulations dealing with matters such as corporate organization and governance, foreign investment, commerce, taxation and trade. However, their experience in implementing, interpreting and enforcing these laws and regulations is limited, and our ability to enforce commercial claims or to resolve commercial disputes is unpredictable. The resolution of these matters may be subject to the exercise of considerable discretion by agencies of the PRC, and forces unrelated to the legal merits of a particular matter or dispute may influence their determination. Any rights we may have to specific performance or to seek an injunction under Chinese law are severely limited, and without a means of recourse by virtue of the Chinese legal system, we may be unable to prevent these situations from occurring. The occurrence of any such events could have a material adverse effect on our business, financial condition and results of operations.

**Because we may not be able to obtain business insurance in the PRC, we may not be protected from risks that are customarily covered by insurance in the United States.**

Business insurance is not readily available in the PRC. To the extent that we suffer a loss of a type which would normally be covered by insurance in the United States, such as product liability and general liability insurance, we would incur significant expenses in both defending any action and in paying any claims that result from a settlement or judgment.

**Failure to comply with the United States Foreign Corrupt Practices Act could subject us to penalties and other adverse consequences.**

We are subject to the United States Foreign Corrupt Practices Act, which generally prohibits United States companies from engaging in bribery or other prohibited payments to foreign officials for the purpose of obtaining or retaining business. Foreign companies, including some that may compete with us, are not subject to these prohibitions. Corruption, extortion, bribery, pay-offs, theft and other fraudulent practices occur from time-to-time in the PRC. We can make no assurance, however, that our employees or other agents will not engage in such conduct for which we might be held responsible. If our employees or other agents are found to have engaged in such practices, we could suffer severe penalties and other consequences that may have a material adverse effect on our business, financial condition and results of operations.

**A downturn in the economy of the PRC may slow our growth and profitability.**

The growth of the Chinese economy has been uneven across geographic regions and economic sectors. There can be no assurance that growth of the Chinese economy will be steady or that any downturn will not have a negative effect on our business especially if it results in either a decreased use of products such as ours or in pressure on us to lower our prices. The Chinese economy has been transitioning from a planned economy to a more market-oriented economy. Although in recent years the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of sound corporate governance in business enterprises, a substantial portion of the productive assets in China is still owned by the Chinese government. The continued control of these assets and other aspects of the national economy by the Chinese government could materially and adversely affect our business. The Chinese government also exercises significant control over Chinese economic growth through the allocation of resources, controlling payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Efforts by the Chinese government to slow the pace of growth of the Chinese economy could result in reduced demand for our products.

Any adverse change in the economic conditions or government policies in China could have a material adverse effect on the overall economic growth and the level of pharmaceutical investments and expenditures in China, which in turn could lead to a reduction in demand for our products and consequently have a material adverse effect on our businesses.

**Downturns in the economies of the U.S. and Europe may affect the PRC economy which could reduce the demand for our products.**

The rapid growth of the PRC economy in recent years has been partially related to the U.S. and European countries' demand for goods made in and exported from the PRC. The downturns in the U.S. and European economies may reduce the demand for goods exported by the PRC which could eventually affect the PRC economy as overseas orders decrease. The downturn in the PRC economy may in turn negatively impact the demand for our products.

**If certain tax exemptions within the PRC regarding withholding taxes are removed, we may be required to deduct corporate withholding taxes from any dividends we may pay in the future.**

Under the PRC's current tax laws, regulations and rulings, companies are exempt from paying withholding taxes with respect dividends paid to stockholders outside of the PRC. However, if the foregoing exemption is removed, we may be required to deduct certain amounts from any dividends we may pay to our stockholders.

**Laiyang Jiangbo is subject to restrictions on making payments to us.**

We are a holding company incorporated in the State of Florida and do not have any assets or conduct any business operations other than our investments in our affiliated entity in China, Laiyang Jiangbo. As a result of our holding company structure, we rely entirely on payments from Laiyang Jiangbo under our contractual arrangements. The operating agreement signed between our 100 % own subsidiary, Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd ("GJBT") and Laiyang Jiangbo provides that Laiyang Jiangbo agrees to accept advices regarding corporate policy advise by GJBT in connection with Laiyang Jiangbo's daily operations and financial management. Thus, Laiyang Jiangbo is obligated to accept our request to repatriate funds from Laiyang Jiangbo. However, as the PRC government imposes controls on the conversion of RMB into foreign currencies and the remittance of currencies out of China. We may experience difficulties in completing the administrative procedures necessary to obtain and remit foreign currency.

29

Pursuant to the Foreign Exchange Control Regulations of the PRC issued by the State Council which came into effect on April 1, 1996, and the Regulations on the Administration of Foreign Exchange Settlement, Sale and Payment of the PRC which came into effect on July 1, 1996, regarding foreign exchange control, conversion of RMB into foreign exchange by Foreign Investment Enterprises, or FIE's, for use on current account items, including the distribution of dividends and profits to foreign investors, is permissible.  FIEs are permitted to convert their after-tax dividends and profits to foreign exchange and remit such foreign exchange to their foreign exchange bank accounts in the PRC. Conversion of RMB into foreign currencies for capital account items, including direct investment, loans, and security investment, is still subject to certain restrictions. On January 14, 1997, the State Council amended the Foreign Exchange Control Regulations and added, among other things, an important provision, which provides that the PRC government shall not impose restrictions on recurring international payments and transfers under current account items.  These rules are subject to change.

Enterprises in the PRC (including FIEs) which require foreign exchange for transactions relating to current account items, may, without approval of the State Administration of Foreign Exchange, or SAFE, effect payment from their foreign exchange account or convert and pay at the designated foreign exchange banks by providing valid receipts and proofs. Convertibility of foreign exchange in respect of capital account items, such as direct investment and capital contribution, is still subject to certain restrictions, and prior approval from the SAFE or its relevant branches must be sought.

Our company is a FIE to which the Foreign Exchange Control Regulations are applicable.  There can be no assurance that we will be able to obtain sufficient foreign exchange to pay dividends or satisfy other foreign exchange requirements in the future.

See "Government control of currency conversion may affect the value of your investment." Furthermore, if our affiliated entity in China incurs debt on its own in the future, the instruments governing the debt may restrict its ability to make payments. If we are unable to receive all of the revenues from our operations through these contractual or dividend arrangements, we may be unable to pay dividends on our ordinary shares.

**Uncertainties with respect to the PRC legal system could adversely affect us.**

We conduct our business primarily through our affiliated Chinese entity, Laiyang Jiangbo. Our operations in China are governed by PRC laws and regulations. We are generally subject to laws and regulations applicable to foreign investments in China and, in particular, laws applicable to wholly foreign-owned enterprises. The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value.

Since 1979, PRC legislation and regulations have significantly enhanced the protections afforded to various forms of foreign investments in China. However, China has not developed a fully integrated legal system and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, because these laws and regulations are relatively new, and because of the limited volume of published decisions and their nonbinding nature, the interpretation and enforcement of these laws and regulations involve uncertainties. In addition, the PRC legal system is based in part on government policies and internal rules (some of which are not published on a timely basis or at all) that may have a retroactive effect. As a result, we may not be aware of our violation of these policies and rules until some time after the violation. In addition, any litigation in China may be protracted and result in substantial costs and diversion of resources and management attention.

**You may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing original actions in China based on United States or other foreign laws against us, our management or the experts named in the prospectus.**

We conduct substantially all of our operations in China and substantially all of our assets are located in China. In addition, most of our senior executive officers reside within China. As a result, it may not be possible to effect service of process within the United States or elsewhere outside China upon our senior executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws. Moreover, our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of judgment of courts.

**Governmental control of currency conversion may affect the value of your investment.**

The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of currency out of China. We receive substantially all of our revenues in RMB. Under our current structure, our income is primarily derived from payments from Laiyang Jiangbo. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and our affiliated entity to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the PRC State Administration of Foreign Exchange by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of bank loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders.

**Fluctuation in the value of RMB may have a material adverse effect on your investment.**

The value of RMB against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions. Our revenues and costs are mostly denominated in RMB, while a significant portion of our financial assets are denominated in U.S. dollars. We rely entirely on fees paid to us by our affiliated entity in China. Any significant fluctuation in value of RMB may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our stock in U.S. dollars. For example, an appreciation of RMB against the U.S. dollar would make any new RMB denominated investments or expenditures more costly to us, to the extent that we need to convert U.S. dollars into RMB for such purposes. An appreciation of RMB against the U.S. dollar would also result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated financial assets into RMB, as RMB is our reporting currency.

**We face risks related to health epidemics and other outbreaks.**

Our business could be adversely affected by the effects of H1N1 virus or another epidemic or outbreak. Since all of our operations are in China, H1N1 virus, Asian Bird Flu or other epidemic in China the future may disrupt our business operations and have a material adverse effect on our financial condition and results of operations. For instance, health or other government regulations adopted in response may require temporary closure of our production facilities or of our offices. Such closures would severely disrupt our business operations and adversely affect our results of operations. We have not adopted any written preventive measures or contingency plans to combat any future outbreak of health epidemics or any other outbreaks.

### *Risks Related to an Investment in Our Securities*

**We do not anticipate paying any cash dividends.**

We presently do not anticipate that we will pay any dividends on any of our capital stock in the foreseeable future. The payment of dividends, if any, would be contingent upon our revenues and earnings, if any, capital requirements, and general financial condition. The payment of any dividends is within the discretion of our Board of Directors. We presently intend to retain all earnings, if any, to implement our business plan; accordingly, we do not anticipate the declaration of any dividends in the foreseeable future.

**Because the OTC Bulletin Board is a quotation system, not an issuer listing service, market or exchange, it may be difficult for you to sell your common stock or you may not be able to sell your common stock for an optimum trading price.**

The OTC Bulletin Board is a regulated quotation service that displays real-time quotes, last sale prices and volume limitations in over-the-counter securities. Because trades and quotations on the OTC Bulletin Board involve a manual process, the market information for such securities cannot be guaranteed. In addition, quote information, or even firm quotes, may not be available. The manual execution process may delay order processing and intervening price fluctuations may result in the failure of a limit order to execute or the execution of a market order at a significantly different price. Execution of trades, execution reporting and the delivery of legal trade confirmations may be delayed significantly. Consequently, one may not be able to sell shares of our common stock at the optimum trading prices.

The dealer's spread (the difference between the bid and ask prices) may be large and may result in substantial losses to the seller of securities on the OTC Bulletin Board if the common stock or other security must be sold immediately. Further, purchasers of securities may incur an immediate "paper" loss due to the price spread. Moreover, dealers trading on the OTC Bulletin Board may not have a bid price for securities bought and sold through the OTC Bulletin Board. Due to the foregoing, demand for securities that are traded through the OTC Bulletin Board may be decreased or eliminated.

**The application of the "penny stock" rules could adversely affect the market price of our common stock and increase your transaction costs to sell those shares.**

In the event the trading price of our common shares reaches below $5 per share, the open-market trading of our common shares will be subject to the "penny stock" rules. The "penny stock" rules impose additional sales practice requirements on broker-dealers who sell securities to persons other than established customers and accredited investors (generally those with assets in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 together with their spouse). For transactions covered by these rules, the broker-dealer must make a special suitability determination for the purchase of securities and have received the purchaser's written consent to the transaction before the purchase. Additionally, for any transaction involving a penny stock, unless exempt, the broker-dealer must deliver, before the transaction, a disclosure schedule prescribed by the SEC relating to the penny stock market. The broker-dealer also must disclose the commissions payable to both the broker-dealer and the registered representative and current quotations for the securities. Finally, monthly statements must be sent disclosing recent price information on the limited market in penny stocks. These additional burdens imposed on broker-dealers may restrict the ability or decrease the willingness of broker-dealers to sell our common shares, and may result in decreased liquidity for our common shares and increased transaction costs for sales and purchases of our common shares as compared to other securities.

**Our common shares are thinly traded and, you may be unable to sell at or near ask prices or at all if you need to sell your shares to raise money or otherwise desire to liquidate your shares.**

We cannot predict the extent to which an active public market for its common stock will develop or be sustained. However, we do not rule out the possibility of applying for listing on the Nasdaq National Market or other exchanges.

Our common shares have historically been sporadically or "thinly-traded" on the OTC Bulletin Board, meaning that the number of persons interested in purchasing our common shares at or near bid prices at any given time may be relatively small or non-existent. This situation is attributable to a number of factors, including the fact that we are a small company which is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community that generate or influence sales volume, and that even if we came to the attention of such persons, they tend to be risk-averse and would be reluctant to follow an unproven company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. As a consequence, there may be periods of several days or more when trading activity in our shares is minimal or non-existent, as compared to a seasoned issuer which has a large and steady volume of trading activity that will generally support continuous sales without an adverse effect on share price. We cannot give you any assurance that a broader or more active public trading market for our common stock will develop or be sustained, or that current trading levels will be sustained.

The market price for our common stock is particularly volatile given our status as a relatively small company with a small and thinly traded "float" and lack of current revenues that could lead to wide fluctuations in our share price. The price at which you purchase our common stock may not be indicative of the price that will prevail in the trading market. You may be unable to sell your common stock at or above your purchase price if at all, which may result in substantial losses to you.

The market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future. The volatility in our share price is attributable to a number of factors. First, as noted above, our common shares are sporadically and/or thinly traded. As a consequence of this lack of liquidity, the trading of relatively small quantities of shares by our shareholders may disproportionately influence the price of those shares in either direction. The price for our shares could, for example, decline precipitously in the event that a large number of our common shares are sold on the market without commensurate demand, as compared to a seasoned issuer which could better absorb those sales without adverse impact on its share price. Secondly, we are a speculative or "risky" investment due to our lack of revenues or profits to date and uncertainty of future market acceptance for our current and potential products. As a consequence of this enhanced risk, more risk-adverse investors may, under the fear of losing all or most of their investment in the event of negative news or lack of progress, be more inclined to sell their shares on the market more quickly and at greater discounts than would be the case with the stock of a seasoned issuer. The following factors may add to the volatility in the price of our common shares: actual or anticipated variations in our quarterly or annual operating results; adverse outcomes; the termination of our contractual agreements with Laiyang Jiangbo; and additions or departures of our key personnel, as well as other items discussed under this "Risk Factors" section, as well as elsewhere in this report. Many of these factors are beyond our control and may decrease the market price of our common shares, regardless of our operating performance. We cannot make any predictions or projections as to what the prevailing market price for our common shares will be at any time, including as to whether our common shares will sustain their current market prices, or as to what effect that the sale of shares or the availability of common shares for sale at any time will have on the prevailing market price. However, we do not rule out the possibility of applying for listing on the Nasdaq National Market or other exchanges.

Shareholders should be aware that, according to SEC Release No. 34-29093, the market for penny stocks has suffered in recent years from patterns of fraud and abuse. Such patterns include (1) control of the market for the security by one or a few broker-dealers that are often related to the promoter or issuer; (2) manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases; (3) boiler room practices involving high-pressure sales tactics and unrealistic price projections by inexperienced sales persons; (4) excessive and undisclosed bid-ask differential and markups by selling broker-dealers; and (5) the wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, along with the resulting inevitable collapse of those prices and with consequent investor losses. Our management is aware of the abuses that have occurred historically in the penny stock market. Although we do not expect to be in a position to dictate the behavior of the market or of broker-dealers who participate in the market, management will strive within the confines of practical limitations to prevent the described patterns from being established with respect to our securities. The occurrence of these patterns or practices could increase the volatility of our share price.

**The market price for our stock may be volatile and the volatility in our common share price may subject us to securities litigation.**

The market price for our stock may be volatile and subject to wide fluctuations in response to factors including the following:

33

- actual or anticipated fluctuations in our quarterly operating results;

- changes in financial estimates by securities research analysts;

- conditions in pharmaceutical and agricultural markets;

- changes in the economic performance or market valuations of other pharmaceutical companies;

- announcements by us or our competitors of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- intellectual property litigation; and

- general economic or political conditions in China.

In addition, the securities market has from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our stock.

The market for our common stock is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future. In the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may, in the future, be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.

**Our corporate actions are substantially controlled by our principal shareholders and affiliated entities.**

Our principal shareholders and their affiliated entities own approximately 44% of our outstanding common shares, representing approximately 44% of our voting power. These shareholders, acting individually or as a group, could exert substantial influence over matters such as electing directors and approving mergers or other business combination transactions. In addition, because of the percentage of ownership and voting concentration in these principal shareholders and their affiliated entities, elections of our board of directors will generally be within the control of these shareholders and their affiliated entities. While all of our shareholders are entitled to vote on matters submitted to our shareholders for approval, the concentration of shares and voting control presently lies with these principal shareholders and their affiliated entities. As such, it would be difficult for shareholders to propose and have approved proposals not supported by management. There can be no assurances that matters voted upon by our officers and directors in their capacity as shareholders will be viewed favorably by all shareholders of our company.

34

**The elimination of monetary liability against our directors, officers and employees under Florida law and the existence of indemnification rights to our directors, officers and employees may result in substantial expenditures by us and may discourage lawsuits against our directors, officers and employees.**

Our articles of incorporation contain specific provisions that eliminate the liability of our directors for monetary damages to our company and shareholders, and we are prepared to give such indemnification to our directors and officers to the extent provided by Florida law. We may also have contractual indemnification obligations under our employment agreements with our officers. The foregoing indemnification obligations could result in our company incurring substantial expenditures to cover the cost of settlement or damage awards against directors and officers, which we may be unable to recoup. These provisions and resultant costs may also discourage our company from bringing a lawsuit against directors and officers for breaches of their fiduciary duties, and may similarly discourage the filing of derivative litigation by our shareholders against our directors and officers even though such actions, if successful, might otherwise benefit our company and shareholders.

**Legislative actions, higher insurance costs and potential new accounting pronouncements may impact our future financial position and results of operations.**

There have been regulatory changes, including the Sarbanes-Oxley Act of 2002, and there may potentially be new accounting pronouncements or additional regulatory rulings that will have an impact on our future financial position and results of operations. The Sarbanes-Oxley Act of 2002 and other rule changes are likely to increase general and administrative costs and expenses. In addition, insurers are likely to increase premiums as a result of high claims rates over the past several years, which we expect will increase our premiums for insurance policies. Further, there could be changes in certain accounting rules. These and other potential changes could materially increase the expenses we report under generally accepted accounting principles, and adversely affect our operating results.

**Past activities of Genesis and its affiliates may lead to future liability.**

Prior to the Exchange Agreement among Genesis, Karmoya and the Karmoya Shareholders executed on October 1, 2007, we engaged in businesses unrelated to our current operations. Neither Genesis's prior management nor any of its shareholders prior to the Exchange Transaction are providing indemnifications against any loss, liability, claim, damage or expense arising out of or based on any breach of or inaccuracy in any of their representations and warranties made regarding such acquisition, and any liabilities relating to such prior business against which we are not completely indemnified may have a material adverse effect on our company. For example, we are aware of three lawsuits arising from past activities of Genesis, alleging breach of contract. Please see "Legal Proceedings" for more information.

**We may need additional capital, and the sale of additional shares or other equity securities could result in additional dilution to our shareholders.**

We believe that our current cash and cash equivalents, anticipated cash flows from operations and the net proceeds from a proposed offering will be sufficient to meet our anticipated cash needs for the near future. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our resources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity securities could result in additional dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

**Existing stockholders may experience some dilution as a result of the exercise of warrants.**

In the May 2008 financing, we issued notes and, in conjunction with the notes, Class A warrants to purchase, collectively, up to 1,875,000 shares of our common stock, subject to adjustment. In the November 2007 financing, we issued debentures and, in connection with the debentures, warrants to purchase, collectively, up to 400,000 shares of our common stock. Any issuances of shares upon any exercise of these warrants will cause dilution in the interests of our shareholders.

**If we fail to maintain an effective system of internal controls, we may not be able to accurately report our financial results or prevent fraud.**

We will be subject to reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on such company's internal controls over financial reporting in its annual report, which contains management's assessment of the effectiveness of our internal controls over financial reporting. In addition, an independent registered public accounting firm must attest to and report on management's assessment of the effectiveness of our internal controls over financial reporting. Our management may conclude that our internal controls over our financial reporting are not effective. Moreover, even if our management concludes that our internal controls over financial reporting are effective, our independent registered public accounting firm may still decline to attest to our management's assessment or may issue a report that is qualified if it is not satisfied with our controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. Our reporting obligations as a public company will place a significant strain on our management, operational and financial resources and systems for the foreseeable future. Effective internal controls, particularly those related to revenue recognition, are necessary for us to produce reliable financial reports and are important to help prevent fraud. As a result, our failure to achieve and maintain effective internal controls over financial reporting could result in the loss of investor confidence in the reliability of our financial statements, which in turn could harm our business and negatively impact the trading price of our stock. Furthermore, we anticipate that we will incur considerable costs and use significant management time and other resources in an effort to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

**We will incur increased costs as a result of being a public company.**

As a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act and other new rules subsequently implemented by SEC have required changes in corporate governance practices of public companies. We expect these new rules and regulations to increase our legal, accounting and financial compliance costs and to make certain corporate activities more time-consuming and costly. In addition, we will incur additional costs associated with our public company reporting requirements. We are currently evaluating and monitoring developments with respect to these new rules, and we cannot predict or estimate the amount of additional costs we may incur or the timing of such costs.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

**Not applicable.**

**ITEM 2. DESCRIPTION OF PROPERTY**

Our principal executive offices are located at Middle Section, Longmao Street, Area A, Laiyang Waixiangxing Industrial Park, Laiyang City, Yantai, Shandong Province, PRC 265200, where we have developed approximately 25,000 square meters of production facilities, office, and garage space. Our total building area is 13,052 square meters,our production workshop area is more than 10,900 square meters and our warehouses area is approximately 1400 square meters. Those properties are owned by us.

On August 13, 2003, the Laiyang Development Planning Agency approved Laiyang Jiangbo's plan to construct garage and office space. On August 18, 2003, the Laiyang Industrial Park Administration certified Laiyang Jiangbo's investment of RMB 10 million ($1.3 million) in Section A of the Industrial Park to build on a 13,000 square meters lot.

36

In October 2007, the Laiyang Bureau of Land and Resources sold us a 50 years land use right for a 266,664 square meters lot located in Laiyang City to Laiyang Jiangbo. The Company paid approximately RMB 60.8 million ($8.9 million) for the land use right.

## ITEM 3. LEGAL PROCEEDINGS

The Company is involved in various legal matters arising in the ordinary course of business. After taking into consideration the Company's legal counsel's evaluation of such matters, the Company's management is of the opinion that the outcome of these matters will not have a significant effect on the Company's consolidated financial position as of June 30, 2009.

The following summarizes the Company's pending legal proceedings as of June 30, 2009:

CRG Partners, Inc. and Capital Research Group, Inc. and Genesis Technology Group, Inc., n/k/a Genesis Pharmaceuticals Enterprises, Inc. (Arbitration) - Case No. 32 145 Y 00976 07, American Arbitration Association, Southeast Case Management Center

On December 4, 2007, CRG Partners, Inc. ("CRGP"), a former consultant of the Company, filed a demand for arbitration against the Company alleging breach of contract and seeking damages of approximately $10 million as compensation for consulting services rendered to the Company. The amount of damages sought by the claimant was equal to the dollar value of 29,978,900 shares of the Company's common stock (Pre 40-to-1 reverse split) in November 2007, in which the claimant alleged were due and owing to CRGP. On December 5, 2007, the Company gave notice of termination of the relationship with CRG under the consulting agreement. CRGP subsequently filed an amendment to the demand for arbitration to include Capital Research Group, Inc. ("CRG") as an added claimant and increased the damage amount sought under this matter to approximately $13.8 million.

The Company subsequently filed counter claims in reference to the aforementioned allegations of breach of contract. In February 2009, the Company was notified by the arbitration panel of American Arbitration Association (the "Panel") that the Panel awarded CRG and CRGP jointly, a net total of $ 980,070 (the "Award") to be paid by the Company on or before February 27, 2009. Once the Award is satisfied, CRG and CRGP would have no further claims against the Company's common stock or other property that were the subject of the arbitration. The amount has been charged to operations for the year ended March 31, 2009, and is included in liabilities assumed from reorganization as of June 30, 2009.

On March 6, 2009, CRG , former consultants of the Company, filed a motion to confirm the arbitration award conferred by a panel of arbitrators of the American Arbitration Association on February 2, 2009. On July 15, 2009, the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County confirmed the arbitration award and entered judgment against Genesis Technology Group, Inc. At June 30, 2009, the award has not been paid and the Company is in the process of appealing the case.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On March 3, 2009, the holders of 52.22% of the Company's issued and outstanding common stock (5,416,200) approved a change of the Company's name "Genesis Pharmaceuticals Enterprises, Inc." to "Jiangbo Pharmaceuticals, Inc." (the "Corporate Name Change"). The Corporate Name Change became effective on April 16, 2009.

**PART II**

**Item 5. MARKET FOR COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is not listed on any stock exchange. Our common stock is traded over-the-counter on the Over-the-Counter Electronic Bulletin Board under the symbol "JGBO". The following table sets forth the high and low bid information for our common stock for each quarter within our last two fiscal years, as reported by the Over-the-Counter Electronic Bulletin Board. The bid prices reflect inter-dealer quotations, do not include retail markups, markdowns or commissions and do not necessarily reflect actual transactions.

|  | LOW | HIGH |
|---|---|---|
| **2009** | | |
| Quarter ended June 30, 2009 | $ 3.75 | $ 13.75 |
| Quarter ended March 31, 2009 | $ 3.59 | $ 5.90 |
| Quarter ended December 31, 2008 | $ 3.31 | $ 8.50 |
| Quarter ended September 30, 2008 | $ 5.25 | $ 11.08 |
| **2008** | | |
| Quarter ended June 30, 2008 | $ 7.50 | $ 14.40 |
| Quarter ended March 31, 2008 | $ 7.04 | $ 14.72 |
| Quarter ended December 31, 2007 | $ 8.80 | $ 14.40 |
| Quarter ended September 30, 2007 | $ 3.40 | $ 6.00 |

As of September 24, 2009, the closing sales price for shares of our common stock was $11.50 per share on the Over-The-Counter Bulletin Board.

**Holders**

As of September 24, 2009, there were approximately 953 shareholders of record of our common stock based upon the shareholders' listing provided by our transfer agent. Our transfer agent is Computershare Trust Company, 350 Indiana St., #800, Golden, Colorado 80401, and its telephone number is (303) 262-0600.

**Dividend Policy**

We have not paid cash dividends on our common stock since the Company became public through reverse merger. We intend to keep future earnings to finance the expansion of our business, and we do not anticipate that any cash dividends will be paid in the foreseeable future. We rely on dividends from Laiyang Jiangbo for our funds and PRC regulations may limit the amount of funds distributed to us from Laiyang Jiangbo, which will affect our ability to declare any dividends. See "Risk Factors - Risks Related to Doing Business in the PRC – Laiyang Jiangbo and GJBT are subject to restrictions on paying dividends and making other payments to us" and " Governmental control of currency conversion may affect the value of your investment."

Our future payment of dividends will depend on our earnings, capital requirements, expansion plans, financial condition and relevant factors that our board of directors may deem relevant. Our retained earnings limits our ability to pay dividends.

38

**Unregistered Sales of Equity Securities and Use of Proceeds**

The following private placements of the Company's securities were made in reliance upon the exemption from registration under Section 4(2) of the Securities Act of 1933, as amended, and/or, Rule 506 of Regulation D promulgated under the Securities Act. The Company did not use underwriters in any of the following private placements.

In July 2008, the Company issued 2,500 shares of common stock to two of the Company's current and former directors as part of their compensation for services. The Company valued these shares at the fair market value on the date of grant of $8 per share, or $20,000 in total, based on the trading price of common stock. We recorded related stock-based compensation expenses of $20,000 for the year ended June 30, 2009, accordingly

In September 2008, we issued 2,500 shares of restricted common stock to two of our former and current directors for director compensation. We valued these common shares at the fair market value on the date of the grant at $9 per share or $22,500 in total. We recorded related stock-based compensation expenses of $22,500 for the year ended June 30, 2009, accordingly.

In December 2008, the Company issued 20,000 shares of its common stock in connection with the conversion of $160,000 of convertible debt relating to the debt financing. As a result of the conversion, the Company recorded $145,524 interest expense to fully amortize the unamortized discount related to the converted dentures.

In January 2009, in connection with the Hongrui acquisition, the Company recorded 643,651 shares of Jiangbo's common stock issuable to Shandong Traditional Chinese Medicine College as part of the consideration for acquisition. The fair value of the common stock of $4.035 per share was based on the weighted average trading price of 5 days prior to the date of the acquisition, and amounted to $2,597,132.

In July 2009, the Company issued 1,009 share of common stock to a director as part of his compensation for services. The Company valued these shares at the fair market value on the date of grant of $9.91 per share, or $10,000 in total, based on the trading price of common stock.

In August, 2009, the Company entered into a Letter Agreement with Pope Investments LLC ("Pope"), pursuant to which the Company issued 82,500 shares of common stock to Pope in lieu of payment of the $660,000 in cash interest that was due and payable to Pope with respect to November 2007 Debentures and the May 2008 Notes held by Pope. In exchange, Pope agreed to waive certain events of defaults (as defined in the November 2007 Debentures and May 2008 Notes) that had occurred as a result of the Company's failure to timely make interest payments on the November 2007 Debentures and May 2008 Notes that were due and payable on May 30, 2009, and agreed not to provide written notice to the Company with respect to the occurrence of either of such events of default.

In September 2009, the Company issued 62,500 shares of its common stock in connection with the conversion of $500,000 of May 2008 Convertible Debentures.

**Issuer Purchases of Equity Securities.**

None.

**ITEM 6. SELECTED FINANCIAL DATA**

As a smaller reporting company, we are not required to provide the information called for by Item 6 of Form 10-K.

39

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

*The following analysis of our consolidated financial condition and results of operations for the years ended June 30, 2009, 2008 and 2007, should be read in conjunction with our audited consolidated financial statements, including footnotes, and other information presented elsewhere in this annual report on Form 10-K. This discussion contains forward-looking statements that involve significant risks and uncertainties. As a result of many factors, such as those set forth under "Forward Looking Statements" and "Item 1A. Risk Factors" and elsewhere in this Form 10-K, our actual results may differ materially from those anticipated in these forward-looking statements. When used in this section, "fiscal 2009" means our fiscal year ended June 30, 2009 and "fiscal 2008" means our fiscal year ended June 30, 2008.*

## OVERVIEW

We were incorporated on August 15, 2001, in the State of Florida under the name Genesis Technology Group, Inc. On October 12, 2001, we consummated a merger with NewAgeCities.com, an Idaho public corporation formed in 1969. We were the surviving entity after the merger.

On October 1, 2007, we completed a share exchange transaction by and among us, Karmoya International Ltd. ("Karmoya"), a British Virgin Islands company, and Karmoya's shareholders. As a result of the share exchange transaction, Karmoya, a company which was established as a "special purpose vehicle" for the foreign capital raising activities of its Chinese subsidiaries, became our wholly-owned subsidiary and our new operating business. Karmoya was incorporated under the laws of the British Virgin Islands on July 17, 2007, and owns 100% of the capital stock of Union Well International Limited ("Union Well"), a Cayman Islands company. Karmoya conducts its business operations through Union Well's wholly-owned subsidiary, Genesis Jiangbo (Laiyang) Biotech Technology Co., Ltd. ("GJBT"). GJBT was incorporated under the laws of the People's Republic of China ("PRC") on September 16, 2007, and registered as a wholly foreign owned enterprise ("WOFE") on September 19, 2007. GJBT has entered into consulting service agreements and equity-related agreements with Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang Jiangbo"), a PRC limited liability company incorporated on August 18, 2003.  On October 12, 2007, the Company's corporate name was changed to Genesis Pharmaceuticals Enterprises, Inc.

As a result of the share exchange transaction, our primary operations consist of the business and operations of Karmoya and its subsidiaries, which are conducted by Laiyang Jiangbo in the PRC. Laiyang Jiangbo produces and sells western pharmaceutical products in China and focuses on developing innovative medicines to address various medical needs for patients worldwide.

On July 27, 2008, our board of directors and the majority holders of our capital stock approved a one-for-forty reverse stock split of our common stock. On August 29, 2008, we received confirmation from the Department of the State of Florida that the Articles of Amendment to the Amended and Restated Articles of Incorporation ("August 2008 Amended Articles of Incorporation") to effect a reverse stock split was duly filed and on September 3, 2008, the reverse stock split was effectuated. Following the reverse stock split, the total number of shares of our common stock outstanding was reduced from 412,986,078 shares to approximately 10,325,000 shares and the maximum number of shares of common stock that the Company is authorized to issue was also reduced from 900,000,000 to 22,500,000. The financial statements have been retroactively adjusted to reflect the reverse split. Additionally, all share representations are on a post-split basis hereinafter.

Pursuant to a Certificate of Amendment to our Amended and Restated Articles of Incorporation filed with the Department of State of the State of Florida which took effect as of April 16, 2009, our name was changed from "Genesis Pharmaceuticals Enterprises, Inc." to "Jiangbo Pharmaceuticals, Inc." (the "Corporate Name Change"). The Corporate Name Change was approved and authorized by our Board of Directors as well as our holders of a majority of the outstanding shares of voting stock by written consent.

As a result of the Corporate Name Change, our stock symbol changed to "JGBO" with the opening of trading on May 12, 2009 on the OTCBB.

40

**FINANCIAL PERFORMANCE HIGHLIGHTS:**

**Net Revenues**

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Net Revenues (in '000) | $ 117,388 | $ 99,547 | $ 76,194 |
| % change year over year | 17.9% | 30.7% | 55% |

Net revenues for fiscal 2009 of $117.4 million reflected an increase of 17.9% over fiscal 2008 net revenues of $99.5 million. Our net revenues experienced 30.7% growth from fiscal 2007, $ 76.2 million, to fiscal 2008, $ 99.5 million.

Gross margin

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Cost of Goods Sold (in '000) | $ 27,909 | $ 22,507 | $ 21,162 |
| *Gross Margin* | 76.2 % | 77.4 % | 72 % |

Gross margin decreased to 76.2% in 2009 compared with 77.4% in 2008 and 72% in 2007. This was primarily due to we reduced the per unit sales price as part of the effort to restructure our distribution and sales system.

SG&A

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| SG&A (in '000) | $ 35,316 | $ 41,593 | $ 25,579 |
| *Percentage of Sales* | 30.1% | 41.8% | 33.6% |

SG&A as a percentage of sales decreased to 30.1 % in 2009 from 41.8 % in 2008 and 33.6% in 2007, as a result of the restructuring our distribution and sales system to sell our products primarily through 28 large independent regional distributors and significantly reducing the commission paid to your sales representatives on those products.

Net income

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Net income (in '000) | $ 28,880 | $ 22,451 | $ 22,053 |
| *net margin* | 24.5% | 22.6% | 28.9% |

Net margin increased to 24.5% in 2009 from 22.55% in 2008, primarily due to lower SG&A as a percentage of sales and partially offset by no tax exemption received in 2009 as compared to 2008.

41

## RESULTS OF OPERATIONS

The following table sets forth the results of our operations for the periods indicated as a percentage of total net sales: ($ in thousands)

| | Year Ended June 30, 2009 | % of Revenue | Year Ended June 30, 2008 | % of Revenue | Year Ended June 30, 2007 | % of Revenue |
|---|---|---|---|---|---|---|
| REVENUES | 117,144 | 99.79% | 93,983 | 94.41% | 72,259 | 94.84% |
| REVENUES - RELATED PARTY | 244 | 0.21% | 5,564 | 5.59% | 3,934 | 5.16% |
| COST OF REVENUES | 27,855 | 23.73% | 21,073 | 21.17% | 19,961 | 26.20% |
| COST OF REVENUES-RELATED PARTIES | 54 | 0.05% | 1,434 | 1.44% | 1,200 | 1.58% |
| GROSS PROFIT | 89,479 | 76.22% | 77,040 | 77.39% | 55,032 | 72.23% |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 35,315 | 30.08% | 41,593 | 41.78% | 25,579 | 33.57% |
| RESEARCH AND DEVELOPMENT | 4,395 | 3.74% | 3,236 | 3.25% | 11,144 | 14.63% |
| INCOME FROM OPERATIONS | 49,768 | 42.40% | 32,211 | 32.36% | 18,309 | 24.03% |
| OTHER EXPENSES(INCOME) | 8,108 | 6.91% | 2,789 | 2.80% | (6,375) | (8.37)% |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 41,660 | 35.49% | 29,422 | 29.56% | 24,684 | 32.40% |
| PROVISION FOR INCOME TAXES | 12,780 | 10.89% | 6,971 | 7.00% | 2,631 | 3.45% |
| NET INCOME | 28,880 | 24.60% | 22,451 | 22.56% | 22,053 | 28.94% |
| OTHER COMPREHENSIVE INCOME | (1,177) | (1.00)% | 6,554 | 6.58% | 1,018 | 1.34% |
| COMPREHENSIVE INCOME | $ 27,703 | 23.60% | $ 29,005 | 29.14% | $ 23,071 | 30.28% |

### Comparison of Years Ended June 30, 2009 and 2008

*REVENUES.* Revenues by product categories were as follows: ($ in thousands)

| Product | Year Ended June 30, 2009 | 2008 | Increase/ (Decrease) | Increase/ (Decrease) |
|---|---|---|---|---|
| Western pharmaceutical medicines | $ 75,814 | $ 86,401 | $ (10,578) | (12.24)% |
| Chinese traditional medicines | 41,574 | 13,145 | 28,429 | 216.27% |
| TOTAL | $ 117,388 | $ 99,546 | $ 17,842 | 17.92% |

Our revenues include revenues from sales and revenues from sales to related party of $117.1 million and $0.2 million, respectively, for the year ended June 30, 2009. During the year ended June 30, 2009, we had revenues from sales of $117.1 million as compared to revenues from sales of $94.0 million for the year ended June 30, 2008, an increase of $23.2 million or approximately 24.64%. During the year ended June 30, 2009, we had revenues from sales to related parties of $0.2 million as compared to revenues from sales to related parties of $5.6 million for the year ended June 30, 2008, a decrease of approximately 95.61%. The overall increase in total revenue was primarily attributable to the increase of sales volume of our Chinese traditional medicine Baobaole chewable tablets and the new product Radix Isatidis Dispersable Tablets that was commercially launched in October 2008, partially offset by the decrease in the revenue generated from Clarithromycin Sustained-release tablets and Itopride Hydrochloride granules. In January 2009, as part of the effort to restructure our distribution and sales system to sell our products primarily through 28 large distributors and reduced, we reduced the per unit sales price by an average of 25.6% for for Clarithromycin Sustained-release tablets, Itopride Hydrochloride granules and Baobaole chewable tables. At the same, we reduced the commission paid to our sales representatives on those products to approximately 5%. The quantities sold for Clarithromycin Sustained-release tablets and Itopride Hydrochloride granules, our two largest products in 2009 were materially consistent with 2008 while the total revenue generated from the two products decreased by $12.5 million, or 14.35% The revenue generated from Baobaole chewable tables increased approximately $16.2 million or 116.48 % in 2009 compared with 2008. While we expect our sales from the Chinese traditional medicines continue to grow, our sales from the western pharmaceutical medicines will have minimal growth as both Clarithromycin Sustained-release tablets and Itopride Hydrochloride granules have entered into their maturity.

COST OF REVENUES. Our cost of revenues includes cost of sales and cost of sales to related party of $27.9 million and $0.1 million, respectively, for the year ended June 30, 2009. For the year ended June 30, 2008, cost of sales and cost of sales to related parties amounted to $21.1 million and $1.4 million, respectively. Total cost of sales for 2009 increased $5.4 million or 24.01% , from $22.5 million for the year ended June 30, 2008 to $27.9 million for the year ended June 30, 2009. Cost of sales as a percentage of net revenue for the year ended June 30, 2009 is approximately 23.78%, compared to the year ended June 30, 2008 at approximately 22.61%. The increase in cost of sales as a percentage of net revenue in fiscal 2009 was primarily attributable to the reduction in the per unit sales price due to our distribution and sales system restructuring effort in January 2009 mentioned above. The increase in cost of sales as a percentage of net revenue in 2009 was partially offset by more sales being generated from products with higher- profit- margins, such as Baobaole chewable tablets and Radix Isatidis Dispersible Tablets and our ability to properly manage raw material purchase prices.

GROSS PROFIT. Gross profit was $89.5 million for the year ended June 30, 2009 as compared to $77.0 million for the year ended June 30, 2008, representing gross margins of approximately 76.22% and 77.39%, respectively. The decrease in the gross profit in fiscal 2009 was primarily due to the lower unit price charged as a result of sales net work restructure mentioned above and partially offset by our improved product sales mixture to generate more sales from products with higher profit margins.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES. Selling, general and administrative expenses totaled $35.3 million for the year ended June 30, 2009, as compared to $41.6 million for the year ended June 30, 2008, a decrease of approximately 15.10% as summarized below ($ in thousands):

| | Years Ended June 30, | |
| | 2009 | 2008 |
|---|---|---|
| Shipping and handling | $ 376 | $ 365 |
| Advertisement, marketing and promotion spending | 7,572 | 13,695 |
| Travel and entertainment- sales related | 1,571 | 982 |
| Depreciation and amortization | 1,068 | 458 |
| Salaries, commissions, wages and related benefits | 22,228 | 24,614 |
| Travel and entertainment- non sales related | 274 | 325 |
| Other | 2,024 | 1,154 |
| Total | $ 35,313 | $ 41,593 |

43

The changes in these expenses during the year ended June 30, 2009, as compared to the corresponding period in 2008 included the following:

- Shipping and handling expenses increased by $0.2 million or approximately 57.81% for the year ended June 30, 2007 as compared to the corresponding period of fiscal 2008, primarily because there was an increase in sales volume in fiscal year 2009 and the increase in fuel costs.

- A decrease of $6.1 million or approximately 44.71% in advertising, marketing and promotional spending for the year ended June 30, 2009 was primarily due to less marketing and promotional spending and better managed advertising and promotional costs in the third and fourth quarter of 2009.

- Travel and entertainment -sales related expenses increased by $0.6 million or approximately 59.98% for the year ended June 30, 2009 as compared to the corresponding period in fiscal 2008 was primarily due to our marketing and sales travel related activities related to establishing the distribution network for the product and promoting our newly launched products in fiscal 2009.

- Depreciation and amortization increased by $0.6 million or 133.19% for the year ended June 30, 2009 as compared to the corresponding period of fiscal 2008, primarily due to additional plant and equipments and intangible assets being depreciated or amortized.

- Salaries, wages, commissions and related benefits decreased by $2.4 million or 9.69% for the year ended June 30, 2009 as compared to the corresponding period of fiscal 2008. The decrease was primarily because the significant decrease in commission paid to our sales representatives beginning in third quarter of 2009. In connection with the distribution and sales system restructuring, we reduced the commissions paid to our sales representatives to approximately 5% for the sale of our three major products which was approximately 30% of the product sales price.

- A decrease of $0.1 million or approximately 15.69% in travel and entertainment -non sales related expenses for the year ended June 30, 2009 as compared to the corresponding period of fiscal 2008 due the increase was primarily due better traveling and entertainment spending controls in fiscal year 2009.

- Other selling, general and administrative expenses, which includes professional fees, utilities, office supplies and expenses increased by $0.9 million or 75.39% for the year ended June 30, 2008 as compared to the corresponding period in fiscal 2008 primarily due to more professional fees, and other expenses related to being a publicly traded company in fiscal 2009.

*RESEARCH AND DEVELOPMENT COSTS.* Research and development costs, which consist fees paid to third parties for research and development related activities conducted for the Company and cost of material used and salaries paid for the development of the Company's products, totaled $4.4 million for the year ended June 30, 2009, as compared to $3.2 million for the year ended June 30, 2008, an increase of approximately $1.2 million or 35.83%. The increase in research and development expenses in fiscal 2009 was due to the expenses for the two cooperative research and development agreements with monthly payments were for the full year in 2009 as compared to three quarters in 2008 as those agreements were signed in second quarter of 2008.

*OTHER EXPENSES.* Our other expenses consisted of loss from discontinued operations, valued added tax and various other tax exemptions from the government, financial expenses and other non-operating expenses. We had net other expense of $8.1 million for the year ended June 30, 2009 as compared to net other expense of $2.8 million for the year ended June 30, 2008, an increase of 5.1 million or 190.69%. The increase in net other expenses was primarily attributable to we did not receive any tax exemption in fiscal 2009 as compared to non-operating income of $1.4 million generated from the tax exemption received from the government, an increase of $1.5 million in debt discount amortization related to the financings in November 2007 and May 2008 and $1.4 million increase in our loss from discontinued operations in fiscal 2009.

*NET INCOME.* Our net income for the year ended June 30, 2009 was $28.9million as compared to $22.5 million for the year ended June 30, 2008, an increase of $6.4 million or 28.63%. The increase in net income is primarily attributable to increase in sales volume and significant decrease in selling expenses and offset by increase in other expenses as well as income tax expense as the Company did not receive any tax exemption from the government in fiscal 2009.

**Comparison of Years Ended June 30, 2008 and 2007**

*REVENUES.* Revenues by product categories were as follows: ($ in thousands)

| Product | Year Ended June 30, | | Increase/ (Decrease) | Increase/ (Decrease) |
|---|---|---|---|---|
| | 2008 | 2007 | | |
| Western pharmaceutical medicines | $ 86,401 | $ 76,194 | $ 10,207 | 13.40% |
| Chinese traditional medicines | 13,145 | - | 13,145 | 100.00% |
| TOTAL | $ 99,546 | $ 76,194 | $ 23,352 | 30.65% |

Our revenues include revenues from sales and revenues from sales to related party of $94.0 million and $5.6 million, respectively, for the year ended June 30, 2008. During the year ended June 30, 2008, we had revenues from sales of $94.0 million as compared to revenues from sales of $72.3 million for the year ended June 30, 2007, an increase of approximately 30.06%. During the year ended June 30, 2008, we had revenues from sales to related parties of $5.6 million as compared to revenues from sales to related parties of $4.0 million for the year ended June 30, 2007, an increase of approximately 41.44%. The overall increase in total revenue was primarily attributable to the increase of sales volume of our best selling products: Clarithromycin sustained-release tablets and Itopride Hydrochloride Granules; additionally, we released a new product, Baobaole chewable tablets in the second quarter of fiscal year 2008 and the product has been very popular in the market. Revenues generated from Clarithromycin sustained-release tablets increased approximately $14.6 million or 45.89 % in 2008 compared with 2007 as the product was in the introduction period in 2007 and entering its growth period in later part of 2008.  Revenues generated from Itopride Hydrochloride granules increased approximately $6.3 million or 21.64 % in 2008 compared with 2007 as the product has been in its growth period since 2007 and entered into its maturity in 2008. The increase in the two products resulted primarily from our strong marketing and sales effort, and increased market demand as the two products are both approaching its maturity in later part of 2008. The increase in revenues was partially offset by a decrease in revenues of $11.1 million or 73.49 % in 2008 compared with 2007 generated from our two products, Ciprofloxacin Hydrochloride tablets and Paracetamol tablets, which are in the declining period due to significant market competition.

We anticipate our revenues generated from our two best selling products, Clarithromycin sustained-release tablets and Itopride Hydrochloride granules, will gradually stabilize in 2009 as the two products have entered into their maturity. The two products are expected to hold their current market share through 2010 as the China SFDA has slowed its process in approving new drug rights resulted in less competition in the near future market. Revenues generated from Baobaole chewable tablets are expected to grow significantly through 2009 as the product is currently in its growth stage and the market demand for the product has been very strong.

*COST OF REVENUES.* Our cost of revenues includes cost of sales and cost of sales to related party of $21.1 million and $1.4 million, respectively, for the year ended June 30, 2008. For the year ended June 30, 2007, cost of sales and to related parties amounted to $20.0 million and $1.2 million, respectively. Total cost of sales for 2008 increased $1.3 million or 6.36%, from $21.1 million for the year ended June 30, 2007 to $22.5 million for the year ended June 30, 2008. Cost of sales as a percentage of net revenue for the year ended June 30, 2008 is approximately 22.61%, compared to the year ended June 30, 2007 at approximately 27.77%. The decrease was attributable to more sales being generated from producing of high-profit-margins products, the highly profitable new product Baobaole chewable tables, more efficient producing process, our ability to better manage raw material purchase prices and the government exemption on sales taxes and miscellaneous fees received in fiscal 2008.

*GROSS PROFIT.* Gross profit was $77.0 million for the year ended June 30, 2008 as compared to $55.0 million for the year ended June 30, 2007, representing gross margins of approximately 77.39% and 72.23%, respectively. The increase in our gross profits was mainly due to decrease in cost of sales as a percentage of net revenue as we better managed raw material purchase prices and our product sales mixture to generate more sales from products with higher profit margins.

*SELLING, GENERAL AND ADMINISTRATIVE EXPENSES.* Selling, general and administrative expenses totaled $41.6 million for the year ended June 30, 2008, as compared to $25.6 million for the year ended June 30, 2007, an increase of approximately 62.56% as summarized below ($ in thousands):

|  | Years Ended June 30, | |
|---|---|---|
|  | 2008 | 2007 |
| Shipping and handling | $ 365 | $ 280 |
| Advertisement, marketing and promotion spending | 13,695 | 7,054 |
| Travel and entertainment- sales related | 982 | 564 |
| Depreciation and amortization | 458 | 280 |
| Salaries, commissions, wages and related benefits | 24,614 | 16,832 |
| Travel and entertainment- non sales related | 325 | 36 |
| Other | 1,154 | 533 |
| Total | $ 41,593 | $ 25,579 |

The changes in these expenses during the year ended June 30, 2008, as compared to the corresponding period in 2007 included the following:

- An increase of $6.6 million or approximately 94.15% in advertising, marketing and promotional spending for the year ended June 30, 2008 was primarily due to TV commercials and magazine advertisements expenses to promote our new product- Baobaole Chewable tablets, as well as our brand name. Additionally, we also increased our marketing and promotional activities to promote our two best selling products.

- Travel and entertainment -sales related expenses increased by $0.4 million or approximately 74.14% for the year ended June 30, 2008 as compared to the corresponding period in fiscal 2007 was primarily due to our marketing and sales travel related activities related to promoting our Baobole Chewable tablets and establishing the distribution network for the product as well as promoting our two other best selling products.

- Shipping and handling expenses increased by $0.1 million or approximately 30.43% for the year ended June 30, 2008 as compared to the corresponding period of fiscal 2007, primarily because there was an increase in sales volume in fiscal year 2008.

- Depreciation and amortization increased by $0.2 million or 63.45% for the year ended June 30, 2008 as compared to the corresponding period of fiscal 2007, primarily due to additional fixed assets being depreciated.

46

- Salaries, wages, commissions and related benefits increased by $7.8 million or 46.23% for the year ended June 30, 2008 as compared to the corresponding period of fiscal 2007. The increase was primarily due to increase in commission payments as a percentage of sales to sales representatives as well as an increase in number of employees and sales representatives as a result of expanding our distribution network from 26 provinces and regions to 30 provinces and regions in fiscal 2008.

- An increase of $0.3 million or approximately 806.12% in travel and entertainment -non sales related expenses for the year ended June 30, 2008 as compared to the corresponding period of fiscal 2007. The increase was primarily due to increase in corporate executives' and managers' entertainment and travel related to public company related activities.

- Other selling, general and administrative expenses, which includes professional fees, utilities, office supplies and expenses increased by $0.6 million or 116.37% for the year ended June 30, 2008 as compared to the corresponding period in fiscal 2008 primarily due to more professional fees, and other expenses related to being a publicly traded company in fiscal 2008.

*RESEARCH AND DEVELOPMENT COSTS.* Research and development costs, which consist fees paid to third parties for research and development related activities conducted for the Company and cost of material used and salaries paid for the development of the Company's products, totaled $3 million for the year ended June 30, 2008, as compared to $11 million for the year ended June 30, 2007, an decrease of approximately 70.96%. The significant decrease in research and development expenses in fiscal 2008 was mainly due to major spending on a research and development project conducted and paid for new drug clinical trials and project were expensed in the second quarter of fiscal 2007. The Company completed several research and development projects prior to the end of fiscal 2007 and those drugs are currently in the final process of being approved by the Chinese SFDA.

*OTHER INCOME (EXPENSES).* Our other expenses consisted of valued added tax and various other tax exemptions from the government, financial expenses and non-operating expenses. We had net other expense of $2.8 million for the year ended June 30, 2008 as compared to net other income of $6.3 million for the year ended June 30, 2007. The increase in net other expenses was due the decrease of $3.5 million tax exemption received by the Company in fiscal 2008, the increase in interest expense as a result of our financings in November 2007 and May 2008, realized and unrealized losses on our marketable securities, and our loss from discontinued operations in fiscal 2008 which we did not occur in fiscal 2007.

*NET INCOME.* Our net income for the year ended June 30, 2008 was $22.5 million as compared to $22.1 million for the year ended June 30, 2007, an increase of $0.4 million or 1.80%. The increase in net income is primarily attributable to increase in sales volume of our best selling products, as well as improved profit margin and partially offset by higher operating expense and significantly $4.7 million less tax exemptions received in fiscal 2008 and the interest expenses related to our financings in November 2007 and May 2008 .

## LIQUIDITY AND CAPITAL RESOURCES

We have historically financed our operations and capital expenditures principally through private placements of debt and equity offerings, bank loans, and cash provided by operations. We did not have significant financing activities in fiscal year 2009. In fiscal year 2008, our primary financing activities included the following:

- In November 2007, we raised $5,000,000 in gross proceeds through the sale of a convertible note. We received $4,645,592 in net proceeds after deducting placement agent discounts and commissions and payment of professional and other related expenses. Further detailed discussion regarding this financing is provided in the footnotes to financial statements.

47

- In May 2008, we raised $30,000,000 in gross proceeds through the sale of a convertible note. We received $28,313,500 in net proceeds after deducting placement agent discounts and commissions and payment of professional and other related expenses. Further detailed discussion regarding this financing is provided in the footnotes to financial statements.

***Cash Flows***

2009 Compared to 2008

Net cash flow provided by operating activities was $62.9 million in fiscal 2009, compared with $17.1 million in fiscal 2008, an increase of $45.8 million. The 2009 increase in cash provided by operating activities primarily due to the followings: 1) increase in our income from continued operations of $7.8 million  2) increase in add-back of amortization on debt discount of $1.5 million, 3) decrease in accounts receivable and accounts receivable-related party of $5.2 million, 4) decrease in advances to suppliers of $1.5 million, 5) increase in accounts payable of $3.8 million 6) increase in accrued liabilities of $1.2 million 7) increase in refundable deposits of $4.1million 8) increase in taxes payable of $11.1 million and  partially offset by the decrease in other payables and other payable –related parties of $1.6 million and decrease from liabilities from discontinued operations of $1.3 million.

Net cash flow used in investing activities was $8.3 million in fiscal 2009 and $7.6 million in fiscal 2008, a $0.7 million increased. Uses of cash flow for investing activities in 2009 included equipment purchases of $$0.1 million and payments for the Hongrui acquisition of $8.6 million.

Net cash flow provided by financing activities was $1.4 million in fiscal 2009 and while net cash flow provided by financing activities was $18.5 million in fiscal 2008. The decrease  of net cash flow provided by financing activities was mainly due to the $33.0 million net proceed received from the two convertible debts financings in fiscal 2008 of which we did not have similar activities in 2009 and partially offset by decrease in payments for dividend of $10.6 million and decrease in change in restricted cash of $2.8 million.

We reported a net increase in cash for the year ended June 30, 2009 of $56.2 million as compared to a net increase in cash of $30.5 million for the year ended June 30, 2008.

Our working capital position improved by $26.6 million to $99.8 million at June 30, 2009 from $73.2  million at June 30, 2008. This increase in working capital is primarily attributable to an increase in cash of $ 56.2 million and a decrease in other payable of $1.4 million offset by a decrease in short term investments of $1.2 million, a decrease in accounts receivables and accounts receivable - related parties totaling of $5.7 million, a decrease in advances to suppliers of $1.5 million, an increase in accounts payable of $3.8 million, an increase in notes payable of $1.5 million, an increase in refundable deposit of $4.1 million, an increase in accrued liabilities of $1.0 million and an increase in taxes payable of $11.2 million.

2008 Compared to 2007

Net cash flow provided by operating activities was $17.1 million in fiscal 2008, compared with $15.3 million in fiscal 2007, an increase of $1.8 million. The 2008 increase in cash provided by operating activities included the followings: 1) decrease in inventory of $1.7 million 2) an add-back of amortization on debt discount of $2.5 million, 3) an add-back of unrealized loss on marketable securities of $0.7 million, 4) increase in other payables and other payables- related parties of $1.1 million and partially offset by the increase in accounts receivable and 5) increase in advances to suppliers. We also have cash payment for liabilities from discontinued operations of $ 1.2 million in 2008 while we do not have corresponding payment in fiscal 2007.

48

Net cash flow used in investing activities was $7.6 million in fiscal 2008 and $0.2 million in fiscal 2007, a $7.4 million increased. Uses of cash flow for investing activities included equipment purchases and payments for intangible assets. The increase of net cash flow used in investing activities in fiscal 2008 was mainly due to increase in property and equipments payments of $0.3 million and purchase of intangible assets of $8.9 million offset by proceeds from sale of marketable securities of $1.0 million and cash received from reverse acquisition of $0.5 million.

Net cash flow provided by financing activities was $18.5 million in fiscal 2008 and while net cash flow used in financing activities was $1.2 million in fiscal 2007. The increase of net cash flow provided by financing activities was mainly due to increase in proceeds from convertible debt of $33 million, decrease in payments for short term loans of $ 0.9 million offset by payment for dividend of $10.6 million, payment to escrow account of $2.0 million and decrease in proceeds from short term loan of $ 1.9 million.

Our working capital position increased $57.2 million, to $73.2 million at June 30, 2008, from $16.0 million at June 30, 2007. This increase in working capital is primarily attributable to the increase in cash in bank of $30.5 million, accounts receivable of $12.5 million, marketable equity securities of $2.1 million, advances to suppliers of $1.4 million and decrease of dividend payable of $10.5 million, notes payable of $2.6 million, short term bank loans of $1.8 million, and offset by decrease of inventories of $1.2 million, and increase of other payables of $2.3 million and the liability assumed from discontinued operations of $1.1 million.

We have historically financed our operations and capital expenditures principally through private placements of debt and equity offerings, bank loans, and cash provided by operations. At June 30, 2009, the majority of our liquid assets were held in the Chinese Renminbi ("RMB") denominations deposited in banks within the PRC. The PRC has strict rules for converting RMB to other currencies and for movement of funds from the PRC to other countries. Consequently, in the future, we may face difficulties in moving funds deposited within the PRC to fund working capital requirements in the U.S. Management has been evaluating and resolving the situation.

We anticipate that our working capital requirements may increase as a result of our anticipated business expansion plan, continued increase in sales, potential increases in the price of our raw materials, competition and our relationship with suppliers or customers. We believe that our existing cash, cash equivalents and cash flows from operations will be sufficient to sustain our current operations for at least the next 12 months. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue.

**Contractual Obligations and Off-Balance Sheet Arrangements**

*Contractual Obligations*

We have certain fixed contractual obligations and commitments that include future estimated payments. Changes in our business needs, cancellation provisions, changing interest rates, and other factors may result in actual payments differing from the estimates. We cannot provide certainty regarding the timing and amounts of payments. We have presented below a summary of the most significant assumptions used in our determination of amounts presented in the tables, in order to assist in the review of this information within the context of our consolidated financial position, results of operations, and cash flows.

The following tables summarize our contractual obligations as of June 30, 2009, and the effect these obligations are expected to have on our liquidity and cash flows in future periods.

49

| Contractual Obligations: | Total | Less than 1 year | 1-3 Years | 3-5 Years | 5 Years + |
|---|---|---|---|---|---|
| Convertible Debenture and Related Interest | $ 39,917,072 | $ 3,329,622 | $ 36,587,450 | $ - | $ - |
| Bank Indebtedness and Related Interest | $ 9,522,500 | $ 9,522,500 | $ - | $ - | $ - |
| Research and Development Contract Obligations | $ 7,398,250 | $ 4,395,000 | $ 2,637,000 | $ 366,250 | $ - |
| Total Contractual Obligations: | $ 56,837,822 | $ 17,247,122 | $ 39,224,450 | $ 366,250 | $ - |

*Payments Due by Period* (column header above the table)

Bank Indebtedness amounts include the short-term bank loans amount and notes payable amount.

*Off-balance Sheet Arrangements*

We have not entered into any other financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**Risk Factors**

*Interest Rates.* Our exposure to market risk for changes in interest rates primarily relates to our short-term investments and short-term obligations; thus, fluctuations in interest rates would not have a material impact on the fair value of these securities. At June 30, 2009, we had approximately $104.4 million in cash and cash equivalents. A hypothetical 2 % increase or decrease in interest rates would not have a material impact on our earnings or loss, or the fair market value or cash flows of these instruments.

*Foreign Exchange Rates.* All of our sales are denominated in the Chinese RMB. As a result, changes in the relative values of the U.S. dollars and the RMB affect our reported levels of revenues and profitability as the results are translated into U.S. dollars for financial reporting purposes. In particular, fluctuations in currency exchange rates could have a significant impact on our financial stability due to a mismatch among various foreign currency-denominated sales and costs. Fluctuations in exchange rates between the U.S. dollar and RMB affect our gross and net profit margins and could result in foreign exchange and operating losses.

Our exposure to foreign exchange risk primarily relates to currency gains or losses resulting from timing differences between signing of sales contracts and settling of these contracts. Furthermore, we translate monetary assets and liabilities denominated in other currencies into RMB, the functional currency of our operating business. Our results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at the unified exchange rate as quoted by the People's Bank of China at the end of the period. Translation adjustments resulting from this process are included in accumulated other comprehensive income in our statements of shareholders' equity. We recorded net foreign currency gains of $ 0.3 million and $5.2 million for the years ended June 30, 2009 and 2008, respectively. We have not used any forward contracts, currency options or borrowings to hedge our exposure to foreign currency exchange risk. We cannot predict the impact of future foreign exchange rate fluctuations on our results of operations and may incur net foreign currency losses in the future. As our sales, denominated in RMB, continue to grow, we will consider using arrangements to hedge our exposure to foreign currency exchange risk.

50

Our financial statements are expressed in U.S. dollars but the functional currency of our operating subsidiary is the RMB. The value of your investment in our stock will be affected by the foreign exchange rates between the U.S. dollar and the RMB. To the extent we hold assets denominated in U.S. dollars, any appreciation of the RMB against the U.S. dollar could result in a change to our statements of operations and a reduction in the value of our U.S. dollar denominated assets. On the other hand, a decline in the value of RMB against the U.S. dollar could reduce the U.S. dollar equivalent amounts of our financial results, the value of your investment in our company and the dividends we may pay in the future, if any, all of which may have a material adverse effect on the price of our stock.

*Credit Risk.* We have not experienced significant credit risk, as most of our customers are long-term customers with excellent payment records. We review our accounts receivable on a regular basis to determine if the allowance for doubtful accounts is adequate at each quarter-end. We typically extend 30 to 90 day trade credit to our largest customers and we have not seen any of our major customers' accounts receivable go uncollected beyond the extended period of time or experienced any material write-off of accounts receivable in the past.

*Inflation Risk.* In recent years, China has not experienced significant inflation, and thus inflation has not had a material impact on our results of operations. According to the National Bureau of Statistics of China ("NBS") (www.stats.gov.cn), the change in Consumer Price Index ("CPI") in China was 3.9%, 1.8% and 1.5% in 2004, 2005 and 2006, respectively. However, in 2007, according to NBS, CPI rose significantly at a monthly average rate of 4.8%. Especially during the months of August, September, October, November, and December, CPI was up 6.5%, 6.2%, 6.5%, 6.9%, and 6.5%, respectively. Inflationary factors, such as increases in the cost of our products and overhead costs, could impair our operating results. Although we do not believe that inflation has had a material impact on our financial position or results of operations to date, a high rate of inflation may have an adverse effect on our ability to maintain current levels of gross margin and selling, general and administrative expenses as a percentage of sales revenue if the selling prices of our products do not increase with these increased costs.

**Basis of Presentation**

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions upon which we rely are reasonable based upon information available to us at the time that these estimates, judgments and assumptions are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the financial statements as well as the reported amounts of revenues and expenses during the periods presented. Our financial statements would be affected to the extent there are material differences between these estimates and actual results. In many cases, the accounting treatment of a particular transaction is specifically dictated by GAAP and does not require management's judgment in its application. There are also areas in which management's judgment in selecting any available alternative would not produce a materially different result.

**CRITICAL ACCOUNTING POLICIES**

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, we evaluate our estimates based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

51

A summary of significant accounting policies is included in Note 2 to the audited consolidated financial statements included in this Form 10-K. This section should be read together with the Summary of Significant Accounting Policies included as Note 2 to the consolidated financial statements included in our Annual Report on Form 10-K for the year ended June 30, 2009. Management believes that the application of these policies on a consistent basis enables us to provide useful and reliable financial information about the company's operating results and financial condition.

## Use of Estimates

The preparation of our consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported net sales and expenses during the reporting periods. On an ongoing basis, we evaluate our estimates and assumptions. We base our estimates on historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. Significant estimates in 2009, 2008 and 2007 include the allowance for doubtful accounts, the allowance for obsolete inventory, the useful life of property and equipment and intangible assets, and accruals for taxes due.

## Inventories

Inventories, consisting of raw materials and finished goods related to the Company's products are stated at the lower of cost or market utilizing the weighted average method.

## Property and equipment

Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed using straight-line method over the estimated useful lives of the assets. The estimated useful lives of the assets are as follows:

|  | Useful Life | |
| --- | --- | --- |
| Building and building improvements | 5 - 40 | Years |
| Manufacturing equipment | 5 - 20 | Years |
| Office equipment and furniture | 5 - 10 | Years |
| Vehicle | 5 | Years |

The cost of repairs and maintenance is expensed as incurred; major replacements and improvements are capitalized. When assets are retired or disposed of, the cost and accumulated depreciation are removed from the accounts, and any resulting gains or losses are included in income in the year of disposition.

Long-lived assets of the Company are reviewed periodically or more often if circumstances dictate, to determine whether their carrying value has become impaired. The Company considers assets to be impaired if the carrying value exceeds the future projected cash flows from related operations. The Company also re-evaluates the periods of amortization to determine whether subsequent events and circumstances warrant revised estimates of useful lives.

In accordance with Statement of Financial Accounting Standards (SFAS) No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", the Company examines the possibility of decreases in the value of fixed assets when events or changes in circumstances reflect the fact that their recorded value may not be recoverable. The Company recognizes an impairment loss when the sum of expected undiscounted future cash flows is less than the carrying amount of the asset. The amount of impairment is measured as the difference between the asset's estimated fair value and its book value.

**Intangible assets**

All land in the People's Republic of China is owned by the government and cannot be sold to any individual or company. The Company has recorded the costs paid to acquire a long-term interest to utilize the land underlying the Company's facility as land use rights. This type of arrangement is common for the use of land in the PRC. The land use rights are amortized on the straight-line method over the term of the land use rights of 50 years.

Purchased technological know-how includes secret formulas, manufacturing processes, technical, procedural manuals and the certificate of drugs production and is amortized using the straight-line method over the expected useful economic life of 5 years, which reflects the period over which those formulas, manufacturing processes, technical and procedural manuals are kept secret to the Company as agreed between the Company and the selling parties.

Intangible assets of the Company are reviewed periodically or more often if circumstances dictate, to determine whether their carrying value has become impaired. The Company considers assets to be impaired if the carrying value exceeds the future projected cash flows from related operations. The Company also re-evaluates the periods of amortization to determine whether subsequent events and circumstances warrant revised estimates of useful lives.

**Investments and restricted investments**

Investments are comprised primarily of equity securities and are stated fair value. Certain of these investments are classified as trading securities based on the Company's intent to sell and dispose of them within the year. Further, certain of these securities are classified as available-for-sale and are reflected as restricted, noncurrent investments based on the Company's intent to hold them beyond one year. For trading securities, realized and unrealized gains and losses are included in the accompanying consolidated statements of income. For available-for-sale securities, realized gains and losses are included in the consolidated statements of income. Unrealized gains and losses for these available-for-sale securities are reported in other comprehensive income, net of tax, in the consolidated statements of shareholders' equity. The Company has no investments that are considered to be held-to-maturity securities.

**Accounting for Stock Based Compensation**

Effective October 1, 2005, we adopted Statement of Financial Accounting Standards No. 123 (revised 2004), Share Based Payment ("SFAS No. 123R"). SFAS No. 123R establishes the financial accounting and reporting standards for stock-based compensation plans. As required by SFAS No. 123R, we recognize the cost resulting from all stock-based payment transactions including shares issued under our stock option plans in the financial statements. The adoption of SFAS No. 123R will have a negative impact on our future results of operations.

**Revenue recognition**

Product sales are generally recognized when title to the product has transferred to customers in accordance with the terms of the sale. The Company recognizes revenue in accordance with the Securities and Exchange Commission's (SEC) Staff Accounting Bulletin (SAB) No. 101, " *Revenue Recognition in Financial Statements*" as amended by SAB No. 104 (together, "SAB 104"), and Statement of Financial Accounting Standards (SFAS) No. 48 " *Revenue Recognition When Right of Return Exists.*" SAB 104 states that revenue should not be recognized until it is realized or realizable and earned. In general, the Company records revenue when persuasive evidence of an arrangement exists, services have been rendered or product delivery has occurred, the sales price to the customer is fixed or determinable, and collectibility is reasonably assured.

The Company is generally not contractually obligated to accept returns. However, on a case-by-case negotiated basis, the Company permits customers to return their products. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 48, "Revenue Recognition when the Right of Return Exists", revenue is recorded net of an allowance for estimated returns. Such reserves are based upon management's evaluation of historical experience and estimated costs. The amount of the reserves ultimately required could differ materially in the near term from amounts included in the consolidated financial statements.

**Income taxes**

The Company's subsidiaries, GJBT and Laiyang Jiangbo, are governed by the Income Tax Law of the People's Republic of China. Income taxes are accounted for under Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which is an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the Company's financial statements or tax returns. The charge for taxation is based on the results for the year as adjusted for items, which are non-assessable or disallowed. It is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred tax is accounted for using the balance sheet liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the financial statements and the corresponding tax basis used in the computation of assessable tax profit. In principle, deferred tax liabilities are recognized for all taxable temporary differences, and deferred tax assets are recognized to the extent that it is probably that taxable profit will be available against which deductible temporary differences can be utilized.

Deferred tax is calculated using tax rates that are expected to apply to the period when the asset is realized or the liability is settled. Deferred tax is charged or credited in the income statement, except when it is related to items credited or charged directly to equity, in which case the deferred tax is also dealt with in equity.

Deferred tax assets and liabilities are offset when they related to income taxes levied by the same taxation authority and the Company intends to settle its current ax assets and liabilities on a net basis.

The Company adopted FASB Interpretation 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), as of January 1, 2007. A tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no affect on the Company's financial statements.

*Variable Interest Entities*

Pursuant to Financial Accounting Standards Board Interpretation No. 46 (Revised), "Consolidation of Variable Interest Entities - an Interpretation of ARB No. 51" ("FIN 46R") we are required to include in our consolidated financial statements the financial statements of variable interest entities. FIN 46R requires a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss for the variable interest entity or is entitled to receive a majority of the variable interest entity's residual returns. Variable interest entities are those entities in which we, through contractual arrangements, bear the risk of, and enjoy the rewards normally associated with ownership of the entity, and therefore we are the primary beneficiary of the entity.

54

Laiyang Jiangbo are considered a variable interest entity ("VIE"), and we are the primary beneficiary. On October 1, 2008, we entered into agreements with Laiyang Jiangbo to which we shall receive 100% of Laiyang Jiangbo's net income. In accordance with these agreements, Laiyang Jiangbo shall pay consulting fees equal to 100% of its net income to our wholly-owned foreign subsidiary, GJBT, and GJBT shall supply the technology and administrative services needed to service Laiyang Jiangbo.

The accounts of Laiyang Jiangbo are consolidated in the accompanying financial statements pursuant to FIN 46R. As a VIE, Laiyang Jiangbo sales are included in our total sales, its income from operations is consolidated with our, and our net income includes all of Laiyang Jiangbo's net income. We do not have any non-controlling interest and accordingly, did not subtract any net income in calculating the net income attributable to us. Because of the contractual arrangements, we have pecuniary interest in Laiyang Jiangbo that require consolidation of our financial statements and Laiyang Jiangbo financial statements.

## Recent accounting pronouncements

In June 2008, the FASB issued Emerging Issues Task Force Issue 07-5 ("EITF 07-5"), "Determining whether an Instrument (or Embedded Feature) is indexed to an Entity's Own Stock." EITF No. 07-5 is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. Early application is not permitted. Paragraph 11(a) of SFAS 133 "Accounting for Derivatives and Hedging Activities" specifies that a contract that would otherwise meet the definition of a derivative but is both (a) indexed to the Company's own stock and (b) classified in stockholders' equity in the statement of financial position would not be considered a derivative financial instrument. EITF 07-5 provides a new two-step model to be applied in determining whether a financial instrument or an embedded feature is indexed to an issuer's own stock and thus able to qualify for the SFAS 133 paragraph 11(a) scope exception. This standard triggers liability accounting on all warrants exercisable at strike prices denominated in any currency other than the functional currency of the operating entity in the PRC (Renminbi). Management is currently evaluating the impact of adoption of EITF 07-5 on the accounting for related convertible notes transactions.

On October 10, 2008, the FASB issued FSP 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active," which clarifies the application of SFAS 157 when the market for a financial asset is inactive. Specifically, FSP 157-3 clarifies how (1) management's internal assumptions should be considered in measuring fair value when observable data are not present, (2) observable market information from an inactive market should be taken into account, and (3) the use of broker quotes or pricing services should be considered in assessing the relevance of observable and unobservable data to measure fair value. The adoption of FSP 157-3 did not have a material impact on the Company's consolidated financial statements.

In November 2008, the FASB issued EITF Issue No. 08-7, "Accounting for Defensive Intangible Assets," or EITF No. 08-7. EITF No. 08-7 discusses that when an entity acquired in a business combination or an asset acquisition an intangible asset that it did not intend to actively use, otherwise known as a defensive asset, the entity historically allocated little or no value to the defensive asset. However, with the issuance of SFAS No. 141(R) and SFAS No. 157 the entity must recognize a value for the defensive asset that reflects the asset's highest and best use based on market assumptions. Upon the effective date of both SFAS No. 141(R) and SFAS No. 157, acquirers will generally assign a greater value to a defensive asset than would typically have been assigned under SFAS No. 141. EITF No. 08-7 will be effective for the first annual reporting period beginning on or after December 15, 2008. EITF No. 08-7 will apply prospectively to business combinations for which the acquisition date is after fiscal years beginning on or after December 15, 2008. The adoption of EITF No. 08-7 did not have a material impact on the Company's results of operations or financial condition.

55

In April 2009, the FASB issued FSP SFAS No. 141 (R), "Accounting for Assets Acquired and Liabilities Assumed in a Business Combination That Arise from Contingencies," or FSP SFAS No. 141 (R). FSP SFAS No. 141 (R) amends and clarifies SFAS No. 141, "Business Combinations," in regards to the initial recognition and measurement, subsequent measurement and accounting, and disclosures of assets and liabilities arising from contingencies in a business combination. FSP SFAS No. 141 (R) applies to all assets acquired and liabilities assumed in a business combination that arise from contingencies that would be within the scope of SFAS No. 5, "Accounting for Contingencies", if not acquired or assumed in a business combination, except for assets or liabilities arising from contingencies that are subject to specific guidance in SFAS No. 141 (R). FSP SFAS No. 141 (R) will be effective for the first annual reporting period beginning on or after December 15, 2008. FSP SFAS No. 141 (R) will apply prospectively to business combinations for which the acquisition date is after fiscal years beginning on or after December 15, 2008. The adoption of SFAS No. 141 (R) will not have a material impact on the Company's results of operations or financial condition.

In April 2009, the FASB issued FSP FAS 157-4, which provides guidance on how to determine the fair value of assets and liabilities when the volume and level of activity for the asset or liability has significantly decreased when compared with normal market activity for the asset or liability as well as guidance on identifying circumstances that indicate a transaction is not orderly. FSP FAS 157-4 is effective for interim and annual periods ending after June 15, 2009. The Company is currently evaluating the financial impact that FSP FAS. 157-4 will have, but expects that the financial impact, if any, will not be material on its Consolidated Financial Statements.

In April 2009, the FASB issued FSP FAS 115-2 and FAS 124-2, which amends the requirements for the recognition and measurement of other-than-temporary impairments for debt securities by modifying the current "intent and ability" indicator. Under FSP FAS 115-2 and FAS 124-2, an other-than-temporary impairment must be recognized if the Company has the intent to sell the debt security or the Company is more likely than not will be required to sell the debt security before its anticipated recovery. In addition, FSP FAS 115-2 and FAS 124-2 requires impairments related to credit loss, which is the difference between the present value of the cash flows expected to be collected and the amortized cost basis for each security, to be recognized in earnings while impairments related to all other factors to be recognized in other comprehensive income. FSP FAS 115-2 and FAS 124-2 is effective for interim and annual periods ending after June 15, 2009. The Company is currently evaluating the financial impact that FSP FAS 115-2 and FAS 124-2 will have, but expects that the financial impact, if any, will not be material on its Consolidated Financial Statements.

In April 2009, the FASB issued FSP 107-1 and 28-1. This FSP amends SFAS 107, to require disclosures about fair value of financial instruments not measured on the balance sheet at fair value in interim financial statements as well as in annual financial statements. Prior to this FSP, fair values for these assets and liabilities were only disclosed annually. This FSP applies to all financial instruments within the scope of SFAS 107 and requires all entities to disclose the method(s) and significant assumptions used to estimate the fair value of financial instruments. This FSP shall be effective for interim periods ending after June 15, 2009, with early adoption permitted for periods ending after March 15, 2009. An entity may early adopt this FSP only if it also elects to early adopt FSP 157-4 and 115-2 and 124-2. This FSP does not require disclosures for earlier periods presented for comparative purposes at initial adoption. In periods after initial adoption, this FSP requires comparative disclosures only for periods ending after initial adoption. The Company is currently evaluating the disclosure requirements of this new FSP.

In May 2009, the FASB issued Statement No. 165, *Subsequent Events* (SFAS No. 165). SFAS No. 165 provides guidance on management's assessment of subsequent events. The new standard clarifies that management must evaluate, as of each reporting period, events or transactions that occur after the balance sheet date "through the date that the financial statements are issued or are available to be issued." Management must perform its assessment for both interim and annual financial reporting periods. SFAS No. 165 does not significantly change the Company's practice for evaluating such events. SFAS No. 165 is effective prospectively for interim and annual periods ending after June 15, 2009 and requires disclosure of the date subsequent events are evaluated through. The Company adopted SFAS No. 165 for the fiscal year ended June 30, 2009. The adoption of SFAS No. 165 did not have any impact on the Company's results of operations and financial condition.

56

In June 2009, the FASB issued Statement of Financial Accounting Standards No. 167, Amendments to FASB Interpretation No. 46(R) ("FAS 167"), which modifies how a company determines when an entity that is insufficiently capitalized or is not controlled through voting (or similar rights) should be consolidated. FAS 167 clarifies that the determination of whether a company is required to consolidate an entity is based on, among other things, an entity's purpose and design and a company's ability to direct the activities of the entity that most significantly impact the entity's economic performance. FAS167 requires an ongoing reassessment of whether a company is the primary beneficiary of a variable interest entity. FAS167 also requires additional disclosures about a company's involvement in variable interest entities and any significant changes in risk exposure due to that involvement. FAS 167 is effective for fiscal years beginning after November 15, 2009. The Company is currently assessing the impact of the standard on its consolidated financial statements

In June 2009, the FASB issued Statement No. 168, The FASB Accounting Standards Codification ™ ("Codification") and the Hierarchy of Generally Accepted Accounting Principles — a replacement of FASB Statement 162 (SFAS No. 168). SFAS No. 168 establishes the Codification as the source of authoritative United States accounting and reporting standards for all non-governmental entities (other than guidance issued by the SEC). The Codification is a reorganization of current GAAP into a topical format that eliminates the current GAAP hierarchy and establishes two levels of guidance — authoritative and nonauthoritative. According to the FASB, all "non-grandfathered, non-SEC accounting literature" that is not included in the Codification would be considered nonauthoritative. The FASB has indicated that the Codification does not change current GAAP. Instead, the changes aim to (1) reduce the time and effort it takes for users to research accounting questions and (2) improve the usability of current accounting standards. The Codification is effective for interim and annual periods ending on or after September 15, 2009. The Company will apply the Codification to its disclosures beginning with the first quarter ended September 30, 2009. As the Codification is not intended to change the existing accounting guidance, its adoption will not have an impact on the Company's results of operations and financial condition.

## Item 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURES AND MARKET RISK

As a smaller reporting company, we are not required to provide the information called for by Item 7A of Form 10-K.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See "Index to Financial Statements" beginning on page F-1 below for our financial statements included in this annual report on Form 10-K.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

On February 25, 2008, the Company's board of directors engaged Moore Stephens Wurth Frazer & Torbet, LLP ("Moore Stephens") to serve as the Company's principal accountant to audit the Company's financial statements. There have been no disagreements with our independent auditors. Prior to the engagement of Moore Stephens as the independent auditor, there were no consulting or other services provided to the Company by Moore Stephens.

## ITEM 9A. CONTROLS AND PROCEDURES

Our management does not expect that our disclosure controls or our internal controls over financial reporting will prevent all error and fraud. A control system, no matter how well conceived and operated, can provide only reasonable, but no absolute, assurance that the objectives of a control system are met. Further, any control system reflects limitations on resources, and the benefits of a control system must be considered relative to its costs. These limitations also include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of a control. A design of a control system is also based upon certain assumptions about potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the *Securities Exchange Act of 1934*, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer (our president) and our principal accounting and financial officer (our chief financial officer) to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of June 30, 2009, the year end period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and our principal accounting officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures were not effective as of the end of the period covered by this annual report due to the significant deficiencies described below in "Management's Report on Internal Control over Financial Reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management, under the supervision of our chief executive officer and chief financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2009. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework. During our assessment of the effectiveness of internal control over financial reporting as of June 30, 2009, management identified significant deficiencies and determined that our internal controls over financial reporting were not effective as of that date. The significant deficiencies related to the following:

*1. Accounting and Finance Personnel Weaknesses* - US GAAP expertise - The current staff in the accounting department does not have extensive experience with U.S. GAAP, and needs substantial training so as to meet with the higher demands of being a U.S. public company. The accounting skills and understanding necessary to fulfill the requirements of U.S. GAAP-based reporting, including the skills of subsidiary financial statements consolidation, are inadequate and were inadequately supervised. The lack of sufficient and adequately trained accounting and finance personnel resulted in an ineffective segregation of duties relative to key financial reporting functions.

*2. Lack of internal audit function*– The Company lacks qualified resources to perform the internal audit functions properly, which was ineffective in preventing and detecting control lapses and errors in the accounting of certain key areas like revenue recognition, inter-company transactions, cash receipt and cash disbursement authorizations, inventory safeguard and proper accumulation for cost of products, in accordance with the appropriate costing method used by the company. In addition, the scope and effectiveness of the internal audit function are yet to be developed.

During majority of fiscal year ended June 30, 2009, our internal accounting staff was primarily engaged in ensuring compliance with PRC accounting and reporting requirements for our operating subsidiaries and was not required to meet or apply U.S. GAAP requirements. As a result, our current accounting department responsible for financial reporting of the Company, on a consolidated basis, is relatively new to U.S. GAAP and the related internal control procedures required of U.S. public companies. Although our accounting staff is professional and experienced in accounting requirements and procedures generally accepted in the PRC, management has determined that they require additional training and assistance in U.S. GAAP matters. Management has determined that our internal audit function is also significantly deficient due to insufficient qualified resources to perform internal audit functions.

In order to correct the foregoing deficiencies, we have taken the following remediation measures:

1. We have started training our internal accounting staff on US GAAP and financial reporting requirements. Additionally, we are also taking steps to hire additional accounting personnel to ensure we have adequate resources to meet the requirements of segregation of duties.

2. We plan on involving both internal accounting and operations personnel and outside consultants with US GAAP technical accounting expertise, as needed, early in the evaluation of a complex, non-routine transaction to obtain additional guidance as to the application of generally accepted accounting principles to such a proposed transaction. During the year ended June 30, 2009, our senior management has started interviewing and selecting outside internal control consultants. In December 2008, we engaged a reputable independent accounting firm as internal control consultants to provide advice and assistance on improving our internal controls. The internal control consultants have began working with our internal audit department to implement new policies and procedures within the financial reporting process with adequate review and approval procedures.

3. We have continued to evaluate the internal audit function in relation to the Company's financial resources and requirements. During the year ended June 30, 2009, we have established an internal audit department and the department has started evaluating the Company's current internal control over financial reporting process. To the extent possible, we will provide necessary trainings to our internal audit staff and implement procedures to assure that the initiation of transactions, the custody of assets and the recording of transactions will be performed by separate individuals.

We believe that the foregoing steps will remediate the significant deficiencies identified above, and we will continue to monitor the effectiveness of these steps and make any changes that our management deems appropriate to insure that the foregoing do not become material weaknesses. We plan to fully implement the above remediation plan by December 31, 2009.

A material weakness (within the meaning of PCAOB Auditing Standard No. 5) is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

Our management is not aware of any material weaknesses in our internal control over financial reporting, and nothing has come to the attention of management that causes them to believe that any material inaccuracies or errors exist in our financial statements as of June 30, 2009. The reportable conditions and other areas of our internal control over financial reporting identified by us as needing improvement have not resulted in a material restatement of our financial statements. Nor are we aware of any instance where such reportable conditions or other identified areas of weakness have resulted in a material misstatement or omission in any report we have filed with or submitted to the Commission.

59

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

**Auditor Attestation**

This annual report does not include an attestation report of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit us to provide only management's report in this annual report.

**Changes in Internal Controls over Financial Reporting**

Except as described above, there were no changes in our internal controls over financial reporting during fiscal year 2009 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control systems are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected. Such limitations include the fact that human judgment in decision-making can be faulty and that breakdowns in internal control can occur because of human failures, such as simple errors or mistakes or intentional circumvention of the established process.

**ITEM 9B. OTHER INFORMATION**

None.

## PART III

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS, CONTROL PERSONS AND CORPORATE GOVERNANCE; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT**

**Current Management**

The following table sets forth the name, age and position of each of our directors, executive officers and significant employees:

| Name | Age | Position |
|------|-----|----------|
| Cao Wubo | 44 | Chief Executive Officer and Chairman of the Board |
| Elsa Sung | 35 | Chief Financial Officer |
| Xu Haibo | 37 | Chief Operating Officer and Director |
| Dong Lining | 50 | Vice President, Director of Technology |
| Yang Weidong | 38 | Vice President, Director of Sales |
| Xin Jingsheng | 54 | Director of Equipment |
| Xue Hong | 41 | Controller |
| Feng Xiaowei | 41 | Director |
| Huang Lei | 27 | Director |
| Ge Jian | 37 | Director |
| Michael Marks | 38 | Director |
| John (Yang) Wang | 39 | Director |

**Cao Wubo** has served as our chief executive officer and chairman of the board since October 2007. He has served as the chairman and general manager of Laiyang Jiangbo since 2003. From 1981 to 1988, Mr. Cao completed his military service in the Chinese Army, during which he was sales section director in Laiyang Yongkang Pharmaceutical Factory. From 1988 to 1998, he continued working in Laiyang Yongkang Pharmaceutical Factory as Marketing Manager. From 1998 to 2003, he was general manager of Laiyang Jiangbo Pharmacy Co. Ltd. and Laiyang Jiangbo Chinese and Western Pharmacy Co. Ltd. He is the founder of Laiyang Jiangbo Pharmacy Co. Ltd., Laiyang Jiangbo Chinese and Western Pharmacy Co. Ltd., and Laiyang Jiangbo Pharmaceutical Co. Ltd.

**Elsa Sung** has served as our chief financial officer since October 2007. Prior to June 2008, she was also Vice President of CFO Oncall, Inc. Prior to joining CFO Oncall, Inc., Ms. Sung was an Audit Manager from January 2006 to July 2007 at Sherb & Co., Boca Raton, Florida, responsible for managing, monitoring, as well as performing audits for domestic and international clients. From June 2005 to December 2005, Ms. Sung was a Senior Internal Auditor at Applica Consumer Products, Inc., an U.S. publicly traded company. From 2002 to 2005, Ms. Sung was with Ernst & Young, LLP in West Palm Beach, Florida as a Senior Auditor in the Assurance and Advisory Business Service Group. Ms. Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants. She received her Master of Business Administration and Bachelor's Degree, graduated "Cum Laude," in Accounting from Florida Atlantic University. She also holds a Bachelor's Degree in Sociology from National Chengchi University in Taipei, Taiwan.

**Xu Haibo** has served as our chief operating officer and director since October 2007. He has served as a deputy general manager of Laiyang Jiangbo since August 2006. He graduated from Shanghai Financial and Economic University in 1993 and has engaged in a banking career for more than ten years. From July 1993 to July 2004, he worked in the Bank of China Yantai Branch as Credit Clerk in the Credit Department, Section Chief in the Operation Department, Governor of the Bank of China Yantai Fushan Branch, and Director of the Risk Control Department in the Bank of China Yantai Branch. From August 2004 to July 2006, he was general manager of Shandong Province Licheng Investment Co. Ltd.

**Dong Lining** has served as our vice president and director of technology since October 2007. He has served as deputy manager of Laiyang Jiangbo since July 2003. He graduated from Shandong Pharmacy University in 1995. From July 1986 to July 2003, he worked in Laiyang Biochemistry Pharmaceutical Factory, where he was a checker, technologist, workshop director, product technology section chief, technology deputy factory director, and factory director. He has published several pharmaceutical thesis articles in magazines such as, Chinese Biochemical Medical Magazine, Food and Drug, and China New Clinical Medicine.

**Yang Weidong** has served as our vice president and director of sales since October 2007. He has served as a deputy general manager for Laiyang Jiangbo since August 2004. He graduated from Nanjing University with a masters degree. From February 1995 to March 2000, he worked at Jiangsu Yangtze Pharmaceutical Co. Ltd as a sales clerk. From April 2000 to July 2004, he was area director in Jiangsu Jizhou Pharmaceutical Co. Ltd.

**Xin Jingsheng** has served as our director of equipment since October 2007. He has served as a deputy general manager of Laiyang Jiangbo since October 2003. He graduated from the Chinese People's Liberation Army Shengqing Engineering Institute in August 1978. Mr. Xin has experience as a member of a group of trained personnel at 54685 Army Pharmacy from April 1983 to August 2001 and at China Laiyang Construction Bureau from August 2001 to September 2003. He has been engaged in the pharmaceutical industry for more than 20 years, and his varied experience includes positions as a technician, engineer assistant, engineer, deputy factory director, factory director and deputy general manager. He has participated in industry training held by the Chinese National Drug Supervising Department and Shandong Drug Supervising Department and is very familiar with laws and statutes in the Chinese pharmaceutical industry.

**Xue Hong** has served as our controller since October 2007. She has served as finance controller of Laiyang Jiangbo since April 2003. From July 1988 to March 1990, she worked in Qingzhou Iron and Steel Works as quality control inspector and auditor. From March 1990 to March 1999, She was a quality examiner at Laiyang City Power Facility. From March 1999 to March 2000, she worked as an accountant at Laiyang Yongkang Company. From March 2000 to September 2003, she was the chief accountant of Laiyang Jiangbo Pharmacy.

**Feng Xiaowei** has served as our director since October 2007. Mr. Feng graduated from Dalian Jiaotong University Railway Locomotive & Car Department with a bachelors degree and Jilin University Postgraduate Research Institute Foreign Economic Law Department with a masters degree. Over the course of his career, he has been procurator in Shenyang Railroad Transportation Procuratorate, associate professor in Jilin University, counsel in China Jilin International Trust and Investment Corporation, expert commissary of China Strategy and Administration Association, and deputy secretary-general of the "China Strengthening Self-Innovative Capacity and Building Innovative Nation Forum." He has participated in the Research on National Economic Development Strategy and in the subject investigation of Beijing Olympic Games, Guangzhou Development Zone and Tianjin Development Zone. He has been commissioner of Yunnan Province Policy and Economic Development Task Team, commissioner of the Xinjiang Uygur Autonomous Region Policy and Economic Development Task Team and commissioner of the China Shi Hezi National Economic Development Zone Task Team. He is the founder of the Chinese Young People Network Home Co. Ltd., and has presided over the China Young People Card Project. From January 2003 to June 2005, he was Vice President of the Chinese Young People Network Home Co. Ltd. Mr. Feng has been the general manager of Anqiao International Investment Co., Ltd. since June 2005 through present.

**Huang Lei** has served as our director since October 2007. Ms. Huang graduated from Kwantlen University College in Canada. She also earned her MBA degree from the University of British Columbia in October 2006. From November 2006 to 2007, she was a marketing manager in CúC Top Enterprises Ltd. Ms. Huang has published articles on business administration at Canada Weekly and school magazines, and earned the Best International Student Scholarship and a full scholarship. Ms. Huang speaks English, French, Mandarin and Cantonese, and has a working knowledge of accountancy and business administration.

**Ge Jian** has served as our director since October 2007. Mr. Ge Jian graduated from Shandong University Management Sciences Department with a Bachelor of Business Administration in 1992. From 1992 to the end of 2000, he worked for the Development and Reform Commission of Yantai. From 2001 to 2006, he was the minister of the Capital Operation Department and the minister of the Development Department in Zhenghai Group Co. Ltd., and a director of Yantai Hualian Development Group Co. Ltd. Since 2006, he has been the general manager of Yantai Zhenghai Pawn Co. Ltd.

**Michael Marks** has served as our director since July 18, 2008. Since 2007, he has served as an independent director of China Housing & Land Development, Inc., a property developer in China. In 2006, Mr. Marks became the President of Middle Kingdom Alliance Corp., a publicly traded Special Purpose Acquisition Corporation active in China. In January of 2003, Mr. Marks founded the China practice of Sonnenblick Goldman, a real estate investment bank, and served as its Managing Director in China until December 2007. In 2001, he founded B2Globe, providing technology solutions to international internet businesses in Asia. In 1999, he co-founded Metro Corporate Training in Shanghai to offer training and management development, and was its Chief Executive Officer until 2001. From 1998 to 1999, Mr. Marks worked as a management consultant with Horwath Asia Pacific in Australia and China. From 1995 to 1998, Mr. Marks worked in the audit, corporate finance and advisory divisions of PricewaterhouseCoopers in South Africa. Mr. Marks received a Bachelor of Commerce (Honors) in 1994 and Masters of Commerce in 1997 from the University of the Witwatersrand in Johannesburg, South Africa. In 1998, he graduated with a Bachelor of Arts (Psychology) degree from the University of South Africa. In 1997, Mr. Marks became a Chartered Accountant in South Africa, and a Fellow of the Association of International Accountants in the United Kingdom in 1999. He speaks fluent Mandarin, French and English.

**John (Yang) Wang** has served as our director since September 8, 2008. Since November 2004, Mr. Wang has been the President of Marbella Capital Partners. Since September 2007, he also serves as the CEO of Hambrecht Asia Acquisition Corp., and is on the Board of Directors of Hong Kong Stock Exchange listed Wuyi International Pharmaceuticals Company Limited. From 2000 to 2004, he was Executive Vice President of SBI E2-Capital (HK) Limited. From 1997 to 1999, he managed Accenture Consulting's (formerly known as Andersen Consulting) Greater China communication, media and high tech strategy practice. Prior to that, he was the lead telecom analyst covering Greater China and Southeast Asia for Pyramid Research, an emerging market telecom research firm based in Cambridge, Massachusetts. Mr. Wang holds a Bachelor of Arts in International Relations from Tufts University and an M.A.L.D. degree in international law and business from The Fletcher School of Law and Diplomacy. He has over 15 years of experience in investment banking and consulting and speaks fluent Mandarin and English.

## Family Relationships

There are no family relationships between or among any of the current directors, executive officers or persons nominated or charged by the Company to become directors or executive officers.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's directors, executive officers and persons who own more than 10% of the Company's Common Stock to file reports of ownership and changes in ownership on Forms 3, 4 and 5 with the Securities and Exchange Commission (the "SEC"). Directors, executive officers and greater than 10% stockholders are required by SEC rules to furnish the Company with copies of Section 16(a) forms they file.

The Company believes that all of its directors, executive officers and greater than 10% beneficial owners complied with all filing requirements applicable to them in fiscal year 2009.

### *Codes of Ethics.*

In January 2006, we adopted a Code of Ethics and Business Conduct to provide guiding principles to our officers, directors and employees. Our Code of Ethics and Business Conduct also strongly recommends that all directors and employees of our company comply with the code in the performance of their duties. Generally, our Code of Ethics and Business Conduct provides guidelines regarding:

- compliance with laws, rules and regulations
- conflicts of interest,
- insider trading,
- corporate opportunities
- competition and fair dealing,
- discrimination and harassment,
- health and safety,
- record-keeping,
- confidentiality,
- protection and proper use of company assets, and
- payments to government personnel.

A copy of the Code of Ethics and Business Conduct is included as Exhibit 14 to our 2007 annual report on Form 10-K filed with the SEC.

**Meetings and Committees of the Board of Directors**

The Board of Directors held seven board meetings during the fiscal year 2009. In addition to meetings of the full Board, directors attended meetings of Board committees on which they served. The Board's standing committees are the Audit and Compensation Committees.

**Committee Membership**

The following table shows the current membership on the standing committees:

| Committee | Chair | Member | Member |
|---|---|---|---|
| Audit | Michael Marks | John (Yang) Wang | Feng Xiaowei |
| Compensation | Feng Xiaowei | John (Yang) Wang | Ge Jian |

*Audit Committee.*

The Board of Directors has an Audit Committee established in accordance with section 3(a)(58) of Securities Exchange Act of 1934 (the "Exchange Act"). The Board of Directors has determined that each of the members of the Audit Committee is "independent," as defined in the corporate governance listing standards of NASDAQ and Rule 10A-3 under the Exchange Act relating to audit committees. In addition, the Board has determined that all members of the Audit Committee are financially literate and that Mr. Marks qualifies as an "audit committee financial expert" as defined by the Securities and Exchange Commission.

The committee assists the Board in fulfilling its oversight responsibilities relating to:

- our auditing, accounting and reporting practices;
- the adequacy of our systems of internal controls;
- and the quality and integrity of publicly reported financial disclosures.

In this role, the committee appoints the independent auditors and reviews and approves the scope of the audit, the financial statements and the independent auditors' fees. The Audit Committee met four time since during the fiscal year 2009 and the Chairman met with management and the external auditors prior to the release of our financial results.

The Audit Committee exercises the powers of the Board of Directors in connection with our accounting and financial reporting practices, and provides a channel of communication between the Board of Directors and independent registered public accountants.

*Compensation Committee.*

The Compensation Committee is comprised of three directors who meet the independence requirements of NASDAQ, are "non-employee directors" for purposes of Rule 16b-3 under the Securities Exchange Act of 1934 and are "outside directors" for purposes of Section 162(m) of the Internal Revenue Code. The purpose of our compensation committee is to discharge the responsibilities of our board of directors relating to compensation of our executive officers. Specific responsibilities of our compensation committee include:

- reviewing and recommending approval of compensation of our executive officers;
- administering our stock incentive plan;

● and reviewing and making recommendations to our board with respect to incentive compensation and equity plans.

The Compensation Committee has yet to hold a meeting since its first inception in July 2008.

Stockholder Nominees

There have been no material changes to the procedures by which security holders may recommend nominees to the registrant's Board of directors since our last annual report on form 10-K.

**Involvement in Certain Legal Proceedings**

There are no orders, judgments, or decrees of any governmental agency or administrator, or of any court of competent jurisdiction, revoking or suspending for cause any license, permit or other authority to engage in the securities business or in the sale of a particular security or temporarily or permanently restraining any of our officers or directors from engaging in or continuing any conduct, practice or employment in connection with the purchase or sale of securities, or convicting such person of any felony or misdemeanor involving a security, or any aspect of the securities business or of theft or of any felony. Nor are any of the officers or directors of any corporation or entity affiliated with us so enjoined.

**ITEM 11. EXECUTIVE COMPENSATION**

*Introductions*

We endeavor to provide our "named executive officers" (as defined in Item 402 of Regulation S-K) with a competitive base salary that is in-line with their roles and responsibilities when compared to peer companies of comparable size in the same or similar locality. It is not uncommon for PRC private corporations in that locality to have base salaries as the sole and only form of compensation. The base salary level is established and reviewed based on the level of responsibilities, the experience and tenure of the individual and the current and potential contributions of the individual. The base salary is compared to similar positions within comparable peer companies and with consideration of the executive's relative experience in his or her position. Base salaries are reviewed periodically and at the time of promotion or other changes in responsibilities.

Under the governance of our newly established compensation committee, we plan to implement a more comprehensive compensation program, which takes into account other elements of compensation, including, without limitation, short and long term compensation, cash and non-cash compensation, and other equity-based compensation such as stock options. This compensation program shall be comparative to our peers in the industry and aimed to retain and attract talented individuals.

**Director Compensation**

The following table sets forth information concerning the compensation of each person who served as a non-employee director during our fiscal year ended June 30, 2009. The compensation for each of our executive officers who also served as a director during fiscal year ended June 30, 2009 is fully reflected under our "Summary Compensation of Named Executive Officers" disclosure below.

**Director Compensation of Non-Employee Directors**
**for Fiscal Year Ended June 30, 2009**

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Feng Xiaowei | $   — | — | — | — | — | $   — | $   — |
| Huang Lei | $   — | — | — | — | — | $   — | $   — |
| Ge Jian | $   — | — | — | — | — | $   — | $   — |
| Michael Marks | $   33,542 | 10,000 | — | — | — | — | $   43,542 |
| John (Yang) Wang | $   25,000 | 11,250 | — | — | — | — | $   36,250 |

The non-executive directors would also be reimbursed for all of their out-of-pocket expenses in traveling to and attending meetings of the Board of Directors and committees on which they would serve.

**Executive Compensation**

The following is a summary of the compensation we paid for each of the three years ended June 30, 2009, 2008 and 2007, respectively (unless otherwise provided) (i) to the persons who acted as our principal executive officers during the three years, (ii) to the person who acted as our principal financial officer or acted in a similar capacity during the three years and (iii) our other executive officers received compensation in excess of $100,000 in these three year. We refer to these individuals in this 10-K as "named executive officers."

**Summary Compensation of Named Executive Officers**

The following table reflects all compensation awarded to, earned by or paid to our named executive officers for our fiscal years ended June 30

| Name and Principal Position | Fiscal Year Ended | Salary ($) | Bonus ($) | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Cao Wubo, Chairman of the Board, Chief Executive Officer, and President | 2009 | $ 156,000 | — | — | — | — | — | — | $ 156,000 |
|  | 2008 | $ 117,000 | — | — | — | — | — | — | $ 117,000 |
|  |  | $ |  |  |  |  |  |  | $ |
| Elsa Sung, Chief Financial Officer | 2009 | $ 120,000 | — | — | — | — | — | — | $ 120,000 |
|  | 2008(1) | $ 67,500 | — | 27,000 | 10,847 | — | 26,295 | — | 131,642 |
| Xu Haibo, Director, Chief Operating Officer | 2009 | $ 67,200 | — | — | — | — | — | — | $ 67,200 |
|  | 2008 | $ 50,400 | — | — | — | — | — | — | $ 50,400 |
| Gary Wolfson, Former Director and Former Chief Executive Officer (2) | 2009 | $ | — | — | — | — | — | — | $ |
|  | 2008(3) | $ 45,375 | — | — | 311,348 | — | — | — | $ 356,723 |
| Adam Wasserman, Former Chief Financial Officer (2) | 2009 | $ | — | — | — | — | — | — | $ |
|  | 2008 | $ 26,803 | — | — | — | — | — | — | $ 26,803 |
| Kenneth Clinton, Former Director and Former President (2) | 2009 | $ | — | — | — | — | — | — | $ |
|  | 2008(4) | $ 45,375 | — | — | 311,348 | — | — | — | $ 356,723 |

66

(1) Ms. Sung's compensation for fiscal 2008 included $94,500 salary payable under the terms of his employment agreement, of which $67,500 was paid by cash, issuance of 3375 shares of our restricted common stock valued at $27,000 in June 2008 and options to purchase 2,000 shares of our common stock at an exercise price of $12 per share representing other annual compensation which were valued at $10,847 pursuant to the terms of her employment agreement. Options to purchase 5,500 shares of our common stock at an average exercise price of $20.09 per share representing nonqualified deferred compensation earnings other annual compensation which were valued at $26,250 pursuant to the terms of her employment agreement. During our fiscal year ended June 30, 2008, we granted Ms. Sung options for 2,000 shares exercisable at a price of $12 per share, 1,750 shares exercisable at a price of $16 per share, 1,875 shares exercisable at a price of $20 per share and 1,875 shares exercisable at $24 per share with vesting period, 500 shares exercisable at a price of $0.105 per share, which was the lowest closing price of our common stock on the OTC Bulletin Board in the 5 trading days immediately preceding the grant date. These options were granted to Ms. Sung in June, 2008. The options expire on June 10, 2013. The value of the option award was calculated using the Black-Scholes option pricing model based on the following assumptions: weighted average life of 5 years; risk-free interest rate of 3.57 %; volatility rate of 95%; and weighted average fair market value of $0.1238 per share at date of grant. The aggregate number of stock awards and option awards issued to Ms. Sung and outstanding as of June 30, 2008 is 3,375 and 7,500, respectively.

(2) Effective October 1, 2007, Mr. Gary Wolfson resigned from his positions as Chief Executive Officer and a director of the Company, Mr. Adam Wasserman resigned as Chief Financial Officer of the Company and Mr. Kenneth Clinton resigned from his positions as President and a director of the Company.

(3) Mr. Wolfson's compensation for fiscal 2008 included $45,250 salary payable under the term of his employment agreement and options to purchase 61,036 shares of our common stock at an exercise price of $4.20 per share representing other annual compensation which were valued at $311,348 pursuant to the terms of his employment

(4) Mr. Clinton's compensation for fiscal 2008 inlcuded $45,250 a salary payable under the term of his employment agreement and options to purchase 61,036 shares of our common stock at an exercise price of $4.20 per share representing other annual compensation which were valued at $311,348 pursuant to the terms of his employment

**Outstanding Equity Awards**

The following table sets forth certain information concerning unexercised options, stock that has not vested, and equity incentive plan awards outstanding as of June 30, 2009 for the named executive officers below:

67

**Outstanding Equity Awards at Fiscal Year Ended
June 30, 2009**

| Name | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Elsa Sung | 2,000 | | | $ 12 | 6/10/2013 | | | | |
| | 1,750 | | | $ 16 | 6/10/2013 | | | | |
| | 1,875 | | | $ 20 | 6/10/2013 | | | | |
| | | | 1,875 | $ 24 | 6/10/2013 | | | | |
| Gary Wolfson (1) | 61,036 | | | $ 4.2 | 12/31/2010 | — | — | — | — |

(1) These options were fully vested as of July 1, 2007.

We currently have no plans that provide for payments or other benefits at, following, or in connection with retirement of our named executive officers.

**Nonqualified defined contribution and other nonqualified deferred compensation plans.**

We currently have no defined contribution or other plans that provide for the deferral of compensation to our named executive officers on a basis that is not tax-qualified.

**Employment Agreements.**

Effective June 10, 2008, the Company entered into an employment agreement (the "Employment Agreement") with Ms. Sung, our Chief Financial Officer. In accordance with the terms of the Employment Agreement, Ms. Sung will receive an annual base salary of $120,000 and will be entitled to receive performance bonuses of (i) $18,000 if the Company is successfully listed or quoted on the New York Stock Exchange, the American Stock Exchange, the NASDAQ Select Market, the NASDAQ Global Market or the NASDAQ Capital Market; (ii) $8,000 if the Company meets its 2008 Guaranteed EBT ( the Company's adjusted 2008 earnings before taxes is more than $26,700,000 USD or, the Company's 2008 adjusted fully diluted earnings before taxes per share is less than $1.6 USD); and (iii) $20,000 if the Company meets its 2009 Guaranteed EBT ( the Company's adjusted 2009 earnings before taxes is less than $38,400,000 USD or, the Company's adjusted fully diluted earnings before taxes per share is less than $2.32 USD). In addition, In connection with Ms. Sung's employment, the Board of Directors has approved a non-qualified stock option grant to Ms. Sung in the amount of 7,500 shares of common stock of the Company vesting over an eighteen months period. All shares pursuant to the option must be exercised within five years after the grant date. If the Company terminates Ms. Sung, without cause or if Ms. Sung terminates her employment for Good Reason (as defined therein), Ms. Sung is entitled to receive (i) a lump sum cash payment equal to any accrued and unpaid salary and bonus; (ii) an amount equal to the sum of (a) 80% of her then current base salary and (b) 50% of the average annual cash bonus payments during the preceding 2 fiscal years, with such sum payable in 6 substantially equal monthly installments; and (iii) 6 months of medical and life insurance costs. If the Company terminates Ms. Sung's employment with Cause, she is entitled to her accrued and unpaid salary and accrued and unpaid bonus through the effective date of termination as well as the reimbursement of any expenses.

**Potential payments upon termination or change-in-control.**

The employment contract with Ms. Sung provided the terms of potential payments upon termination. A description of her employment agreement can be found above in the section titled "Employment Agreements".