ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth, as of June 30, 2009, certain information concerning the beneficial ownership of our Common Stock by (i) each shareholder known by us to own beneficially five percent or more of our outstanding Common Stock; (ii) each director; (iii) each executive officer; and (iv) all of our executive officers and directors as a group, and their percentage ownership and voting power.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. Unless otherwise indicated in the table, the persons and entities named in the table have sole voting and sole investment power with respect to the shares set forth opposite the shareholder's name. Unless otherwise indicated, the address of each beneficial owner listed below is c/o Laiyang Jiangbo Pharmaceuticals Enterprises, Inc., Middle Section, Longmao Street, Area A, Laiyang Waixiangxing Industrial Park, Laiyang City, Yantai, Shandong Province, PRC 265200. The percentage of class beneficially owned set forth below is based on 11,142,046 shares of common stock outstanding on September 24, 2009. The issued and outstanding shares do not include 2,415,900 shares of our common stock issuable upon the exercise of our outstanding warrants and options and 4,292,500 shares of our common stock issuable upon conversion of our standing convertible debts.

| Named Executive Officers and Directors | Number of Shares of Common Stock Beneficially Owned (1) (2) | Percentage of Outstanding Common Stock |
|---|---|---|
| Cao Wubo, Chief Executive Officer and Chairman of the Board† | 4,856,592(3) | 43.58% |
| Elsa Sung, Chief Financial Officer† | 3,875 | * |
| Xu Haibo, Vice President, Chief Operating Officer and Director† | — | — |
| Dong Lining, Vice President, Director of Technology† | — | — |
| Yang Weidong, Vice President, Director of Sales† | — | — |
| Xin Jingsheng, Director of Equipment† | — | — |
| Xue Hong, Controller† | 7,500 | * |
| Feng Xiaowei, Director† | — | — |
| Huang Lei, Director† | 9,993 | * |
| Ge Jian, Director† | 1,250 | * |
| Michael Marks† | 1,250 | * |
| John (Yang) Wang† | | |
| Total Held by Directors and Executive Officers (twelve individuals) | 4,880,460 | 43.80% |
| **5% Shareholders** | | |
| Verda International Limited (4) A-1 Building Dasi Street Laiyan City, Shandong Province, PRC | 4,856,592 | 43.58% |
| Qiao Pengju No. 1 Building, Zhongxiao District Mashang Road No.4-002 Laiyang City, Shandong Province, PRC | 643,651 | 5.77% |
| Pope Investments LLC(5)(6) 5100 Poplar Avenue, Suite 805 Memphis, Tennessee 38137 | 1,113,090 | 9.99% |

* Represents less than one percent (1%).

(1)  Based on 11,142,046 outstanding shares of Common Stock as of September 24, 2009.

(2)  Unless otherwise noted, the Company believes that all persons named in the table have sole voting and investment power with respect to all shares of the Common Stock beneficially owned by them. A person is deemed to be the beneficial owner of securities which may be acquired by such person within sixty (60) days from the date indicated above upon the exercise of options, warrants or convertible securities. Each beneficial owner's percentage of ownership is determined by assuming that options, warrants or convertible securities that are held by such person (not those held by any other person) and which are exercisable within sixty (60) days of the date indicated above, have been exercised.

(3)  Includes 4,856,592 shares of common stock owned by Verda International Limited, a company of which Mr. Cao is the Executive Director and owner of 100% of the equity interest. The address for Verda International Limited is A-1 Building Dasi Street,Laiyang City, Shandong province, China.

(4)  The natural person with voting power and investment power on behalf of Verda International Limited is Mr. Cao Wubo.

(5)  Includes (i) 625,000 shares of Common Stock issuable to Pope Investments LLC,, upon conversion of $5,000,000 aggregate principal amount of the Company's Debentures and 400,000 shares of Common Stock issuable upon exercise of the November Warrants and (ii) up to an additional 2,1250,000 shares of Common Stock of the 2,125,000 shares of Common Stock issuable to Pope Investments upon conversion of $17,000,000 aggregate principal amount of the Company's Notes and 1,062,500 shares of Common Stock issuable upon exercise of 1,062,500 Class A Warrants. Pope Asset Management LLC, a Tennessee limited liability company ("Pope Asset") serves as an investment adviser and/or manager to Pope Investments. Pope Asset is the sole manager for Pope Investments and has sole voting control and investment and disposition power and discretion with respect to all securities held by Pope Investments. Pope Asset may be deemed to beneficially own shares owned or held by, or held for the account or benefit of, Pope Investments. Mr. William P. Wells is the sole manager of Pope Asset. Mr. Wells may be deemed to own shares owned or held by, or held for the account or benefit of, Pope Investments. Pope Asset and Mr. Wells do not directly own any shares of Common Stock

(6)  The percentage of shares of Common Stock that may be beneficially owned by Pope Investments is limited to 9.99% and no shares of Common Stock in excess of this beneficial ownership limitation may be issued by the Company to Pope Investments. This limitation may be waived by Pope Investments at any time upon 61 days' notice to the Company.

**Securities Authorized for Issuance Under Equity Compensation Plans or Individual Compensation Arrangements**

The following table sets forth information as of June 30, 2009 regarding securities authorized for issuance under equity compensation plans, including individual compensation arrangements, by us under our 2002 Stock Option Plan and our 2003 Stock Option, our 2004 Stock Plan as amended and any compensation plans not previously approved by our shareholders as of June 30, 2009.

## Equity Compensation as of June 30, 2009

| Plan Category | Number of securities to be Issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column 2) |
|---|---|---|---|
| | 133,400 | $ 4.20 | |
| Equity Compensation Plans or | 2,000 | $ 12.00 | - |
| Individual Compensation | 1,750 | $ 16.00 | - |
| Arrangements Not Approved by | 1,875 | $ 20.00 | - |
| Security Holders (1) | 1,875 | $ 24.00 | - |
| **TOTAL** | 140,900 | $ 5.18 | |

(1) Equity compensation plan not approved by shareholders is comprised of options granted and/or restricted stock to be issued to employees and non-employees, including directors, consultants, advisers, suppliers, vendors, customers and lenders for purposes including to provide continued incentives, as compensation for services and/or to satisfy outstanding indebtedness to them.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

### Agreement and Plan of Share Exchange

On October 1, 2007, we executed a Share Exchange Agreement ("Exchange Agreement") by and among Karmoya International Limited, a British Virgin Islands company ("Karmoya"), and the shareholders of 100% of Karmoya's capital stock (the "Karmoya Shareholders") on the one hand, and us and the majority shareholders of our capital stock (the "Genesis Shareholders") on the other hand. Separately, Karmoya owns 100% of the capital stock of Union Well International Limited, a Cayman Islands company ("Union Well"), which has established and owns 100% of the equity in Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., a wholly foreign owned enterprise in the People's Republic of China ("GJBT"). GJBT has entered into consulting service agreements and equity-related agreements with Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang Jiangbo"), a limited liability company headquartered in, and organized under the laws of, China.

Under the Exchange Agreement, on the Closing Date, we issued 5,995,780 shares of our Series B Voting Convertible Preferred Stock, which were converted into 299,789,000 shares of our common stock on October 26, 2007. As a result of this transaction, the Karmoya Shareholders became our controlling shareholders and Karmoya became our wholly owned subsidiary. In connection with Karmoya becoming our wholly owned subsidiary, we acquired the business and operations of the LJ Group, and our principal business activities continued to be conducted through the LJ Group's operating company in China, Laiyang Jiangbo.

### Our Contractual Arrangements with Laiyang Jiangbo and Its Shareholders

PRC law currently limits foreign equity ownership of Chinese companies. To comply with these foreign ownership restrictions, we operate our business in China through a series of contractual arrangements with Laiyang Jiangbo and its shareholders that were executed on September 21, 2007. For a description of these contractual arrangements, see "Contractual Arrangements with Laiyang Jiangbo and Its Shareholders" under the "Business" section above.

As a result of the Exchange Transaction, we have contractual arrangements with Laiyang Jiangbo which give us the ability to substantially influence Laiyang Jiangbo's daily operations and financial affairs, appoint its senior executives and approve all matters requiring shareholder approval.

### Related Parties Transactions of Laiyang Jiangbo

Set forth below are the related parties transactions since July 1, 2008 between Laiyang Jiangbo's shareholders, officers and/or directors, and Laiyang Jiangbo. As a result of the Exchange Transaction, we have contractual arrangements with Laiyang Jiangbo which give us the ability to substantially influence Laiyang Jiangbo's daily operations and financial affairs, appoint its senior executives and approve all matters requiring shareholder approval.

Accounts receivable - related parties

The Company had engaged in business activities with three related parties, Jiangbo Chinese-Western Pharmacy, Laiyang Jiangbo Medicals, Co., Ltd, and Yantai Jiangbo Pharmaceuticals Co., Ltd. The Company's Chief Executive Officer and other related parties have majority ownership of these entities. At June 30, 2009 and 2008, accounts receivable from the Company's product sales to these related entities were $0 and $673,808, respectively. Accounts receivable due from related parties are receivable in cash and due within 3 to 6 months. For the years ended June 30, 2009, 2008, and 2007, the Company recorded sales to related parties as follows:

| Name of Related Party | Relationship | Net Sales | | |
|---|---|---|---|---|
| | | 2009 | 2008 | 2007 |
| Jiangbo Chinese-Western Pharmacy | 90% owned by Chief Executive Officer | $        108,176 | $     1,622,935 | $     3,018,502 |
| Laiyang Jiangbo Medicals, Co. Ltd | 100% owned by Chief Executive Officer and his spouse | - | 1,185,183 | 436,909 |
| Yantai Jiangbo Pharmaceuticals Co., Ltd. | Owned by Other Related Party | 135,850 | 2,755,980 | 478,470 |
| Total | | $        244,026 | $     5,564,098 | $     3,933,881 |

Other income from related parties

The Company leases two of its buildings to Jiangbo Chinese-Western Pharmacy. For the years ended June 30, 2009, 2008, and 2007, the Company recorded other income of $382,970, $110,152, and $102,472 from leasing the two buildings.

Other payables - related parties

Other payable-related parties primarily consist of accrued salary payable to the Company's officers and directors, and advances from the Company's Chief Executive Officer. These advances are short-term in nature and bear no interest. The amounts are expected to be repaid in the form of cash.  Other payable - related parties consisted of the following:

| | June 30, 2009 | June 30, 2008 |
|---|---|---|
| Payable to Wubo Cao, Chief Executive Officer and Chairman of the Board | $     184,435 | $     281,137 |
| Payable to Haibo Xu, Chief Operating Officer and Director | 33,688 | 43,839 |
| Payable to Elsa Sung, Chief Financial Officer | 18,333 | - |
| Payable to John Wang, Director | 2,500 | - |
| Total other payable - related parties | $     238,956 | $     324,976 |

**May 2008 Escrow Agreement**

In connection with the May 2008 Financing, Mr. Cao, the Company's Chief Executive Officer and Chairman of the Board, placed 3,750,000 shares of common stock of the Company owned by him into an escrow account pursuant to a make good escrow agreement, dated May 30, 2008 (the "Make Good Escrow Agreement"). In the event that either (i) the Company's adjusted 2008 earnings before taxes is less than $26,700,000 USD ("2008 Guaranteed EBT") or (ii) the Company's 2008 adjusted fully diluted earnings before taxes per share is less than $1.6 USD ("2008 Guaranteed Diluted EBT"), 1,500,000 of such shares (the "2008 Make Good Shares") are to be released pro rata to the May 2008 Investors. In the event that either (i) the Company's adjusted 2009 earnings before taxes is less $38,400,000 USD ("2009 Guaranteed EBT") or (ii) the Company's adjusted fully diluted earnings before taxes per share is less than $2.32 USD (or $2.24 USD if the 500,000 shares of common stock held in escrow in connection with the November 2007 private placement have been released from escrow) ("2009 Guaranteed Diluted EBT"), 2,250,000 of such shares (the "2009 Make Good Shares") are to be released pro rata to the May 2008 Investors. Should the Company successfully satisfy these respective financial milestones, the 2008 Make Good Shares and 2009 Make Good Shares will be returned to Mr. Cao. The Company has determined that both thresholds for the period ended June 30 2009 and June 30, 2008 have been met. The make good shares have yet to be returned to Mr. Cao. In addition, Mr. Cao is required to deliver shares of common stock owned by him to the Investors on a pro rata basis equal to the number of shares (the "Settlement Shares") required to satisfy all costs and expenses associated with the settlement of all legal and other matters pertaining to the Company prior to or in connection with the completion of the Company's October 2007 share exchange in accordance with formulas set forth in the May 2008 Securities Purchase Agreement (post 40-to-1 reverse split).

**Director Independence**

For our description of director independence, see "Board Committees and Director Independence" under the section entitled "Directors, Executive Officers, Promoters, Control Persons and Corporate Governance; Compliance with Section 16(a) of the Exchange Act" above.

**ITEM 14 PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Aggregate fees billed by our current principal accountants, Moore Stephens Wurth Frazer and Torbet, LLP for audit services related to the most recent fiscal year, and for other professional services billed in the most recent fiscal year, were as follows:

|  | Fiscal 2009 | Fiscal 2008 |
|---|---|---|
| Audit Fees | $ 268,600 | $ 245,000 |
| Audit-Related Fees | 26,000 | 20,000 |
| Tax Fees | 8,000 | - |
| All Other Fees | - | - |
| Total | $ 302,600 | $ 265,000 |

Aggregate fees billed by our previous principal accountants, Sherb & Co., for audit services related to the most recent two fiscal years, and for other professional services billed in the most recent two fiscal years, were as follows:

73

| | Fiscal 2007 |
|---|---|
| Audit Fees | $  82,500 |
| Audit-Related Fees | 0 |
| Tax Fees | 12,500 |
| All Other Fees | 0 |
| Total | $  95,000 |

**Audit Fees**— This category includes the audit of our annual financial statements, review of financial statements included in our Form 10-Q Quarterly Reports and services that are normally provided by the independent auditors in connection with engagements for those fiscal years. This category also includes advice on audit and accounting matters that arose during, or as a result of, the audit or the review of interim financial statements.

**Audit-Related Fees**— This category consists of assurance and related services by the independent auditors that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees disclosed under this category include consultation regarding our correspondence with the SEC and other accounting consulting.

**Tax Fees**— This category consists of professional services rendered by our independent auditors for tax compliance and tax advice. The services for the fees disclosed under this category include tax return preparation and technical tax advice.

**All Other Fees**— This category consists of fees for other miscellaneous items.

**Pre-Approval Policies and Procedures**— Prior to engaging its accountants to perform particular services, our board of directors obtains an estimate for the service to be performed. All of the services described above were approved by the board of directors in accordance with its procedure.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a) Financial Statements and Financial Statements Schedules

The following financial statements of Jiangbo Pharmaceuticals, Inc. and Reports of Independent Registered Public Accounting Firms are presented in the "F" pages of this report:

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets - as of June 30, 2009 and 2008 | F-2 |
| Consolidated Statements of Income and Other Comprehensive Income - for the Years ended June 30, 2009, 2008 and 2007 | F-3 |
| Consolidated Statements of Shareholders' Equity - for the Years ended June 30, 2009, 2008 and 2007 | F-4 |
| Consolidated Statements of Cash Flows - for the Years ended June 30, 2009, 2008 and 2007 | F-5 |
| Notes to Consolidated Financial Statements | F-6 - F-38 |

(b) Exhibits

*Filed Herewith

| Exhibit Number | Description |
|---|---|
| 2.1 | Share Acquisition and Exchange Agreement by and among Genesis, Karmoya and Karmoya Shareholders dated October 1, 2007 (1) |
| 3.1 | Articles of Incorporation (2) |
| 3.2 | Bylaws (2) |
| 3.3 | Articles of Amendment to Articles of Incorporation (2) |
| 3.4 | Articles of Amendment to Articles of Incorporation (2) |
| 3.5 | Articles of Amendment to Articles of Incorporation (3) |
| 3.6 | Articles of Amendment to Articles of Incorporation (4) |
| 3.7 | Articles of Amendment to Articles of Incorporation (5) |
| 4.1 | Articles of Amendment to Articles of Incorporation, Preferences and Rights of Series A Preferred Stock (6) |
| 4.2 | Articles of Amendment to Articles of Incorporation, Preferences and Rights of Series B Voting Convertible Preferred Stock (7) |
| 4.3 | 6% Convertible Subordinated Debenture, dated November 7, 2007 (8) |
| 4.4 | Common Stock Purchase Warrant, dated November 7, 2007 (8) |
| 4.5 | Form of 6% Convertible Note (9) |
| 4.6 | Form of Class A Common Stock Purchase Warrant (9) |
| 10.1 | Securities Purchase Agreement, dated as of November 6, 2007, between Genesis Pharmaceuticals Enterprises, Inc. and Pope Investments, LLC (8) |
| 10.2 | Registration Rights Agreement, dated as of November 6, 2007, between Genesis Pharmaceuticals Enterprises, Inc. and Pope Investments, LLC (8) |
| 10.3 | Closing Escrow Agreement, dated as of November 6, 2007, by and among Genesis Pharmaceuticals Enterprises, Inc., Pope Investments, LLC and Sichenzia Ross Friedman Ference LLP (8) |
| 10.4 | Securities Purchase Agreement, dated May 30, 2008, by and among the Company, Karmoya International Ltd., Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., Wubo Cao and the investors party thereto (9) |
| 10.5 | Make Good Escrow Agreement, dated May 30, 2008, by and among the Company, the investors party thereto, Pope Investments LLC, Wubo Cao and Loeb & Loeb LLP (9) |
| 10.6 | Holdback Escrow Agreement, dated May 30, 2008, by and among the Company, the investors party thereto and Loeb & Loeb LLP (9) |
| 10.7 | Registration Rights Agreement, dated May 30, 2008, by and among the Company and the investors party thereto (9) |
| 10.8 | Lock-up Agreement, dated May 30, 2008, between the Company and Wubo Cao (9) |
| 10.9 | Employment Agreement between Elsa Sung and the Company, dated June 10, 2008 (10) |
| 10.10 | Consulting Agreement between the Company and Robert Cain, dated September 10, 2008 (11) |
| 10.11 | Asset Transfer Contract between Shandong Traditional Chinese Medicine College, The Traditional Chinese Medicine College of Shandong Hongrui Pharmaceutical Factory and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated January 23, 2009.(14) |
| 10.12 | Lease Agreement between Laiyang Jiangbo Pharmaceutical Co., Ltd and Jiangbo Chinese-Western Pharmacy dated May 4, 2008 (15) |
| 10.13 | Unofficial Summary Translation of the Supplemental Asset Transfer Agreement between Shandong Traditional Chinese Medicine College, The Traditional Chinese Medicine College of Shandong Hongrui Pharmaceutical Factory and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated February 10, 2009. (16) |

| 10.14 | Letter Agreement between the Company and Pope Investments LLC dated August 10, 2009. (17) |
| 10.15 | Unofficial Summary Translation of the Technology Cooperation Agreement between Shangdon University and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated  September 16, 2007 * |
| 10.16 | Unofficial Summary Translation of the Pharmaceutical Industrialization Joint Base Agreement between Institute of Microbiology, Chinese Academy of Sciences and Laiyang Jiangbo Pharmaceutical Co. Ltd date November 12, 2007* |
| 14.1 | Code of Business Conduct and Ethics (12) |
| 31.1 | Certification by the Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) * |
| 31.2 | Certification by the Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a)* |
| 32.1 | Certification of the Chief Executive Officer pursuant 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 32.2 | Certification of the Chief Financial Officer pursuant 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 * |
| 99.1 | Consulting Services Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.2 | Equity Pledge Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.3 | Operating Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.4 | Proxy Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.5 | Option Agreement between Genesis Jiangbo (Laiyang) Biotech Technologies Co., Ltd., and Laiyang Jiangbo Pharmaceutical Co., Ltd. dated September 21, 2007 (English Translation) (1) |
| 99.6 | Audit Committee Charter (13) |
| 99.7 | Compensation Committee Charter (13) |

(1)   Incorporated by reference to the Company's Current Report on Form 8-K filed on October 1, 2007.

(2)   Incorporated by reference to the Company's Registration Statement on Form SB-2 filed on September 1, 1999.

(3)   Incorporated by reference to the Company's Current Report on Form 8-K filed on August 21, 2008.

(4)   Incorporated by reference to the Company's Current Report on Form 8-K filed on September 5, 2008.

(5)   Incorporated by reference to the Company's Current Report on Form 8-K filed on April 21, 2009.

(6)   Incorporated by reference to the Company's Quarterly Report on Form 10-QSB filed on January 22, 2004.

(7)   Incorporated by reference to the Company's Current Report on Form 8-K filed on October 9, 2007.

(8)   Incorporated by reference to the Company's Current Report on Form 8-K filed on November 9, 2007.

(9)   Incorporated by reference to the Company's Current Report on Form 8-K filed on June 3, 2008.

(10)   Incorporated by reference to the Company's Current Report on Form 8-K filed on June 12, 2008.

(11)   Incorporated by reference to the Company's Current Report on Form 8-K filed on September 12, 2008.

(12)   Incorporated by reference to the Company's Annual Report on Form 10-KSB filed on January 13, 2006.

(13)   Incorporated by reference to the Company's Registration Statement on Form S-1/A filed on August 26, 2008.

(14)   Incorporated by reference to the Company's Current Report on Form 8-K filed on January 29, 2009.

(15)   Incorporated by reference to the Company's Annual Report on Form 10-K/A filed on April 10, 2009.

(16)   Incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on May 15, 2009.

(17)   Incorporated by reference to the Company's Current Report on Form 8-K filed on August 14, 2009.

* Filed herewith.

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on September 28, 2009.

**JIANGBO PHARMACEUTICALS, INC.**

/s/  Cao Wubo

Cao Wubo, Chief Executive Officer and
President

In accordance with the Securities Exchange of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| NAME | TITLE | DATE |
|---|---|---|
| /s/ Cao Wubo<br>Cao Wubo | Chairman of the Board, Chief Executive Officer and President | September 28, 2009 |
| /s/ Xu Haibo<br>Xu Haibo | Vice President, Chief Operating Officer and Director | September 28, 2009 |
| /s/ Elsa Sung<br>Elsa Sung | Chief Financial Officer | September 28, 2009 |
| /s/ Xue Hong<br>Xue Hong | Financial Controller | September 28, 2009 |
| /s/ Feng Xiaowei<br>Feng Xiaowei | Director | September 28, 2009 |

77

| /s/ Huang Lei | Director | September 28, 2009 |
| Huang Lei | | |

| /s/ Ge Jian | Director | September 28, 2009 |
| Ge Jian | | |

| /s/Michael Marks | Director | September 28, 2009 |
| Michael Marks | | |

| /s/John (Yang) Wang | Director | September 28, 2009 |
| John (Yang) Wang | | |

78

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Jiangbo Pharmaceuticals, Inc. and Subsidiaries

We have audited the consolidated balance sheets of Jiangbo Pharmaceuticals, Inc. and Subsidiaries (the "Company") as of June 30, 2009 and 2008, and the consolidated statements of income and other comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended June 30, 2009. Jiangbo Pharmaceuticals, Inc.'s management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2009 in conformity with accounting principles generally accepted in the United States of America.

/S/ Moore Stephens Wurth Frazer and Torbet, LLP

Brea, California
September 28, 2009

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICAL ENTERPRISES, INC.)
CONSOLIDATED BALANCE SHEETS
AS OF JUNE 30, 2009 AND 2008

ASSETS

| | 2009 | 2008 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| Cash | $ 104,366,117 | $ 48,195,798 |
| Restricted cash | 7,325,000 | 7,839,785 |
| Investments | 879,228 | 2,055,241 |
| Accounts receivable, net of allowance for doubtful accounts of $694,370 and $155,662 as of June 30, 2009 and 2008, respectively | 19,222,707 | 24,312,077 |
| Accounts receivable - related parties | - | 673,808 |
| Inventories | 3,277,194 | 3,906,174 |
| Other receivables | 167,012 | 152,469 |
| Advances to suppliers | 236,496 | 1,718,504 |
| Financing costs - current | 680,303 | 680,303 |
| Total current assets | 136,154,057 | 89,534,159 |
| | | |
| **PLANT AND EQUIPMENT, net** | 13,957,397 | 11,225,844 |
| | | |
| **OTHER ASSETS:** | | |
| Restricted investments | 1,033,463 | 2,481,413 |
| Financing costs, net | 556,365 | 1,236,641 |
| Intangible assets, net | 17,041,181 | 9,916,801 |
| Total other assets | 18,631,009 | 13,634,855 |
| | | |
| Total assets | $ 168,742,463 | $ 114,394,858 |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | 2009 | 2008 |
|---|---|---|
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 6,146,497 | $ 2,341,812 |
| Short term bank loans | 2,197,500 | 2,772,100 |
| Notes payable | 7,325,000 | 5,843,295 |
| Other payables | 2,152,063 | 3,510,864 |
| Refundable security deposits due to distributors | 4,102,000 | - |
| Other payables - related parties | 238,956 | 324,976 |
| Accrued liabilities | 1,356,898 | 334,439 |
| Liabilities assumed from reorganization | 1,565,036 | 1,084,427 |
| Taxes payable | 11,248,226 | 166,433 |
| Total current liabilities | 36,332,176 | 16,378,346 |
| | | |
| CONVERTIBLE DEBT, net of discount $28,493,089 and $32,499,957 as of June 30, 2009 and 2008, respectively | 6,346,911 | 2,500,043 |
| | | |
| Total liabilities | 42,679,087 | 18,878,389 |
| | | |
| COMMITMENTS AND CONTINGENCIES | | |
| | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Convertible preferred stock Series A ($0.001 par value; 0 and 20,000,000 shares authorized as of June 30, 2009 and 2008, respectively; 0 shares issued and outstanding as of June 30, 2009 and 2008) | | |
| Common stock ($0.001 par value, 22,500,000 and 15,000,000 shares authorized, 10,435,099 and 9,767,844 shares issued and outstanding as of June 30, 2009 and 2008, respectively) | 10,435 | 9,770 |
| Paid-in-capital | 48,397,794 | 45,554,513 |
| Captial contribution receivable | (11,000) | (11,000) |
| Retained earnings | 67,888,667 | 39,008,403 |
| Statutory reserves | 3,253,878 | 3,253,878 |
| Accumulated other comprehensive income | 6,523,602 | 7,700,905 |
| Total shareholders' equity | 126,063,376 | 95,516,469 |
| Total liabilities and shareholders' equity | $ 168,742,463 | $ 114,394,858 |

See report of indepdendent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICAL ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF INCOME AND OTHER COMPREHENSIVE INCOME
FOR THE YEARS ENDED JUNE 30, 2009, 2008 AND 2007

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| REVENUES: | | | |
| Sales | $ 117,143,950 | $ 93,982,407 | $ 72,259,812 |
| Sales - related parties | 244,026 | 5,564,098 | 3,933,881 |
| TOTAL REVENUES, net | 117,387,976 | 99,546,505 | 76,193,693 |
| | | | |
| Cost of sales | 27,854,747 | 21,072,674 | 19,961,439 |
| Cost of sales - related parties | 54,519 | 1,433,873 | 1,200,091 |
| COST OF SALES | 27,909,266 | 22,506,547 | 21,161,530 |
| | | | |
| GROSS PROFIT | 89,478,710 | 77,039,958 | 55,032,163 |
| | | | |
| RESEARCH AND DEVELOPMENT EXPENSE | 4,395,000 | 3,235,715 | 11,143,830 |
| | | | |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 35,315,529 | 41,593,197 | 25,579,361 |
| | | | |
| INCOME FROM OPERATIONS | 49,768,181 | 32,211,046 | 18,308,972 |
| | | | |
| OTHER (INCOME) EXPENSE, NET | | | |
| Non-operating expense | 894,014 | 708,338 | - |
| Non-operating income | (89,453) | (1,281,149) | (6,484,484) |
| Non-operating income - related party | (382,970) | (110,152) | (102,472) |
| Interest expense, net | 5,904,511 | 3,092,183 | 211,616 |
| Loss from discontinued operations | 1,781,946 | 380,027 | - |
| OTHER EXPENSE (INCOME), NET | 8,108,048 | 2,789,247 | (6,375,340) |
| | | | |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 41,660,133 | 29,421,799 | 24,684,312 |
| | | | |
| PROVISION FOR INCOME TAXES | 12,779,869 | 6,970,739 | 2,631,256 |
| | | | |
| NET INCOME | 28,880,264 | 22,451,060 | 22,053,056 |
| | | | |
| OTHER COMPREHENSIVE INCOME: | | | |
| Unrealized gain (loss) on marketable securities | (1,514,230) | 1,347,852 | - |
| Foreign currency translation adjustment | 336,927 | 5,206,612 | 1,018,130 |
| | | | |
| COMPREHENSIVE INCOME | $ 27,702,961 | $ 29,005,524 | $ 23,071,186 |
| | | | |
| WEIGTED AVERAGE NUMBER OF SHARES: | | | |
| Basic | 10,061,326 | 9,164,127 | 7,494,740 |
| Diluted | 14,484,830 | 9,737,832 | 7,494,740 |
| | | | |
| EARNINGS PER SHARE: | | | |
| Basic | $ 2.87 | $ 2.45 | $ 2.94 |
| Diluted | $ 0.09 | $ 1.84 | $ 2.94 |

See report of indepdendent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICAL ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Common Stock Par Vaule $0.001 | | Treasury Stock | | Additional Paid-in capital | Capital contribution receivable | Retained Earnings | | Accumulated other comprehensive income | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of shares | Common stock | Number of shares | Treasury stock | | | Statutory reserves | Unrestricted earnings | | |
| BALANCE, June 30, 2006 | 7,494,740 | $ 7,495 | 10,000 | $ (2,805) | $ 13,216,309 | $(12,011,000) | $ 648,667 | $ 7,453,498 | $ 128,311 | $ 9,440,475 |
| Capital contribution | | | | | 5,128,000 | | | | | 5,128,000 |
| Dividend distribution | | | | | | | | (10,344,000) | | (10,344,000) |
| Net income | | | | | | | | 22,053,056 | | 22,053,056 |
| Adjustment to statutory reserve | | | | | | | 1,508,970 | (1,508,970) | | |
| Foreign currency translation gain | | | | | | | | | 1,018,130 | 1,018,130 |
| BALANCE, June 30, 2007 | 7,494,740 | $ 7,495 | 10,000 | $ (2,805) | $ 18,344,309 | $(12,011,000) | $2,157,637 | $ 17,653,584 | $ 1,146,441 | $ 27,295,661 |
| Recapitalization of Company | 2,131,603 | 2,132 | | | 3,815,813 | | | | | 3,817,959 |
| Common stock Issued for conversion of options | 44,031 | 44 | | | (44) | | | | | 0 |
| Issuance of common stock @ $4.80 per share | 37,500 | 38 | | | 179,963 | | | | | 180,001 |
| Exercise of stock options to common stock @ $4.20 per share | 37,500 | 38 | | | 157,463 | | | | | 157,501 |
| Conversion of convertible preferred stock A to common stock | 16,595 | 17 | | | (2) | | | | | - |
| Capital contribution registered | | | | | (12,000,000) | 12,000,000 | | | | - |
| Sales of treasury stock | | | (10,000) | 2,805 | (830) | | | | | 1,975 |
| Grant of warrants and beneficial conversion feature in connection with convertible debt | | | | | 35,000,000 | | | | | 35,000,000 |
| Common stock issued for service @ $8.00 per share | 5,875 | 6 | | | 46,994 | | | | | 47,000 |
| Stock option compensation | | | | | 10,847 | | | | | 10,847 |
| Net income | | | | | | | | 22,451,060 | | 22,451,060 |
| Adjustment to statutory reserve | | | | | | | 1,096,241 | (1,096,241) | | - |
| Change in fair value on restricted marketable equity securities | | | | | | | | | 1,347,852 | 1,347,852 |
| Foreign currency translation gain | | | | | | | | | 5,206,612 | 5,206,612 |
| BALANCE, June 30, 2008 | 9,767,844 | $ 9,770 | - | $ | $ 45,554,513 | $ (11,000) | $3,253,878 | $ 39,008,403 | $ 7,700,905 | $ 95,516,469 |
| Shares issued for adjustments for 1:40 reverse split | 1,104 | - | | | | | | | | - |
| Cancellation of common stock for settlement @ $8 per share | (2,500) | (2) | | | (19,998) | | | | | (20,000) |
| Common stock issued for service @ $8 per share | 2,500 | 2 | | | 19,998 | | | | | 20,000 |
| Common stock issued for service @ $9 per share | 2,500 | 2 | | | 22,498 | | | | | 22,500 |
| Common stock issued to Hongrui @ $4.035 per share | 643,651 | 644 | | | 2,596,488 | | | | | 2,597,132 |
| Stock-based compensation | | | | | 64,314 | | | | | 64,314 |
| Conversion of convertible debt to stock | 20,000 | 20 | | | 159,980 | | | | | 160,000 |
| Net income | | | | | | | | 28,880,264 | | 28,880,264 |
| Change in fair value on restricted marketable equity securities | | | | | | | | | (1,514,230) | (1,514,230) |
| Foreign currency translation gain | | | | | | | | | 336,927 | 336,927 |
| BALANCE, June 30, 2009 | 10,435,099 | $10,435 | - | $ | $ 48,397,794 | $ (11,000) | $3,253,878 | $ 67,888,667 | $ 6,523,602 | $126,063,376 |

See report of indepdendent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICAL ENTERPRISES, INC.)
CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED JUNE 30, 2009, 2008 AND 2007

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 28,880,264 | $ 22,451,060 | $ 22,053,056 |
| Loss from discontinued operations | 1,781,946 | 380,027 | - |
| Income from continued operations | 30,662,210 | 22,831,087 | 22,053,056 |
| Adjustments to reconcile net income to cash | | | |
| provided by operating activities: | | | |
| Depreciation | 679,507 | 517,863 | 364,417 |
| Amortization of intangible assets | 735,427 | 184,465 | 122,126 |
| Amortization of debt issuance costs | 680,276 | 123,964 | - |
| Amortization of debt discount | 4,006,868 | 2,500,043 | - |
| Bad debt (recovery) expense | 538,069 | (27,641) | - |
| Loss on sale of marketable securities | 473,303 | - | - |
| Unrealized loss on investments | 229,425 | 696,528 | - |
| Other non-cash settlement income expense | (20,000) | - | - |
| Common stock issued for services | - | 46,994 | - |
| Amortization of stock option compensation | 106,815 | 10,847 | - |
| Gain on forgiveness of debt | - | (86,752) | - |
| Changes in operating assets and liabilities | | | |
| Accounts receivable | 4,651,284 | (10,534,270) | (1,534,814) |
| Accounts receivable - related parties | 676,579 | (113,465) | (62,599) |
| Notes receivables | - | 60,694 | (26,626) |
| Inventories | 792,293 | 1,686,090 | 1,727,215 |
| Other receivables | (21,038) | (111,571) | (20,889) |
| Advances to suppliers | 1,495,805 | (1,259,254) | (66,821) |
| Other assets | - | 92,996 | 1,563,800 |
| Accounts payable | 3,795,084 | 55,085 | (2,027,968) |
| Accrued liabilities | 1,182,018 | 211,362 | 45,567 |
| Other payables | (1,534,740) | 2,033,689 | (827,498) |
| Other payables - related parties | (86,692) | (822,155) | (3,848,086) |
| Refundable security deposits due to distributors | 4,102,000 | - | - |
| Liabilities assumed from reorganization | (1,301,323) | (1,172,816) | - |
| Taxes payable | 11,081,110 | 169,790 | (2,168,912) |
| Net cash provided by operating activities | 62,924,266 | 17,093,573 | 15,291,968 |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Acquisition of Hongrui | (8,584,900) | - | - |
| Proceeds from sale of investments | 407,005 | 1,034,028 | - |
| Proceeds from sale of restricted investments | - | 155,000 | - |
| Purchase of equipment | (156,702) | (453,718) | (183,237) |
| Purchase of intangible assets | - | (8,870,631) | - |
| Cash proceeds from sale of equipment | 15,615 | - | - |
| Cash proceeds from reverse acquisition | - | 534,950 | - |
| Net cash used in investing activities | (8,318,982) | (7,600,371) | (183,237) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Change in restricted cash | 538,815 | 3,292,168 | 435,022 |
| Proceeds from notes payable | 13,896,990 | - | - |
| Principal payments on notes payable | (12,439,315) | (3,292,168) | (435,022) |
| Borrowings on short term bank loans | 2,197,500 | 2,616,110 | 4,471,600 |
| Principal payments on short term bank loans | (2,783,500) | (4,819,150) | (5,688,450) |
| Proceeds from sale of common stock | - | 337,500 | - |
| Proceeds from sale of treasury stock | - | 1,975 | - |
| Payment to escrow acount | - | (1,996,490) | - |
| Payments for dividend | - | (10,608,000) | - |
| Proceeds from convertible debt | - | 32,974,500 | - |
| Payments for debt issuance cost | - | (15,408) | - |
| Net cash provided by (used in) financing activities | 1,410,490 | 18,491,037 | (1,216,850) |
| | | | |
| **EFFECTS OF EXCHANGE RATE CHANGE IN CASH** | 154,545 | 2,474,351 | 473,729 |

| | | | | |
|---|---|---|---|---|
| NET INCREASE IN CASH | | 56,170,319 | 30,458,590 | 14,365,610 |
| CASH, beginning of the year | | 48,195,798 | 17,737,208 | 3,371,598 |
| CASH, end of the year | $ | 104,366,117 | $ 48,195,798 | $ 17,737,208 |

SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

| | | | | |
|---|---|---|---|---|
| Cash paid for interest | $ | 2,255,809 | $ 493,781 | $ 280,628 |
| Cash paid for taxes | $ | 6,167,810 | $ 7,001,264 | $ 447,911 |
| Non-cash investing and financing activities: | $ | | $ | $ |
| Capital contribution made bia contribution of land use rights and buildings | $ | | $ | $ 51,280,000 |
| Common stock issued to acquire Hongrui | $ | 2,597,132 | $ | $ |

See report of independent registered public accounting firm.
The accompanying notes are an integral part of these consolidated financial statements.

F-5

JIANGBO PHARMACEUTICALS, INC. AND SUBSIDIARIES
(FORMERLY KNOWN AS GENESIS PHARMACEUTICALS ENTERPRISES, INC.)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

JUNE 30, 2009

**Note 1 – Organization and business**

Jiangbo Pharmaceuticals, Inc. (the "Company" or "Jiangbo") was originally incorporated in the state of Florida on August 15, 2001, under the name Genesis Technology Group, Inc. with the principal business objective of operating as a business development and marketing firm that specializes in advising and providing a turnkey solution for small and mid-sized Chinese companies entering western markets. On October 12, 2007, after a share exchange transaction, the Company's corporate name was changed to Genesis Pharmaceuticals Enterprises, Inc ("Genesis").

Pursuant to a Certificate of Amendment to the Amended and Restated Articles of Incorporation filed with the State of Florida which took effect as of April 16, 2009, the Company's name was changed from "Genesis Pharmaceuticals Enterprises, Inc." to "Jiangbo Pharmaceuticals, Inc." (the "Corporate Name Change"). The Corporate Name Change was approved and authorized by the Board of Directors of the Company as well as the holders of a majority of the outstanding shares of the Company's voting stock by written consent. As a result of the Corporate Name Change, our stock symbol changed to "JGBO" with the opening of trading on May 12, 2009 on the OTCBB.

On October 1, 2007, Genesis executed a Share Acquisition and Exchange Agreement ("Exchange Agreement") by and among Genesis, Karmoya International Ltd. ("Karmoya"), a British Virgin Islands ("BVI") company, and the shareholders of 100% of Karmoya's capital stock (the "Karmoya Shareholders"). After the closing of the share exchange transaction, Karmoya became the Company's wholly-owned subsidiary, and the Company's primary operations now consist of the business and operations of Karmoya and its subsidiaries.

Contemporaneous with the share exchange agreement in October 2007, the Company discontinued the business development and marketing segment of the Company, which had been the Company's principal business objective prior to the reverse merger as described in Note 6. (The business development and marketing segment represented 100% of the Company's activities prior to October 1, 2007.) Liabilities of the business development and marketing segment are reclassified as liabilities assumed from reorganization in the accompanying consolidated balance sheets. The results of operations and cash flows of the business development and marketing segment of the Company have been reflected as loss from discontinued operations in the consolidated statements of income and consolidated statements of cash flows, respectively, for the years ended June 30, 2009 and 2008. Except for Jiangbo Pharmaceuticals, Inc., all other entities that were consolidated into the Company prior to October 1, 2007, have been administratively dissolved.

Karmoya was established on July 18, 2007, under the laws of British Virgin Islands. Karmoya was established as a "special purpose vehicle" for the foreign capital raising activities of Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang Jiangbo"), a limited liability company formed under the laws of the People's Republic of China (the "PRC" or "China"). China's State Administration of Foreign Exchange ("SAFE") requires the shareholders of any Chinese companies to obtain SAFE's approval before establishing any offshore holding company structure for foreign financing as well as subsequent acquisition matters under an official notice known as "Circular 106" in the PRC. On September 19, 2007, Karmoya was approved by the local Chinese SAFE as a "special purpose vehicle" offshore company.

On September 20, 2007, Karmoya acquired 100% of Union Well International Limited ("Union Well"), a Cayman Islands corporation established on May 9, 2007. On September 17, 2007, Union Well established a wholly-owned subsidiary, Genesis Jiangbo ("Laiyang") Biotech Technology Co., Ltd. ("GJBT"), in the PRC as a wholly-owned foreign limited liability company with an original registered capital of $12 million. GJBT develops, manufactures, and sells health medicines. The Company increased its registered capital in GJBT to $30,000,000 in June 2008. In August 2008, the PRC government approved for GJBT to increase its registered capital from $30 million to $58 million. In August 2008, the PRC government approved for GJBT to increase its registered capital from $30 million to $58 million. The PRC laws require Union Well, the 100% owner of GJBT to contribute at least 20% of the registered capital within 30 days of the approval and the remaining balance was required to be contributed within two years of the approval date. In August 2008, GJBT received additional registered capital in the amount of $1,996,001

See report of independent registered public accounting firm.

F-6

Laiyang Jiangbo was formed under laws of the PRC in August 2003, with registered capital of $1,210,000 (RMB 10,000,000). On December 1, 2006, Laiyang Jiangbo's registered capital increased to $6,664,000 (RMB 50,000,000), and on December 22, 2006, the registered capital was funded by the contribution of certain buildings to the Company. Laiyang Jiangbo produces and sells western pharmaceutical products in China and focuses on developing innovative medicines to address various medical needs for patients worldwide. Laiyang Jiangbo operates in 26 provinces in the PRC, and is headquartered in Laiyang City, Shandong province, China.

On September 21, 2007, GJBT entered into a series of contractual arrangements ("Contractual Arrangements") with Laiyang Jiangbo and its shareholders. Under the terms of the Contractual Arrangements, GJBT took control over the management of the business activities of Laiyang Jiangbo and holds a 100% variable interest in Laiyang Jiangbo. The Contractual Arrangements are comprised of a series of agreements, including a Consulting Services Agreement and an Operating Agreement, through which GJBT has the right to advise, consult, manage, and operate Laiyang Jiangbo, and collect and own all of their respective net profits. Additionally, Laiyang Jiangbo's shareholders have granted their voting rights over Laiyang Jiangbo to GJBT. In order to further reinforce GJBT's rights to control and operate Laiyang Jiangbo, Laiyang Jiangbo and its shareholders have granted GJBT the exclusive right and option to acquire all of their equity interests in Laiyang Jiangbo or, alternatively, all of the assets of Laiyang Jiangbo. Further Laiyang Jiangbo's shareholders have pledged all of their rights, titles, and interests in Laiyang Jiangbo to GJBT. GJBT is 100% owned by Union Well International Ltd. ("Union Well") which is 100% owned Karmoya. The Company's CEO and Chairman, Mr. Cao Wubo and his wife, Mrs. Xun Guihong, jointly owned 74.4 % of Karmoya prior to October 1, 2007. Remaining 25.6% of Karmoya ownership was transferred to Genesis Technology Group, Inc. (now known as Genesis Pharmaceuticals Enterprises, Inc.) from various parties on October 1, 2007. As Karmoya, Union Well, and GJBT all have the same sole executive director, Mr. Cao Wubo, and the voting ownership of Laiyang Jiangbo and GJBT meet the criteria for common control for accounting purposes, Laiyang Jiangbo and GJBT have been operated under the common control.

Karmoya used the contractual arrangements to gain control of Laiyang Jiangbo, instead of using a complete acquisition of Laiyang Jiangbo's assets or equity to make Laiyang Jiangbo a wholly-owned subsidiary of Karmoya, due to the following: (i) PRC laws governing share exchanges with foreign entities, which became effective on September 8, 2006, make the consequences of such acquisitions uncertain and (ii) other than by share exchange, PRC's laws would require Karmoya to acquire Laiyang Jiangbo in cash, and at the time of the acquisition, Karmoya was unable to raise sufficient funds to pay the full appraised cash fair value for Laiyang Jiangbo's assets or shares as required under PRC laws.

In October 2007, the Company recapitalized the Company to give effect to the Exchange Agreement. Under generally accepted accounting principles, the acquisition by the Company of Karmoya is considered to be capital transactions in substance, rather than a business combination. That is, the acquisition is equivalent to the acquisition by Karmoya of the Company, then known as Genesis Technology Group, Inc., with the issuance of stock by Karmoya for the net monetary assets of the Company. This transaction is reflected as a recapitalization, and is accounted for as a change in capital structure. Accordingly, the accounting for the acquisition is identical to that resulting from a reverse acquisition. Under reverse acquisition accounting, the comparative historical financial statements of the Company, as the legal acquirer, are those of the accounting acquirer, Karmoya. Since Karmoya, Union Well and GJBT did not have any business activities, the Company's accompanying financial statements prior to the closing on the reverse acquisition reflect only the business activities of Laiyang Jiangbo. The financial statements reflect the recapitalization of the shareholders' equity as if the transactions occurred as of the beginning of the first period presented.

See report of independent registered public accounting firm.

F-7

Pursuant to the Exchange Agreement, the shareholders of Karmoya transferred to the Company all of the outstanding shares of Karmoya in exchange for 597 shares of the Company's common stock, and 5,995,780 shares of the Company's Series B convertible voting preferred stock and convertible into 299,789,000 common shares of the Company. The 594 shares of common stock and 5,995,780 shares of preferred stocks issued to the former Karmoya stockholders are deemed to be outstanding for all periods reported prior to the date of the reverse acquisition. Upon the preferred stock conversion, as of the closing date, the holder of the preferred stock would hold approximately 75% of the Company's issued and outstanding common stock. As a result, Karmoya became the Company's wholly-owned subsidiary. As a result of the transaction pursuant to the Exchange Agreement, the Company's business has become the business of Laiyang Jiangbo. The sole director and officer of Karmoya is Mr. Wubo Cao, who, as a result of the exchange, became the Chief Executive Officer, President and Chairman of the Board of the Company.

## Note 2 - Summary of significant accounting policies

Basis of presentation

The Company prepares its consolidated financial statements in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). All significant inter-company accounts and transactions have been eliminated in consolidation.

Principles of consolidation

The accompanying consolidated financial statements include the accounts of the following entities, and all significant intercompany transactions and balanced have been eliminated in consolidation:

| Consolidated entity name: | Percentage of ownership |
|---|---|
| Karmoya International Ltd. | 100% |
| Union Well International Limited | 100% |
| Genesis Jiangbo Biotech Technology Co., Ltd. | 100% |
| Laiyang Jiangbo Pharmaceutical Co., Ltd. | Variable Interest Entity |

Financial Accounting Standards Board ("FASB") Interpretation Number ("FIN") 46 (revised December 2003), "Consolidation of Variable Interest Entities, an Interpretation of ARB No. 51" ("FIN 46R"), addresses whether certain types of entities, referred to as variable interest entities should be consolidated in a company's consolidated financial statements. In accordance with the provisions of FIN 46R, Laiyang Jiangbo is considered variable interest entities, and the Company is the primary beneficiary. The Company's relationships with Laiyang Jiangbo and its shareholders are governed by a series of contractual arrangements between GJBT, the Company's wholly foreign-owned enterprise in the PRC, and Laiyang Jiangbo, which is the operating company of the Company in the PRC. Under PRC laws, each of GJBT and Laiyang Jiangbo is an independent legal entity and neither of them is exposed to liabilities incurred by the other parties. The contractual arrangements constitute valid and binding obligations of the parties of such agreements. Each of the contractual arrangements and the rights and obligations of the parties thereto are enforceable and valid in accordance with the laws of the PRC.

On September 21, 2007, the Company entered into the following contractual arrangements with Laiyang Jiangbo:

Consulting Services Agreement: Pursuant to the exclusive consulting services agreement between GJBT and Laiyang Jiangbo, GJBT has the exclusive right to provide to Laiyang Jiangbo general consulting services related to pharmaceutical business operations, as well as consulting services related to human resources and technological research and development of pharmaceutical products and health supplements (the "Services"). Under this agreement, GJBT owns the intellectual property rights developed or discovered through research and development while providing the Services for Laiyang Jiangbo. Laiyang Jiangbo pays a quarterly consulting service fee in Chinese Renminbi (" RMB ") to GJBT that is equal to all of Laiyang Jiangbo's revenue for such quarter.

See report of independent registered public accounting firm.

F-8

Operating Agreement: Pursuant to the operating agreement among GJBT, Laiyang Jiangbo and the shareholders of Laiyang Jiangbo who collectively hold 100% of the outstanding shares of Laiyang Jiangbo (collectively, the " Laiyang Shareholders "), GJBT provides guidance and instructions on Laiyang Jiangbo's daily operations, financial management and employment issues. The Laiyang Shareholders must appoint the candidates recommended by GJBT as members of Laiyang Jiangbo's board of directors. GJBT has the right to appoint senior executives of Laiyang Jiangbo. In addition, GJBT agrees to guarantee Laiyang Jiangbo's performance under any agreements or arrangements relating to Laiyang Jiangbo's business arrangements with any third party. Laiyang Jiangbo, in return, agreed to pledge its accounts receivable and all of its assets to GJBT. Moreover, Laiyang Jiangbo agrees that without the prior consent of GJBT, Laiyang Jiangbo will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Laiyang Jiangbo, including, but not limited to, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party, or transfer of any agreements relating to its business operation to any third party. The term of this agreement is ten (10) years from September 21, 2007, unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

Equity Pledge Agreement: Pursuant to the equity pledge agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders pledged all of their equity interests in Laiyang Jiangbo to GJBT to guarantee Laiyang Jiangbo's performance of its obligations under the consulting services agreement. If either Laiyang Jiangbo or any of the Laiyang Shareholders breaches its respective contractual obligations, GJBT, as pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The Laiyang Shareholders also granted GJBT an exclusive, irrevocable power of attorney to take actions in the place and stead of the Laiyang Shareholders to carry out the security provisions of the equity pledge agreement and take any action and execute any instrument that GJBT may deem necessary or advisable to accomplish the purposes of the equity pledge agreement. The Laiyang Shareholders agreed, among other things, not to dispose of the pledged equity interests or take any actions that would prejudice GJBT's interest. The equity pledge agreement will expire two (2) years after Laiyang Jiangbo obligations under the exclusive consulting services agreement have been fulfilled.

Option Agreement: Pursuant to the option agreement among GJBT, Laiyang Jiangbo and the Laiyang Shareholders, the Laiyang Shareholders irrevocably granted GJBT or its designated person an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Laiyang Jiangbo for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. GJBT or its designated person has sole discretion to decide when to exercise the option, whether in part or in full. The term of this agreement is ten (10) years from September 21, 2007, unless early termination occurs in accordance with the provisions of the agreement and may be extended only upon GJBT's written confirmation prior to the expiration of the this agreement, with the extended term to be mutually agreed upon by the parties.

Proxy Agreement: Pursuant to the proxy agreement among GJBT and the Laiyang Shareholders, the Laiyang Shareholders agreed to irrevocably grant and entrust all the rights to exercise their voting power to the person(s) appointed by GJBT. GJBT may from time to time establish and amend rules to govern how GJBT shall exercise the powers granted to it by the Laiyang Shareholders, and GJBT shall take action only in accordance with such rules. The Laiyang Shareholders shall not transfer their equity interests in Laiyang Jiangbo to any individual or company (other than GJBT or the individuals or entities designated by GJBT). The Laiyang Shareholders acknowledged that they will continue to perform this agreement even if one or more than one of them no longer hold the equity interests of Laiyang Jiangbo. This agreement may not be terminated without the unanimous consent of all of the parties, except that GJBT may terminate this agreement by giving thirty (30) days prior written notice to the Laiyang Shareholders.

See report of independent registered public accounting firm.

F-9

These contractual arrangements obligate GJBT to absorb a majority of the risk of loss from Laiyang Jiangbo's activities and enable GJBT to receive a majority of its expected residual returns. GJBT also has the right to appoint senior executives and members of Laiyang Jiangbo's board of directors, and Laiyang Jiangbo also agrees that without the prior consent of GJBT, Laiyang Jiangbo will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Laiyang Jiangbo. Because of the contractual arrangements, the Company has a pecuniary interest in Laiyang Jiangbo that requires consolidation of the Company's and Laiyang Jiangbo's financial statements.

Reverse stock split

In July 2008, the Company approved a 40-to-1 reverse stock split, effective on September 4, 2008. The accompanying consolidated financial statements have been retroactively adjusted to reflect the reverse split. All share representations are on a post-split basis.

Foreign currency translation

The reporting currency of the Company is the U.S. dollar ("USD"). The functional currency of the Company is the local currency, the Chinese Renminbi ("RMB"). In accordance with Statement of Financial Accounting Standards ("SFAS") No. 52, "Foreign Currency Translation," results of operations and cash flows are translated at average exchange rates during the period, assets and liabilities are translated at the unified exchange rates as quoted by the People's Bank of China at the end of the period, and equity is translated at historical exchange rates. As a result, amounts related to assets and liabilities reported on the consolidated statements of cash flows will not necessarily agree with changes in the corresponding balances on the consolidated balance sheets. Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in the results of operations as incurred.

Asset and liability accounts at June 30, 2009, were translated at 6.83 RMB to $1.00 USD as compared to 6.85 RMB to $1.00 USD at June 30, 2008. The average translation rates applied to income statements for the years ended June 30, 2009, 2008, and 2007 were 6.83 RMB, 7.26 RMB and 7.81 RMB to $1.00 USD, respectively.

Use of estimates

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. The significant estimates made in the preparation of the Company's consolidated financial statements relate to the assessment of the carrying values of accounts receivable and related allowance for doubtful accounts, allowance for obsolete inventory, sales returns, fair value of warrants and beneficial conversion features related to the convertible notes, and fair value of options granted to employees. Actual results could be materially different from these estimates upon which the carrying values were based.

Revenue recognition

Product sales are generally recognized when title to the product has transferred to customers in accordance with the terms of the sale. The Company recognizes revenue in accordance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") No. 101, "Revenue Recognition in Financial Statements," as amended by SAB No. 104 (together, "SAB 104"), and SFAS No. 48 ("SFAS 48") "Revenue Recognition When Right of Return Exists." SAB 104 states that revenue should not be recognized until it is realized or realizable and earned. In general, the Company records revenue when persuasive evidence of an arrangement exists, services have been rendered or product delivery has occurred, the sales price to the customer is fixed or determinable, and collectability is reasonably assured.

See report of independent registered public accounting firm.

F-10

The Company is generally not contractually obligated to accept returns. However, on a case by case negotiated basis, the Company permits customers to return their products. In accordance with SFAS 48, revenue is recorded net of an allowance for estimated returns. Such reserves are based upon management's evaluation of historical experience and estimated costs. The amount of the reserves ultimately required could differ materially in the near term from amounts included in the accompanying consolidated statements of income.

Financial instruments

SFAS 107, "Disclosures about Fair Value of Financial Instruments," defines financial instruments and requires fair value disclosures about those instruments. SFAS 157, "Fair Value Measurements," adopted July 1, 2008, defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosures requirements for fair value measures. Investments, receivables, payables, short term loans and convertible debt all qualify as financial instruments. Management concluded the receivables, payables and short term loans approximate their fair values because of the short period of time between the origination of such instruments and their expected realization and, if applicable, their stated rates of interest are equivalent to rates currently available.

The three levels of valuation hierarchy are defined as follows:

- Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.
- Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.
- Level 3 inputs to the valuation methodology are unobservable and significant to the fair value measurement.

The Company analyzes all financial instruments with features of both liabilities and equity under SFAS 150, "Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity," SFAS 133, "Accounting for Derivative Instruments and Hedging Activities," and EITF 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock." Further, as required by SFAS 157, financial assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. Depending on the product and the terms of the transaction, the fair value of notes payable and derivative liabilities were modeled using a series of techniques, including closed-form analytic formula, such as the Black-Scholes option-pricing model.

The following table sets forth by level within the fair value hierarchy the financial assets and liabilities that were accounted for at fair value on a recurring basis.

| | Carrying Value at June 30, 2009 | Fair Value Measurements at June 30, 2009, Using Fair Value Hierarchy | | |
| --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 |
| Investments | $ 879,228 | $ 879,228 | $ - | $ - |
| Investments, restricted | 1,033,463 | 1,033,463 | - | - |
| $5M Convertible Debt (November 2007) | 1,362,923 | - | - | 5,276,423 |
| $29.8M Convertible Debt (May 2008) | 4,983,988 | - | - | 31,251,796 |
| Total | $ 8,259,602 | $ 1,912,691 | $ - | $ 36,528,219 |

See report of independent registered public accounting firm.

The Company did not identify any other non-recurring assets and liabilities that are required to be presented on the consolidated balance sheets at fair value in accordance with SFAS 157.

SFAS 159, "The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115," became effective for the Company on July 1, 2008. SFAS 159 provides the Company with the irrevocable option to elect fair value for the initial and subsequent measurement for certain financial assets and liabilities on a contract-by-contract basis with the difference between the carrying value before election of the fair value option and the fair value recorded upon election as an adjustment to beginning retained earnings. The Company chose not to elect the fair value option.

Stock-based compensation

The Company records stock-based compensation expense pursuant to SFAS No. 123R ("SFAS 123R"), "Share Based Payment." SFAS 123R requires companies to measure compensation cost for stock-based employee compensation plans at fair value at the grant date and recognize the expense over the employee's requisite service period. The Company estimates the fair value of the award using the Black-Scholes option pricing model. Under SFAS 123R, the Company's expected volatility assumption is based on the historical volatility of Company's stock or the expected volatility of similar entities. The expected life assumption is primarily based on historical exercise patterns and employee post-vesting termination behavior. The risk-free interest rate for the expected term of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

Stock-based compensation expense is recognized based on awards expected to vest, and there were no estimated forfeitures as the Company has a short history of issuing options. SFAS 123R requires forfeitures to be estimated at the time of grant and be revised in subsequent periods, if necessary, if actual forfeitures differ from those estimates.

The Company uses the Black-Scholes option-pricing model which was developed for use in estimating the fair value of options. Option-pricing models require the input of highly complex and subjective variables including the expected life of options granted and the Company's expected stock price volatility over a period equal to or greater than the expected life of the options. Because changes in the subjective assumptions can materially affect the estimated value of the Company's employee stock options, it is management's opinion that the Black-Scholes option-pricing model may not provide an accurate measure of the fair value of the Company's employee stock options. Although the fair value of employee stock options is determined in accordance with SFAS 123R using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction.

Comprehensive income

SFAS No. 130 ("SFAS 130"), "Reporting Comprehensive Income," establishes standards for reporting and display of comprehensive income and its components in financial statements. It requires that all items that are required to be recognized under accounting standards as components of comprehensive income be reported in a financial statement that is displayed with the same prominence as other financial statements. The accompanying consolidated financial statements include the provisions of SFAS 130.

Cash and cash equivalents

Cash and cash equivalents include cash on hand and demand deposits in accounts maintained with state-owned banks within the PRC. The Company considers all highly liquid instruments with original maturities of three months or less, and money market accounts to be cash and cash equivalents.

See report of independent registered public accounting firm.

The Company maintains cash deposits in financial institutions that exceed the amounts insured by the U.S. government. Balances at financial institutions or state-owned banks within the PRC are not covered by insurance. Non-performance by these institutions could expose the Company to losses for amounts in excess of insured balances. At June 30, 2009 and 2008, the Company's bank balances, including restricted cash balances, exceeded government-insured limits by approximately $111,684,000 and $55,576,000, respectively. The Company has not experienced non-performance by these institutions.

Restricted cash

Restricted cash represent amounts set aside by the Company in accordance with the Company's debt agreements with certain financial institutions. These cash amounts are designated for the purpose of paying down the principal amounts owed to the financial institutions, and these amounts are held at the same financial institutions with which the Company has debt agreements. Due to the short-term nature of the Company's debt obligations to these banks, the corresponding restricted cash balances have been classified as current in the consolidated balance sheets.

As of June 30, 2009 and 2008, the Company had restricted cash of $7,325,000 and $7,839,785, respectively, of which $7,325,000 and $5,843,295, respectively, were maintained as security deposits for bank acceptance related to the Company's notes payable. At June 30, 2008, $1,996,490 of the restricted cash amounts were maintained in the Company's legal counsel's hold-back escrow account related to the May 2008 convertible note issuance (Note 14), contingent on the Company's satisfaction of certain financing terms. These monies were released to the Company in full in July 2008.

Investments and restricted investments

Investments are comprised primarily of marketable equity securities of publicly traded companies and are stated at fair value based on the trade price of these securities. These investments are classified as trading securities based on the Company's intent to sell them within the year. Restricted investments are marketable equity securities of publicly traded companies that were acquired through the reverse merger and contained U.S. Securities and Exchange Commission Rule 144 restrictions on the securities. These securities are classified as available-for-sale and are reflected as restricted and noncurrent investments as the restrictions are expected to be fully terminated beyond one year period and the Company intends to hold them beyond one year. Restricted investments are carried at fair value which is estimated using the most recent contemporaneous offering price for these restricted securities.

For trading securities, realized and unrealized gains and losses are included in the accompanying consolidated statements of income. For available-for-sale securities, realized gains and losses are included in the consolidated statements of income. Unrealized gains and losses for these available-for-sale securities are reported in other comprehensive income, net of tax, in the consolidated statements of shareholders' equity. The Company has no investments that are considered to be held-to-maturity securities.

For the year ended June 30, 2009, realized loss on trading securities amounted to $473,303. Unrealized loss on trading securities amounted to $229,425 for the year ended June 30, 2009. For the year ended June 30, 2008, realized loss on trading securities amounted to $44,881. Unrealized loss on trading securities amounted to $651,464 for the year ended June 30, 2008.

For the year ended June 30, 2009, unrealized loss on available-for-sales securities amounted to $1,514,230. For the year ended June 30, 2008, unrealized gain on available-for-sales securities amounted to $1,347,852.

For the years ended June 30, 2007, there was no realized or unrealized gain or loss on trading securities or available-for-sale securities.

See report of independent registered public accounting firm.

F-13

Accounts receivable

In the normal course of business, the Company extends credit to its customers without requiring collateral or other security interests. Management reviews its accounts receivables at each reporting period to provide for an allowance against accounts receivable for an amount that could become uncollectible. This review process may involve the identification of payment problems with specific customers. The Company estimates this allowance based on the aging of the accounts receivable, historical collection experience, and other relevant factors, such as changes in the economy and the imposition of regulatory requirements that can have an impact on the industry. These factors continuously change, and can have an impact on collections and the Company's estimation process. These impacts may be material.

Certain accounts receivable amounts are charged off against allowances after designated period of collection efforts. Subsequent cash recoveries are recognized as income in the period when they occur.

The activities in the allowance for doubtful accounts are as follows for the years ended June 30, 2009 and 2008:

|  | 2009 | 2008 |
|---|---|---|
| Beginning allowance for doubtful accounts | $ 155,662 | $ 166,696 |
| Bad debt expense (recovery) | 538,068 | (27,641) |
| Foreign currency translation adjustments | 640 | 16,607 |
| Ending allowance for doubtful accounts | $ 694,370 | $ 155,662 |

Inventories

Inventories, consisting of raw materials and finished goods related to the Company's products, are stated at the lower of cost or market utilizing the weighted average method.
The Company reviews its inventory periodically for possible obsolescence or to determine if any reserve is necessary. As of June 30, 2009 and 2008, the Company determined that no inventory reserves were necessary.

Advances to suppliers

Advances to suppliers represent partial payments or deposits for future inventory purchases. These advances to suppliers are non-interest bearing and unsecured. From time to time, vendors require a certain amount of monies to be deposited with them as a guarantee that the Company will receive their purchases on a timely basis. As of June 30, 2009, and 2008, the Company's advance to suppliers amounted to approximately $236,000 and $1,719,000, respectively.

Plant and equipment

Plant and equipment are stated at cost less accumulated depreciation. Additions and improvements to plant and equipment accounts are recorded at cost. When assets are retired or disposed of, the cost and accumulated depreciation are removed from the accounts, and any resulting gains or losses are included in the results of operations in the year of disposition. Maintenance, repairs, and minor renewals are charged directly to expense as incurred. Major additions and betterments to plant and equipment accounts are capitalized. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The estimated useful lives of the assets are as follows:

|  | Useful Life | |
|---|---|---|
| Buildings and building improvements | 5 – 40 | Years |
| Manufacturing equipment | 5 – 20 | Years |
| Office equipment and furniture | 5 – 10 | Years |
| Vehicles | 5 | Years |

See report of independent registered public accounting firm.

Intangible assets

All land in the PRC is owned by the PRC government and cannot be sold to any individual or company. The Company has recorded the amounts paid to the PRC government to acquire long-term interests to utilize land underlying the Company's facilities as land use rights. This type of arrangement is common for the use of land in the PRC. The land use rights are amortized on the straight-line method over the terms of the land use rights, which range from 20 to 50 years. The Company acquired land use rights in August 2004 and October 2007 in the amounts of approximately $879,000 and $8,871,000, respectively, which are included in intangible assets. (See Note 8)

Intangible assets also consist of purchased technological know-how ("patents"). This includes secret formulas, manufacturing processes, technical and procedural manuals, and the certificate of drugs production, and customer list and customer relationships and are amortized using the straight-line method over the expected useful life of 3 to 5 years, which reflects the period over which the patents are kept secret to the Company as agreed between the Company and the selling parties. (See Note 8)

The estimated useful lives of intangible assets are as follows:

|  | Useful Life |
| --- | --- |
| Land use rights | 50 Years |
| Patents | 5 Years |
| Licenses | 5 Years |
| Customer list and customer relationships | 3 Years |
| Trade secrets - formulas and know how technology | 5 Years |

Impairment of long-lived assets

Long-lived assets of the Company are reviewed periodically or more often if circumstances dictate, to determine whether their carrying values have become impaired. The Company considers assets to be impaired if the carrying values exceed the future projected cash flows from related operations. The Company also re-evaluates the periods of depreciation to determine whether subsequent events and circumstances warrant revised estimates of useful lives. As of June 30, 2009, the Company expects these assets to be fully recoverable.

Beneficial conversion feature of convertible notes

The Company accounted for the $5,000,000 and $30,000,000 secured convertible notes issued pursuant to the subscription agreements discussed in Note 13 under Emerging Issues Task Force ("EITF") 00-27, "Application of Issue 98-5 to Certain Convertible Instruments." In accordance with EITF 00-27, the Company has determined that the convertible notes contained beneficial conversion feature because on November 6, 2007, the effective conversion price of the $5,000,000 convertible note was $5.81 when the market value per share was $16.00, and on May 30, 2008, the effective conversion price of the $30,000,000 convertible note was $5.10 when the market value per share was $12.00. Total value of beneficial conversion feature of $2,904,092 for the November 6, 2007 convertible note and $19,111,323 for the May 30, 2008 convertible debt was treated as a discount to the convertible notes. The beneficial conversion feature is amortized using the effective interest method over the term of the notes. As of June 30, 2009 and 2008, a total of $17,955,637 and $20,453,441, respectively, remained unamortized relating to the beneficial conversion features.

Income taxes

The Company accounts for income taxes in accordance with SFAS No. 109 ("SFAS 109"), "Accounting for Income Taxes." Under the asset and liability method as required by SFAS 109, deferred income taxes are recognized for the tax consequences of temporary differences by applying enacted statutory tax rates applicable to future years to differences between the financial statement carrying amounts and the tax bases of existing assets and liabilities. Under SFAS 109, the effect on deferred income taxes of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recognized if it is more likely than not that some portion, or all of, a deferred tax asset will not be realized. As of June 30, 2009 and 2008, the Company did not have any net deferred tax assets or liabilities, and as such, no valuation allowances were recorded at June 30, 2009 and 2008.

See report of independent registered public accounting firm.

The Company adopted FIN 48, "Accounting for Uncertainty in Income Taxes – an Interpretation of FASB Statement No. 109," as of July 1, 2007. FIN 48 clarifies the accounting and disclosure for uncertain tax positions and prescribes a recognition threshold and measurement attribute for recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

Under FIN 48, evaluation of a tax position is a two-step process. The first step is to determine whether it is more-likely-than-not that a tax position will be sustained upon examination, including the resolution of any related appeals or litigation based on the technical merits of that position. The second step is to measure a tax position that meets the more-likely-than-not threshold to determine the amount of benefit to be recognized in the financial statements. A tax position is measured at the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. Tax positions that previously failed to meet the more-likely-than-not recognition threshold should be recognized in the first subsequent period in which the threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not criteria should be de-recognized in the first subsequent financial reporting period in which the threshold is no longer met.

The Company's operations are subject to income and transaction taxes in the United States and in the PRC jurisdictions. Significant estimates and judgments are required in determining the Company's worldwide provision for income taxes. Some of these estimates are based on interpretations of existing tax laws or regulations, and as a result the ultimate amount of tax liability may be uncertain. However, the Company does not anticipate any events that would lead to changes to these uncertainties.

Value added tax

The Company is subject to value added tax ("VAT") for manufacturing products and business tax for services provided. The applicable VAT rate is 17% for products sold in the PRC. The amount of VAT liability is determined by applying the applicable tax rate to the invoiced amount of goods sold (output VAT) less VAT paid on purchases made with the relevant supporting invoices (input VAT). Under the commercial practice of the PRC, the Company pays VAT based on tax invoices issued. The tax invoices may be issued subsequent to the date on which revenue is recognized, and there may be a considerable delay between the date on which the revenue is recognized and the date on which the tax invoice is issued. In the event that the PRC tax authorities dispute the date on which revenue is recognized for tax purposes, the PRC tax office has the right to assess a penalty, which can range from zero to five times the amount of the taxes which are determined to be late or deficient, and will be expensed in the period if and when a determination is been made by the taxing authorities that a penalty is due.

VAT on sales and VAT on purchases amounted to $17,037,463 and $2,918,492, respectively, for the year ended June 30, 2009. VAT on sales and VAT on purchases amounted to $16,975,054 and $3,283,855, respectively, for the year ended June 30, 2008. VAT on sales and VAT on purchases amounted to $5,523,840 and $262,013, respectively, for the year ended June 30, 2007. Sales and purchases are recorded net of VAT collected and paid as the Company acts as an agent for the government. VAT taxes are not impacted by the income tax holiday. The Chinese local government exempted $1,428,804 and $6,126,464 of the Company's VAT tax liability at June 30, 2008 and 2007, respectively, and this exemption has been included in the consolidated statement of income for the year then ended. The Company did not receive any VAT tax exemption in the year ended June 30, 2009.

See report of independent registered public accounting firm.

F-16

Shipping and handling

Shipping and handling costs related to costs of goods sold are included in selling, general and administrative expenses. Shipping and handling costs amounted to $575,743, $365,327 and $280,099 for the years ended June 30, 2009, 2008, and 2007, respectively.

Advertising

Expenses incurred in the advertising of the Company and the Company's products are charged to operations currently. Advertising expenses amounted to $2,572,631, $4,653,121 and $1,280,900 for the years ended June 30, 2009, 2008 and 2007, respectively.

Research and development

Research and development costs are expensed as incurred. These costs primarily consist of cost of material used and salaries paid for the development of the Company's products and fees paid to third parties to assist in such efforts. Research and development costs for the years ended June 30, 2009, 2008, and 2007 were approximately $4,395,000, $3,236,000, and $11,144,000, respectively.

Recent accounting pronouncements

In June 2008, the FASB issued Emerging Issues Task Force Issue No. 07-5 ("EITF 07-5"), "Determining whether an Instrument (or Embedded Feature) is indexed to an Entity's Own Stock." EITF No. 07-5 is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. Early application is not permitted. Paragraph 11(a) of SFAS 133 "Accounting for Derivatives and Hedging Activities" specifies that a contract that would otherwise meet the definition of a derivative but is both (a) indexed to the Company's own stock and (b) classified in stockholders' equity in the statement of financial position would not be considered a derivative financial instrument. EITF 07-5 provides a new two-step model to be applied in determining whether a financial instrument or an embedded feature is indexed to an issuer's own stock and thus able to qualify for the SFAS 133 paragraph 11(a) scope exception. This standard triggers liability accounting on all warrants exercisable at strike prices denominated in any currency other than the functional currency of the operating entity in the PRC (Renminbi). Management is currently evaluating the impact of adoption of EITF 07-5 on the accounting for related convertible notes transactions.

On October 10, 2008, the FASB issued FSP 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active," which clarifies the application of SFAS 157 when the market for a financial asset is inactive. Specifically, FSP 157-3 clarifies how (1) management's internal assumptions should be considered in measuring fair value when observable data are not present, (2) observable market information from an inactive market should be taken into account, and (3) the use of broker quotes or pricing services should be considered in assessing the relevance of observable and unobservable data to measure fair value. The adoption of FSP 157-3 did not have a material impact on the Company's consolidated financial statements.

In November 2008, the FASB issued EITF Issue No. 08-7, "Accounting for Defensive Intangible Assets." EITF No. 08-7 discusses that when an entity acquired in a business combination or an asset acquisition an intangible asset that it did not intend to actively use, otherwise known as a defensive asset, the entity historically allocated little or no value to the defensive asset. However, with the issuance of SFAS 141(R) and SFAS 157 the entity must recognize a value for the defensive asset that reflects the asset's highest and best use based on market assumptions. Upon the effective date of both SFAS 141(R) and SFAS 157, acquirers will generally assign a greater value to a defensive asset than would typically have been assigned under SFAS 141. EITF No. 08-7 will be effective for the first annual reporting period beginning on or after December 15, 2008. EITF No. 08-7 will apply prospectively to business combinations for which the acquisition date is after fiscal years beginning on or after December 15, 2008. The adoption of EITF No. 08-7 is not expected to have a material impact on the Company's results of operations or financial condition.

See report of independent registered public accounting firm.

F-17

In April 2009, the FASB issued FSP SFAS No. 141 (R), "Accounting for Assets Acquired and Liabilities Assumed in a Business Combination That Arise from Contingencies," or FSP SFAS No. 141 (R). FSP SFAS No. 141 (R) amends and clarifies SFAS No. 141, "Business Combinations," in regards to the initial recognition and measurement, subsequent measurement and accounting, and disclosures of assets and liabilities arising from contingencies in a business combination. FSP SFAS No. 141 (R) applies to all assets acquired and liabilities assumed in a business combination that arise from contingencies that would be within the scope of SFAS No. 5, "Accounting for Contingencies", if not acquired or assumed in a business combination, except for assets or liabilities arising from contingencies that are subject to specific guidance in SFAS No. 141 (R). FSP SFAS No. 141 (R) will be effective for the first annual reporting period beginning on or after December 15, 2008. FSP SFAS No. 141(R) will apply prospectively to business combinations for which the acquisition date is after fiscal years beginning on or after December 15, 2008. The adoption of SFAS No. 141 (R) will not have a material impact on the Company's results of operations or financial condition.

In April 2009, the FASB issued FSP FAS 157-4, which provides guidance on how to determine the fair value of assets and liabilities when the volume and level of activity for the asset or liability has significantly decreased when compared with normal market activity for the asset or liability as well as guidance on identifying circumstances that indicate a transaction is not orderly. FSP FAS 157-4 is effective for interim and annual periods ending after June 15, 2009. The Company is currently evaluating the financial impact of FSP FAS 157-4, but expects that the financial impact, if any, will not be material on its consolidated financial statements.

In April 2009, the FASB issued FSP FAS 115-2 and FAS 124-2, which amends the requirements for the recognition and measurement of other-than-temporary impairments for debt securities by modifying the current "intent and ability" indicator. Under FSP FAS 115-2 and FAS 124-2, an other-than-temporary impairment must be recognized if the Company has the intent to sell the debt security or the Company is more likely than not will be required to sell the debt security before its anticipated recovery. In addition, FSP FAS 115-2 and FAS 124-2 requires impairments related to credit loss, which is the difference between the present value of the cash flows expected to be collected and the amortized cost basis for each security, to be recognized in earnings while impairments related to all other factors to be recognized in other comprehensive income. FSP FAS 115-2 and FAS 124-2 is effective for interim and annual periods ending after June 15, 2009. The Company is currently evaluating the financial impact of FSP FAS 115-2 and FAS 124-2 , but expects that the financial impact, if any, will not be material on its consolidated financial statements.

In April 2009, the FASB issued FSP 107-1 and 28-1. This FSP amends SFAS 107, to require disclosures about fair value of financial instruments not measured on the balance sheet at fair value in interim financial statements as well as in annual financial statements. Prior to this FSP, fair values for these assets and liabilities were only disclosed annually. This FSP applies to all financial instruments within the scope of SFAS 107 and requires all entities to disclose the method(s) and significant assumptions used to estimate the fair value of financial instruments. This FSP is effective for interim periods ending after June 15, 2009, with early adoption permitted for periods ending after March 15, 2009. An entity may early adopt this FSP only if it also elects to early adopt FSP 157-4 and 115-2 and 124-2. This FSP does not require disclosures for earlier periods presented for comparative purposes at initial adoption. In periods after initial adoption, this FSP requires comparative disclosures only for periods ending after initial adoption. The Company is currently evaluating the disclosure requirements of this new FSP.

In May 2009, the FASB issued SFAS No. 165, "Subsequent Events ("SFAS 165")." SFAS 165 provides guidance on management's assessment of subsequent events. The new standard clarifies that management must evaluate, as of each reporting period, events or transactions that occur after the balance sheet date through the date that the financial statements are issued or are available to be issued. Management must perform its assessment for both interim and annual financial reporting periods. SFAS 165 does not significantly change the Company's practice for evaluating such events. SFAS 165 is effective prospectively for interim and annual periods ending after June 15, 2009 and requires disclosure of the date subsequent events are evaluated through.

See report of independent registered public accounting firm.

F-18

In June 2009, the FASB issued SFAS No. 167, "Amendments to FASB Interpretation No. 46(R)" ("FAS 167"), which modifies how a company determines when an entity that is insufficiently capitalized or is not controlled through voting (or similar rights) should be consolidated. SFAS 167 clarifies that the determination of whether a company is required to consolidate an entity is based on, among other things, an entity's purpose and design and a company's ability to direct the activities of the entity that most significantly impact the entity's economic performance. SFAS167 requires an ongoing reassessment of whether a company is the primary beneficiary of a variable interest entity. SFAS167 also requires additional disclosures about a company's involvement in variable interest entities and any significant changes in risk exposure due to that involvement. SFAS 167 is effective for fiscal years beginning after November 15, 2009. The Company is currently assessing the impact of the standard on its consolidated financial statements.

In June 2009, the FASB issued SFAS No. 168, "The FASB Accounting Standards Codification ("Codification") and the Hierarchy of Generally Accepted Accounting Principles — a replacement of FASB Statement 162" ("SFAS 168"). SFAS 168 establishes the Codification as the source of authoritative United States accounting and reporting standards for all non-governmental entities (other than guidance issued by the SEC). The Codification is a reorganization of current GAAP into a topical format that eliminates the current GAAP hierarchy and establishes two levels of guidance — authoritative and non-authoritative. According to the FASB, all "non-grandfathered, non-SEC accounting literature" that is not included in the Codification would be considered non-authoritative. The FASB has indicated that the Codification does not change current GAAP. Instead, the changes aim to (1) reduce the time and effort it takes for users to research accounting questions and (2) improve the usability of current accounting standards. The Codification is effective for interim and annual periods ending on or after September 15, 2009. The Company will apply the Codification to its disclosures beginning with the first quarter ending September 30, 2009. As the Codification is not intended to change the existing accounting guidance, its adoption will not have an impact on the Company's results of operations or financial condition.

<u>Company reporting year end</u>

For financial statement reporting purposes in the United States of America, the Company adopted June 30 as its fiscal year end, beginning in 2007.

<u>Reclassifications</u>

Certain amounts in the prior year's consolidated financial statements have been reclassified to conform to the current period presentation with no impact on the previously reported net income or cash flows.

**Note 3 - Acquisition**

On January 23, 2009, Laiyang Jiangbo entered into an asset acquisition agreement (the "Agreement") with Shandong Traditional Chinese Medicine College (the "Medicine College") and Shandong Hongrui Pharmaceutical Factory ("Shandong Hongrui" or "Hongrui"), a wholly-owned subsidiary of Medicine College, pursuant to which Laiyang Jiangbo purchased the majority of the assets owned by Hongrui, including all tangible assets, all manufacturing and office buildings, land, equipment and inventories and all rights to manufacture and distribute Hongrui's 22 Traditional Chinese Medicines ("TCMs"), for an original contract purchase price of approximately $12 million consisting of approximately $9.6 million in cash and 643,651 shares of Jiangbo's common stock. The $4.035 fair value of each common share was based on the weighted average trading price of the common stock of 5 days prior to the execution of the Agreement and amounted to $2,597,132. On February 10, 2009, the Agreement was amended to revise the total purchase price to approximately $11.1 million consisting of approximately $8.6 million in cash. The Company is obligated to issue 643,651 shares of Jiangbo's stock to Medicine College within one year of the date of the execution of the Agreement. As of June 30, 2009, Laiyang Jiangbo paid approximately $8.6 million in cash in full. The 643,651 shares of Jiangbo's common stock issuable to Medicine College in connection with the acquisition of Hongrui have been included in the accompanying consolidated balance sheet as outstanding shares.

See report of independent registered public accounting firm.

F-19

The Company accounted for this acquisition using the purchase method of accounting in accordance with SFAS 141, "Business Combinations." The purchase price was determined based on an arm's length negotiation and no finder's fees or commissions were paid in connection with this acquisition.

The following represents the allocation of the purchase price to the net assets acquired based on their respective fair values. The accompanying consolidated financial statements include the acquisition of Hongrui, effective February 5, 2009. The following represents the allocation of the purchase price to the net assets acquired based on their respective fair values.

| | | |
|---|---|---:|
| Inventory | $ | 147,250 |
| Plant and equipments | | 3,223,808 |
| Intangible assets | | 7,810,974 |
| Total assets acquired | | 11,182,032 |
| Net assets acquired | | 11,182,032 |
| Total consideration | $ | 11,182,032 |

The following pro forma consolidated results of operations for the years ended June 30, 2009 and 2008, as if the acquisition of Hongrui had been completed as of the beginning of each year presented. The pro forma information gives effect to actual operating results prior to the acquisition. The pro forma amounts does not purport to be indicative of the results that would have actually been obtained if the acquisition had occurred as of the beginning of the years presented and is not intended to be a projection of future results:

| | | Year Ended June 30, 2009 | | Year Ended June 30, 2008 |
|---|---|---:|---|---:|
| Net Revenues | $ | 124,729,372 | $ | 115,573,456 |
| Income from Operations | | 50,265,379 | | 34,244,471 |
| Net Income | | 29,234,644 | | 23,848,737 |
| Net Income Per Shares | | | | |
| Basic | $ | 2.80 | $ | 2.43 |
| Diluted | $ | 0.11 | $ | 2.30 |
| Weighted Average number of shares outstanding | | | | |
| Basic | | 10,424,592 | | 9,807,778 |
| Diluted | | 14,848,096 | | 10,381,483 |

**Note 4 - Earnings per share**

The Company reports earnings per share in accordance with the provisions of SFAS No. 128 ("SFAS 128"), "Earnings Per Share." SFAS 128 requires presentation of basic and diluted earnings per share in conjunction with the disclosure of the methodology used in computing such earnings per share. Basic earnings per share excludes dilution and is computed by dividing income available to common shareholders by the weighted average common shares outstanding during the period. Diluted earnings per share takes into account the potential dilution that could occur if securities or other contracts to issue common stock were exercised and converted into common stock.

All share and per share amounts used in the Company's financial statements and notes thereto have been retroactively restated to reflect the 40-to-1 reverse stock split, which occurred on September 4, 2008.

See report of independent registered public accounting firm.

F-20

The following is a reconciliation of the basic and diluted earnings per share computations for the years ended June 30, 2009, 2008, and 2007:

**Basic earning per share**

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| For the years ended June 30, 2009, 2008 and 2007 | | | |
| Net income for basic earnings per share | $ 28,880,264 | $ 22,451,060 | $ 22,053,056 |
| Weighted average shares used in basic computation | 10,061,326 | 9,164,127 | 7,494,740 |
| Earnings per share – Basic | $ 2.87 | $ 2.45 | $ 2.94 |

**Diluted earnings per share**

| | 2009 | 2008 | 2007 |
|---|---|---|---|
| For the years ended June 30, 2009, 2008 and 2007 | | | |
| Net income for basic earnings per share | $ 28,880,264 | $ 22,451,060 | $ 22,053,056 |
| Add: interest expense | 2,124,340 | 195,833 | |
| Add: financing cost amortization | 680,276 | 71,708 | |
| Add: note discount amortization | 4,004,868 | 545,359 | |
| Subtract: unamortized financing cost at beginning of the period | (1,916,944) | (349,000) | - |
| Subtract: unamortized debt discount at beginning of the period | (32,499,957) | (5,000,000) | - |
| Net income for diluted earnings per share | 1,274,847 | 17,914,960 | 22,053,056 |
| Weighted average shares used in basic computation | 10,061,326 | 9,164,127 | 7,494,740 |
| Diluted effect of stock options | 48,504 | 87,910 | |
| Diluted effect of warrants | - | 79,973 | - |
| Diluted effect of convertible notes | 4,375,000 | 405,822 | - |
| Weighted average shares used in diluted computation | 14,484,830 | 9,737,832 | 7,494,740 |
| Earnings per share: | | | |
| Basic | $ 2.87 | $ 2.45 | $ 2.94 |
| Diluted | $ 0.09 | $ 1.84 | $ 2.94 |

For the year ended June 30, 2009, 2,275,000 warrants at an average exercise price of $9.65 and 7,500 options at an average exercise price of $17.93 were not included in the diluted earnings per share calculation due to the anti-diluted effect.

For the year ended June 30, 2008, the $30,000,000 convertible debt, 2,275,000 warrants at an average exercise price of $9.65 and 7,500 options at an average exercise price of $17.93 were not included in the diluted earnings per share calculation due to the anti-diluted effect.

For the year ended June 30, 2007, all options and warrants were excluded in the diluted earnings per share calculation due to the anti-diluted effect.

See report of independent registered public accounting firm.

**Note 5 - Discontinued operations**

In connection with the reverse merger with Karmoya on October 1, 2007, the Company determined to discontinue its operations of business development and marketing, as it no longer supported its core business strategy. The discontinuance of these operations did not involve any sale of assets of assumption of liabilities by another party. In conjunction with the discontinuance of operations, the Company determined that the assets related to the Company's business development and marketing operations were subject to the recognition of impairment. However, since the related assets are continuing to be used by the Company's Karmoya and subsidiaries, the Company determined that there had been no impairment. The remaining liabilities of the discontinued operations are reflected in the consolidated balance sheets under the caption "liabilities assumed from reorganization" which amounted to approximately $1,565,000 and $1,084,000 as of June 30, 2009 and 2008, respectively.

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the results of operations of a component of entity that has been disposed of or is classified as held for sale shall be reported in discontinued operations. Accordingly, the results of operations of the business development and marketing operation segment are reported as discontinued operations in the accompanying consolidated statements of income for the years ended June 30, 2009 and 2008. As the accompanying consolidated statements of income for the year ended June 30, 2007 reflect the results of operations for Karmoya and its subsidiaries, the discontinued operations of Genesis did not have any impact on the consolidated statements of income for those periods presented.

The following is a summary of the components of the loss from discontinued operations for the years ended June 30, 2009 and 2008:

|  | 2009 | 2008 |
|---|---|---|
| Revenues | | $ - |
| Cost of sales | | - |
| Gross profit | | - |
| Operating and other non-operating expenses | 1,781,946 | 380,027 |
| Loss from discontinued operations before other expenses and income taxes | 1,781,946 | 380,027 |
| Income tax benefit | - | - |
| Loss from discontinued operations | $ 1,781,946 | $ 380,027 |

**Note 6 - Inventories**

Inventories consisted of the following:

|  | June 30, 2009 | June 30, 2008 |
|---|---|---|
| Raw materials | $ 1,539,612 | $ 2,164,138 |
| Work-in-process | 55,992 | 531,076 |
| Packing materials | 483,297 | 204,763 |
| Finished goods | 1,198,303 | 1,006,197 |
| Total | $ 3,277,194 | $ 3,906,174 |

**Note 7 - Plant and equipment**

Plant and equipment consist of the following at June 30, 2009 and 2008:

|  | 2009 | 2008 |
|---|---|---|
| Buildings and building improvements | $ 12,798,375 | $ 10,926,369 |
| Manufacturing equipment | 2,603,114 | 1,188,643 |
| Office equipment and furniture | 291,061 | 298,137 |
| Vehicle | 477,396 | 380,485 |
| Total | 16,169,946 | 12,793,634 |
| Less: accumulated depreciation | (2,212,549) | (1,567,790) |
| Total | $ 13,957,397 | $ 11,225,844 |

See report of independent registered public accounting firm.

For the years ended June 30, 2009, 2008, and 2007, depreciation expense amounted to $679,507, $517,863, and $364,417, respectively.

**Note 8 - Intangible assets**

At June 30, 2009 and 2008, intangible assets consist of the following:

|  | 2009 | 2008 |
|---|---|---|
| Land use rights | $ 11,245,939 | $ 9,930,157 |
| Patents | 4,937,050 | 539,830 |
| Customer lists and customer relationships | 1,123,580 | |
| Trade secrets- formulas and manufacture process know-how | 1,025,500 | |
| Licenses | 23,368 | 23,271 |
| Total | 18,355,436 | 10,493,258 |
| Less: accumulated amortization | (1,314,255) | (576,457) |
| Total | $ 17,041,181 | $ 9,916,801 |

The estimated amortization expense for the next five years and thereafter are

| Years ending June 30: | |
|---|---|
| 2010 | $ 1,743,299 |
| 2011 | 1,682,606 |
| 2012 | 1,518,984 |
| 2013 | 1,300,754 |
| 2014 and thereafter | 10,795,537 |
| Total | $ 17,041,181 |

For the years ended June 30, 2009, 2008, and 2007, amortization expense relating to the above intangible assets amounted to $735,427, $184,465, and $122,126, respectively.

**Note 9 - Debt**

Short term bank loans

Short term bank loan represents an amount due to a bank that is due within one year. This loan can be renewed with the bank upon maturity. The Company's short term bank loan consisted of the following:

|  | June 30, 2009 | June 30,2008 |
|---|---|---|
| Loan from Bank of Communication; due December 2009 and September 2008; interest rates of 6.37% and 8.64% per annum; monthly interest payment; guaranteed by related party, Jiangbo Chinese-Western Pharmacy. | $ 2,197,500 | $ 2,772,100 |
| Total | $ 2,197,500 | $ 2,772,100 |

Interest expense related to the bank loans amounted to $116,649, $436,818, and $280,628 for the years ended June 30, 2009, 2008, and 2007, respectively.

See report of independent registered public accounting firm.

Notes Payable

Notes payable represent amounts due to a bank which are normally secured and are typically renewed. All notes payable are secured by the Company's restricted cash. The Company's notes payables consist of the following:

| | June 30, 2009 | June 30, 2008 |
|---|---|---|
| Commercial Bank, various amounts, due from April 2009 to September 2009; 100% of restricted cash deposited. | $ 7,325,000 | $ 5,843,295 |
| Total | $ 7,325,000 | $ 5,843,295 |

**Note 10 - Related party transactions**

Accounts receivable - related parties

The Company had engaged in business activities with three related parties, Jiangbo Chinese-Western Pharmacy, Laiyang Jiangbo Medicals, Co., Ltd, and Yantai Jiangbo Pharmaceuticals Co., Ltd. The Company's Chief Executive Officer and other related parties have majority ownership of these entities. At June 30, 2009 and 2008, accounts receivable from the Company's product sales to these related entities were $0 and $673,808, respectively. Accounts receivable due from related parties are receivable in cash and due within three to six months. For the years ended June 30, 2009, 2008, and 2007, the Company recorded sales to related parties as follows:

| Name of Related Party | Relationship | Net Sales | | |
|---|---|---|---|---|
| | | 2009 | 2008 | 2007 |
| Jiangbo Chinese-Western Pharmacy | 90% owned by Chief Executive Officer | $ 108,176 | $ 1,622,935 | $ 3,018,502 |
| Laiyang Jiangbo Medicals, Co. Ltd | 100% owned by Chief Executive Officer and his spouse | - | 1,185,183 | 436,909 |
| Yantai Jiangbo Pharmaceuticals Co., Ltd. | Owned by Other Related Party | 135,850 | 2,755,980 | 478,470 |
| Total | | $ 244,026 | $ 5,564,098 | $ 3,933,881 |

See report of independent registered public accounting firm.

F-24

Other income from related parties

The Company leases two of its buildings to Jiangbo Chinese-Western Pharmacy. For the years ended June 30, 2009, 2008, and 2007, the Company recorded other income of $382,970, $110,152, and $102,472 from leasing the two aforementioned buildings.

Other payables - related parties

Other payables-related parties primarily consist of accrued salary payable to the Company's officers and directors, and advances from the Company's Chief Executive Officer. These advances are short-term in nature and bear no interest. The amounts are expected to be repaid in the form of cash.  Other payables - related parties consisted of the following:

| | June 30, 2009 | June 30, 2008 |
|---|---|---|
| Payable to Wubo Cao, Chief Executive Officer and Chairman of the Board | $ 184,435 | $ 281,137 |
| Payable to Haibo Xu, Chief Operating Officer and Director | 33,688 | 43,839 |
| Payable to Elsa Sung, Chief Financial Officer | 18,333 | - |
| Payable to John Wang, Director | 2,500 | - |
| Total other payable - related parties | $ 238,956 | $ 324,976 |

**Note 11 - Concentration of major customers, suppliers, and products**

For the years ended June 30, 2009, 2008 and 2007, three products accounted for 88%, 95% and 95%, respectively, of the Company's total sales.

For the years ended June 30, 2009, 2008, and 2007, five customers accounted for approximately 25.6%, 18.1%, and 33.3%, respectively, of the Company's sales. These five customers represented 31.4% and 11.8% of the Company's total accounts receivable as of June 30, 2009 and 2008, respectively.

For the years ended June 30, 2009, 2008 and 2007, five suppliers accounted for approximately 63.3%, 67.7% and 87.2%, respectively, of the Company's purchases. These five suppliers represented 82.4% and 63.8% of the Company's total accounts payable as of June 30, 2009 and 2008, respectively.

**Note 12 - Taxes**

Income taxes

The Company is subject to the United States federal income tax at a tax rate of 34%. No provision for income taxes in the U.S. has been made as the company had no U.S. taxable income during the years ended June 30, 2009, 2008, and 2007.

The Company's wholly-owned subsidiaries, Karmoya and Union Well were incorporated in the British Virgin Islands and Cayman Islands, respectively. Under the current laws of the BVI and Cayman Islands, the two entities are not subject to income taxes.

See report of independent registered public accounting firm.

Prior to January 1, 2008, companies established in the PRC were generally subject to an enterprise income tax ("EIT") rate of 33.0%, which included a 30.0% state income tax and a 3.0% local income tax. The PRC local government has provided various incentives to companies in order to encourage economic development. Such incentives include reduced tax rates and other measures. On March 16, 2007, the National People's Congress of China passed the new Enterprise Income Tax Law ("EIT Law"), and on November 28, 2007, the State Council of China passed the Implementing Rules for the EIT Law ("Implementing Rules") which took effect on January 1, 2008. The EIT Law and Implementing Rules impose a unified EIT of 25.0% on all domestic-invested enterprises and Foreign Investment Enterprises ("FIEs"), unless they qualify under certain limited exceptions. Therefore, nearly all FIEs are subject to the new tax rate alongside other domestic businesses rather than benefiting from the foreign enterprise income tax, and its associated preferential tax treatments, beginning January 1, 2008.

In addition to the changes to the current tax structure, under the EIT Law, an enterprise established outside of China with "de facto management bodies" within China is considered a resident enterprise and will normally be subject to an EIT of 25.0% on its global income. The Implementing Rules define the term "de facto management bodies" as "an establishment that exercises, in substance, overall management and control over the production, business, personnel, accounting, etc., of a Chinese enterprise." If the PRC tax authorities subsequently determine that the Company should be classified as a resident enterprise, then the organization's global income will be subject to PRC income tax of rate 25.0%. Laiyang Jiangbo and GJBT were subject to 25% income tax rate since January 1, 2008, and 33% income tax rate prior to January 1, 2008.

Liangyang Jiangbo was subject to 33% income tax rate from January 1, 2007, to December 31, 2007, and 25% from January 1, 2008, to June 30, 2009. In 2007 and 2008, the Chinese local government granted Laiyang Jiangbo special tax waivers to exempt and release certain corporate income tax, value added tax, and other miscellaneous tax liabilities; the PRC local government has provided various incentives to local companies in order to encourage economic development. Such incentives include reduced tax rates and other measures. The tax waivers were provided on a non-recurring basis. For the year ended June 30, 2009, the Company did not receive any tax exemptions. For the year ended June 30, 2008, the Company received $5,256,634 in tax exemption. Of that amount, $2,114,983 was reflected as reduction of the provision for income taxes; $1,695,671 was reflected as reduction of sales tax and miscellaneous fees; and $1,445,980 was recorded as non-operating income. The Chinese local government exempted all of the Company's taxes due for the period from January 1, 2007 to June 30, 2007. For that period, the Company received $9,931,919 tax exemption as of June 30, 2007, of which $3,338,774 was reflected as reduction of the provision for income taxes, and $6,593,145 was recorded as non-operating income.

Total tax exemptions for the years ended June 30, 2008 and 2007 is summarized as follows:

|  | June 30, 2008 | June 30, 2007 |
|---|---|---|
| VAT tax exemption | $    1,428,804 | $    6,126,464 |
| Income tax exemption | 2,114,983 | 2,986,806 |
| City construction tax exemption | 1,079,063 | 510,362 |
| Others | 633,784 | 308,287 |
| Total | $    5,256,634 | $    9,931,919 |

The table below summarizes the differences between the U.S. statutory federal rate and the Company's effective tax rate and are as follows for the fiscal years ended June 30, 2009, 2008 and 2007:

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| U.S. statutory rates | 34.0% | 34.0% | 34.0% |
| Foreign income not recognized in the U.S. | (34.0)% | (34.0)% | (34.0)% |
| China income taxes | 25.0% | 25.0% | 33.0% |
| China income tax exemptions | - | (5.6)% | (18.6)% |
| Other Items(a) | 5.7% | 4.3% | (3.7)% |
| Total provision for income taxes | 30.7% | 23.7% | 10.7% |

See report of independent registered public accounting firm.

F-26

(a)  The 5.7% and 4.3% represent the expenses incurred by the Company that are not deductible for PRC income tax purpose for the years ended June 30, 2009 and 2008 respectively. The 3.7% represents the non-operating income generated by the Company that is not taxable for the year ended June 30, 2007.

Taxes Payable

Taxes payable as of June 30, 2009 and 2008 are as follows:

|  | 2009 | 2008 |
|---|---|---|
| Value added tax | $ 4,090,492 | $ 83,775 |
| Income taxes | 6,689,199 | 62,733 |
| Other taxes | 468,535 | 19,925 |
| Total | $ 11,248,226 | $ 166,433 |

Jiangbo incurred net operating losses of $9,327,288 for income tax purposes for the year ended June 30, 2009.  The estimated net operating loss carry forwards for US income taxes amounted to $1,177,231 which may be available to reduce future years' taxable income. These carry forwards will expire, if not utilized, from 2026 through 2029.  Management believes that the realization of the benefits from these losses appears uncertain due to the Company's limited operating history and continuing losses for US income tax purposes.  Accordingly, the Company has provided a 100% valuation allowance on the deferred tax asset benefit to reduce the asset to zero.  The net change in the valuation allowance for the period ended June 30, 2009 was $400,259 and the accumulated valuation allowance as of June 30, 2009 amounted to $761,368. Management reviews this valuation allowance periodically and makes adjustments as necessary.

The Company has cumulative undistributed earnings of foreign subsidiaries of approximately $81,041,000 as of June 30, 2009, and is included in consolidated retained earnings and will continue to be indefinitely reinvested in international operations.  Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of these earnings, nor is it practicable to estimate the amount of income taxes that would have to be provided if the Company concluded that such earnings will be remitted in the future.

**Note 13 - Convertible Debt**

November 2007 Convertible Debentures

On November 7, 2007, the Company entered into a Securities Purchase Agreement (the "November 2007 Purchase Agreement") with Pope Investments, LLC (the "November 2007 Investor"). Pursuant to the November 2007 Purchase Agreement, the Company issued and sold to the November 2007 Investor, $5,000,000 consisting of: (a) 6% convertible subordinated debentures due November 30, 2010 (the "November 2007 Debenture") and (b) a three-year warrant to purchase 250,000 shares of the Company's common stock, par value $0.001 per share, at an exercise price of $12.8 per share, subject to adjustment as provided therein. The November 2007 Debenture bears interest at the rate of 6% per annum and the initial conversion price of the debentures is $10 per share. In connection with the offering, the Company placed in escrow 500,000 shares of its common stock. In connection with the May 2008 financing, the November 2007 Debenture conversion price was subsequently adjusted to $8 per share (Post 40-to-1 reverse split).

See report of independent registered public accounting firm.

The Company evaluated the application of EITF 98-5, "Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios," and EITF 00-27, "Application of Issue No. 98-5 to Certain Convertible Instruments," and concluded that the convertible debenture has a beneficial conversion feature. The Company estimated the fair value of the beneficial conversion feature of the November 2007 Debenture at $2,904,093 as a discount to par value. The fair value of the warrants was estimated at $2,095,907. The two amounts are recorded together as debt discount and amortized using the effective interest method over the three-year term of the debenture.

The fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 3 years, (3) expected volatility of 197%, and (4) zero expected dividends. The total estimated fair value of the warrants granted and beneficial conversion feature of the November 2007 Debenture should not exceed the $5,000,000 Debenture, and the calculated warrant value was used to determine the allocation between the fair value of the beneficial conversion feature of the November 2007 Debenture and the fair value of the warrants.

In connection with the private placement, the Company paid the placement agents a fee of $250,000 and incurred other expenses of $104,408, which were capitalized as deferred debt issuance costs and is being amortized to interest expense over the life of the debenture. During the years ended June 30, 2009 and 2008, amortization of debt issuance costs related to the November 2007 Purchase Agreement was $118,136 and $77,116, respectively. The remaining balance of debt issuance costs of the November 2007 Purchase Agreement at June 30, 2009 and 2008 was $159,155 and $277,291, respectively. The amortization of debt discounts was $817,564 and $545,359 for the years ended June 30, 2009 and 2008, respectively, which has been included in interest expense on the accompanying consolidated statements of income. The balance of the debt discount was $3,637,077 and $4,454,641 at June 30, 2009 and 2008, respectively.

The November 2007 Debenture bears interest at the rate of 6% per annum, payable in semi-annual installments on May 31 and November 30 of each year, with the first interest payment due on May 31, 2008. The initial conversion price ("November 2007 Conversion Price") of the November 2007 Debentures is $10 per share. If the Company issues common stock at a price that is less than the effective November 2007 Conversion Price, or common stock equivalents with an exercise or conversion price less than the then effective November 2007 Conversion Price, the November 2007 Conversion Price of the November 2007 Debenture and the exercise price of the warrants will be reduced to such price. The November 2007 Debenture may not be prepaid without the prior written consent of the Holder, as defined. In connection with the Offering, the Company placed in escrow 500,000 shares of common stock issued by the Company in the name of the escrow agent. In the event the Company's consolidated Net Income Per Share (as defined in the Purchase Agreement), for the year ended June 30, 2008, is less than $1.52, the escrow agent shall deliver the 500,000 shares to the November 2007 Investor. The Company has concluded its fiscal 2008 Net Income Per Share has met the required amount and no shares were delivered to the November 2007 Investor.

Pursuant to the November 2007 Purchase Agreement, the Company entered into a Registration Rights Agreement. In accordance with the Registration Rights Agreement, the Company must file on each Filing Date (as defined in the Registration Rights Agreement) a registration statement to register the portion of the Registrable Securities (as defined therein) as permitted by the SEC's guidance. The initial registration statement must be filed within 90 days of the Closing Date and declared effective within 180 days following the Closing Date. Any subsequent registration statements that are required to be filed on the earliest practical date on which the Company is permitted by the SEC's guidance to file such additional registration statement, these statements must be effective 90 days following the date on which it is required to be filed. In the event that the registration statement is not timely filed or declared effective, the Company will be required to pay liquidated damages. Such liquidated damages shall be, at the investor's option, either $1,643.83 or 164 shares of common stock per day that the registration statement is not timely filed or declared effective as required pursuant to the Registration Rights Agreement, subject to an amount of liquidated damages not exceeding either $600,000, and 60,000 shares of common stock, or a combination thereof based upon 12% liquidated damages in the aggregate. In December 2006, the FASB issued FSP EITF 00-19-2, "Accounting for Registration Payments," which was effective immediately. This FSP amended EITF 00-19 to require potential registration payment arrangements be treated as a contingency pursuant to SFAS No. 5, "Accounting for Contingencies," rather than at fair value. The November 2007 Investor has subsequently agreed to allow the Company to file the November 2007 registration statement in conjunction with the Company's financing in May 2008 and, as such, no liquidated damages were incurred for the year ended June 30, 2008.

See report of independent registered public accounting firm.

F-28

The financing was completed through a private placement to accredited investors and is exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended ("Securities Act").

<u>May 2008 Convertible Debentures</u>

On May 30, 2008, the "Company entered into a Securities Purchase Agreement (the "May 2008 Securities Purchase Agreement") with certain investors (the "May 2008 Investors"), pursuant to which, on May 30, 2008, the Company sold to the May 2008 Investors 6% convertible debentures (the "May 2008 Notes") and warrants to purchase 1,875,000 shares of the Company's common stock ("May 2008 Warrants"), for an aggregate amount of $30,000,000 (the "May 2008 Purchase Price"), in transactions exempt from registration under the Securities Act of 1933, as amended (the "May 2008 Financing"). Pursuant to the terms of the May 2008 Securities Purchase Agreement, the Company will use the net proceeds from the Financing for working capital purposes. Also pursuant to the terms of the May 2008 Securities Purchase Agreement, the Company must, among other things, increase the number of its authorized shares of common stock to 22,500,000 by August 31, 2008, and is prohibited from issuing any "Future Priced Securities" as such term is described by NASD IM-4350-1 for one year following the closing of the Financing. The Company has satisfied the increase in the number of its authorized shares of common stock in August 2008 (post 40-to-1 reverse split).

The May 2008 Notes are due May 30, 2011, and are convertible into shares of the Company's common stock at a conversion price equal to $8, subject to adjustment pursuant to customary anti-dilution provisions and automatic downward adjustments in the event of certain sales or issuances by the Company of common stock at a price per share less than $8. Interest on the outstanding principal balance of the May 2008 Notes is payable at a rate of 6% per annum, in semi-annual installments payable on November 30 and May 30 of each year, with the first interest payment due on November 30, 2008. At any time after the issuance of the May 2008 Note, any May 2008 Investor may convert its May 2008 Note, in whole or in part, into shares of the Company's common stock, provided that such May 2008 Investor shall not effect any conversion if immediately after such conversion, such May 2008 Investor and its affiliates would, in the aggregate, beneficially own more than 9.99% of the Company's outstanding common stock. The May 2008 Notes are convertible at the option of the Company if the following four conditions are met: (i) effectiveness of a registration statement with respect to the shares of the Company's common stock underlying the Notes and the Warrants; (ii) the Volume Weighted Average Price ("VWAP") of the common stock has been equal to or greater than 250% of the conversion price, as adjusted, for 20 consecutive trading days on its principal trading market; (iii) the average dollar trading volume of the common stock exceeds $500,000 on its principal trading market for the same 20 days; and (iv) the Company achieves 2008 Guaranteed EBT (as hereinafter defined) and 2009 Guaranteed EBT (as hereinafter defined). A holder of a May 2008 Note may require the Company to redeem all or a portion of such May 2008 Note for cash at a redemption price as set forth in the May 2008 Notes, in the event of a change in control of the Company, an event of default or if any governmental agency in the PRC challenges or takes action that would adversely affect the transactions contemplated by the Securities Purchase Agreement. The May 2008 warrants are exercisable for a five-year period that is beginning on May 30, 2008 at an initial exercise price of $10 per share.

The Company evaluated the application of EITF 98-5 and EITF 00-27, and concluded that the convertible debenture has a beneficial conversion feature. The Company estimated the fair value of the beneficial conversion feature of the May 2008 Note at $19,111,323 as a discount to par value. The fair value of the warrants was estimated at $10,888,677. The two amounts are recorded together as debt discount and amortized using the effective interest method over the three-year term of the debenture.

See report of independent registered public accounting firm.

F-29

The fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.2%), (2) expected warrant life of 5 years, (3) expected volatility of 95%, and (4) zero expected dividends. The total estimated fair value of the warrants granted and beneficial conversion feature of the May 2008 Note should not exceed the $30,000,000 Debenture, and the calculated warrant value was used to determine the allocation between the fair value of the beneficial conversion feature of the May 2008 Debenture and the fair value of the warrants.

In connection with the private placement, the Company paid the placement agents a fee of $1,500,000 and incurred other expenses of $186,500, which were capitalized as deferred debt issuance costs and is being amortized to interest expense over the life of the debenture. During the years ended June 30, 2009 and 2008, amortization of debt issuance costs related to the May 2008 Purchase Agreement was $562,140 and $46,848, respectively. The remaining balance of debt issuance costs of the May 2008 Purchase Agreement at June 30, 2009 and 2008 was $1,077,513 and $1,639,653, respectively. The amortization of debt discounts was $3,189,304 and $1,954,684 for the years ended June 30, 2009 and 2008, respectively, which has been included in interest expense on the accompanying consolidated statements of income. The balance of the unamortized debt discount was $24,856,012 and $28,045,316 at June 30, 2009 and 2008, respectively.

In connection with the May 2008 Financing, the Company entered into a holdback escrow agreement (the "Holdback Escrow Agreement") dated May 30, 2008, with the May 2008 Investors and Loeb & Loeb LLP, as Escrow Agent, pursuant to which $4,000,000 of the May 2008 Purchase Price was deposited into an escrow account with the Escrow Agent at the closing of the Financing. Pursuant to the terms of the Holdback Escrow Agreement, (i) $2,000,000 of the escrowed funds will be released to the Company upon the Company's satisfaction no later than 120 days following the closing of the Financing of an obligation that the board of directors be comprised of at least five members (at least two of whom are to be fluent English speakers who possess necessary experience to serve as a director of a public company), a majority of whom will be independent directors acceptable to Pope Investments LLC ("Pope") and (ii) $2,000,000 of the escrowed funds will be released to the Company upon the Company's satisfaction no later than six months following the closing of the Financing of an obligation to hire a qualified full-time chief financial officer (as defined in the May 2008 Securities Purchase Agreement). In the event that either or both of these obligations is not so satisfied, the applicable portion of the escrowed funds will be released pro rata to the Investors. The Company has satisfied both requirements and the holdback money was fully released to the Company in July 2008.

In connection with the May 2008 Financing, Mr. Cao, the Company's Chief Executive Officer and Chairman of the Board, placed 3,750,000 shares of common stock of the Company owned by him into an escrow account pursuant to a make good escrow agreement, dated May 30, 2008 (the "Make Good Escrow Agreement"). In the event that either (i) the Company's adjusted 2008 earnings before taxes is less than $26,700,000 USD ("2008 Guaranteed EBT") or (ii) the Company's 2008 adjusted fully diluted earnings before taxes per share is less than $1.6 USD ("2008 Guaranteed Diluted EBT"), 1,500,000 of such shares (the "2008 Make Good Shares") are to be released pro rata to the May 2008 Investors. In the event that either (i) the Company's adjusted 2009 earnings before taxes is less than $38,400,000 USD ("2009 Guaranteed EBT") or (ii) the Company's adjusted fully diluted earnings before taxes per share is less than $2.32 USD (or $2.24 USD if the 500,000 shares of common stock held in escrow in connection with the November 2007 private placement have been released from escrow) ("2009 Guaranteed Diluted EBT"), 2,250,000 of such shares (the "2009 Make Good Shares") are to be released pro rata to the May 2008 Investors. Should the Company successfully satisfy these respective financial milestones, the 2008 Make Good Shares and 2009 Make Good Shares will be returned to Mr. Cao. In addition, Mr. Cao is required to deliver shares of common stock owned by him to the Investors on a pro rata basis equal to the number of shares (the "Settlement Shares") required to satisfy all costs and expenses associated with the settlement of all legal and other matters pertaining to the Company prior to or in connection with the completion of the Company's October 2007 share exchange in accordance with formulas set forth in the May 2008 Securities Purchase Agreement (post 40-to-1 reverse split). The Company has determined that both thresholds for the periods ended June 30, 2008 and June 30, 2009 have been met. The make good shares have yet to be returned to Mr. Cao.

See report of independent registered public accounting firm.

F-30

The security purchase agreement set forth permitted indebtedness which the Company's lease obligations and purchase money indebtedness is limited up to $1,500,000 per year in connection with new acquisition of capital assets and lease obligations. Permitted investment set forth with the security purchase agreement limits capital expenditure of the Company not to exceed $5,000,000 in any rolling 12 months.

Pursuant to a Registration Rights Agreement, the Company agreed to file a registration statement covering the resale of the shares of common stock underlying the May 2008 Notes and Warrants, (ii) the 2008 Make Good Shares, (iii) the 2009 Make Good Shares, and (iv) the Settlement Shares. The Company must file an initial registration statement covering the shares of common stock underlying the Notes and Warrants no later than 45 days from the closing of the Financing and to have such registration statement declared effective no later than 180 days from the closing of the Financing. If the Company does not timely file such registration statement or cause it to be declared effective by the required dates, then the Company will be required to pay liquidated damages to the Investors equal to 1.0% of the aggregate Purchase Price paid by such Investors for each month that the Company does not file the registration statement or cause it to be declared effective. Notwithstanding the foregoing, in no event shall liquidated damages exceed 10% of the aggregate amount of the May 2008 Purchase Price. The Company satisfied its obligations under the Registration Rights Agreement by filing the required registration statement and causing it to be declared effective within the time periods set forth in the Registration Rights Agreement.

During the year ended June 30, 2009, the Company issued 20,000 shares of its common stock upon conversion of $160,000 convertible debt.

The above two convertible debenture liabilities are as follows:

|  | June 30, 2009 | June 30, 2008 |
|---|---|---|
| November 2007 convertible debenture note payable | $ 5,000,000 | $ 5,000,000 |
| May 2008 convertible debenture note payable | 29,840,000 | 30,000,000 |
| Total convertible debenture note payable | 34,840,000 | 35,000,000 |
| Less: Unamortized discount on November 2007 convertible debenture note payable | (3,637,077) | (4,454,641) |
| Less: Unamortized discount on May 2008 convertible debenture note payable | (24,856,012) | (28,045,316) |
| Convertible debentures, net | $ 6,346,911 | $ 2,500,043 |

**Note 14 - Shareholders' equity**

Common Stock

In July 2008, the Board of Directors approved a 40-to-1 reverse stock split that became effective on September 4, 2008. Those holding fractional shares were rounded up the next whole share. Subsequent to the stock split, the Company had approximately 9,768,000 shares issued and outstanding. The total number of authorized shares became 22,500,000. These consolidated financial statements have been retroactively adjusted to reflect the reverse split. Additionally, all share representations are on a post-split basis.

In July 2008, in connection with the settlement (see Note 20) with Mr. Fernando Praca (Fernando Praca, Plaintiff vs. EXTREMA, LLC and Genesis Pharmaceuticals Enterprises, Inc.- Case No. 50 2005 CA 005317, Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida), the Company cancelled 2,500 shares of its common stock (post 40-to-1 reverse split) and the cancelled shares were valued at fair market value on the date of cancellation at $8 per share or $20,000 in total, based on the trading price of the common stock. For the year ended June 30, 2009, the Company recorded settlement income of $20,000 related to this settlement.

See report of independent registered public accounting firm.

F-31

In July 2008, the Company issued 2,500 shares of common stock to two of the Company's current and former directors as part of their compensation for services. The Company valued these shares at the fair market value on the date of grant of $8 per share, or $20,000 in total, based on the trading price of common stock (post 40-to-1 reverse split). In September 2008, the Company issued 2,500 shares of common stock to two of the Company's current and ex-directors as part of compensation for services. The Company valued these shares at the fair market value on the date of grant of $9 per share, or $22,500 in total, based on the trading price of common stock (post 40-to-1 reverse split).

In November 2008, the Board of the Directors of the Company authorized a share buyback program to purchase the Company's common stock in the open market with a $2,000,000 limitation. As of the date of these consolidated financial statements, no shares were purchased in the open market.

In December 2008, the Company issued 20,000 shares of its common stock in connection with the conversion of $160,000 of convertible debt. In connection with the conversion, the Company recorded $145,524 interest expense to fully amortize the unamortized discount related to the converted dentures.

In January 2009, in connection with the Hongrui acquisition, the Company recorded 643,651 shares of Jiangbo's common stock issuable to Shandong Traditional Chinese Medicine College as part of the consideration for acquisition. The fair value of the common stock of $4.035 per share was based on the weighted average trading price of 5 days prior to the date of the acquisition, and amounted to $2,597,132.

In May 2009, in connection with the Company's name change to Jiangbo Pharmaceuticals, Inc., the Company changed the trading symbol for its common stock to "JGBO." This change in trading symbol became effective on May 12, 2009.

Registered capital contribution receivable

At inception, Karmoya issued 1,000 shares of common stock to its founder. The shares were valued at par value. On September 20, 2007, the Company issued 9,000 shares of common stock to nine individuals at par value. The balance of $10,000 is shown in capital contribution receivable on the accompanying consolidated financial statements. As part of its agreements with the shareholders, the Company was to receive the entire $10,000 in October 2007. As of June 30, 2009, the Company has not received the $10,000.

Union Well was established with a registered capital of $1,000. In connection with Karmoya's acquisition of Union Well, the registered capital of $1,000 is reflected as capital contribution receivable on the accompanying consolidated financial statements. The $1,000 was due in October 2007; however, as of June 30, 2009, the Company has not received the $1,000.

PRC laws require the owner of a WOFE to contribute at least 15% of the registered capital within 90 days of its business license issuance date and the remaining balance is required to be contributed within two years of the business license issuance date. In June 2008, the PRC government approved GJBT to increase its registered capital from $12,000,000 to $30,000,000. By June 30, 2008, the Company had funded GJBT the entire registered capital required in accordance with PRC laws. In August 2008, the PRC government approved GJBT to increase its registered capital from $30,000,000 to $59,800,000. The PRC laws require Union Well, the 100% owner of GJBT to contribute at least 20% of the registered capital within 30 days of the approval, and the remaining balance is required to be contributed within two years of the approval date. In August 2008, GJBT received additional registered capital in the amount of approximately $1,966,000. As of June 30, 2009, the Company has not received the remaining contribution receivable in the amount of $27,845,000. If the remaining contribution receivable cannot be received by August 2010, the Company may be required to reduce its registered capital or apply to extend the registered capital due date with the government.

See report of independent registered public accounting firm.

**Note 15 - Warrants**

In connection with the May 2008 financing, the exercise price of outstanding warrants issued in 2004 to purchase 74,085 shares of common stock was reduced to $8 per share. The 2004 warrants contain full ratchet anti-dilution provisions to the exercise price, which due to the Company's May 2008 financing, resulted in the 2004 warrants to be exercisable at $8 per share. The provisions of the 2004 Warrants which result in the reduction of the exercise price remain in place. The 74,085 shares of warrants were fully expired as of June 30, 2009.

In connection with the $5,000,000 November 2007 Convertible Debenture, 6% convertible subordinated debenture note, the Company issued a three-year warrant to purchase 250,000 shares of common stock, at an exercise price of $12.80 per share. The calculated fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 3 years, (3) expected volatility of 197%, and (4) zero expected dividends. In connection with the May 2008 financing, the exercise price of outstanding warrants issued in November 2007 was reduced to $8 per share and the total number of warrants to purchase common stock was increased to 400,000.

In connection with the $30,000,000 May 2008 Convertible Debentures, the Company issued a five-year warrant to purchase 1,875,000 shares of common stock, at an exercise price of $10 per share. The calculated fair value of the warrants granted with this private placement was computed using the Black-Scholes option-pricing model. Variables used in the option-pricing model include (1) risk-free interest rate at the date of grant (4.5%), (2) expected warrant life of 5 years, (3) expected volatility of 95%, and (4) zero expected dividends.

On February 15, 2009, the Company granted 40,000 stock warrants to a consultant at an exercise price of $6.00 per share exercisable for a period of three years. The warrants fully vest on July 15, 2009. The fair value of this warrant grant was estimated on the date of grant using the Black-Scholes option-pricing model with the following assumptions: (1) risk-free interest rate at the date of grant (1.83%), (2) expected warrant life of three years, (3) expected volatility of 106%, and (4) zero expected dividends. In connection with these warrants, the Company recorded stock-based compensation expense of $46,508 and stock based deferred compensation of $77,400 for the year ended June 30, 2009.

A summary of the warrants as of June 30, 2009, and changes during the years ended June 30, 2009 and 2008, respectively, is presented below:

|  | Number of warrants |
|---|---|
| Outstanding as of June 30, 2007 | 74,085 |
| Granted | 2,275,000 |
| Forfeited | |
| Exercised | - |
| Outstanding as of June 30, 2008 | 2,349,085 |
| Granted | 40,000 |
| Forfeited | (74,085) |
| Exercised | - |
| Outstanding as of June 30, 2009 | 2,315,000 |

The following is a summary of the status of warrants outstanding at June 30, 2009:

| Outstanding Warrants | | | Exercisable Warrants | | |
|---|---|---|---|---|---|
| Average Exercise Price | Number | Average Remaining Contractual Life | Average Exercise Price | Number | Average Remaining Contractual Life |
| $ 6.00 | 40,000 | 2.63 | $ 6.00 | | |
| $ 8.00 | 400,000 | 3.36 | $ 8.00 | 400,000 | 3.36 |
| $ 10.00 | 1,875,000 | 3.92 | $ 10.00 | 1,875,000 | 3.92 |
| Total | 2,315,000 | | | 2,275,000 | |

See report of independent registered public accounting firm.

The Company has 2,275,000 warrants outstanding and exercisable at an average exercise price of $9.65 per share as of June 30, 2009.

**Note 16 - Stock options**

On July 1, 2007, 133,400 options were granted and the fair value of this option grant was estimated on the date of the grant using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Expected Life | Expected Volatility | Dividend Yield | Risk Free Interest Rate | Grant Date Fair Value |
|---|---|---|---|---|---|
| Former officers | 3.50 years | 195% | 0% | 4.50% | $ 5.20 |

On June 10, 2008, 7,500 options were granted and the fair value of this option grant was estimated on the date of the grant using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Expected Life | Expected Volatility | Dividend Yield | Risk Free Interest Rate | Grant Date Average Fair Value |
|---|---|---|---|---|---|
| Current officer | 5 years | 95% | 0% | 2.51% | $ 8.00 |

As of June 30, 2009, of the 7,500 options held by the Company's executives, directors, and employees, 5,625 were vested.

The following is a summary of the option activity during the years ended June 30, 2009 and 2008, respectively:

| | Number of options |
|---|---|
| Outstanding as of June 30, 2007 | 194,436 |
| Granted | 7,500 |
| Forfeited | (23,536) |
| Exercised | (37,500) |
| Outstanding as of June 30, 2008 | 140,900 |
| Granted | - |
| Forfeited | - |
| Exercised | - |
| Outstanding as of June 30, 2009 | 140,900 |

The following is a summary of the status of options outstanding at June 30, 2009:

See report of independent registered public accounting firm.

F-34

| | Outstanding options | | Exercisable options | |
| --- | --- | --- | --- | --- |
| Average Exercise price | Number | Average remaining contractual life (years) | Average exercise price | Number |
| $      4.20 | 133,400 | 1.50 | $     4.20 | 133,400 |
| 12.00 | 2,000 | 4.00 | 12.00 | 2,000 |
| 16.00 | 1,750 | 4.00 | 16.00 | 1,750 |
| 20.00 | 1,875 | 4.00 | 20.00 | 1,875 |
| 24.00 | 1,875 | 4.00 | - | - |
| $      4.93 | 140,900 | | $     4.40 | 139,025 |

For the years ended June 30, 2009 and 2008, the Company recorded total stock-based compensation expense of $104,107 and $57,847, respectively. As of June 30, 2009 and 2008, there was approximately $89,000 and $26,000, respectively, of total unrecognized compensation expense related to unvested share-based compensation arrangements granted. That cost is expected to be recognized over a weight average period of six months.

## Note 17 - Statutory reserves

The Company is required to make appropriations to reserve funds, comprising the statutory surplus reserve and discretionary surplus reserve, based on after-tax net income determined in accordance with generally accepted accounting principles of the PRC ("PRC GAAP"). Appropriation to the statutory surplus reserve is required to be at least 10% of the after tax net income determined in accordance with PRC GAAP until the reserve is equal to 50% of the entities' registered capital. Appropriations to the discretionary surplus reserve are made at the discretion of the Board of Directors.

The statutory surplus reserve fund is non-distributable other than during liquidation and can be used to fund previous years' losses, if any, and may be utilized for business expansion or converted into share capital by issuing new shares to existing shareholders in proportion to their shareholding or by increasing the par value of the shares currently held by them, provided that the remaining reserve balance after such issue is not less than 25% of the registered capital.

The discretionary surplus fund may be used to acquire fixed assets or to increase the working capital to expend on production and operations of the business. The Company's Board of Directors decided not to make an appropriation to this reserve for 2009, 2008, and 2007.

Pursuant to the Company's articles of incorporation, the Company should appropriate 10% of the net profit as statutory surplus reserve up to 50% of the Company's registered capital. For the year ended June 30, 2008, the Company appropriated to the statutory surplus reserve in the amount of $1,096,241. The Company's statutory surplus reserve has reached 50% of its registered capital as of June 30, 2008, as such; no additional reserve was recorded during the year ended June 30, 2009.

## Note 18 - Employee pension

Employee pension in the Company generally includes two parts: the first part to be paid by the Company is 30.6% of $128 for each qualified employee each month. The other part, paid by the employees, is 11% of $128 each month. For the years ended June 30, 2009, 2008, and 2007, the Company made pension contributions in the amount of approximately $146,000, $35,000, and $32,000, respectively.

## Note 19 - Accumulated other comprehensive income

The components of accumulated other comprehensive income for the years ended June 30, 2009 and 2008 are as follows:

See report of independent registered public accounting firm.

F-35

| | June 30, 2009 | June 30, 2008 |
|---|---|---|
| Beginning Balance | $ 7,700,905 | $ 1,146,441 |
| Foreign currency translation gain | 336,926 | 5,206,612 |
| Unrealized gain (loss) on restricted marketable securities | (1,514,230) | 1,347,852 |
| Ending Balance | $ 6,523,601 | $ 7,700,905 |

**Note 20 - Commitments and contingencies**

Operations based in the PRC

The Company's operations are carried out in the PRC. Accordingly, the Company's business, financial condition, and results of operations may be influenced by the political, economic, and legal environments in the PRC, and by the general state of the PRC's economy.

The Company's operations in the PRC are subject to specific considerations and significant risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic, and legal environments, and foreign currency exchange. The Company's results may be adversely affected by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among others.

R&D Agreement

In September 2007, the Company entered into a three year Cooperative Research and Development Agreement ("CRADA") with Pharmaceutical Institute of Shandong University (the "University"). Pursuant to the CRADA, the University is responsible for designing, researching and developing designated pharmaceutical projects for the Company. Additionally, the University will also provide technical services and training to the Company. As part of the CRADA, the Company will pay approximately $3,500,000 (RMB 24,000,000) plus out-of-pocket expenses to the University annually, and provide internship opportunities for students of the University. The Company will have the primary ownership of the designated research and development project results.

In November 2007, the Company entered into a five year CRADA with Institute of Microbiology (Chinese Academy of Sciences) (the "Institute"). Under the CRADA, the Institute is responsible for designing, researching and developing designated pharmaceutical projects for the Company. Additionally, the Institute will also provide technical services and trainings to the Company. As part of the CRADA, the Company will pay approximately $880,000 (RMB 6,000,000) to the Institute annually. The Company will have the primary ownership of the designated research and development project results.

For the years ended June 30, 2009 and 2008, approximately $4,395,000 and $3,236,000 related to the two CRADAs, respectively, was incurred as research and development expenses. As of June 30, 2009, the Company's future estimated payments to those CRADAs amounted to approximately $4,100,000.

Legal proceedings

The Company is involved in various legal matters arising in the ordinary course of business. The following summarizes the Company's pending and settled legal proceedings as of June 30, 2009:

Fernando Praca, Plaintiff vs. EXTREMA, LLC and Genesis Pharmaceuticals Enterprises, Inc.- Case No. 50 2005 CA 005317, Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida

Fernando Praca, former Director and former President of the Company's discontinued subsidiary, Extrema LLC, filed an action in Dade County, Florida against Extrema, LLC and the Company in June 2005 relating to damages arising from the sale of Extrema LLC to Genesis Technology Group, Inc. Fernando Praca had filed a Motion of Temporary Injunction but had not proceeded to move this case forward. The plaintiff has decided to reinitiate the legal action in March 2008. In July 2008, the Company and Fernando Praca entered into a Settlement Agreement whereby Fernando Praca agreed to dismiss this action against the Company and to surrender to the Company for cancellation, 100,000 shares of common stock in the Company held by him. The Company agreed to provide Fernando Praca with a legal opinion of its counsel removing the restrictive legend on the 1,269,607 shares of common stock held by Fernando Praca. This matter was settled in July 2008. (See Note 14)

See report of independent registered public accounting firm.

CRG Partners, Inc. and Capital Research Group, Inc. and Genesis Technology Group, Inc., n/k/a Genesis Pharmaceuticals Enterprises, Inc. (Arbitration) - Case No. 32 145 Y 00976 07, American Arbitration Association, Southeast Case Management Center

On December 4, 2007, CRG Partners, Inc. ("CRGP"), a former consultant of the Company, filed a demand for arbitration against the Company alleging breach of contract and seeking damages of approximately $10 million as compensation for consulting services rendered to the Company. The amount of damages sought by the claimant was equal to the dollar value of 29,978,900 shares of the Company's common stock (Pre 40-to-1 reverse split) in November 2007, in which the claimant alleged were due and owing to CRGP. On December 5, 2007, the Company gave notice of termination of the relationship with CRG under the consulting agreement. CRGP subsequently filed an amendment to the demand for arbitration to include Capital Research Group, Inc. ("CRG") as an added claimant and increased the damage amount sought under this matter to approximately $13.8 million. The Company subsequently filed counter claims in reference to the aforementioned allegations of breach of contract.

In February 2009, the Company was notified by the arbitration panel of American Arbitration Association (the "Panel") that the Panel awarded CRG and CRGP jointly, a net total of $980,070 (the "Award") to be paid by the Company on or before February 27, 2009. Once the Award is satisfied, CRG and CRGP would have no further claims against the Company's common stock or other property that were the subject of the arbitration. The amount has been charged to operations for year ended June 30, 2009, and is included in liabilities assumed from reorganization as of June 30, 2009.

On March 6, 2009, CRG Partners, Inc. ("CRGP") and Capital Research Group, Inc. ("CRG"), former consultants of the Company, filed a motion to confirm the arbitration award conferred by a panel of arbitrators of the American Arbitration Association on February 2, 2009. On July 15, 2009, the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County confirmed the arbitration award and entered judgment against Genesis Technology Group, Inc. At June 30, 2009, the award has not been paid and the Company is in the process of appealing the case.

China West II, LLC and Genesis Technology Group, Inc., n/k/a Genesis Pharmaceuticals Enterprises, Inc. (Arbitration)

In June 2008, China West II, LLC ("CW II") filed a Demand For Arbitration with the American Arbitration Association ("AAA") the case of *CW II and Genesis Technology Group, Inc. n/k/a Genesis Pharmaceuticals Enterprises, Inc. and Joshua Tan.* In that matter, CW II sought breach of contract damages in connection with the Company's October 2007 reverse merger from the Company and Joshua Tan, former director of the Company, jointly and severally for approximately $6,700,000 estimated by CW II.

In January 2009, the Company received a written notice from the Panel that CW II had withdrawn the Demand for Arbitration without prejudice.

See report of independent registered public accounting firm.

F-37

China West, LLC and Genesis Technology Group, Inc., n/k/a Genesis Pharmaceuticals Enterprises, Inc. (Arbitration)

In November 2008, China West, LLC ("CW") filed a Demand For Arbitration with the American Arbitration Association the case of *CW and Genesis Technology Group, Inc. n/k/a Genesis Pharmaceuticals Enterprises, Inc. and Joshua Tan*. In that matter, CW sought from the Company in the amount of approximately $7,500,000 for breach of contract and fiduciary duty damages in connection with the Company's October 2007 reverse merger.

In February 2009, the Company received a written notice from the Panel that CW II had withdrawn the arbitration without prejudice.

**Note 21 - Subsequent events**

In July 2009, the Company issued 1,009 share of common stock to a director as part of his compensation for services. The Company valued these shares at the fair market value on the date of grant of $9.91 per share, or $10,000 in total, based on the trading price of common stock (post 40-to-1 reverse split).

As a result of the delay in its ability to transfer cash out of PRC (partially due to the stricter foreign exchange restrictions and regulations imposed in the PRC starting in December 2008), the Company became delinquent on the payment of interests under the November 2007 Debentures and May 2008 Notes in June 2008. On August 10, 2009, the Company and Pope Investments LLC ("Pope") entered into a Letter Agreement (the "Letter Agreement"), whereby Pope agreed (i) to waive certain provisions set forth in the November 2007 Purchase Agreement, by and between the Company and Pope with respect to the November 2007 Debentures of the Company issued to Pope, and (ii) to waive certain provisions set forth in the May 2008 Securities Purchase Agreement, by and between the Company and the investors who are parties thereto (collectively, the "Investors") with respect to the May 2008 Notes issued to the Investors. Pope is the holder of $5,000,000 principal amount of the November 2007 Debentures and the holder of $17,000,000 aggregate principal amount of the May 2008 Notes (collectively, the "Pope Notes").

Pursuant to the Letter Agreement, Pope (i) agreed to waive until August 17, 2009 the Events of Default (as defined in the November 2007 Debentures and May 2008 Notes) that have occurred as a result of the Company's failure to timely make interest payments on the November 2007 Debentures and May 2008 Notes that were due and payable on May 30, 2009, and agreed not to provide written notice to the Company with respect to the occurrence of either of such Events of Default provided that the Company has made such interest payment to the holders of the November 2007 Debentures and the holders of the May 2008 Notes on or prior to August 17, 2009, (ii) agreed that in lieu of payment of the $660,000 in cash interest with respect to the Pope Notes that was due and payable to Pope on May 30, 2009, that the Company shall issue to Pope on or prior to August 17, 2009, 82,500 shares (the "Shares") of its Common Stock (such payment shall be referred to herein as the "Special Interest Payment"), and (iii) waived each and every applicable provision of the 2007 Purchase Agreement, the 2008 Securities Purchase Agreement (including, without limitation Section 4.17 (Right of First Refusal) and 4.21(c) (Additional Negative Covenants of the Company)), the November 2007 Debentures and the May 2008 Notes, each to the extent necessary in order to permit the Company to make the Special Interest Payment.

The Company subsequently satisfied its interest payment obligations to the investors and the 82,500 shares of Special Interest Payment were issued on August 10, 2009.

In September 2009, the Company issued 62,500 shares of its common stock in connection with the conversion of $500,000 of May 2008 Convertible Debentures.

The Company has performed an evaluation of subsequent events through September 28, 2009, which is the date these consolidated financial statements were issued.

See report of independent registered public accounting firm.

F-38

Exhibit 10.15

Unofficial Summary Translation

Shandong University

Laiyang Jiangbo Pharmaceuticals Co, Ltd

Technology Cooperation Agreement

September 16, 2007

**Cooperation Agreement**

Biochemistry and Biotechnology Research Institute of Pharmaceuticals Institute of Shandong University (Party A) has great talent and technology strength and specialized in drug research and development. To better utilize all the favorable circumstances, better transform results of technology research, and provide better environments for talent training and practice, it should timely seek to cooperate with enterprises with certain advantages and fundamentals to accomplish win-win situations

Laiyang Jiangbo Pharmaceuticals Co, Ltd (Party B) is a pharmaceutical manufacture company and, to future develop itself, it shall closely rely on advanced science and related technology and It actively cooperates with related scientific research institutions to improve its research and development capability.

Party A and Party B reached the agreement and made the follow contractual terms based on the mutual benefits of both parties:

**A.   Main content of the contract.**

Both parties will closely cooperate on production development, technological development, personnel training and transformations of scientific and technological achievements in the field of biochemical and biological drugs area.

**B. Responsibilities and obligations of both parties**
a.    Party A
1.    Shall provide all technical services, cooperate with Party B to establish projects and actively apply for related scientific and technological funding with party B.
2.    Develop new products with party B.
3.    Train technical personnel for Party B.
4.    Actively provide information related to technological research achievements and products information to Party B.

5.  Shall help Party B to timely solve technological problems encountered during production and research process.

b.  Party B
1.  Shall be responsible for provide funding needed for the essential research work for the research and development projects established by both parties.
2.  Shall pay for all the expenses included necessary labor fees incurred by Party A for servicing Party B.
3.  Pay the annual payment of RMB 24,000,000 as research and development fund to Party A.
4.  Coordinate work with Party A actively.
5.  Provides necessary conditions for the research and intern work for undergraduate and graduate students from Party A, including foods and accommodations.

### C.  Distribution of property rights and project outcomes
1.  Results of project established by both parties and the project funding was provided by Party B shall belong to both Party A and Party B with primarily ownership belongs to Party B. The profit shall be shared by both parties according to certain percentages (Separate agreement will be signed to determine profit sharing percentage) after the research outcomes are transformed into production. If Party A provides research results on its own, both parties shall establish agreements for the ownership of the property right and outcomes.
2.  The spending of technology development funds planned by both parties and obtained by Party B from related government departments shall be discussed and agreed based on tasks and responsibilities of each party.

### D.  Funding and payment
1.  After the contract is signed and research topics are established by both parties, Party B shall provide research and development funding to Party A in various phases (Basically RMB 2,000,000 per month).
2.  Party B shall pay Party A RMB 24,000,000 annually for research and development funding. First payment shall be committed within ten days after the signing of the agreement. Monthly payment shall be due at the end of the month.

### E.  Breach of Agreement
Neither side shall disclose information related to production, project technological documentation owned by both parties to a third party. The party breaches the contract shall pay for the compensation for the economic loss of the other party. Both parties shall carry out their own responsibilities and obligations after the agreement is signed. The other party has the right for termination if one party breaches the contract.

### F.  Others
1.  The contract becomes effective after it's signed. Matters not mentioned herein shall be decided through negotiation between both parties to reach a decision.

2.   This agreement shall be valid for a period of three years.
3.   This agreement has two copies, one each for both parties.

School of Pharmacy, Shandong University (Party A) (Seal)
Representative:
September 16, 2007

Laiyang Jiangbo Pharmaceuticals Co, Ltd (Part B) (Seal)
Representative:

September 16, 2007

Exhibit 10.16

Unofficial Summary Translation

Institute of Microbiology, Chinese Academy of Sciences
Laiyang Jiangbo Pharmaceutical Co. Ltd
Pharmaceutical Industrialization Joint Base Agreement

Party A: Institute of Microbiology, Chinese Academy of Sciences (IMCAS)
Party B: Laiyang Jiangbo Pharmaceutical Co, .Ltd.

Under the background of National "Eleventh Five-Year Plan" program, IMCAS actively promotes the industrialization of scientific research to utilize its own advantages adequately and implements the policy of IMCAS and the knowledge innovation project. With the foundation of continuous improved yearly production value and revenues, Laiyang Jiangbo Pharmaceutical Co. Ltd. focuses on strengthening the basic research of biomedical industrial in order to achieve a new level. Therefore, both parties reached the agreement to form the "Joint base of industrialization, Institute of Microbiology, Chinese Academy of Sciences-Laiyang Jiangbo Pharmaceutical Co. Ltd" with the formation of good cooperative research system in order to promote the further development of bio- pharmaceutical industry with the approach of joining enterprise and institute. This agreement is signed for the implementation of this cooperation.

A.   Name of the Joint base of industrialization
Joint base of industrialization, Institute of Microbiology, Chinese Academy of Sciences – Laiyang Jiangbo Pharmaceutical Co, Ltd

B.   Operation model of the Joint base of industrialization
1.   Joint base of industrialization will be licensed and operated at Party B.
2.   Party A and Party B should both assign a representative to take responsibility for the work of joint base of industrialization. Both of Party A and Party B can recruit related employees in accordance with requirement.
3.   The joint base should hold at least one working conference or academic exchange every year and both parties' research and managerial personnel should participate the conference or academic exchange.

C.   Responsibilities of both Party
1.   Party A.
a.   Give Party B the priority to get the transferable technological achievements.
b.   Cultivate post-doctoral or master and doctoral students and training related technical staff for Party B. Related expenses will be negotiated by both parties.
c.   Within the scientific research scope of IMCAS, Party A will solve the problems encountered in Party B's production process for Party B; specific issues will be resolved by other agreements between the two parties.

d.   Both parties should apply for national and local projects (such as 863 projects etc). Party A shall provide party B technical support.

2.   Party B.
a. Provide party A related industrial technological achievements transformation platform.
b. Provide RMB 6,000,000 per year operating expenses for the Joint base of industrialization.
c. Bear enterprise related responsibilities during the application process of national and local projects.

D.   Cooperation period
The agreement is for five years (November 2006 till November 2010). Both parties will renegotiate the terms after the contract expires.

E.   Others
   1.   Matters not mentioned herein and other possible disputes occurred during the operation process of the cooperative library shall be decided through mutual negotiations.
   2.   This agreement shall be validated with the representatives from both parties' signatures and seals. This agreement has four copies, two copies for both sides with same legal effect.

Party A (Representative): (Seal)
Institute of Microbiology, Chinese Academy of Sciences
November 12, 2007

Party B (Representative): (Seal)
Laiyang Jiangbo Pharmaceutical Co. Ltd.
November 12, 2007

EXHIBIT 31.1

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**ACCOMPANYING PERIODIC REPORT**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Cao Wubo, Chief Executive Officer and President of Jiangbo Pharmaceuticals, Inc. (the "Company"), certify that:

1. I have reviewed this report on Form 10-K of Jiangbo Pharmaceuticals, Inc..;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: September 28, 2009

/s/ Cao Wubo
_____
Cao Wubo
Chief Executive Officer and President

**EXHIBIT 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**ACCOMPANYING PERIODIC REPORT**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Elsa Sung, Chief Financial Officer of Jiangbo Pharmaceuticals, Inc. (the "Company"), certify that:

1.  I have reviewed this report on Form 10-K of Jiangbo Pharmaceuticals, Inc.

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: September 28, 2009

/s/ Elsa Sung
Elsa Sung,
Chief Financial Officer

**EXHIBIT 32.1**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER
## PURSUANT TO 18 USC § 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE
## SARBANES-OXLEY ACT OF 2002

In connection with the annual report of Jiangbo Pharmaceuticals, Inc. ("the Company") on Form 10-K for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof ("the Report"), I, Cao Wubo, Chief Executive Officer and President, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(a)   The annual report on Form 10-K for the year ended June 30, 2009 of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(b)   Information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: September 28, 2009

/s/ Cao Wubo
_____
Cao Wubo
Chief Executive Officer and President

**EXHIBIT 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 USC § 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE**
**SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Jiangbo Pharmaceuticals, Inc. ("the Company") on Form 10-K for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof ("the Report"), I, Elsa Sung, Chief Financial Officer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

    (a)   The annual report on Form 10-K for the year ended June 30, 2009 of the Company fully complies with the requirements of section 13 (a) or 15(d) of the Securities Exchange Act of 1934; and

    (b)   Information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: September 28, 2009

/s/ Elsa Sung
Elsa Sung
Chief Financial Officer