UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-22556-Civ-COOKE/BANDSTRA

In re JIANGBO PHARMACEUTICALS,
INC., SECURITIES LITIGATION

_____/

## OMNIBUS ORDER ON DEFENDANTS' MOTIONS TO DISMISS

THIS MATTER is before me on Defendant Elsa Sung's Motion to Dismiss (ECF No. 51) and Defendant Frazer, LLP's Motion to Dismiss (ECF No. 63). I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided, the Motions are granted.

### I. BACKGROUND

Lead Plaintiffs, Christopher Brody and Tara Lewis, bring this federal securities class action on behalf of themselves and a putative class of all persons or entities (collectively, "Plaintiffs") who purchased or acquired Jiangbo Pharmaceuticals, Inc.'s ("Jiangbo" or the "Company") securities on the open market between June 8, 2010, through and including May 31, 2011 (the "Class Period"). Plaintiffs bring this action against Jiangbo, its external auditor, Frazer, LLP ("Frazer"), and certain of its officers, including its former Chief Financial Officer ("CFO"), Elsa Sung (collectively, "Defendants").[1] Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5. Sung and Frazer filed motions to dismiss Plaintiff's Consolidated Amended Complaint ("CAC"). Jiangbo is in default for failure to appear or otherwise respond to this action. (ECF No. 79).

---

[1] Plaintiffs have voluntarily dismissed claims against CFO Oncall, Inc., a firm specializing in financial consulting services, which employed Elsa Sung, and Frost, PLLC, an accounting firm. (ECF No. 85).

Jiangbo is a holding company incorporated in Florida, which operates, controls, and owns the pharmaceutical business of Laiyang Jiangbo Pharmaceutical Co., Ltd. ("Laiyang Jiangbo"), which operates entirely in the People's Republic of China.  (CAC ¶¶ 9, 11).  Laiyang Jiangbo researches, develops, manufactures, and sells pharmaceutical products, health supplements, and herbal-based medicinal compounds in China.  (CAC ¶ 11).

Moving Defendant Elsa Sung was Jiangbo's CFO from October 2007 until she resigned effective March 31, 2011.  (CAC ¶ 73).  After her resignation, she served as a part-time consultant to the Company.   Jiangbo Pharms., Inc., Current Report (Form 8-K), at 2 (Mar. 18, 2011). According to Plaintiffs, as CFO, Sung was responsible for Jiangbo's day-to-day operations.  (CAC ¶ 73).

Moving Defendant Frazer[2] is an accounting firm with its principal place of business in California.  (CAC ¶ 89).  On February 25, 2008, Jiangbo's board of directors engaged Frazer to serve as its principal accountant to audit the Company's financial statements.  (*Id.*)  On April 4, 2011, Jiangbo disclosed that Frazer had notified the Company that it did not intend to stand for reappointment as the Company's principal accountant for the next fiscal year.  (CAC ¶ 130).

The CAC identifies what Plaintiffs contend are materially false and misleading statements or omissions in Jiangbo's various press releases, SEC filings, and financial statements, which they allege overstated the Company's cash balances, failed to disclose related-party transactions, failed to disclose the existence of SEC and internal investigations, and failed to disclose the Company's and its officers' failure to cooperate with the Audit Committee's internal investigation.  (*See* CAC ¶ 36).   According to Plaintiffs, Defendants made these alleged materially false and misleading

---

[2] When Jiangbo engaged Frazer, it was known as Moore Stephens Wurth Frazer and Torbert LLP ("Moore Stephens").  (CAC ¶ 89).  As a result of a merger, on January 1, 2010, Moore Stephens became Frazer Frost LLP.  (CAC ¶ 93).  On May 1, 2011, Frost PLLC unwound its merger with Frazer LLP.  (CAC ¶ 100).  The firms resumed their existence as separate entities.  (*Id.*)  For ease of reference, I will refer to the accounting firm as "Frazer" in this Order.

statements or omissions to maintain artificially high market prices for Jiangbo's securities.  (CAC ¶ 266).

A. **Jiangbo's Debt Issuances**

To raise capital, in November 2007, Jiangbo borrowed $5 million from Pope Investments, LLC ("Pope") through the private sale of convertible notes (the "2007 Debentures").  (CAC ¶ 47). In May 2008, Jiangbo raised an additional $30 million through the sale of convertible notes to certain investors including Pope (the "2008 Debentures").  (CAC ¶ 48).

According to Jiangbo's public filings, in December 2009, Jiangbo became delinquent on interest payments on the 2007 and 2008 Debentures purportedly as a result of a delay in its ability to transfer cash out of China, partially due to the country's recently imposed stricter foreign exchange restrictions and regulations.  Jiangbo Pharms., Inc., Quarterly Report (Form 10-Q), at 24 (May 23, 2011).  In February 2010, Pope entered into a waiver agreement with Jiangbo to waive the default in exchange for certain renegotiated payment terms, which extended the deadline for the Company to make the interest payments to February 25, 2010.  *Id*.  Jiangbo was unable to meet the waiver agreement's terms.  *Id*.  On January 19, 2011, Jiangbo and Pope entered into a Letter Agreement, which included renegotiated payment terms and extended the due date of the 2007 Debenture to February 28, 2011.  *Id*.  On February 28, 2011, and May 30, 2011, Jiangbo defaulted on the 2007 and 2008 Debentures, respectively.  Jiangbo Pharms., Inc., Proxy Statement (Schedule 14A), at 12 (May 31, 2011).  According to its public filing, the defaults were due to delays in the Company's ability to transfer cash out of China.  *Id*.

B. **Jiangbo's 2010 and Early 2011 Results**

On May 17, 2010, Jiangbo filed with the SEC its quarterly report on Form 10-Q for the third quarter of fiscal year ("FY") 2009 (ended March 31, 2010).  (CAC ¶ 148).  The filing reported cash in the amount of $96 million.  (*Id*.)  Chairman of the Board of Directors Wubo Cao and CFO Sung

certified that the information in the report did not contain untrue statements or omissions of material fact, and fairly presented the Company's financial condition, its operations results, and its cash flows. (CAC ¶ 149).

During a conference call on May 17, 2010, Sung stated that Jiangbo's cash position for the quarter ended March 31, 2010, was $108 million. (CAC ¶ 150). On May 20, 2010, Jiangbo issued a press release and filed a corresponding Form 8-K that Sung signed, which repeated the financial results reported three days earlier, including $96.5 million in cash and an additional $11.5 million in restricted cash. (CAC ¶ 151).

On September 28, 2010, Jiangbo filed with the SEC an annual report on Form 10-K for FY 2010 (ended June 30, 2010), which Sung, among others, signed. (CAC ¶ 153). The SEC filing states that, as of June 30, 2010, Jiangbo had cash and cash equivalents in the amount of $108.6 million. (CAC ¶ 154). Sung and Jiangbo's Chief Executive Officer ("CEO") Linxian Jin certified that the information in the report did not contain untrue statements or omissions of material fact, and fairly presented the Company's financial condition, its operations results, and its cash flows. (CAC ¶ 155). Included with the 2010 Form 10-K was Frazer's audit report also stating that the consolidated financial statements contained in the SEC filing fairly presented Jiangbo's consolidated financial position and consolidated operations results and cash flows. (CAC ¶ 156).

On September 30, 2010, Jiangbo issued a press release and filed a corresponding Form 8-K that Sung signed, which repeated the financial results reported two days earlier, including $108.6 million in cash. (CAC ¶ 157). During a conference call on September 30, 2010, Sung described Jiangbo's "strong cash balance" and "unique flexibilities" to pursue new opportunities in the pharmaceutical industry. (CAC ¶ 158).

On November 15, 2010, Jiangbo filed with the SEC a quarterly report on Form 10-Q for the first quarter of FY 2011 (ended September 30, 2010), which Sung and Jin signed. (CAC ¶ 160).

The SEC filing reported net revenues in the amount of $27.7 million for the quarter, net income of $10.6 million, and cash of $123.9 million.  (*Id.*)  Sung and Jin certified that the information in the report did not contain untrue statements or omissions of material fact, and fairly presented the Company's financial condition, its operations results, and its cash flows.  (CAC ¶ 161).

On November 16, 2010, Jiangbo issued a press release and filed a corresponding Form 8-K that Sung signed, which repeated the financial results reported the previous day, including $123.9 million in cash.  (CAC ¶ 162).  During a conference call on the same day, Sung reiterated that Jiangbo's cash position was $123 million, and stated that the company "was continuing to evaluate ways to deploy capital in order to enhance shareholder value."  (CAC ¶ 163).  According to Plaintiffs, in reaction to these announcements, on November 16, 2010, Jiangbo's shares closed at $7.08 per share, up $0.40, or 6%, from the previous day's close on heavy trading volume of 258,512 shares.  (CAC ¶ 164).

On February 22, 2011, Jiangbo filed with the SEC a quarterly report on Form 10-Q for the second quarter of FY 2011 (ended December 31, 2010), which Sung and Jin signed.  (CAC ¶ 167).  The SEC filing reported cash of $135 million.  (*Id.*)  Sung and Jin again certified that the information in the report did not contain untrue statements or omissions of material fact, and fairly presented the Company's financial condition, its operations results, and its cash flows.  (CAC ¶ 168).

On February 23, 2011, Jiangbo issued a press release and filed a corresponding Form 8-K that Sung signed, which stated that the Company "continued to generate robust cash flow from operations and . . . ended the period with over $135.0 million in cash and cash equivalents."  (CAC ¶ 169).  During a conference call on the same day, Sung described Jiangbo's "increased revenue and strong cash flow," and stated that, from a management perspective, the Company's stock was undervalued.  (CAC ¶ 170).  According to Plaintiffs, in reaction to these announcements, on

February 23, 2011, Jiangbo's shares closed at $6.32 per share, up $0.27, or 4.5%, from the previous day's close on heavy trading volume of 160,380 shares.  (CAC ¶ 171).

Plaintiffs maintain that these statements concerning Jiangbo's results were false because (i) they overstated Jiangbo's cash balances, (ii) they failed to disclose a RMB 200 million ($31 million) transfer to Shandong Hilead Biotechnology Co., Ltd. ("Hilead"), an entity controlled by Chairman of the Board Wubo Cao (the "Hilead transaction"), and (iii) Cao's, Jin's, and Sung's certifications did not fairly present the Company's financial condition or its operating results. (CAC ¶¶ 28, 152, 159, 165, 172).  Plaintiffs also allege that Frazer's "clean" audit report included with the Company's Form 10-K for FY 2010 was also untrue because Frazer did not conduct its audit in accordance with Public Company Accounting Oversight Board ("PCAOB") standards, and the financial statements did not fairly present Jiangbo's consolidated financial position.  (CAC ¶ 159).

C.  **SEC and Audit Committee Investigations and Events Leading up to Trading Halt**

On June 8, 2010, Jiangbo's stock began trading on the NASDAQ.  (CAC ¶ 16).  Plaintiffs allege that six months later, in December 2010, the SEC began a non-public informal investigation into Jiangbo.  (CAC ¶ 17).  In February 2011, Jiangbo's Audit Committee began a non-public internal investigation into the issues raised by the SEC.  (CAC ¶ 18).  Two independent members of the Audit Committee, Michael Marks and John Wang, led the internal investigation.  (CAC ¶¶ 23-30).

Plaintiffs point to several events between March and May 2011, which led to NASDAQ's decision to halt trading of Jiangbo stock on May 31, 2011.  On March 18, 2011, Jiangbo disclosed that Sung had resigned as CFO, to be effective on March 31, 2011, although the Company did not have a successor for the position.  (CAC ¶ 127).  On March 26, 2011, the SEC informed Jiangbo that it had begun a non-public formal investigation.  (CAC ¶ 129).  In response, the Audit

Committee retained Cadwalader Wickersham & Taft LLP ("Cadwalader"), a law firm, and Ernst & Young (China) Advisory Limited ("E&Y"), an accounting firm, to assist in the investigation. (CAC ¶¶ 26, 140). On April 4, 2011, Jiangbo disclosed that it had retained a new independent auditor to replace Frazer "following the notification by [Frazer] that it did not intend to stand for re-appointment as the company's principal accountant for the next fiscal year." (CAC ¶ 130).

On May 23, 2011, Jiangbo disclosed that it failed to make a $3.5 million principal payment due on the 2007 Debenture. (CAC ¶ 132). It also disclosed that it was likely that the sole holder of the 2007 Debenture would institute legal proceedings against the Company, which "would be materially adverse to the Company's ability to continue its business as it is presently conducted." (*Id*.)

Jiangbo's Form 10-Q filed on May 23, 2011, and signed by Jin and Sung, reported cash of $146 million. (CAC ¶ 174). Sung and Jin certified that the information in the filing did not contain untrue statements or omissions of material fact, and fairly presented the Company's financial condition, its operations results, and its cash flows. (CAC ¶ 175). On May 24, 2011, Jiangbo issued a press release and filed a corresponding Form 8-K that Sung and Jin signed, which stated that the Company "continued to generate robust cash flow from operations and ended the period with over $146 million in cash and cash equivalents, some of which we plan to deploy on strategic acquisitions . . . ." (CAC ¶ 176). During a conference call on May 25, 2011, Jin stated that the Company was trying to negotiate with the debenture holders and noted that "so far the management hasn't thought of the procedures of seeking bankruptcy protection." (CAC ¶¶ 134, 135, 177).

Plaintiffs maintain that these statements concerning Jiangbo's results were false because, among other things, (i) they overstated Jiangbo's cash balances, (ii) they failed to disclose the Hilead transaction, (iii) Jin's and Sung's certifications did not fairly present the financial condition of the Company or its operating results, (iv) they did not disclose or take into account the fact that

Jiangbo's Audit Committee began an internal investigation in February 2011, and (v) they did not disclose or take into account the fact that the SEC issued a subpoena to the Company and began a formal investigation in March 2011.  (CAC ¶ 178).

On May 27, 2011, Jiangbo disclosed for the first time the existence of an SEC investigation through a Form 10-Q/A.  (CAC ¶¶ 137, 138).  On May 31, 2011, NASDAQ halted trading in Jiangbo's stock, which last traded at $3.08.  (CAC ¶ 139).  Plaintiffs allege that this action wiped out virtually all remaining value in Jiangbo's shares.  (*Id.*)  The shares began trading again on August 4, 2011, at $0.25, down $2.83, or 92%, from their last traded price on the NASDAQ.  (*Id.*)  On November 10, 2011, shortly before Plaintiffs filed their Consolidated Amended Complaint, Jiangbo stock closed at $0.14.

D. **Audit Committee Resignation Letter**

On June 7, 2011, Jiangbo filed a Form 8-K with the SEC disclosing that Marks and Wang resigned from the Audit Committee.  (CAC ¶ 140).  The Form 8-K attached a resignation letter, which described the reasons for their resignation (the "Resignation Letter" or the "Letter").  (CAC Ex. A).  The Resignation Letter provided that Jiangbo's Chairman of the Board and members of his management team "have exhibited repeatedly their unwillingness to cooperate in even the most basic requests from the investigation team, despite numerous and repeated explanations by the Audit Committee and Cadwalader to explain the importance of this investigation and the expectations of the SEC."  (CAC Ex. A, at 1).  It goes on to identify in detail the instances of senior managements' uncooperative responses to the independent internal investigation from April 19 to June 3, 2011, including refusals to provide documents relevant to the financial audit or to allow E&Y to perform a walk-through of the Company.  (*See* CAC Ex. A, at 2-21).  Marks and Wang concluded:

> The recent and consistent history of the Company's lack of cooperation with
> respect to the internal investigation is therefore more than likely to continue, and

has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner.  Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholders by remaining on the Board.

(CAC Ex. A, at 22).

The Resignation Letter also provided that

the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity and correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation.

(CAC Ex. A, at 1).  It noted that Jiangbo did not pay Cadwalader and E&Y from the Company's

principal operating account, despite providing documentation to the Audit Committee reflecting an

adequate cash balance to make the payments.  (CAC Ex. A, at 21).  Rather, Jiangbo made payments

from a smaller Company account or from personal bank accounts belonging to an individual

Jiangbo employee.  (CAC Ex. A, at 20-21).  Jiangbo also made several delayed or partial, piecemeal

payments to Cadwalader.  (CAC Ex. A, at 22).  Marks and Wang concluded:

The explanation for the timing and manner of payment is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

(CAC Ex. A, at 22).  As a result of all of the foregoing, Cadwalader and E&Y withdrew their

respective engagements, with the Audit Committee's consent, and Marks and Wang, the

independent members of the Committee, resigned.  (CAC Ex. A, at 1).

In light of the Resignation Letter, Plaintiffs maintain that certain statements included in

Jiangbo's May 23 and 24, 2011 Forms 10-Q and 8-K were false because, in addition to the reasons

discussed in section I.C, *supra,* the filings failed to disclose:  (i) that Cao and the Company's

management were not cooperating with the SEC or the Audit Committee's investigation and were

not promptly paying the Audit Committee's advisors from Company accounts; and (ii) that Marks

and Wang notified the Board of Directors on May 23, 2011, that they did not intend to stand for re-election at the upcoming annual meeting scheduled for June 27, 2011.  (CAC ¶ 178).

   E. **Alleged GAAP Violations**

   Plaintiffs allege that Defendants used improper accounting practices in violation of Generally Accepted Accounting Principles ("GAAP") and SEC reporting requirements to artificially inflate Jiangbo's assets, stockholders' equity, and earnings during the Class Period. (CAC ¶ 181).  Plaintiffs allege Jiangbo's managers were responsible for preparing financial statements that conform with GAAP, but failed to do so.  (CAC ¶ 183).  In particular, Sung, among others, signed certifications attesting to the adequacy of Jiangbo's internal controls over financial reporting to ensure that the Company's financial statements were prepared in accordance to GAAP, and certified that Jiangbo's 2010 Form 10-K fairly presented the Company's financial condition and operations results.  (CAC ¶ 187).  According to Plaintiffs, Sung fraudulently certified Jiangbo's financial statements despite knowing they were "recklessly prepared and egregiously misstated." (*Id.*)

   Plaintiffs allege that Jiangbo overstated or incorrectly calculated its accounts receivable in violation of GAAP.  They note that Jiangbo's accounts receivable disclosure for the quarter ended March 31, 2011, showed accounts receivable reduced by accumulated depreciation, which is not a GAAP-compliant calculation.  (CAC ¶ 188).  Further, Plaintiffs allege that Jiangbo's collection of accounts receivable progressively worsened during the Class Period.  (CAC ¶ 189).  A June 9, 2011 analyst report noted that Jiangbo had reduced the pace of its collections, and its collections were at a slower rate than its industry peers.  (*Id.*)

   Plaintiffs claim that as accounts receivable age, their probability of collection decreases, but instead of increasing its allowance for doubtful accounts, Jiangbo decreased it.  (CAC ¶¶ 189, 190). Plaintiffs allege that Defendants knowingly ignored Jiangbo's decreasing collections and

intentionally understated its allowance for doubtful accounts.  (CAC ¶ 190).  Defendants materially overstated Jiangbo's assets and earnings throughout the Class Period, therefore violating GAAP.  (CAC ¶ 191).

F.  **Alleged GAAS Violations**

Plaintiffs allege that Frazer failed to comply with Generally Accepted Auditing Standards ("GAAS"), standards the PCAOB and the American Institute of Certified Public Accountants ("AICPA") set, when it issued false and misleading audit reports.  (CAC ¶¶ 192, 193).  Plaintiffs claim Frazer certified the materially false and misleading reports with knowledge of Jiangbo's true condition, or with reckless disregard thereof.  (CAC ¶ 194).

According to Plaintiffs, Frazer (i) knew or recklessly disregarded that Jiangbo's financial statements had not been prepared in conformity with GAAP, and therefore did not present fairly the Company's financial position, (ii) failed to perform sufficient procedures to audit Jiangbo's cash and accounts receivable, and (iii) did not exercise due professional care regarding its audit procedures in light of Jiangbo's admitted internal control deficiencies.  (CAC ¶¶ 195, 196).  Jiangbo disclosed in its FY 2010 Form 10-K:  "During our assessment of the effectiveness of internal control over financial reporting as of June 30, 2010, management identified significant deficiencies and determined that our internal controls over financial reporting were not effective as of that date."  (CAC ¶ 196).  The significant deficiencies related to (i) weaknesses in accounting and finance personnel's GAAP experience and expertise, (ii) lack of resources to perform internal audit functions properly, and (iii) insufficient segregation of duties in the financial reporting process.  Jiangbo Pharms., Inc., Annual Report (Form 10-K), at 54-55 (Sept. 28, 2010).

Plaintiffs allege that, had Frazer conducted its audit in compliance with GAAS, it would have discovered Jiangbo's overstated cash and understated allowance for doubtful accounts.  (CAC ¶¶ 198-202).  Plaintiffs identify each investigatory step Frazer failed to take, including conducting

inspections, observations, inquiries, and confirmations to obtain sufficient competent evidence to support a reasonable basis for its opinions regarding Jiangbo's financial statements under audit. (CAC ¶¶ 199-208). Plaintiffs also claim that Frazer violated GAAS by failing to issue an adverse opinion stating Jiangbo's 2010 financial statements were not fairly presented or stating that it could not issue any opinion at all. (CAC ¶¶ 209-212).

Finally, Plaintiffs claim that Frazer had a financial incentive to commit fraud—it wanted to continue receiving its substantial audit and audit-related fees from Jiangbo. (CAC ¶ 213). Frazer's willingness to ignore accounting irregularities made it an attractive auditor candidate for Chinese companies. (CAC ¶ 216). According to Plaintiffs, Frazer has failed to follow professional auditing standards while acting as the independent auditor for several different Chinese companies. (CAC ¶¶ 214, 215).

## II. LEGAL STANDARDS

### A. Pleading Standards

A plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Detailed factual allegations are not required, but a pleading "that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

When considering a motion to dismiss filed under Rule 12(b)(6), the court must accept all of

the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A court's consideration when ruling on a motion to dismiss is generally limited to the complaint and any incorporated exhibits. *See Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000). In a securities fraud case, however, a court may take judicial notice of public documents required by, and filed with, the SEC. *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1278 (11th Cir. 1999).

Securities fraud claims must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires a complaint "to state with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc*., 544 F.3d 1230, 1237 (11th Cir. 2008). Rule 9(b) is satisfied when the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id*. (quoting *Tello v. Dean Witter Reynolds, Inc*., 494 F.3d 956, 972 (11th Cir. 2007)).

Additionally, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737, imposes two extra requirements on plaintiffs pleading securities fraud. First, a plaintiff "must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "[W]here the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004). Second, the PSLRA raises the standard for pleading scienter by requiring that, for each alleged act or omission, the plaintiff

"state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "[T]he complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238 (internal quotation marks omitted). The "strong inference" of scienter required under the PSLRA is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In making this determination, a court must consider the complaint in its entirety, not any particular allegation in isolation. *Id.* at 322.

### B. Elements of Securities' Claims

Plaintiffs assert claims under Section 10(b) of the Exchange Act, which prohibits:

[A]ny person, directly or indirectly . . . [from] . . . us[ing] or employ[ing], in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5, in turn, makes it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. A securities fraud claim under Section 10(b) or Rule 10b-5 has six elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss,

commonly called 'loss causation.'" *Mizzaro*, 544 F.3d at 1236-37.

Plaintiffs also assert claims under Section 20(a) of the Exchange Act, which imposes joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). To state a Section 20(a) claim, Plaintiffs must allege three elements: (1) that Jiangbo committed a primary violation of the securities laws; (2) that the individual defendants had to power to control Jiangbo's general business affairs; and (3) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Mizzaro*, 544 F.3d at 1237 (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001)). A plaintiff only adequately pleads a Section 20(a) claim if it adequately pleads a primary violation. *Id.*

### III. ANALYSIS

A. **Sung's Motion to Dismiss**

In Count I, Plaintiffs allege Defendants, including Sung, violated Section 10(b) and Rule 10b-5. As to this claim, Sung argues that Plaintiffs fail to state a claim against her for primary liability under Section 10(b) and Rule 10b-5 because they fail to sufficiently plead facts to establish that the statements they challenge were false. Specifically, she contends that the following claims were not pled with requisite particularity: that Jiangbo overstated it cash balances; that Jiangbo failed to properly disclose the Hilead transaction; and that Jiangbo overstated the value of the Company's accounts receivable. She argues that she cannot be held liable for any statements the Company made after she resigned as CFO. Sung further argues that Plaintiffs have not pled adequate facts to give rise to a strong inference that she acted with scienter or to establish loss causation.

In Count II, Plaintiffs allege that all of the individual defendants, including Sung, violated Section 20(a). As to this claim, Sung argues that Plaintiffs fail to state a claim against her for

control person liability because they have failed to establish a predicate violation of Section 10(b) or Rule 10b-5, or they have not pled sufficient facts to show that she had the power to control Jiangbo's general affairs and to influence the corporate policy that resulted in the alleged primary violation.  I will consider each argument in turn.

1. ***Allegations of Cash Overstatement***

Sung argues that Plaintiffs fail to state a claim against her for primary liability under Section 10(b) and Rule 10b-5 because they fail to plead with requisite particularity that Jiangbo's reported cash balances were in fact false, i.e., they fail to show that Jiangbo overstated its cash balances.  She contends that Plaintiffs' claim on this ground is based solely on speculation.  She argues that Plaintiffs do not state facts regarding (i) the amount by which the reported cash balances were overstated, (ii) whether the amount of the overstatements was material, (iii) who authorized or participated in the overstatements, or (iv) whether Sung knew about the overstatements and, if so, how she knew.

Plaintiff identifies precisely what statements Defendants, including Sung, made, the time and place of each statement, and the content of each statement.  Plaintiff states that Defendants' fraudulent and misleading statements inflated the value of Jiangbo's securities throughout the Class Period, and Plaintiffs relied on those statements to their detriment.  Plaintiffs specify each statement relating to cash balances, which they contend were false or misleading.  They provide the reason why the statements were misleading, i.e., they overstated the Company's actual cash balances.  They also state with particularity facts that form the basis for their allegation that Defendants overstated Jiangbo's cash balances.  The CAC alleges that (i) the Audit Committee had "serious concerns" about veracity and correctness of the Company's banking information, (ii) Jiangbo's senior managers refused to cooperate with the SEC and the Audit Committee investigations, and (iii) Jiangbo defaulted on debenture obligations in the amounts of $6 million and $3.5 million

despite reporting cash balances of over $100 million.

These facts provide a sufficient basis, at this stage of litigation, to support Plaintiffs' allegations that Jiangbo's cash balances were overstated. *Cf. Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1281-82 (S.D. Fla. 2008) (finding complaint allegations sufficient where plaintiffs alleged with particularity the loans that were risky, why they were risky, what contributed to the undisclosed risk, what statements were materially false, why they were false, and what defendants stood to gain); *Bruhl v. PriceWaterhouseCoopers Int'l*, No. 03-23044, 2007 WL 983263, at *1 (S.D. Fla. Mar. 27, 2007) (finding complaint properly apprised defendant of plaintiff's claim that certain statements were fraudulent: "[i]t specifies the misstatements (the actual NAV numbers in the monthly statements after March, 2000), how they were fraudulent (they grossly overstated the actual value of the Funds' assets), to whom they were made (each investor who received them on a monthly basis), and that Plaintiffs relied on them to their detriment (they would otherwise not have purchased the shares)"); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1349-50 (S.D. Fla. 2002) (finding that the complaint met all PSLRA requirements by stating sufficient facts related to scienter and specifying "the allegedly misleading statements and why the Plaintiffs believe they were misleading (i.e., the 'cooking of the books' by Defendants)"). The fact that Jiangbo was unable to make payments on its loans despite reporting large cash balances supports the inference that the Company did not have as much cash on hand as it was reporting. Further, the Resignation Letter also discussed Jiangbo's inability to make timely payments to E&Y and Cadwalader. The Letter expressed concern about the banking information Jiangbo employees provided to the members of the internal investigation team. Specifically, the Letter mentioned that, despite showing large cash balances in a Company bank account, the Company paid E&Y and Cadwalader from much smaller accounts or an employee's account. These facts support Plaintiffs' allegations that Jiangbo's cash balances were actually much lower than the

amount Defendants reported.

In her Motion, Sung maintains that Jiangbo defaulted on the 2007 and 2008 Debentures because it could not easily move money out of China.  Sung notes that the challenged SEC filings contained the following disclosure:

> The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of currency out of China. We receive substantially all of our revenues in RMB.  Under our current structure, our income is primarily derived from payments from Laiyang Jiangbo. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and our affiliated entity to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations.  Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the PRC State Administration of Foreign Exchange by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of bank loans denominated in foreign currencies.  The PRC government may also at its discretion restrict access in the future to foreign currencies for current account transactions.

*See, e.g.*, Jiangbo Pharms., Inc., Annual Report (Form 10-K), at 29 (Sept. 28, 2010).

The existence of Chinese regulations that may have prevented Jiangbo from remitting sufficient currency from China to the United States may form the basis of a viable defense. However, the existence of this potential defense does not preclude Plaintiffs from moving forward with their claim at this stage of litigation.  *Cf. In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (stating that defendant's facts negating nefarious intent "such as the fact that the Company's financials were reviewed and certified by an independent auditor, the accounting methodology was disclosed at all times, and the lack of traditional 'red flags' such as confidential witnesses or insider trading" consist of potential defenses, which did not preclude plaintiffs from adequately stating a Section 10(b) claim).

2.  ***Non-disclosure of Hilead Transaction***

Plaintiffs allege that Defendants failed to properly disclose a related-party payment Jiangbo made to Hilead in the amount of RMB 200 million ($31 million).   Sung argues that Plaintiffs fail to allege facts regarding the Hilead transaction with necessary particularity.   Specifically, Plaintiffs fail to allege when the transaction occurred, who authorized the transfer, who made the transfer, or whether Jiangbo was a party to the Hilead transaction.

"A defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose."   *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (internal quotation marks omitted).   Item 404(a) of SEC Regulation S-K, 17 C.F.R. § 229.404(a) ("Item 404(a)"), requires the disclosure of any transaction "in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

Having reviewed the CAC's allegations, I agree that Plaintiffs fail to allege sufficient facts to state a claim for relief based on the alleged non-disclosure of the Hilead transaction.   Plaintiff argues that Defendants, including Sung, had a duty to disclose the Hilead transaction because it was a related-party transaction exceeding $120,000.   Plaintiffs allege it was a related-party transaction because Jiangbo's Chairman of the Board, Wubo Cao, controlled Hilead.   Plaintiffs fail to allege, however, that Jiangbo was a party to the transaction or when the transaction occurred.   Because the CAC does not contain any factual allegations to establish that Jiangbo was a party to the transaction, Plaintiffs fail to establish that Defendants had a duty to disclose it under Item 404(a).   By failing to state when the transaction occurred, Plaintiffs also fail to sufficiently allege that Defendants had a duty to disclose the transaction at the time they made the statements Plaintiffs challenge in the CAC.

3.   *Allegedly Overstated Value of Accounts Receivable*

Plaintiffs allege that Jiangbo's financial statements did not comport with GAAP because they overstated or incorrectly calculated the Company's accounts receivable.  They also allege that, although Jiangbo's rate of collection of accounts receivable decreased, Defendants decreased the Company's allowance for doubtful accounts instead of properly increasing it.  Sung argues that Plaintiffs' allegations that Defendants overstated Jiangbo's accounts receivable balance in violation of GAAP lack the particularity that the PLSRA requires.  Plaintiffs do not provide any opposition to Sung's arguments.

To substantiate a claim that Defendants overstated accounts receivable, the CAC "must include details about when and to what level the accounts receivable should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts were uncollectible." *Cole v. Health Mgmt. Assocs., Inc.*, No. 2:07cv00484, 2009 WL 2713178, at *7-8 (M.D. Fla. Jul. 17, 2009) (emphasis omitted) (quoting *Freed v. Universal Health Servs., Inc.,* No. Civ. A.04-1233, 2005 WL 1030195, at *9 (E.D. Pa. May 3, 2005)).

The CAC does not contain sufficient facts to show that the reported accounts receivable were false or that the Company failed to properly write off uncollectible receivables.  Plaintiffs provide only one instance of incorrect accounting, which Sung argues was a typographical error (the statement reported that accounts receivable were reduced by "accumulated depreciation" instead of "allowance of doubtful accounts"), and notes that she did not sign the filing and therefore is not responsible for it.  Otherwise, Plaintiffs' allegations are simply general, vague, and conclusory.[3] *Cf. Cole*, 2009 WL 2713178, at *8; *Payne v. DeLuca*, 433 F. Supp. 2d 547, 580 (W.D. Pa. 2006)

---

[3] Additionally, Sung points out that Jiangbo actually increased its allowance for doubtful accounts in FY 2010 by more than 93% over the prior year.  *See* Jiangbo Pharms., Inc., Annual Report (Form 10-K), at F-13 (Sept. 28, 2010).  Thus, it appears that some of Plaintiffs' factual allegations may also be incorrect.

(concluding plaintiffs failed to plead with particularity their claims that defendants distorted certain data disclosed to the public by using unreasonable accounting practices); *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (dismissing securities fraud claim because plaintiffs failed to substantiate conclusion that defendants committed a GAAP violation).

4.  ***Post-resignation Statements***

Sung argues that she cannot be held liable for any statements Jiangbo made after her resignation as CFO became effective on March 31, 2011.  Sung served as a part-time consultant for the Company after that date.  Plaintiffs do not respond to this argument.

In certain circumstances, a company's false and misleading public statements made be imputed to corporate officers presumed to be involved in the company's daily business:

> Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other group published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.

*In re Pegasus Wireless Corp. Sec. Litig.*, No. 07-81113, 2009 WL 3055205, at *3 (S.D. Fla. Sept. 21, 2009).

Plaintiffs allege that Sung acted as CFO until March 31, 2011, and as a senior executive officer, she was responsible for Jiangbo's day-to-day operations.  (CAC ¶ 73).  Plaintiffs make one conclusory allegation that each of the defendants "enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and sales at all relevant times."  (CAC ¶ 269).  They do not allege that Sung was involved in Jiangbo's day-to-day affairs after she resigned as CFO.  They do not allege that, as a part-time consultant, she was directly involved in controlling the

content of any challenged statements.[4]  *See In re Pegasus Wireless Corp.*, 2009 WL 3055205, at *3.

Having reviewed the CAC's allegations and the relevant authority, I find that Plaintiffs do not

allege sufficient facts to show that Sung may be held liable for any statements the other defendants

made after she resigned as CFO in March 31, 2011.

  5.  ***Allegations of Scienter***

  To withstand dismissal, a complaint must state with particularity facts giving rise to a strong

inference that each defendant acted with scienter in each act or omission alleged.  § 78u-4(b)(2)(A);

*see Phillips*, 374 F.3d at 1018 ("[A] plaintiff, to proceed beyond the pleading stage, must allege

facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged

violations.").  A "strong inference" of scienter means an inference that is "more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  This requires that the court view the allegations

collectively, not in isolation.  *Id*. at 326.  The court must consider "whether *all* of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." *Id*. at 322-23.  Further, the court must engage in a

comparative analysis of the allegations:  "[t]o determine whether the plaintiff has alleged facts that

give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable

explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.

  This heightened pleading standard does not alter the substantive intent requirements to

establish a Section 10(b) and Rule 10b-5 claim.  In the Eleventh Circuit, a Section 10(b) or Rule

---

[4] Moreover, Plaintiffs might not be able to establish Sung's liability with respect to statements made after March 31, 2011, when Sung was no longer an officer with the Company.  *See, e.g.*, *In re Sensormatic Electronics Corp. Sec. Litig.*, No. 018346-Civ-Hurley, 2002 WL 1352427, at *4 (S.D. Fla. Jun. 10, 2002) (noting that group published doctrine applies to all "inside" corporate officers and directors, who are presumed to have knowledge of and involvement in the day to day affairs of the company); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1078 (N.D. Cal. 2002) ("Because [defendant] was not an officer of [the company] at the time the statements were made, the group published information doctrine cannot apply.").

10b-5 violation requires a showing of either an "intent to deceive, manipulate, or defraud" or "severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* A motive and opportunity to commit fraud, without more, cannot establish scienter. *Bryant*, 187 F.3d at 1285-86.

Viewed as a whole, the CAC alleges the following facts to support an inference of scienter as to Sung: (i) Sung willfully refused to cooperate with, and obstructed, the SEC's and the Audit Committee's investigations; (ii) Sung resigned within weeks of Jiangbo's disclosure that Frazer did not intend to stand for re-appointment as the Company's principal accountant; (iii) the magnitude and nature of misstatements support scienter; (iv) there were multiple GAAP and GAAS violations and "red flags," which consisted of Jiangbo's internal control weaknesses and the existence of an SEC investigation; (v) Sung executed three Sarbanes-Oxley ("SOX") certifications, which stated that the Company's internal controls and procedures ensured that she knew about any material information relating the Jiangbo; (vi) as CFO, Sung was responsible for the accuracy of the Company's financial statements; and (vii) Sung misrepresented her professional qualification in Jiangbo's 2010 Form 10-K because it stated she was a licensed CPA, but her license was actually inactive.

Sung points to the following facts, which she contends supports the opposite inference, that she did not act with scienter: (i) Jiangbo received unqualified audit opinions from Frazer for its FY 2009 and 2010 financial statements; (ii) Jiangbo has not restated any of its financial statements; (iii) Sung never sold a single share of Jiangbo stock during the Class Period and therefore did not profit from any alleged fraud; (iv) Jiangbo's debtholders agreed during the Class Period to accept

equity in the Company; and (v) Sung conducted her work primarily from Florida, while all of the Company's operations and its principal executive offices were in Laiyang, China.  She also argues that her CPA license status is immaterial.

Having considered the complaint allegations collectively and all inferences in favor of either party, I find that the CAC fails to allege sufficient facts to establish a strong inference of scienter as to Sung.  Assuming Plaintiff's allegations regarding overstated cash balances are true, the inference that Sung intentionally or with severe recklessness failed to disclose Jiangbo's true financial condition is not as compelling as the competing inference that Sung failed to disclose Jiangbo's true financial condition because she either was unaware of, or, at most, was grossly negligent in failing to discover the true amount of the Company's cash balances.  Plaintiffs' allegations are insufficient to show that Sung knew of any fraud or that the alleged false or misleading information contained in the Company's public statements were so obvious that she must have been aware of it.

Plaintiffs' "must have known" theory fails because they do not allege sufficient facts about the fraud to establish that Sung, even as the CFO, should have detected it.[5]  First, although Plaintiffs allege in conclusory fashion that Sung was involved in Jiangbo's day-to-day operations and therefore must have known that the cash balance amounts were incorrect, they fail to allege particularized facts to support that allegation.  *See In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1342 (S.D. Fla. 1999) (finding that complaint adequately alleged scienter where it detailed defendant's "role in the day-to-day operations of [the company] and his intimate involvement in

---

[5] Because Plaintiffs do not allege when the Hilead transaction occurred, I will not infer that it occurred when Sung signed Jiangbo's financial statements.  *See FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1304 (11th Cir. 2011) (declining to infer scienter based on allegations that did not contain even an approximate date: "[O]missions and ambiguities count against inferring scienter."); *cf. In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) ("[P]laintiffs do not specify when during the Class Period the alleged acquisitions took place. Accordingly, it would be impossible to determine whether any particular insider sales are linked temporally to any alleged acquisitions and whether those Individual Defendants who occupied executive positions for only part of the Class Period were in positions of power at [the defendant company] when the alleged acquisitions took place.").

many of the allegedly fraudulent sales practices.").  In fact, Sung worked mainly in Florida, while the Company conducted its operations in Laiyang.  These facts support the competing inference that Sung did not know the Company's true financial condition.

Additionally, Plaintiffs do not allege sufficient facts about the allegedly overstated cash balances to show that the amounts were so off base that Sung should have suspected they were incorrect or paid particular attention to them.  *Cf. Mizzaro*, 544 F.3d at 1251 (finding amount of fraud did not establish scienter:  "This is not a case where allegedly fraudulent transactions amounted to an overwhelming percentage of the corporation's business.").  Although the stated cash balance amounts are large, Plaintiffs do not allege, for example, what the cash balances should have been, what would have been a comparative "normal" or "expected" amount at the time for a similar company, or even that Sung, based on her prior experience as a CPA or as a CFO, would have known, or should have suspected, that those particular numbers were suspicious.  *Cf. id.* ("[E]ven assuming the fraud was widespread, [the court] ha[s] no reliable way of estimating its total amount, let alone inferring from the dollar amount the knowledge of senior management.").  Further, Jiangbo's receipt of unqualified audit opinions and the fact that Jiangbo has not restated its financial statements supports the competing inference that Sung was unaware of the fraud, or, at most, acted negligently.  *Cf. Druskin v. Answerthink,Inc.*, 299 F. Supp. 2d 1307, 1323-24 (S.D. Fla. 2004); *Cole*, 2009 WL 2713178, at *10.

Plaintiffs argue that the CAC's allegations establish scienter as to Sung because there were multiple GAAP and GAAS violations and "red flags," consisting of Jiangbo's internal control weaknesses and the existence of an SEC investigation.  Plaintiffs allege that, in light of these violations and red flags, Sung's execution of SOX certifications, which stated that the Company's internal controls and procedures were adequate to ensure that she knew about any material information relating the Jiangbo, demonstrate scienter.  A certifier is only reckless if she "had

reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).  Here, Plaintiffs fail to establish the magnitude of any cash balance overstatements or other undisclosed transactions, that any accounting errors were glaring,[6] that Sung had actual knowledge or was informed of any alleged GAAP or GAAS violations, *see Cheney v. CyberGuard Corp.,* No. 98-6879, 2000 WL 1140306, at *9 (S.D. Fla. Jul. 31, 2000), or how the existence of the SEC and Audit Committee investigations should have tipped Sung off to the alleged cash balance overstatements (e.g., the CAC does not contain any allegations about what Sung knew about the scope of the investigations).

As to Plaintiffs' remaining arguments regarding Sung's and Frazer's resignations, non-cooperation with the internal investigation, and CPA license, I do not find that, as pled, they support an inference of scienter.  Although Sung resigned from the Company, Plaintiffs fail to allege any facts to suggest that she left because of accounting improprieties or for any other nefarious reason. *See In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1172 (S.D. Fla. 2004) (resignation of key employees was insufficient to show scienter, where plaintiffs did not establish connection between resignation and accounting errors).  In fact, she stayed on with the Company as a consultant after her resignation.  *See In re Nvidia Corp. Sec. Litig.*, No. 08-cv-04260, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) (no strong inference of scienter where plaintiffs offered no specifics about employees' resignation and CEO remained with the company in an interim capacity).  The Resignation Letter does not establish that she failed to cooperate with, or obstructed, the Audit Committee's internal investigation.  The Letter shows that in May 25, 2011, she told Cadwalader that she did not object to providing her materials to the law firm, but Jiangbo had not authorized her

---

[6] Although Plaintiffs identify one instance of a glaring accounting inaccuracy with respect to Jiangbo's March 31, 2011 accounts receivable disclosure, it appeared in a financial statement after Sung resigned as CFO.

26

to do so.  (CAC Ex. A, at 15).  On May 27, 2011, she informed Cadwalader that Jiangbo had permitted her to provide her company-related materials for examination and review and coordinated with Cadwalader and E&Y to make arrangements to meet with them.  (CAC Ex. A, at 17).  The Letter states that no final arrangement for the collection of these materials was made, but does not state why.  (*Id*.)  Nothing in the Letter suggests it was due to Sung's non-cooperation.

Lastly, the fact that Sung stated she was a licensed CPA when in fact her license had expired appears to be irrelevant.  Plaintiffs did not identify this as one of the false and misleading statements on which its action is based.  Further, Plaintiffs do not allege any facts to support its contention that this misrepresentation is material, i.e., that a reasonable person "would attach importance" to whether she was a CPA "in determining his course of action."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).  In any case, it is unlikely that an investor would consider Sung's CPA status material, as it does not relate to her ability to perform the function of a CFO or to her integrity, and there are no factual allegations suggesting she touted her CPA experience to draw investors.  *Compare id* at 770-71 (president and CEO's prior bankruptcy was material because he put his experience at issue by touting his expertise in business and his employer was marketing to people would had little experience in debt purchasing, who would be relying on his expertise to generate returns), *with Greenhouse v. MCG Capital Corp*., 392 F.3d 650, 658 (4th Cir. 2004) (finding CEO's misrepresentation that he had obtained a college degree, when he had in fact completed only three years at a university was immaterial because it did not alter the large body of information investors had about the company's financial data and the CEO's other qualifications).  I do not find that this misrepresentation, as pled, supports a finding of scienter here.

Even though Plaintiffs sufficiently allege that Jiangbo's financial statements may have contained materially false or misleading information regarding its cash balances, they have not alleged sufficient facts to yield a *strong* inference of scienter as to Sung.  This is not to say, of

course, that the CAC may not plead scienter sufficiently as to other individual defendants, or that an amendment would not cure the deficiencies noted herein.  Further facts regarding the magnitude of the fraud and Sung's knowledge or involvement in the Company's operations and preparation of the financial statements may well be sufficient to show scienter in this case.

6. *Allegations of Loss Causation*

To state a claim under Section 10(b), a plaintiff must establish "loss causation," which is "a causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "Loss causation is not subject to heightened pleading standards but must be supported by a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Meyer v. St. Joe Co.*, No. 5:11-cv-27/RS-EMT, 2011 WL 3750324, at *3 (N.D. Fla. Aug. 24, 2011) (citing *Dura Pharms.*, 544 U.S. at 346).

"[A] person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the loss the purchaser sustains when the facts become generally known and as a result share value depreciates" *Dura Pharms.*, 544 U.S. at 344 (quoting Restatement of Torts § 548A, Comment b, at 107) (internal quotation marks omitted). That moment when the alleged misstatement or omission becomes public is called a "corrective disclosure."  *Meyer*, 2011 WL 3750324, at *3.  A corrective disclosure, however, is not required to plead loss causation.  Further, the plaintiff need not show that the defendant's disclosure was "tantamount to a confession of fraud."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).  It is sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542, 2011 WL 1585605, at *15 (S.D. Fla. Apr. 25, 2011); *Freudenberg*, 712 F. Supp. 2d at 202.  The disclosure need only reveal "part of the relevant truth--the truth obscured by the fraudulent statements."  *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1368

28

(N.D. Ga. 2010) (quoting *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-30 (5th Cir. 2009)) (internal quotation marks omitted).  A plaintiff may do this by showing there were a series of partial disclosures, which revealed the defendant's true financial condition.  *See Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *6 (N.D. Ill. Jul. 28, 2009).

Plaintiffs allege that, through a series of disclosures regarding Jiangbo's several, and then final, defaults on the 2007 and 2008 Debenture,[7] and Jin's statements in a conference call about the possibility that Jiangbo might file for bankruptcy because of its inability to make the debenture payments, the market learned that Jiangbo's cash reserves were overstated.  Plaintiffs show that, following each disclosure, the Company's share prices dropped and trading was ultimately halted on May 31, 2011.  These allegations are sufficient to show loss causation.[8]  *Cf. Ustian*, 2009 WL 2386156, at *6 ("[Plaintiffs] have identified a series of disclosures—a leakage of information— which indicated that [the defendant's] financial statements and accounting practices were unreliable.  The market incorporated this information as the truth about the alleged fraud slowly leaked into the marketplace and share prices fell after each instance."); *Freudenberg*, 712 F. Supp. 2d at 202-03 (listing disclosures regarding the company's financial condition, each of which consisted of a partial materialization of concealed risks regarding company's risky loan pools).

---

[7] Sung argues that this was "old news" because in May 2010 Jiangbo disclosed that it had become delinquent on the interest payments for the 2007 and 2008 Debentures.  The debtholders ultimately agreed to waive the non-payment.  In January 2011, the Company disclosed a new delinquency, which was again waived.  On May 23, 2011, the Company disclosed a final default under the 2007 and 2008 Debenture.  On May 25, 2011, Jin made statements about the possibility of bankruptcy.  The 2011 statements do not consist of information that was already publicly available.

[8] Plaintiffs also point to other disclosures regarding resignations and the existence of an SEC and internal investigation, each of which was followed by a drop in stock price.  None of these disclosures revealed any improprieties, although at least one court has found that the announcement of an informal SEC inquiry may be sufficient to show loss causation, *see In re Bradley Pharms., Inc. Sec. Litig.,* 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006), and, in certain circumstances employees' resignations may constitute a corrective disclosure, *see In re Enron Corp. Sec., Derivative  & ERISA Litig.*, No. MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005).

7.  *Control Person Liability*

Section 20(a) holds controlling persons "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable" under the Exchange Act.  15 U.S.C. § 78t(a).  Because Plaintiffs have failed to establish a predicate violation of Section 10(b) or Rule 10b–5 as to Sung, their Section 20(a) claim against her cannot stand.

B.  **Frazer's Motion to Dismiss**

Frazer joins in and adopts Sung's motion with respect to her argument that Plaintiffs failed to state with particularity their claims that Jiangbo's cash balances and accounts receivable were overstated.  I have fully addressed these arguments above.  Frazer also argues that Plaintiffs have not pled sufficient facts giving rise to a strong inference that it acted with scienter, and Plaintiffs have failed to show that Defendants' alleged misstatements proximately caused their damages.  I will address these arguments below.

1.  *Allegations of Scienter*

The heightened pleading standard and framework for analyzing a complaint's allegations with respect to scienter are stated above.  When claiming that an auditor acted with knowledge or severe reckless disregard, a plaintiff must show "that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."  *In re Eagle Building Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1327 (S.D. Fla. 2004) (quoting *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154 (D. Mass. 2001)).

"GAAP and GAAS violations provide evidence of scienter when accompanied by additional facts and circumstances that raise an issue of fraudulent intent."  *Id.* at 1331 (internal quotation marks omitted).  Such facts and circumstances include the magnitude of the fraud, the extent of the

auditor's involvement with the corporation, the existence of GAAS violations, a lack of internal controls of which the auditor should have been aware, knowledge of the existence of a government investigation into the company, the existence of other "red flags" that would have exposed the fraud, but which the auditor ignored, a motive to commit or participate in the fraud, or conflicts of interest that might compromise the auditor's independence.  *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1335-37 (S.D. Fla. 2002) (analyzing case law, and finding plaintiffs failed to establish auditors acted with scienter); *In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1358-59 (S.D. Fla. 2002) (finding plaintiffs sufficiently pled scienter where they alleged numerous GAAP and GAAS violations, a large magnitude of misstatements, a lack of internal controls in nineteen problem areas, a number of restatements, and that auditor knew or disregarded a number of red flags, including suspicious sales and purchases of overprices loans and securities).

Taken collectively, I find that the CAC's allegations fail to give rise to a strong inference of scienter with respect to Frazer.  Although Plaintiffs allege the existence of GAAS and GAAP violations, these alone will not establish the requisite state of mind in a securities fraud action.  The additional facts and circumstances alleged in the CAC are insufficient to show Frazer acted with knowledge or reckless disregard.

Plaintiffs' allegations about the overstated cash balances do not show that they constituted a "drastic overstatement" of financial results, which may, in some cases, give rise to a strong inference of scienter when combined with the existence of GAAP and GAAS violations.[9]  *See In re Sunterra Corp.*, 199 F. Supp. 2d at 1335 (citing *Carley Capital Grp. v. Deloitte & Touche, L.L.P.*,

---

[9] Plaintiffs allege the existence of a massive fraud, relying on facts about the Company's overstated cash balances, the non-disclosed Hilead transaction, a sizeable related-party transaction, and the overstated accounts receivable.  Because the Plaintiffs have not provided even an approximate date in which the Hilead transaction occurred, I cannot determine whether Frazer failed to properly investigate it at the time it conducted its audit. Additionally, as I noted above, the CAC does not contain sufficient facts to show that the Company's reported accounts receivables were false or that the Company failed to properly write off uncollectible receivables.

27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998)); *cf. In re Eagle Building Techs.,* 319 F. Supp. 2d at 1327-28 ("[W]hen the grave overstatements and understatements in the income statement, balance sheet, and statement of cash flows are taken into consideration with the relatively small number of transactions during the class period and the fact that the one fabricated transaction constituted 74% of the company's business, it does not appear that [the auditor] conducted any type of audit whatsoever.").   Further, Plaintiffs do not allege facts to show that Frazer should have suspected fraud based on its review of the cash balance numbers it received from the Company.  *See Reiger v. PriceWaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007-08 (S.D. Cal. 2000) (noting that an independent accountant often depends on its client to provide the information base for the audit). Plaintiffs do not allege, for example, that Frazer had extensive involvement with the Company, knowledge of the pharmaceutical industry in China, or historical data regarding the Company's cash balances, any of which might lead it to suspect that the reported cash balances were overstated, either in comparison to market trends or industry peers.  *See id.* at 1009 ("Where a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the accountant's awareness of those details."); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (affirming dismissal of action against auditor, noting that plaintiffs did not plead sufficient facts to show accountant knew the details about trends in product sales that made certain transactions suspicious).

Plaintiffs also fail to allege the existence of glaring red flags that should have placed Frazer on notice of the alleged fraud.  Because the SEC only notified Jiangbo of its informal investigation in December 2010, Frazer did not know about it when it conducted its audit of the year ended June 30, 2010, which resulted in a clean audit report disclosed on September 28, 2010.   Although Jiangbo admitted to internal controls weaknesses, they were confined to three areas—lack of personnel's expertise in GAAP, lack of resources to perform an internal audit, and insufficient

segregation of financial reporting duties.  In contrast, when the court in *In re Hamilton Bankcorp* relied on lack of internal controls as one of several red flags to support scienter, the plaintiffs had alleged nineteen specific problem areas, supported by a separate report. 194 F. Supp. 2d at 1359. Although there is no "magic number" of problem areas that a plaintiff must show to support scienter, I find, on the whole, that Plaintiffs have failed to allege that the internal controls weaknesses were so pervasive and obvious in nature as to establish, at a minimum, severe reckless disregard.  *Cf. Grand Lodge of Penn. v. Peters*, 550 F. Supp. 2d 1363, 1373 (M.D. Fla. 2008) ("That [the auditor] should have been suspicious of [the company's] lack of internal controls does not render the audit so fraught with recklessness that a jury could infer intent to defraud.").

Plaintiffs also point to the fact that Frazer decided not to stand for reappointment as Jiangbo's principal accountant for the next fiscal year effective just days after Sung's resignation. In connection with Frazer's departure, Jiangbo disclosed that there were no disagreements between the Company and the auditor with respect to accounting practices, financial statement disclosures, or auditing scope or procedures.  Jiangbo Pharms., Inc., Current Report (Form 8-K), at 2 (Apr. 4, 2011).  In connection with Sung's departure, Jiangbo similarly disclosed that there were no disagreements between she and the Company on any matter relating to the Company's operations, policies, or practices, and she was resigning for family reasons.  Jiangbo Pharms., Inc., Current Report (Form 8-K), at 2 (Mar. 18, 2011).  The mere departure of executives or auditors, without more, is insufficient to support a strong inference of scienter, and Plaintiffs fail to allege any facts linking the departures with the alleged accounting fraud.  *See, e.g.*, *City of Brockton Retirement Sys. v. Shaw Grp. Inc*., 540 F. Supp. 2d 464, 474-75 (S.D.N.Y. 2008) (finding no inference of scienter could be drawn from auditor's resignation where public filings disclosed that there were no disagreements between the auditor and the company); *In re Intelligroup Sec. Litig*., 527 F. Supp. 2d 262, 347 (D.N.J. 2007) (noting strong inference of scienter may be established where employee was

publicly and immediately fired "for such cause as intentional ignorance of 'red flags' about undergoing wrongdoings" or where resignations occur within close temporal proximity of disclosure of error "and is accompanied by an extraordinary corporate punishment measure"); *In re Sportsline.com*, 366 F. Supp. 2d at 1172 ("The instant Complaint, however, fails to plead any connection between the resignation of [the former president of corporate and business development and the former president of operations] and the accounting errors that led [the company] to restate its financial statements."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) ("Plaintiffs . . . have alleged no facts linking the resignation of [employees] to the accounting improprieties at [the company].").

Finally, Plaintiffs' allegations that Frazer had a conflict of interest or motive to commit or cover the fraud fall flat. A conflict of interest exists "as a result of a special financial relationship between corporation and auditor whereby the auditor has a stake in the corporation's success." *In re Sunterra Corp.*, 199 F. Supp. 2d at 1337; *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000) (finding that plaintiffs' allegations of conflict of interest supported a finding a scienter by showing the auditor "took on a vested interest in the performance and profitability of the Company beyond that related to a desire to be paid for its auditing services"). Here, the only alleged motive for fraud is to continue obtaining fees. This is insufficient to show scienter, when compared with what the auditor stands to lose by participating in fraud—its reputation and ability to secure further work. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir. 1990) ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [it] would suffer from a perception that it would muffle a client's fraud.").

In sum, the CAC fails to establish that Frazer's audit amounted to "no audit at all or an egregious refusal to see the obvious or investigate the doubtful." *In re Hamilton Bankcorp.*, 194 F.

Supp. 2d at 1359.  Plaintiffs therefore fail to establish Frazer acted with scienter.  Their Section 10(b) and Rule 10b-5 claims against the auditor cannot stand.

    2.  *Allegations of Loss Causation*

I have found that the Plaintiffs have sufficiently pled loss causation, and I will not repeat my analysis of causation here.  To the extent Frazer argues that Plaintiffs' losses were actually caused other business risks, these contentions present issues of fact not properly before me at this stage of the litigation.  *Freudenberg*, 712 F. Supp. 2d at 203.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant Sung's Motion to Dismiss is **GRANTED** and Defendant Frazer's Motion to Dismiss is **GRANTED**.

Because Plaintiffs have not been previously put on notice of the deficiencies in the CAC, and it is not clear that any amendment would necessarily be futile, I will allow Plaintiffs to have an opportunity to amend their complaint.  *See Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir. 2001); *In re Sunterra Corp.*, 199 F. Supp. 2d at 1339.  Accordingly, Plaintiffs' Consolidated Amended Complaint is **DISMISSED** *without prejudice*.  Plaintiffs may file a Second Consolidated Amended Complaint within fourteen days from the date of this Order.

**DONE and ORDERED** in chambers at Miami, Florida, this 1st day of August 2012.

_____

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Ted E. Bandstra, U.S. Magistrate Judge*
*Counsel of record*

35